Andrew Dean (NY Bar)
Monique C. Winkler (Cal. Bar No. 213031)
John K. Han (Cal. Bar No. 208086)
  hanjo@sec.gov
Heather E. Marlow (Cal. Bar No. 215261)
  marlowh@sec.gov
Amanda L. Straub (NY Bar)
  strauba@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Jonathan Larmore; ArciTerra Companies, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisors, LLC; and Cole Capital Funds, LLC, | |
| Defendants, and | |
| Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY OF THE ACTION

1.     From at least 2017 through the present, Defendant Jonathan Moynahan Larmore ("Larmore") has siphoned tens of millions of dollars from investment funds

and entities related to ArciTerra Companies, LLC ("ArciTerra") for his personal enrichment and other unauthorized uses.

2.      From at least 2006 to September 2023, Defendant Larmore was the Chief Executive Officer ("CEO") of ArciTerra, manager of a complex of entities involved with commercial real estate investment, development, and management. Beginning in 2006, Larmore and ArciTerra raised approximately $45 million from approximately 1045 investors for two private funds, ArciTerra Note Fund II, LLC ("Fund II") and ArciTerra Note Fund III, LLC ("Fund III") (together, the "Funds"), to which Larmore owed fiduciary duties as an investment adviser.

3.      But by at least January 2017, Larmore was engaged in a scheme by which he misappropriated millions of dollars from the Funds' holdings by diverting it to Defendant ArciTerra Strategic Retail Advisors, LLC ("ASR Advisor"), an entity Larmore controls and owns with his mother, Relief Defendant Marcia Larmore. Larmore used the ASR Advisor account as his multi-million-dollar slush fund, taking money from the various entities he controlled—including from real estate holdings owned by the Funds—to pay for other cash needs of his businesses, and to fund his lavish lifestyle of private jets, yachts, and expensive residences.

4.      ArciTerra's own records establish that tens of millions of dollars—none of which are legitimate fees, distributions, or compensation—have flowed through ASR Advisor to Larmore, as well as to other entities owned by Larmore and his family members.

5.      In or around September 2023, Larmore abdicated his direct control over ArciTerra by nominally resigning as its "Manager," but retained his ability to influence the management and sale of ArciTerra's assets by appointing his own agent as one of the two new co-managers. The two new co-managers also serve as agents for Larmore and his wife, respectively, in their pending divorce proceeding and serve in a fiduciary capacity to them. However, the co-managers do not acknowledge any fiduciary duty to ensure that Fund II and III assets are managed for the benefit of the

1    Funds and their investors.

2        6.      After relinquishing his formal management duties for ArciTerra, Larmore

3    turned to a new scheme involving stock manipulation. In November 2023, Larmore,

4    using Defendant Cole Capital Funds, LLC ("Cole Capital"), an entity he had created

5    just a month earlier in October 2023, engaged in transactions aimed at manipulating

6    the price of the securities of WeWork, Inc., an unrelated company whose shares are

7    publicly traded over the NASDAQ National Markets under the symbol "WE." On

8    November 3, 2023, Larmore sought to have disseminated through a wire service a

9    press release riddled with false and misleading statements announcing a purportedly

10   imminent Cole Capital tender offer for WeWork shares, a transaction that Larmore did

11   not have the actual intent or ability to execute. Larmore mistimed how long it would

12   take to have the press release published, and it did not go public until 5:12 p.m. EDT.

13   Shortly after the press release was published, WeWork's stock price increased by

14   close to 150% in afterhours trading.

15       7.      Unbeknownst to the public, however, two days before dropping his press

16   release, Larmore had purchased a large quantity of out-of-the-money WeWork call

17   options that could have made Larmore hundreds of thousands to millions of dollars if

18   the price of WeWork stock had increased significantly before they expired. Because

19   he mistimed the press release, however, his options expired just over an hour before

20   the WeWork stock price spiked as a result of his manipulative conduct.

21       8.      Defendants and Relief Defendants have each been unjustly enriched, at

22   the expense of investors. The SEC brings this enforcement action to obtain emergency

23   relief from the Court pending final relief, including among other things: a temporary

24   restraining order and preliminary injunction enjoining Defendants from further

25   violations of the securities laws; asset freezes designed to stop further

26   misappropriation and dissipation of assets; an order appointing an equity receiver over

27   certain Defendants, Relief Defendants, and their affiliates; and related orders.

28

JURISDICTION AND VENUE

9.      The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)] and Sections 209(d) and 209(e) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

10.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

11.    Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

12.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in Arizona.

13.    Under Civil Local Rule 5.1(a), this civil action is appropriate for assignment to the Phoenix Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Phoenix, and in Maricopa County. In addition, Defendant ArciTerra's principal place of business until recently was in Phoenix, Arizona.

DEFENDANTS

14.    **Defendant Jonathan Moynahan Larmore**, age 50, is the co-founder and Chief Executive Officer ("CEO") of Defendant ArciTerra. Larmore has residences in Arizona, Indiana, and Florida. Until September, Larmore fully controlled ArciTerra, which is owned by Relief Defendant CSL Investments, LLC; Larmore is a co-owner (with his wife) of CSL Investments, LLC. Through direct or indirect interests, Larmore also owns or controls various other ArciTerra-related entities, as well as numerous entities that are not related to the other entity Defendants. Larmore

is an investment adviser to the Funds.

15.     **Defendant ArciTerra Companies, LLC** (known as ArciTerra Group, LLC until 2007) is an Arizona company that until approximately April 2023 had its principal place of business in Phoenix, Arizona, through which it conducted real estate investment, development, and management. It was established in 2005 by Larmore, who fully controlled the company until recently. According to tax documents, ArciTerra is owned 25% by Larmore through Relief Defendant CSL Investments, LLC, which he owns with his wife, Relief Defendant Michelle Larmore, who also owns 25% of ArciTerra, and 50% by his mother, Relief Defendant Marcia Larmore, through an entity she owns. In or around April 2023, ArciTerra terminated its Arizona operations and employees.

16.     **Defendant ArciTerra Note Advisors II, LLC** ("Fund II Advisors") is organized under the laws of Arizona and is the investment adviser to ArciTerra Note Fund II, LLC. Fund II Advisors is, in turn, managed by ArciTerra. Larmore controlled and has an indirect ownership interest in Fund II Advisors.

17.     **Defendant ArciTerra Note Advisors III, LLC** ("Fund III Advisors") is organized under the laws of Arizona and is the investment adviser to ArciTerra Note Fund III, LLC. Fund III Advisors is, in turn, managed by ArciTerra. Larmore controlled and has an indirect ownership interest in Fund III Advisors.

18.     **Defendant ArciTerra Strategic Retail Advisor, LLC** ("ASR Advisor") is organized under the laws of Arizona with its principal place of business in Phoenix, Arizona. ASR Advisor is owned in part by Larmore and in part by his mother, Relief Defendant Marcia Larmore, and was until recently controlled by Larmore. ASR Advisor owns bank accounts that Defendants used to move cash among various ArciTerra entities. ASR Advisor also has invested in various commercial properties.

19.     **Defendant Cole Capital Funds, LLC** ("Cole Capital") was incorporated by Larmore in Arizona on October 6, 2023. Its principal place of business is Phoenix, Arizona. Larmore is the CEO of Cole Capital.

20.     Fund II Advisors, Fund III Advisors, and ASR Advisor have each agreed to and executed tolling agreements with the SEC for the time period October 17, 2023 through January 17, 2024.

RELIEF DEFENDANTS

21.     **Relief Defendant Michelle Ann Larmore**, age 50, is currently married to Larmore and a resident of Phoenix, Arizona. She is identified in corporate and tax records as owner or part owner of various ArciTerra-related entities, including as co-owner with Larmore of Relief Defendant CSL Investments, LLC, which has ownership in ArciTerra. Michelle Larmore filed legal separation proceedings against Jonathan Larmore in March 2023 in Phoenix, Arizona, which are ongoing and referred to below as "divorce proceedings."

22.     **Relief Defendant Marcia Moynahan Larmore**, age 77, is the mother of Larmore and a resident of Arizona and Indiana, and she is identified in corporate records as holding senior positions at various ArciTerra-related entities, including as manager, president, and principal of an entity, Moynahan Investments, LLC, which has ownership in ArciTerra.

23.     **Relief Defendant CSL Investments, LLC** ("CSL Investments") is incorporated in Arizona with its principal place of business in Indiana. CSL Investments is controlled by Larmore and owned by Larmore and his wife. CSL Investments has a 50% ownership interest in ArciTerra.

24.     **Relief Defendant MML Investments, LLC** ("MML Investments") is incorporated in Arizona, and is wholly owned and controlled by Relief Defendant Marcia Larmore.

25.     **Relief Defendant JMMAL Investments, LLC** ("JMMAL Investments") is incorporated and headquartered in Arizona, and is wholly or partly owned, and wholly controlled, by Larmore.

26.     **Relief Defendant Spike Holdings, LLC** ("Spike Holdings") is incorporated and headquartered in Arizona, and is wholly owned and controlled by

1 | Defendant Jonathan Larmore.

2 | FACTUAL ALLEGATIONS

3 | 27.   Since its inception in 2005, ArciTerra has served as the manager for three

4 | ArciTerra real estate investment funds, multiple ArciTerra real estate investment trusts

5 | (REITs), and a number of limited liability companies, including some with outside

6 | investors, that own one or more commercial properties.

7 | 28.   In October 2006, Larmore formed ArciTerra Note Fund II, LLC (referred

8 | to throughout this complaint as "Fund II"). Larmore designated Defendant Fund II

9 | Advisors the sole member of, and "advisor" to, Fund II. Fund II Advisors is in turn

10 | managed by ArciTerra, and is compensated through fees for its management of Fund

11 | II and its assets. Defendant Fund II Advisors is an investment adviser.

12 | 29.   Under the Advisers Act, an investment adviser is a person who, for

13 | compensation, engages in the business of providing investment advice to others,

14 | including a private fund, about investing in securities. Advisers that manage portfolios

15 | for funds provide ongoing advice about buying, selling, and holding investments and,

16 | in an ongoing advisory relationship, monitor the investments and their alignment with

17 | the investment objectives and best interests of their fund clients. Investment advisers

18 | are fiduciaries to their clients, including fund clients.

19 | 30.   Larmore, who controls Defendants ArciTerra and Fund II Advisors, and

20 | is compensated for this role, also acts or has acted as an investment adviser to Fund II.

21 | 31.   In 2006 and 2007, Fund II raised a total of approximately $20 million

22 | from approximately 466 investors by issuing secured notes that bear an interest rate of

23 | 8.25% per annum. Fund II used $20 million in proceeds of the offering of secured

24 | notes to purchase, directly or through wholly owned intermediaries, various real-

25 | estate-related assets, including (i) limited partnership interests in ArciTerra National

26 | REIT LP ("National REIT"), (ii) limited partnership interests in ATG REIT RSC, LP

27 | ("ATG REIT"), (iii) LLC interests in Glen Rosa 32, LLC ("Glen Rosa"), holding

28 | company of a nursing-home property in Phoenix, Arizona, and (iv) LLC interests in

ArciTerra Vermont, which holds a commercial property in Indianapolis, Indiana. Some of these interests, including the limited partnership interests in National REIT, are securities.

32.   In February 2008, Larmore formed ArciTerra Note Fund III, LLC ("Fund III") and designated Fund III Advisors as the sole member of, and "advisor" to, Fund III. Fund III Advisors, like Fund II Advisors, is also managed by ArciTerra, is an investment adviser to Fund III, and is similarly compensated through fees for its management.

33.   Larmore, who controls Defendants ArciTerra and Fund III Advisors, and is compensated for this role, also acts or has acted as an investment adviser to Fund III.

34.   In 2008 and 2009, Fund III raised approximately $25 million from approximately 579 investors by issuing secured notes that bear an interest rate of 9.25% per annum. Fund III used proceeds of the $25 million note offering to purchase, directly or through wholly owned intermediaries, various real-estate-related assets, including (i) limited partnership interests in National REIT, (ii) limited partnership shares in ATG REIT, (iii) LLC interests in Glen Rosa, and (iv) preferred stock in a real-estate enterprise managed by a third party held through a wholly owned entity called ArciTerra NS Investment Co. ("ArciTerra NS"). Some of these interests, including the limited partnership interests in National REIT and preferred stock held via ArciTerra NS, are securities.

35.   Fund II and Fund III are distinct investment vehicles, with different investors from each other and from other ArciTerra-related entities. They also have their own, distinct investment holdings and expected revenues based on their underlying investments.

### Larmore Misappropriates Money from the Funds' Assets

36.   Beginning no later than January 1, 2017, through at least June 2023 (the most recent period for which records are available), Defendants Larmore, ArciTerra,

Fund II Advisors, Fund III Advisors, and ASR Advisor commingled cash transferred from Fund II and Fund III assets with other cash in bank accounts owned by other ArciTerra entities, without regard for the fund or investor pool to which the cash belonged.

37.     During this same time period, Larmore misappropriated at least $17 million from those commingled assets through payments to himself or entities he or his family own, including to pay for his family's personal credit card bills.

38.     Larmore diverted money from the Funds by taking advantage of his control over ArciTerra and its related entities. He directed ArciTerra's personnel to transfer a total of at least $35 million, via various intermediary entities, from bank accounts associated with holdings of the Funds ("Fund Holding Accounts") to the account in the name of Defendant ASR Advisor (which is owned by Larmore and his mother, Relief Defendant Marcia Larmore).

39.     In particular, during this time period, Larmore directed ArciTerra personnel to transfer a total of approximately $12.5 million from Glen Rosa, and approximately $22.5 million from ATG REIT, to Defendant ASR Advisor. Funds II and III jointly own both Glen Rosa and ATG REIT.

40.     During this time period, at Larmore's direction, ArciTerra staff routinely transferred cash from Fund Holding Accounts, and accounts owned by or associated with other ArciTerra investment vehicles, into ASR Advisor's account. They did so to facilitate cash needs, on an ad hoc basis, of any ArciTerra investment vehicles without regard to any relationship between the source of the cash used and the intended beneficiary of the cash used, as well as to pay Larmore's personal expenses. These cash transfers were not legitimate fees, distributions, or compensation to Larmore or entities owned by Larmore and his family. The amounts taken from Glen Rosa and ATG REIT were commingled with other money in ASR Advisor's account and misused in this manner.

41.     ArciTerra personnel recorded these cash transfers in ArciTerra's

accounting records, and indicated in those records which entities or accounts the resulting debts were "due from" and "due to."

42. Fund II and Fund III's use of proceeds disclosures to investors did not permit Larmore, ArciTerra, or the Fund Advisors to transfer cash out of the Fund Holding Accounts without creating formal evidence of an actual loan, or other substantiated debt, and without identifying the enforceable repayment terms, security interests, interest payments, or other terms that would evidence an economic benefit to the Funds. The Funds' written disclosures certainly did not authorize Larmore to use its monies for his personal expenses, and as a fiduciary to the Funds such use would not have been permissible.

43. Among the many inappropriate diversions of cash to Larmore's personal use were transfers made to pay for his wife's (Relief Defendant Michelle Larmore) and his children's personal credit card bills. Larmore essentially treated the ASR Advisor bank account as his own personal bank account to fund his lavish lifestyle of private jets, yachts, high-end cars, and expensive residences. ArciTerra's staff recorded the payments for Larmore's personal expenses as "due from" his personal account and the account of his personal entity, JMMAL Investments.

44. As of December 31, 2022, Larmore had diverted over $17 million from ArciTerra entities, through ASR Advisor, to his personal account and the account of JMMAL Investments. Larmore has not repaid these cash transfers.

45. Larmore has depleted ASR Advisor's account, making it impossible for ASR Advisor to return the millions of dollars "due to" the Fund Holding Accounts. As of June 30, 2023, ArciTerra's books reflected cash transfers to ASR Advisor totaling approximately $53 million from various ArciTerra-related entities and investment vehicles (some owned by other outside investors). This amount includes approximately $35 million that was transferred out of the Fund Holding Accounts and which ArciTerra describes as "due from" ASR Advisor to accounts associated with Fund II and Fund III assets.

46.     Amounts in the ASR Advisor account that were not ultimately transferred to Larmore and his family were utilized for the cash needs of various ArciTerra-affiliated entities, without regard to whether the cash was taken from holdings owned by entities with outside investors.

47.     Ultimately, nearly all cash transferred to ASR Advisor has been dissipated. As of October 4, 2023, according to ArciTerra, ASR Advisor had less than $500 remaining in its bank account.

### Larmore Leaves ArciTerra and the Funds in Turmoil

48.     From 2019 to the present, most of the ArciTerra-related investment vehicles and entities had ceased making payments to investors. Furthermore, the cash transfers at times deprived the companies in which Fund II and Fund III had invested that own real properties of the ability to sustain normal operations, which negatively impacted the value of the properties themselves by depriving them of money needed for repairs and maintenance.

49.     During the past year, Larmore has become increasingly volatile, and his actions suggest that he is desperate for cash. In April 2023, Larmore fired all ArciTerra employees in Phoenix, and he shuttered ArciTerra's office, leaving few or no employees to conduct ArciTerra's business.

50.     In April 2023, Larmore sent an email to a large group of people, with the subject line: "The Perfect Storm Sale." In the email, Larmore stated that he wished to sell off all the assets in ArciTerra's portfolio, as well as everything he personally owned, including his family's homes, cars, boats, artwork, and jewelry, in seventy-five days. The ArciTerra portfolio assets would include holdings and real property held by Fund II and Fund III, as well as assets held by other ArciTerra-related investment vehicles. Larmore stated that he wished "to shed the baggage of my past and start fresh" and that he needed to liquidate all of his business and personal assets to "finish dividing assets with my wife" who had filed a divorce proceeding the previous month.

51.     In July 2023, Larmore agreed on behalf of ArciTerra to hire a consultant (the "Consultant") who was tasked with liquidating all ArciTerra-related assets as quickly as possible. The Consultant's scope of duties includes selling all assets held by Fund II, Fund III, and other ArciTerra investment vehicles.

52.     In August 2023, under the terms of an agreement filed in the Larmore's Arizona divorce proceeding, Larmore selected the Consultant, and Michelle Larmore selected ArciTerra's former Chief Operating Officer ("former COO"), to act as their respective agents in the disposition of ArciTerra assets for purposes of division of the marital estate. However, Larmore and his wife may continue to advise their agents on the management of all properties and accounts.

53.     In September 2023, Larmore formally resigned from his management role at ArciTerra, and the Consultant and the former COO were appointed to serve as co-managers. They are each paid a commission for the sale of any real properties, and are additionally paid a flat fee of $50,000 a month and a $100,000 quarterly bonus. Their compensation provides them with additional incentive to pursue the interests of the people who appointed them, Larmore and his wife, and not the interests of the Funds.

54.     Neither co-manager acknowledges a role as investment adviser or fiduciary to the Funds or any other ArciTerra investment vehicles with outside investors. Their sole purpose appears to be to liquidate assets, including Fund II and Fund III assets, to benefit Larmore and his wife. Larmore's abandonment of ArciTerra, his actions to liquidate assets, and his failure to put in place an investment adviser or fiduciary to the Funds are violations of his fiduciary duties.

## Larmore Manipulates WeWork Stock

55.     In early October 2023, after relinquishing direct access to ArciTerra's coffers, and aware he was being investigated by SEC staff, Larmore formed Defendant Cole Capital in the State of Arizona. Larmore listed with the Arizona Secretary of State the address of Cole Capital as a shared office space area hosted by

the firm WeWork, in Phoenix, Arizona. Also at that time, Larmore launched a website for Cole Capital, where Larmore (omitting his first name, as Moynahan Larmore) was listed as the CEO.

56.     On or about November 1 and November 2, 2023, Larmore purchased a total of 72,846 call option contracts on the common stock of the publicly-traded company WeWork, the common stock of which is sold under the ticker symbol "WE" on the NASDAQ National Market, for $0.03 to $0.15 per contract. Call options give the purchaser the right, but not the obligation, to buy the underlying security for the price stated in the option (the "strike price") on or before the expiration date identified in the option; the call option contracts in question would have given Larmore the right to acquire 7,284,600 shares of WeWork common stock before they expired. Also on November 1 and November 2, Larmore bought 343,641 shares of WeWork stock.

57.     Larmore purchased very short-term call options. The expiration date for the vast majority of the WeWork call options was November 3, 2023, at 4:00 p.m. EDT. A smaller portion had an expiration date of November 10, 2023, at 4:00 p.m. EDT.

58.     Larmore's options were also significantly "out-of-the-money." Call options are considered "out-of-the-money" when the strike price of the option is higher than the current trading price of the underlying security. For instance, WeWork's common stock closed on November 2, 2023 at a price of $1.15 per share, and at the close of the following day, November 3, 2023, the price was $0.84 per share. In contrast, the strike prices for the WeWork call options Larmore purchased ranged from $2 to $5. Having purchased the out-of-the money call options for pennies per contract, Larmore stood to make substantial gains if the stock price rose above the strike price of some or all of the options.

59.     On the morning of November 3, 2023, Larmore sent an email to an SEC mailbox from an email address at the Cole Capital website. The email attached a document that Larmore was seeking to file publicly with the SEC, identified as a

"Schedule TO." A Schedule TO is a filing required to be made with the SEC by a person who intends to make a "tender offer" for securities registered under the Securities Exchange Act of 1934. A tender offer is a proposal by a person to buy all (or most) of the shares of a publicly traded company for a stated price by a specified date.

60.     In the document identified as a Schedule TO, attached to the email to the SEC from the Cole Capital address, Larmore included the text of a letter that Larmore indicated he had sent to WeWork's CEO and its Board of Directors that morning, which stated, in part:

> We believe that it is in the best interest of WeWork to support our acquisition of 51% of all the outstanding shares owned by minority shareholders at a price of $9.00 per share and provide Cole with proper representation on the company board.
>
> We have received feedback from City National Bank and JP Morgan regarding the financing for this acquisition and expect to select a lender and have a financing commitment prior to execution of a definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to assist us with this transaction. We stand ready to proceed timely.

61.     The $9.00 per share price contained in the letter represented a premium of more than $7.89 over WeWork's closing price of $1.11 per share on November 2, 2023.

62.     On November 3, at 5:12 p.m. EDT, a Cole Capital press release was disseminated through a wire service and picked up by several media sites. Larmore arranged to send out the release through the wire service, and he paid for its publication. Larmore had submitted the release to the service well before the close of trading hours that day, but the service had rejected it at least once for formatting issues or other irregularities.

63.     The release was titled "A Proposal by Cole Capital Funds Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per share in Cash." The press release further stated that Cole Capital had sent a letter to the WeWork Board of Directors, reiterating the same statement quoted above from the

1  Schedule TO attached to Larmore's email to the SEC.

2      64.      Although at the close of market trading (4:00 p.m. EDT) on November 3,

3  2023, WeWork's stock price closed at $0.83 per share, immediately after the press

4  release was published, the share price of WeWork jumped in afterhours trading to

5  $1.45 per share, and reached a high that evening of $2.14 per share, at 6:31 p.m. EDT.

6  Most websites that had posted the press release removed it by the next morning. The

7  stock price closed at $1.18 at the end of afterhours trading.

8      65.      Larmore did not exercise his November 3 call options because they had

9  expired before the press release was published, and he did not exercise his November

10  10 call options because the stock price did not exceed the strike price. Indeed, on

11  Monday, November 6, 2023, WeWork filed for Chapter 11 bankruptcy protection.

12      66.      Larmore's press release did not reflect a bona fide offer for WeWork

13  stock. Larmore and Cole Capital did not have sufficient liquid capital to execute Cole

14  Capital's proposed tender offer. Additionally, Larmore and Cole Capital did not have,

15  and did not have any reasonable prospects for securing, the financing required for

16  such a tender offer. Rather, Larmore's apparent purpose in the scheme was simply to

17  manipulate WeWork's stock price, in an attempt to profit from the change in price by

18  trading in WeWork options.

19                                **Relief Defendants**

20      67.      Relief Defendants CSL Investments, MML Investments, and JMMAL

21  Investments received money from other ArciTerra-related entities, to which they were

22  not entitled and had no legitimate claim. Those funds were commingled with money

23  from other ArciTerra-related entities, and then paid from the ASR Advisor bank

24  account to Relief Defendants CSL Investments, MML Investments, and JMMAL

25  Investments. ArciTerra's accounting records show that, as of December 31, 2022,

26  almost $9.8 million is "due from" CSL Investments to ASR Advisor, almost $4.9

27  million is "due from" MML Investments to ASR Advisor, and over $11.5 million is

28  "due from" JMMAL Investments to ASR Advisor.

68.     Relief Defendant Spike Holdings also received money from other ArciTerra-related entities to which it is not entitled and for which it has no legitimate claim, including direct transfers from a property-holding entity belonging to Fund II and Fund III.

69.     Relief Defendant Michelle Larmore received money to which she was not entitled and over which she has no legitimate claim. Michelle Larmore received some such money through ArciTerra's payment of her personal expenses such as credit card bills, as well as through her partial ownership of CSL Investments.

70.     Relief Defendant Marcia Larmore received money to which she was not entitled and over which she has no legitimate claim. Marcia Larmore received some such money through her ownership of MML Investments and partial ownership of other ArciTerra-related entities.

FIRST CLAIM FOR RELIEF

*Violations of Sections 206(1) and 206(2) of the Advisers Act by Defendants Larmore, Fund II Advisors, and Fund III Advisors*

71.     The SEC realleges and incorporates by reference the above paragraphs 1 through 70.

72.     Defendants Larmore, Fund II Advisors, and Fund III Advisors are investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

73.     By engaging in the conduct described above, Defendants Larmore, Fund II Advisors, and Fund III Advisors, while acting as investment advisers, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) acting with scienter, employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) negligently or knowingly engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

74.     By reason of the foregoing, Defendants Larmore, Fund II Advisors, and

Fund III Advisors violated, and unless restrained and enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## SECOND CLAIM FOR RELIEF

*Aiding and Abetting Violations of Sections 206(1) and 206(2)*
*of the Advisers Act by Defendant Larmore*

75.   The SEC realleges and incorporates by reference the above paragraphs 1 through 70.

76.   Defendants Fund II Advisors and Fund III Advisors violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

77.   By engaging in the conduct described above, Defendant Larmore aided and abetted Fund II Advisors' and Fund III Advisors' violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly providing substantial assistance to Defendants Fund II Advisors and Fund III Advisors, who, while acting as investment advisers, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, (a) acting with scienter, employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) negligently or knowingly engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

78.   By reason of the foregoing, Defendant Larmore, directly or indirectly, aided and abetted and is liable for violations of, and unless restrained and enjoined, will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

## THIRD CLAIM FOR RELIEF

*Aiding and Abetting Violations of Sections 206(1) and 206(2)*
*of the Advisers Act by Defendants ArciTerra and ASR Advisor*

79.   The SEC realleges and incorporates by reference the above paragraphs 1

1  through 70.

2      80.    Defendants Larmore, Fund II Advisors, Fund III Advisors violated

3  Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

4      81.    By engaging in the conduct described above, Defendants ArciTerra and

5  ASR Advisor aided and abetted Larmore's, Fund II Advisors', and Fund III Advisors'

6  violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly

7  providing substantial assistance to Defendants Larmore, Fund II Advisors, and Fund

8  III Advisors, who, while acting as investment advisers, directly or indirectly, by the

9  use of the mails or any means or instrumentality of interstate commerce, (a) acting

10  with scienter, employed or are employing devices, schemes or artifices to defraud

11  clients or prospective clients; and (b) negligently or knowingly engaged in or are

12  engaging in transactions, practices, or courses of business which operated as a fraud or

13  deceit upon clients or prospective clients.

14      82.    By reason of the foregoing, Defendants ArciTerra and ASR Advisor,

15  directly or indirectly, aided and abetted and are liable for violations of, and unless

16  restrained and enjoined, will continue to violate, Sections 206(1) and (2) of the

17  Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

18                      FOURTH CLAIM FOR RELIEF

19  *Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder by*

20                  *Defendants Larmore and Cole Capital*

21      83.    The SEC realleges and incorporates by reference the above paragraphs 1

22  through 70.

23      84.    By engaging in the conduct described above, Defendants Larmore and

24  Cole Capital each, directly or indirectly, in connection with the purchase or sale of

25  securities, by the use of means or instrumentalities of interstate commerce, or the

26  mails, with scienter:

27          (a)    Employed devices, schemes, or artifices to defraud;

28          (b)    Made untrue statements of material fact or omitted to state material

facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

85. By reason of the foregoing, Defendants Larmore and Cole Capital violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

FIFTH CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-8 Thereunder by Defendants Larmore and Cole Capital*

86. The SEC realleges and incorporates by reference the above paragraphs 1 through 70.

87. By engaging in the conduct described above, Defendants Larmore and Cole Capital (1) each made untrue statements of a material fact and each omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (2) each engaged in fraudulent, deceptive, or manipulative acts or practices, in connection with a tender offer.

88. By engaging in the conduct described above, Defendants Larmore and Cole Capital, in connection with a tender offer, engaged in fraudulent, deceptive, or manipulative acts or practices, by publicly announcing that Cole Capital planned to make a tender offer that has not yet been commenced, where Defendants Larmore and Cole Capital (a) made the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer; (b) intended, directly or indirectly, for the announcement to manipulate the market price

of the stock of the bidder or subject company; and (c) did not have the reasonable belief that Cole Capital would have the means to purchase securities to complete the offer.

89.     By reason of the foregoing, Defendants Larmore and Cole Capital violated, and unless restrained and enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-8 [17 C.F.R. § 240.14e-8] promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court grant the following relief:

### I.

An order temporarily and preliminarily, through final judgments, restraining and enjoining Defendants Larmore, Fund II Advisors, Fund III Advisors, ArciTerra and ASR Advisor from directly or indirectly violating Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)]; and temporarily and preliminarily, through final judgments, restraining and enjoining Larmore and Cole Capital from directly or indirectly violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. § 78j(b) and 78n(e)] and Rules 10b-5 and 14e-8 [17 C.F.R. §§ 240.10b-5 and 240.14e-8].

### II.

An order temporarily and preliminarily, through final judgments, appointing a receiver over Defendants Fund II Advisors, Fund III Advisors, ArciTerra, ASR Advisor, and Relief Defendants CSL Investments, MML Investments, Spike Holdings, and JMMAL Investments (collectively, "Receivership Entities"), and any known or unknown affiliates of the Receivership Entities.

### III.

An order temporarily and preliminarily, through final judgments, staying all pending cases and enjoining the filing of any new bankruptcy, foreclosure, or

receivership actions by or against ArciTerra or any other Receivership Entity or any receivership assets, wherever located.

## IV.

An order temporarily and preliminarily, through final judgments, freezing the assets of Defendants Larmore, Fund II Advisors, Fund III Advisors, ArciTerra, ASR Advisor, Cole Capital, and Relief Defendants CSL Investments, MML Investments, Spike Holdings, JMMAL Investments, and their known or unknown affiliates.

## V.

An order temporarily and preliminarily, through final judgments, prohibiting the Defendants and Relief Defendants from the acceptance, deposit, or disbursement of additional fund monies or investor funds, or causing any assets or funds of the Defendants or Relief Defendants to be withdrawn, transferred, pledged, or encumbered.

## VI.

An order requiring a verified accounting of assets by Defendants Larmore, Fund II Advisors, Fund III Advisors, ArciTerra, ASR Advisor, Cole Capital, and Relief Defendants Michelle Larmore, Marcia Larmore, CSL Investments, MML Investments, Spike Holdings, JMMAL Investments, and their known and unknown affiliates.

## VII.

An order temporarily and preliminarily, through the Court's decision on the SEC's application for a preliminary injunction, permitting expedited discovery.

## VIII.

An order temporarily, and preliminarily through final judgments, restraining and enjoining Defendants, Relief Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the SEC to relevant documents, books, and records.

IX.

Final Judgments permanently restraining and enjoining Defendants Larmore, Fund II Advisors, Fund III Advisors, ArciTerra and ASR Advisor from directly or indirectly violating Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)]; and permanently restraining and enjoining Larmore and Cole Capital from directly or indirectly violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. § 78j(b) and 78n(e)] and Rules 10b-5 and 14e-8 [17 C.F.R. §§ 240.10b-5 and 240.14e-8].

X.

Final judgments requiring each of the Defendants and Relief Defendants to disgorge the ill-gotten gains or unjust enrichment each of them obtained or derived from such violations, and an order requiring each of the Defendants to pay a civil monetary penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

XI.

Final judgments, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting Defendant Larmore from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)].

XII.

That the Court retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XIII.

That the Court grant such other and further relief as this Court may determine to be just and necessary.

Dated:  November 28, 2023          Respectfully submitted,


                                   */s/ John K. Han*
                                   John K. Han
                                   Heather E. Marlow
                                   Amanda L. Straub
                                   Attorneys for Plaintiff
                                   SECURITIES AND EXCHANGE
                                   COMMISSION