Andrew Dean (NY Bar)
Monique C. Winkler (Cal. Bar No. 212031)
John K. Han (Cal. Bar No. 208086)
  hanjo@sec.gov
Heather E. Marlow (Cal. Bar No. 215261)
  marlowh@sec.gov
Amanda L. Straub (NY Bar)
  strauba@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission, | Case No.: |
| Plaintiff, | |
| v. | **PLAINTIFF SEC'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND RELATED EQUITABLE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES** |
| Jonathan Larmore; ArciTerra Companies, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisors, LLC; Cole Capital Funds, LLC. | |
| Defendants, and | |
| Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC. | |
| Relief Defendants. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") hereby moves, *ex parte*, for an order temporarily restraining and enjoining Defendants Jonathan Larmore; ArciTerra Companies, LLC ("ArciTerra"); ArciTerra Note Advisors II, LLC ("Fund II Advisors"); ArciTerra Note Advisors III, LLC ("Fund III Advisors"); ArciTerra Strategic Retail Advisor, LLC ("ASR Advisor"); and Cole Capital Funds, LLC (collectively, "Defendants") from violations of the federal securities laws. In particular, the SEC moves the Court for an immediate order: (1) enjoining Defendants from violating specific federal securities laws and from engaging in specified conduct; (2) freezing Defendants' assets and freezing assets of the entity Relief Defendants CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC; (3) appointing a receiver over Defendants ArciTerra, Fund II Advisors, Fund III Advisors, ASR Advisor, and their affiliates; (4) staying all pending cases, and enjoining the filing of any new bankruptcy, foreclosure, receivership, or other actions by or against the Defendants under receivership and their affiliates; (5) requiring Defendants and Relief Defendants to prepare a verified accounting; (6) permitting expedited discovery; (7) prohibiting the destruction of documents; and (8) requiring Defendants and the entity Relief Defendants to show cause why the Court should not issue a Preliminary Injunction imposing the requested relief during the pendency of this action.

The Commission's motion is brought pursuant to Section 21(d) of the Securities Exchange Act of 1934 and Section 209(d) of the Investment Advisers Act of 1940, which each authorize the SEC to obtain against any person a temporary restraining order (without a bond) "[u]pon a showing that such person has engaged, is engaged, or is about to engage" in acts or practices that violate provisions under those federal securities laws. *See* 15 U.S.C. §§ 78u(d) and 80b-9(d). The Commission's motion is supported by the attached Memorandum of Points and Authorities; the Declaration of

Michael D. Foley; the Declaration of Heather E. Marlow; the [Proposed] Temporary
Restraining Order and Order for Ancillary Relief; and the [Proposed] Order
Appointing Receiver, Freezing Assets, and Imposing Litigation Injunction.

Pursuant to federal statutes, namely Section 21(d) of the Exchange Act, 15
U.S.C. § 78u(d), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d), the
SEC moves for a temporary restraining order and other ancillary relief without notice
to the adverse parties. As described in detail in the Complaint and attached
Memorandum, and the supporting declarations, Defendants have committed, and are
continuing to commit, violations of the federal securities laws and are actively
attempting to sell, and are otherwise dissipating, commercial and personal assets
connected to their misconduct. Immediate and irreparable injury, loss, or damage will
result if Defendants and Relief Defendants are notified of the SEC's motion before the
Court hears the SEC's motion, including that the Defendants will likely continue to
liquidate and dissipate assets and funds that should be returned to investors. Marlow
Decl. ¶ 46. Accordingly, the SEC has not given Defendants or Relief Defendants
notice of this motion prior to its filing. *Id.*

Dated:  November 28, 2023          Respectfully submitted,


                                   */s/ John K. Han*
                                   John K. Han
                                   Heather E. Marlow
                                   Amanda L. Straub
                                   Attorneys for Plaintiff
                                   SECURITIES AND EXCHANGE
                                   COMMISSION

1

2

## **TABLE OF CONTENTS**

3

MEMORANDUM OF POINTS AND AUTHORITIES ..............................1

4

I.    INTRODUCTION ....................................................................1

5

6

II.    FACTS ....................................................................................4

7

    A.    Larmore and the ArciTerra Entity Defendants ......................4

8

    B.    Larmore Misappropriated Investor Funds for His
Personal Use .................................................................5

9

        1.  Larmore Decided How to Move Funds Among the ArciTerra
Entities ................................................................5

10

11

        2.  Larmore Transferred Investor Funds Out of Investments
and Commingled Them in ASR Advisor's Account ...................6

12

13

        3.  Larmore Freely Used Money from ASR Advisor's Account........7

14

        4.  Larmore's Recent Actions to Liquidate Assets ...........................10

15

        5.  Larmore and Cole Capital's November 3, 2023
Manipulation of WeWork Securities .............................................11

16

17

III.    ARGUMENT .........................................................................13

18

    A.    Defendants Should Be Restrained from Violating the
Federal Securities Laws .................................................13

19

20

        1.  Defendants Violated the Antifraud Provisions of the
Advisers Act ........................................................16

21

22

        2.  WeWork Stock Manipulation: Defendants Larmore
and Cole Capital Engaged in Fraud in Connection
with Securities .......................................................21

23

24

            a.  Violations of Section 10(b) of the Exchange Act and Rule
10b-5 Thereunder................................................21

25

26

            b.  Violations of Section 14(e) of the Exchange Act and Rule
14e-8 Thereunder ..............................................24

27

28

3.  Defendants Are Likely to Continue Their Illegal Conduct......... 25

B.    The Court Should Appoint a Receiver ...............................................26

C.    The Court Should Order an Asset Freeze .........................................30

D.    The Court Should Order Other Ancillary Relief...............................32

IV.    CONCLUSION ........................................................................................33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Abramason v. Flescherner*, 569 F.2d 862 (2d Cir. 1977) .............................................. 17

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .................................................................. 22

*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) .................................... 17 n.4

*ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015) ............................... 23

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997) ........................................................... 21

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ........................................................ 22

*Federal Trade Commission v. Consumer Defense, LLC*, 926 F.3d 1208
   (9th Cir. 2019) ............................................................................................................ 14

*First Guaranty Bank v. Larmore, et al.*, 5:23-cv-683 (W.D. La.) ................................. 30

*FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989) ............................................................. 14

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) .............................................. 14

*Gas Natural v. E.On AG*, 468 F. Supp. 2d 595 (S.D.N.Y. 2006) .................................. 24

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................................ 22

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ................................ 22

*Houdini, Inc. v. Goodbaskets, LLC*, 166 Fed. App'x 946 (9th Cir. 2006) .............. 15 n.3

*In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir. 1993) ...................... 24

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) ......................................... 22

*In the Matter of Alexander V. Stein*, 59 S.E.C. Docket 1115, 1995 WL 358127
   (SEC opinion June 8, 1995) ....................................................................................... 19

*Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135 (2011) ............. 23

*Lorenzo v. SEC*, --- U.S. ---, 139 S. Ct. 1094 (2019) ............................................... 21, 22

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................ 14

*Ponce v. SEC*, 345 F.3d 722 (9th Cir. 2003) .................................................................. 20

*Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir. 1988) ........................ 30

*Schauss v. Metals Depository Corp.*, 757 F.2d 649 (5th Cir. 1985) ............................. 29

*SEC v. Baccam*, 2017 WL 5952168 (C.D. Cal. June 14, 2017) .................................... 31

*SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2006) ...............................17 n.4

*SEC v. Billion Coupons, Inc.*, No. 1:09-cv-00068-JMS-KSC
  (D. Haw. Feb. 18, 2009) .......................................................................33

*SEC v. Capital Consultants, LLC*, 397 F.3d 733 (9th Cir. 2005) ....................26

*SEC v. Capital Cove Bancorp, LLC*, No. 8:15-cv-00980-JLS-JC,
  2015 WL 9704076 (C.D. Cal. Sept. 1, 2015) ...................................15 n.2

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963) ....................16

*SEC v. Chiase*, No. 10 Civ. 5110, 2011 WL 6176209 (D.N.J. Dec. 12, 2011) ...........19

*SEC v. Colello,* 139 F.3d 674 (9th Cir. 1998) ........................................31

*SEC v. Credit First Fund*, No. 05-cv-8741-DSF-PJWx, 2006 WL 4729240
  (C.D. Cal. Feb. 13, 2006) .....................................................................27

*SEC v. Eadgear, Inc.*, No. 3:14-CV-04294-RS, 2014 WL 6900938
  (N.D. Cal. Dec. 8, 2014) ...............................................................15 n.2

*SEC v. Fifth Ave. Coach Lines, Inc.*, 289 F. Supp. 3 (S.D.N.Y. 1968) ...............27

*SEC v. First Financial Group of Texas*, 645 F.2d 429 (5th Cir. 1981) .................27, 28

*SEC v. Hardy*, 803 F.2d 1034 (9th Cir. 1986) ......................................26

*SEC v. Homestead Props., L.P.*, No. SACV09-01331-CJC(MLGx),
  2009 WL 5173685 (C.D. Cal. Dec. 18, 2009) .................................15 n.2

*SEC v. Infinity Grp.*, 212 F.3d 180 (3d Cir. 2000) ...............................30

*SEC v. Int'l Swiss Invests. Corp.*, 895 F.2d 1272 (9th Cir. 1990) .................30, 32

*SEC v. Life Wealth Mgmt., Inc.*, No. 10-cv-4769 RSWL, 2012 WL 12919299
  (C.D. Cal. Nov. 9, 2012) .....................................................................20

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ..............14

*SEC v. Manor Nursing Ctrs.*, 458 F.2d 1082 (2d Cir. 1972) ...............20, 21, 23

*SEC v. Muehler*, No. 2:18-cv-01677-CAS-SK, WL 2018 WL 1665637
  (C.D. Cal. Apr. 4, 2018) .................................................................15 n.2

*SEC v. Murphy*, 626 F.2d 633 (9th Cir 1980) .......................................25, 26

*SEC v. Olsen*, 243 F. Supp. 338 (S.D.N.Y. 1965) ...............................19

*SEC v. Pac. West Capital Group, Inc.*, No. 2:15-cv-02563-FMO-FFM,
  2015 WL 9694808 (C.D. Cal. Apr. 7, 2015) .................................15 n.2

*SEC v. S.J. Howey, Co.*, 328 U.S. 293 (1943) ........................................................ 17 n.4

*SEC v. San Francisco Regional Center, LLC*, No. 3:17-cv-00223-RS,
   2017 WL 1092315 (N.D. Cal. Mar. 23, 2017) ................................................. 15 n.2

*SEC v. Schooler*, 902 F. Supp. 2d 1341 (S.D. Cal. 2012) ................................... 15 n.2

*SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338 (5th Cir. 2011) ............................ 29

*SEC v. Sztrom*, 538 F. Supp.3d 1050 (S.D. Cal 2021) ......................................... 21

*SEC v. Trabulse*, 526 F. Supp. 2d 1008 (N.D. Cal. 2007) ................................... 15 n.2

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ............................................... 30

*SEC v. Universal Fin.*, 760 F.2d 1034 (9th Cir. 1985) ......................................... 28

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) .............................................*passim*

*SEC v. Wencke*, 783 F.2d 829 (9th Cir. 1986) ..................................................... 27

*SEC v. World Capital Market, Inc.*, 864 F.3d 996 (9th Cir. 2017) ......................... 31

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) .......................................................... 31

*TMI Trust Co. v. ArciTerra Note Fund II, LLC, et al.*, CV2023-008887
   (Sup. Ct of Arizona, County of Maricopa) ........................................................ 28

*Torres v. Milusnic, LLC*, 472 F. Supp. 3d 713 (C. D. Cal. 2020) ......................... 15 n.3

*Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979) ........... 16

*Vernazza v. SEC,* 327 F.3d 851 (9th Cir. 2003) .................................................. 16

*United States v. First Nat'l City Bank,* 379 U.S. 378 (1965) ................................... 30

*United States v. Nutri-Cology, Inc.*, 982 F.2d 394 (9th Cir. 1992) ......................... 15

*Varjabadian v. Emulex Corp.,* 888 F.3d 399 (9th Cir. 2019) .................................. 24

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................. 14 n.1

**REGULATIONS**

17 C.F.R. § 230.405 ...................................................................................... 27 n.6

17 C.F.R. § 240.10b-5 .................................................................................... 21

17 C.F.R. § 240.14(d)-100 ............................................................................. 12

17 C.F.R. § 240.14(e)-8 .................................................................................. 25

**STATUTES**

15 U.S.C. § 78j(b) .......................................................................................... 21

15 U.S.C. § 78u(d) ......................................................................................... 14

15 U.S.C. § 78u(d)(5) .................................................................................... 30

15 U.S.C. § 80b-2(a)(11) ............................................................................... 17

15 U.S.C. § 80b-2(a)(18) ............................................................................... 17

15 U.S.C. § 80b-6(1) ...................................................................................... 16

15 U.S.C. § 80b-6(2) ...................................................................................... 16

15 U.S.C. § 80b-9(d) ........................................................................... 14, 20, 21

15 U.S.C. § 80b-9(f) ............................................................................... 20, 21

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") seeks emergency relief to protect investors in connection with ongoing fraudulent conduct by defendants Jonathan Larmore ("Larmore") and entities he owns or controls or has used to carry out these violations, namely: ArciTerra Companies, LLC ("ArciTerra"); ArciTerra Note Advisors II, LLC ("Fund II Advisors"); ArciTerra Note Advisors III, LLC ("Fund III Advisors"); ArciTerra Strategic Retail Advisor, LLC ("ASR Advisor"); and Cole Capital Funds, LLC ("Cole Capital"). As described below and evidenced by the attached declarations, Larmore is engaged in an ongoing fraud, and each of the named Defendants has also violated, or aided and abetted violations of, antifraud provisions of the federal securities laws. The emergency relief sought—including a temporary restraining order providing for specific injunctions, the appointment of an equity receiver, and asset freezes—is necessary to protect investors and to maintain the status quo pending the outcome of this litigation.

From at least 2006 to September 2023, Larmore was the Chief Executive Officer of ArciTerra, an entity he founded and controlled, and over which he still exerts influence through his agent. Larmore also managed and controlled a large complex of related entities involved in commercial real estate investment, development, and management (collectively, the "ArciTerra entities"). Two of these entities are private real estate investment funds ("Funds") which together raised approximately $45 million from investors. From no later than 2017 through 2023, Larmore directed ArciTerra staff to transfer approximately $35 million from the investor-owned Funds to the account of another ArciTerra entity Larmore controlled, Defendant ASR Advisor. Once investor funds were transferred into ASR Advisor's account, Larmore caused those investor monies to be commingled with other amounts

that originated from other entities under his control. In effect, Larmore used Defendant ASR Advisor's account as a virtual piggybank, paying for his personal expenses and enriching himself. By 2023, Larmore had moved over $17 million from ASR Advisor's account to his personal accounts. ArciTerra recorded these transfers in its accounting system as "due from" Larmore and his personal entities, but neither Larmore nor the other entities he diverted money to have repaid those monies. As an investment adviser for the Funds, Larmore breached his fiduciary duty by stealing millions of dollars from them.

On April 17, 2023, Larmore sent an email to a broad group of his contacts with the subject line: "The Perfect Storm Sale…" In the email, Larmore declared that he intended "to shed the baggage of my past and start fresh" by selling his business and personal assets including, but not limited to: the portfolio of ArciTerra properties and all other commercial properties that he owns (in part or in full); accounts receivable; and a raft of his personal luxury items, including high-end cars, boats, art and jewelry, and real estate properties held in his name. Larmore stated that he intended to sell everything in seventy-five days to finish dividing assets with his wife from whom he was separating. In early September 2023, Larmore resigned as "limited liability company manager" of ArciTerra, and two persons were appointed as "co-Managers," pursuant to a letter agreement (between Larmore and his wife) in Larmore's divorce proceeding, with the stated purpose of protecting Larmore's and his wife's interests; however, no one at ArciTerra currently acknowledges any fiduciary responsibility to the investor Funds.

After purportedly giving up direct access to ArciTerra's coffers, and aware by this time he was being investigated by SEC Enforcement staff, in October and November 2023, Larmore devised a new unlawful scheme in which he manipulated the value of the publicly traded securities of WeWork, Inc. ("WeWork"). Larmore sought to "pump up" the price of WeWork's stock so that he could personally profit

from the positive change in its price. To carry out this scheme, on November 1 and 2, 2023, Larmore purchased tens of thousands of call options on WeWork stock.

Then, on November 3, 2023, Larmore issued a press release on behalf of Cole Capital that included a letter purportedly sent from Cole Capital to the Board of Directors of WeWork. (In fact, the letter had been sent to two WeWork Investor Relations email addresses visible on the WeWork website.) In the letter, Cole Capital, in what is referred to as a tender offer, offered to purchase 51% of WeWork's outstanding minority-ownership shares for a price of $9 per share, over nine times the market price of the stock. However, the letter was false and misleading in that, among other things, it misrepresented the actual intention and ability of Cole Capital to carry out the tender offer. News feeds published the press release after regular trading hours ended at 4:00 p.m. ET. WeWork's share price climbed in afterhours trading that day, rising from a per-share price of $0.8355 at the market-day close, to over $2 per share at its peak in afterhours trading.

Larmore, however, did not exercise his call options because most of them had expired at the close of trading on November 3, 2023. Unfortunately for Larmore, the press release announcing the tender offer was delayed and did not publish until after regular trading hours concluded. Larmore had submitted Cole Capital's release to the wire service well before the close of trading hours that day, but the service had rejected it at least once for formatting issues and other irregularities, and it was therefore not released until after regular trading hours ended at 4:00 p.m. ET.

This motion for emergency relief is necessary because Defendant Larmore continues to take desperate measures involving blatant violations of the antifraud provisions of the federal securities laws. Larmore is actively attempting to sell all of the commercial real estate assets of the ArciTerra entities, as well as his personal assets, and no one is acting as a fiduciary on behalf of the investor Funds from whom he has siphoned millions of dollars. Also, Larmore has turned recently to fraudulent behavior involving manipulating the stock market even though he is aware of the

SEC's investigation into his conduct. Because these ongoing violations of federal securities laws will continue unless addressed, the SEC seeks emergency relief including a temporary restraining order enjoining Larmore, and the Defendant entities, from further violations and from other specific conduct; a freeze of assets to maintain the status quo and the appointment of a receiver, as well as other ancillary relief as set forth below.

## II.    FACTS

### A.    Larmore and the ArciTerra Entity Defendants

In 2005, Larmore founded and became CEO of ArciTerra Group, LLC, a real estate and management company headquartered in Phoenix, Arizona, which was the predecessor to ArciTerra, formed in 2007. Declaration of Heather E. Marlow ("Marlow Decl.") ¶ 12, Ex. 4; ¶ 13, Ex. 5; ¶ 23 (Rice Interview). According to its social media presence, ArciTerra has "created 19 investment offerings, raised approximately $187 million in capital and owns approximately 83 properties in 26 states." Marlow Decl. ¶ 14, Ex. 27 (LinkedIn page).

Over the years, ArciTerra has managed over a hundred related entities. Marlow Decl. ¶ 23 (Rice Interview); ¶ 30, Ex. 22. Importantly for the present action, two entities ArciTerra manages are private real estate investment funds called ArciTerra Note Fund II, LLC ("Fund II") and ArciTerra Note Fund III, LLC ("Fund III"). Marlow Decl. ¶ 17, Ex. 23; ¶ 19, Ex. 24 (POM Fund II and POM Fund III). Larmore established Fund II in 2006 and 2007 as a private real estate investment fund, through the offering of secured notes purchased by approximately 466 investors and raising approximately $20 million in total. Marlow Decl. ¶¶ 17, 18. The Private Offering Memorandum ("POM") for Fund II identifies its "advisor" as "Note Fund II Advisors"; and the adviser is itself "managed" by ArciTerra. Marlow Decl. ¶ 17, Ex. 23 at 1. Larmore established Fund III in 2008 and 2009, also by selling secured notes to 579 investors, raising approximately $25 million. Marlow Decl. ¶¶ 19, 20. Fund

III's POM similarly designated that Fund III and its adviser, Note Fund III Advisors, would also be managed by ArciTerra. Marlow Decl. ¶ 19, Ex. 24 at 1. Larmore, through his control of ArciTerra, made the ultimate decisions regarding the use of the amounts raised from both investor Funds, including the acquisition and selling of real properties, investments in securities (such as limited partnership units in ArciTerra National REIT, LP, which Larmore and ArciTerra manage, and preferred stock in a third-party venture held through ArciTerra NS Investment Co.), and use of tenant proceeds. Marlow Decl. ¶¶ 21, 23 (Larmore Interview; Rice Interview).

**B.   Larmore Misappropriated Investor Funds for His Personal Use**

**1.   Larmore Decided How to Move Funds Among the ArciTerra Entities**

From at least 2017 through June 2023, Larmore siphoned money from Fund II and Fund III by transferring the money in those Funds to accounts of various ArciTerra entities, then commingling the money with proceeds from other businesses, and finally funneling the money to his own accounts or using it for his own personal expenses. At Larmore's direction, the ArciTerra accounting staff transferred cash among the ArciTerra entities and recorded the transactions in ArciTerra's central accounting system. Marlow Decl. ¶ 9, Ex. 1 (Investigative Testimony Transcript of Kathleen Bouet ("Bouet Tr.") at 16:13-17; 35:10-36:9;145:9-147:15). In directing ArciTerra's staff to effect the transfers, Larmore placed no restrictions on which entities' cash could be drawn from to meet a need, even if the money originated from Fund II and Fund III or other investment vehicles with outside investors. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 128:22-130:12; 145:9-147:15); ¶ 22 (Gulbranson Interview).

In 2010, Larmore established Defendant ASR Advisor and made himself and his mother, Marcia Larmore, the owners. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 57:12-22). Starting no later than 2017, Larmore used ASR Advisor's bank account as a central clearinghouse to transfer money among the ArciTerra entities, and to divert

money to himself. Marlow Decl. ¶ 22 (Gulbranson Interview). Larmore directed the ArciTerra accounting staff to make the cash transfers. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 131:12-132:1; 144:5-13; 145:9-147:15; 206:1-207:14); ¶ 22 (Gulbranson Interview). As described in the Declaration of Michael Foley ("Foley Decl.") (an accountant with the SEC, who has closely reviewed the ArciTerra accounting records), the cash transfers were recorded in the financial records of the various entities, specifically, in a general ledger account, and identified as "due to ASR Advisor" or "due fr ASR Advisor." Foley Decl. ¶ 18. In the case of "due to ASR Advisor," the caption means that an entity was the net recipient of funds from ASR Advisor and had a debt owed to ASR Advisor; in the case of "due fr ASR Advisor," that caption means that an entity was a net contributor of funds to ASR Advisor. Foley Decl. ¶ 18.

Prior to making cash transfers, ArciTerra's accounting staff sought approval from Larmore to move money to meet cash needs and fulfill Larmore's directions. For example, on May 3, 2023, an accountant for ArciTerra sent an email to Larmore (and others) asking for approval to move money between certain entities. Marlow Decl. ¶ 24, Ex. 7 (BouetK-E-164). "We have the $45,900 payment pulling from the [ArciTerra] account today. Please confirm ok to fund." *Id*. The accountant further identified in the email where the funds would be drawn, and how they would be transferred through several intermediary entities and labeled as "loan" and "consulting" payments. *Id*. On May 4, 2023, Larmore gave his approval by email. *Id.*

### 2.     Larmore Transferred Investor Funds Out of Investments and Commingled Them in ASR Advisor's Account

The money raised as offering proceeds by Fund II and Fund III was used to purchase, directly or through wholly owned intermediaries, various real-estate-related assets, including securities. Among those assets purchased are limited partnership interests in ATG REIT RSC, LP ("ATG REIT"), an entity that owns two commercial properties in Kansas and Indiana, and ownership interests in Glenrosa 32, LLC

("Glenrosa"), an entity that owns a nursing-home property in Phoenix, Arizona. Foley Decl. ¶¶ 8, 11. As described below, both ATG REIT and Glenrosa are jointly and wholly owned by Fund II and Fund III.

According to ArciTerra's records, as of June 30, 2023, Fund II had invested $7.8 million in ATG REIT and Fund III had invested $15.2 million in this entity, for a combined total of $23 million. Foley Decl. ¶¶ 9, 10. However, ArciTerra's records further reveal that, as of June 30, 2023, ATG REIT had transferred $22.5 million to ASR Advisor. Foley Decl. ¶ 15.

Similarly, as of June 30, 2023, Fund II and Fund III had invested a combined total of $10.8 million in Glenrosa (through an intermediary entity). Foley Decl. ¶ 11. However, Larmore diverted $12.5 million from Glenrosa to ASR Advisor. Foley Decl. ¶ 15. Together, these diversions from the investor Funds, through ATG REIT and Glenrosa, to ASR Advisor totaled $35 million. Foley Decl. ¶ 15.

As the money from the investor Funds was moved into ASR Advisor's account, Larmore commingled the money with cash from other sources. Foley Decl. ¶ 17. In total, as of June 2023, Larmore directed the net transfer of over $53 million from other ArciTerra entities into ASR Advisor's account. Foley Decl. ¶ 20.

### 3. Larmore Freely Used Money from ASR Advisor's Account

Larmore also directed ArciTerra's staff to pay his personal expenses from the commingled funds in ASR Advisor's account. As Larmore received bills for his personal expenses, he forwarded them to the accounting staff (or to the supervisor of that staff) with an email instructing: "Pay this." Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 144:5-13). For example, on January 10, 2023, Larmore sent an email to an accountant attaching an invoice for $4,500 from Waterwise Pools (for "Contractor Labor cost pool builder's fee" for a vacation home belonging to Larmore and his wife) and instructed her to "Please pay this week." Marlow Decl. ¶ 25, Ex. 26 (BouetK-E-2, 4). Also on January 10, 2023, Larmore sent another email to an accountant instructing her

to "Please pay this week" an invoice for the same vacation home from Waterwise Pools for $8,138 (for second half of cover and parts). Marlow Decl. ¶ 26, Ex. 25 (BouetK-E-5, 7). In addition, Larmore, his wife, and his children each had credit cards for their personal use, which were also billed to ArciTerra and paid by the ArciTerra accounting staff. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 118:5-120:7); ¶ 11, Ex. 3 (Investigative Testimony Transcript of Michelle Larmore ("M. Larmore Tr.") at 100:4-21; 128:1-7; 129:5-130:7). The accounting staff recorded these credit card expenses as "due to" or "due from" Larmore's personal accounts. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 118:5-120:7).

Under Larmore's management, ArciTerra's accounting staff prioritized the payment of Larmore's personal expenses. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 144:5-147:7). Whenever Larmore's personal accounts had insufficient funds, the accounting staff looked to any ArciTerra entity with surplus funds to pay for his personal expenses. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 144:5-147:7). The accounting staff had access to, and used, any bank account within the ArciTerra structure (including investor-related entities) to pay Larmore's personal bills. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 130:1-12, 144:5-147:7); ¶ 22 (Gulbranson Interview). The accounting staff moved funds up from entities with cash, through the intermediary entity, ASR Advisor, and then paid Larmore's personal expenses. In ArciTerra's accounting records, the transfers to Larmore were recorded as "due from" Larmore's personal accounts, which were identified as "JMMAL Investments" ("JMMAL") and "JML." Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 170:12-171:10, 172:10-19, 206:1-207:24); Foley Decl. ¶¶ 21, 23.

According to ArciTerra records from 2018 to 2022, the accounting staff recorded numerous individual cash payments per month to JMMAL and JML's general ledger accounts ranging from several hundred dollars to millions of dollars. Foley Decl. ¶ 24. By the end of 2022, ArciTerra's accounting records indicate that Larmore (JML) owed ASR Advisor $6,241,733, and his entity JMMAL owed

$11,542,468, for a combined total of over $17 million. Foley Decl. ¶ 24. The designation of transfers as "due from" in ArciTerra's accounting records establish the amounts Larmore owes, and further evidence his acknowledgement that the amounts were not payments for amounts owed to him.

At Larmore's request, an ArciTerra accountant periodically provided reports to him that described how much he owed based on the payments made to his personal accounts, including a year-to-date report in October or November 2022. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 139:14-140:13). However, the accounting staff could not recall Larmore ever repaying any of the money he had taken. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 123:2-12; 128:6-129:25; 150:4-7); ¶ 22 (Gulbranson Interview). ArciTerra's accounting staff did not see any attempt by Larmore to put cash back into the company to pay down his debt. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 123:2-12; 128:6-129:25; 139:14-140:13); ¶ 22 (Gulbranson Interview).

In addition, Larmore transferred funds from ASR Advisor to entities that he or his immediate family owned (in whole or in part), including Relief Defendants CSL Investments, LLC ("CSL Investments"), MML Investments, LLC ("MML Investments"), and JMMAL Investments, LLC ("JMMAL"). CSL Investments is owned by Larmore and his wife, Michelle Larmore, and, as of December 31, 2022, owes $9.7 million to ASR Advisor. Foley Decl. ¶ 25. MML Investments is wholly owned by Larmore's mother, Marcia Larmore, and owes $4.9 million to ASR Advisor as of that same date. Foley Decl. ¶ 25; Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 71:5-10). JMMAL is owned, in whole or in part by Larmore, and owes $11.5 million to ASR Advisor. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 171:2-10). Furthermore, Larmore improperly transferred funds from Glenrosa to Relief Defendant Spike Holdings, LLC ("Spike Holdings") which is wholly owned by Larmore. Marlow Decl. ¶ 9, Ex. 1 (Bouet Tr. at 54:11-13).  In 2023, Glenrosa transferred at least $131,000 to Spike Holdings. Foley Decl. ¶ 16.

### 4.    Larmore's Recent Actions to Liquidate Assets

In approximately spring 2023, Larmore began to proclaim publicly his intent to dissolve ArciTerra and liquidate its assets and his own personal assets, and he has taken significant steps towards this goal. In March 2023, Larmore fired nearly all of ArciTerra's employees and shut down its headquarters in Phoenix, Arizona, and moved the remaining business operations to a small office in Florida. Marlow Decl. ¶¶ 21, 23. On April 17, 2023, Larmore sent an email to a large group of people with the subject line: "The Perfect Storm Sale…" Marlow Decl. ¶ 27, Ex. 8 (Larmore Email, dated April 17, 2023). In the email, Larmore declared that he intended "to shed the baggage of my past and start fresh" by selling his business and personal assets. *Id*. Larmore listed for sale the portfolio of ArciTerra properties and all other commercial properties, whether he owned them fully or only in part, without regard to whether there were outside investors, and regardless of how he came to be the titled owner. *Id*. Larmore also identified the businesses' accounts receivable. *Id*. Finally, he offered for sale an array of his personal property, including luxury items such as five high-end cars (Ferrari, Porsche, Aston Martin, Range Rover, and Cadillac Escalade); several watercrafts (Boston Whaler, Nautique Paragon, Pontoon Boat, 5 Jet Skis, sail boat, and surf jet); and art and jewelry. *Id*. Larmore also identified for sale at least nine real properties, with furnishings, which he also claimed to own personally. *Id*. Larmore stated that he wanted to sell his business and personal assets within seventy-five days in order complete a division of assets with his wife, who had filed legal separation proceedings in March 2023 (the "divorce proceeding"). *Id*.

In a Resolution of ArciTerra, dated September 1, 2023, Larmore resigned as "limited liability company manager" of ArciTerra, and, pursuant to a letter agreement in Larmore's divorce proceeding, two persons were appointed as "co-Managers" of ArciTerra, to protect the relative interests of Larmore and his wife. Marlow Decl. ¶ 28, Ex. 9 at pg. 1; ¶ 29, Ex. 10 at para. 3. A consultant (who was a social acquaintance of Larmore's) was appointed to serve as Larmore's agent, and

ArciTerra's former Chief Operating Officer was appointed to serve as his wife's agent. Marlow Decl. ¶ 29, Ex. 10 at para. 3. However, the "co-Managers" do not consider themselves investment advisers or fiduciaries to Fund II or Fund III. Marlow Decl. ¶ 10, Ex. 2 (Investigative Testimony Transcript of Dan DeCarlo ("DeCarlo Tr.") at 18:7-14); ¶ 23 (Rice Interview). ArciTerra is actively attempting to sell the properties under its control, including approximately seventeen commercial properties that are owned by investor-related entities. Marlow Decl. ¶ 30, Ex. 22 (entity list). Currently, there is no one at ArciTerra acknowledging a responsibility to be a fiduciary to the Funds or otherwise look out for the interests of Fund investors.

### 5.      Larmore and Cole Capital's November 3, 2023 Manipulation of WeWork Securities

On October 6, 2023, Larmore, using the name J. Moynahan Larmore, formed Cole Capital Funds, LLC in the State of Arizona. Marlow Decl. ¶ 31, Ex. 11. The Arizona Secretary of State website lists the business type as a real estate and rental leasing business. *Id*. On that same date, colecapitalfunds.com was created. Marlow Decl. ¶ 32, Ex.12. The colecapitalfunds.com website states that Moynahan Larmore is the CEO of Cole Capital. Marlow Decl. ¶ 33, Ex. 13. "Moynahan" is Larmore's middle name. Marlow Decl. ¶ 21.

In early November 2023, Larmore took several steps to manipulate the value of the publicly traded securities of WeWork, Inc. ("WeWork") on the NASDAQ National Market in an attempt to profit from a change in its price by purchasing call options. The buyer of a call option has the right, but not the obligation, to purchase a certain stock at a certain price (the "strike price") up until a defined expiration date. Marlow Decl. ¶ 34, Ex. 14. If the price of the stock exceeds the strike price when the call option is executed, then the buyer of the call option will profit. *Id.* On November 1 and 2, 2023, Larmore purchased a total of 72,846 WeWork call option contracts through approximately five brokerage accounts he controls, with approximately 71,000 of these call options set to expire on November 3, 2023 at 4:00 p.m. ET, and

the remainder set to expire on November 10, 2023 at 4:00 p.m. ET. Marlow Decl.
¶ 35. This quantity of call option contracts, if exercised, would have allowed Larmore
to acquire 7,284,600 shares of WeWork common stock. *Id*. Larmore paid between
$.03 and $.15 per contract to purchase these call options. *Id*. At the time, WeWork's
stock price ranged between $1.11 and $1.23. Marlow Decl. ¶ 38, Ex. 16. However, the
strike prices for these call options ranged between $2 and $5, meaning that the stock
price of WeWork would need to increase significantly in just a few days for Larmore
to exercise the options at a profit. Marlow Decl. ¶ 35. Larmore also bought 343,641
shares of WeWork stock on November 2. *Id*.

On November 3, 2023 at 9:11 a.m. ET, Larmore emailed the SEC's Shareholder
Proposals mailbox from his address at colecapitalfunds.com, attaching a Schedule TO,
and claiming to commence a purported tender offer by Cole Capital to acquire
WeWork. Marlow Decl. ¶ 36, Ex. 28. A Schedule TO is a form required to be filed by
a person who intends to make a tender offer for the purchase of securities of a
company, where the tender offer would result in the purchaser acquiring more than
5% of a class of securities issued by that public company. *See* 17 C.F.R. § 240.14d-
100. The Schedule TO, which was not accepted for filing by the SEC, included the
text of a letter that Larmore indicated he had sent to WeWork's CEO and its Board of
Directors that morning, stating, in part:

> We believe that it is in the best interest of WeWork to support our
> acquisition of 51% of all the outstanding shares owned by minority
> shareholders at a price of $9.00 per share and provide Cole with proper
> representation on the company board.
>
> We have received feedback from City National Bank and JP Morgan
> regarding the financing for this acquisition and expect to select a
> lender and have a financing commitment prior to execution of a
> definitive agreement.
>
> We have consulted with God, legal, financial and other advisors to
> assist us with this transaction. We stand ready to proceed timely.
>
> In addition, we have evaluated WeWork's current locations and have
> evaluated several new locations which we believe will add to an
> expanded WeWork community.

1  Marlow Decl. ¶ 36, Ex. 28. (Schedule TO).

2      Also on November 3, Larmore submitted the Cole Capital press release to a

3  wire service well before the close of regular NASDAQ trading hours at 4 p.m. ET, but

4  the service rejected the release at least once for formatting errors or other issues.

5  Marlow Decl. ¶ 40. Finally, at 5:12 p.m. ET, several business news outlets posted the

6  Cole Capital press release. The release was titled "A Proposal by Cole Capital Funds

7  Seeks to Acquire 51% of all minority ownership shares of WeWork, Inc. for $9.00 per

8  share in Cash." Marlow Decl. ¶ 37, Ex. 15 (Press Release). It stated that Cole Capital

9  had sent a letter to the WeWork Board of Directors and quoted the full text of the

10  letter to WeWork's board, copied above. Marlow Decl. ¶ 36, Ex. 28 at 8. Within a

11  minute of the press release's posting, the stock jumped from $.85 to $1.45 and

12  continued to rise, reaching its high of $2.14 at 6:31 p.m. Marlow Decl. ¶ 38, Ex. 16.

13  The stock price then began to trend downward and closed at $1.18 at the end of

14  afterhours trading. *Id*. Most websites that had posted the press release took it down

15  just over an hour after having posted it. Marlow Decl. ¶ 39, Ex. 17.

16      Larmore could not profitably exercise his call options before the Cole Capital

17  press release was publicly posted because his November 3 call options expired at 4:00

18  p.m. ET that day, an hour before the news outlets circulated the press release; in

19  addition, the stock price never exceeded the strike price for his November 10 call

20  options. Marlow Decl. ¶ 35; ¶ 38, Ex. 16.

21
22  **III.  ARGUMENT**

23      **A.  Defendants Should Be Restrained from Violating the Federal
            Securities Laws**

24      Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), and

25  Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") both

26  authorize the SEC to obtain against any person a temporary restraining order (without

27  a bond) "[u]pon a showing that such person has engaged, is engaged, or is about to

28  engage" in acts or practices that violate provisions under either of those securities acts.

*See* 15 U.S.C. §§ 78u(d) and 80b-9(d). The SEC appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Mgmt. Dynamics*, *Inc*., 515 F.2d 801, 808 (2d Cir. 1975). Because enforcement actions such as this case are brought in the public interest, the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989) (quoting *Fed. Trade Comm'n v. H.N. Singer*, *Inc*., 668 F.2d 1107, 1112 (9th Cir. 1982)).

Thus, the traditional four-part test under Federal Rule of Civil Procedure 65 for weighing the need for preliminary relief operates differently, because in enforcement actions irreparable injury merges with the public interest factor.[1] *See, e.g., Nken v. Holder*, 556 U.S. 418, 435 (2009) ("Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). As the Ninth Circuit explained in *Fed. Trade Comm'n v. H.N. Singer*: "In the ordinary case, *i.e.*, one not involving statutory enforcement, the traditional irreparable injury showing is required. On the other hand, in a case involving statutory enforcement, where the applicable statute authorizes injunctive relief, the traditional irreparable injury showing is not required." 668 F.2d 1107, 1112 (9th Cir. 1982); *see also Fed. Trade Comm'n v. Consumer Defense, LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019) ("Although in the ordinary case a showing of irreparable harm is required to obtain injunctive relief, no such showing is required when

---

[1] *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (To meet the four-part test applied in non-enforcement actions under Rule 65: "The proponent of an asset freeze must therefore establish the elements for a preliminary injunction: that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

1  injunctive relief is sought in connection with a statutory enforcement action where the

2  applicable statute authorizes injunctive relief.").

3  Accordingly, emergency injunctive relief should be ordered where the SEC

4  shows "either (1) a combination of probable success on the merits and the possibility

5  of irreparable injury or (2) that serious questions are raised and the balance of

6  hardships tips in the applicant's favor." *United States v. Nutri-Cology*, *Inc.*, 982 F.2d

7  394, 397 (9th Cir. 1992) (quotations and citations omitted).[2] In any event, as set forth

8  below, the evidence aptly demonstrates that Defendants have violated, and are

9  continuing to violate, the antifraud provisions of the federal securities laws, and their

10  actions will continue to result in serious injury to the public without the requested

11  relief.[3]

12  

13  [2] To apply this standard, several district courts in the Ninth Circuit have interpreted the

14  preliminary injunctive relief standard in SEC emergency actions to require that the
   SEC make only a two-prong showing: (1) a *prima facie* case that the defendant has

15  violated the federal securities laws, and (2) a reasonable likelihood that the defendant
   will repeat his violations. *See, e.g., SEC v. Muehler*, No. 2:18-cv-01677-CAS-SK, WL

16  2018 WL 1665637 (C.D. Cal. Apr. 4, 2018); *SEC v. San Francisco Regional Center,*

17  *LLC*, No. 17-cv-00223-RS, 2017 WL 1092315 (N.D. Cal. Mar. 23, 2017); *SEC v.*
   *Capital Cove Bancorp, LLC*, No. 8:15-cv-00980-JLS-JC, 2015 WL 9704076, at *5-6

18  (C.D. Cal. Sept. 1, 2015); *SEC v. Pac. West Capital Group, Inc.*, No. 2:15-cv-02563-

19  FMO-FFM, 2015 WL 9694808, at *4 (C.D. Cal. Apr. 7, 2015); *SEC v. Eadgear, Inc.*,

20  No. 3:14-CV-04294-RS, 2014 WL 6900938, at *1 (N.D. Cal. Dec. 8, 2014); *SEC v.*
   *Schooler*, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012); *SEC v. Homestead Props.,*

21  *L.P.*, No. SACV09-01331-CJC(MLGx), 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18,

22  2009); *SEC v. Trabulse*, 526 F. Supp. 2d 1008, 1012 (N.D. Cal. 2007).

23  [3] In considering a motion for temporary restraining order or preliminary injunction, the

24  court may consider evidence that would be inadmissible at trial, such as hearsay,
   because the federal rules of evidence do not apply to these proceedings. *See Houdini*

25  *Inc. v. Goodbaskets, LLC*, 166 Fed. App'x 946, 947 (9th Cir. 2006) (district court
   could consider hearsay and biased evidence because the rules of evidence do not apply

26  to preliminary injunction proceedings); *Torres v. Milusnic*, 472 F. Supp. 3d 713, 747

27  n.21 (C.D. Cal. 2020) (the court may consider inadmissible evidence, including
   hearsay, in determining whether to issue a temporary restraining order or preliminary

28  injunction).

In this case, as further discussed below, Defendants violated the antifraud provisions of (1) the Advisers Act, by misappropriating and commingling investor funds; and (2) the Exchange Act, by manipulating the price of WeWork stock.

### 1.   Defendants Violated the Antifraud Provisions of the Advisers Act

Sections 206(1) and 206(2) of the Advisers Act prohibit any investment adviser from, directly or indirectly, employing any device, scheme, or artifice to defraud any client or prospective client; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. 15 U.S.C. § 80b-6(1) and (2). A person violates these provisions if (1) acting as an investment adviser, (2) he breaches his fiduciary duties owed to his clients. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194 (1963).

The Supreme Court has characterized the fiduciary duty owed by an investment adviser under these provisions as the duty of "utmost good faith, and full and fair disclosure of material facts," and "an affirmative obligation to employ reasonable care" for the benefit of the adviser's clients. *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 16, 27 (1979). Additionally, to establish a violation of Section 206(1), "scienter"—or the "mental state embracing intent to deceive, manipulate, or defraud"—is required. *Id*. The Ninth Circuit has held that scienter under Advisers Act Section 206(1) may be supported by either "knowing or reckless conduct." *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). However, to prove a violation of Advisers Act Section 206(2), scienter is not required, and instead negligence—or the failure to use ordinary care—will suffice. *Capital Gains*, 375 U.S. at 195. As set forth below, Defendants Larmore, Fund II Advisors, and Fund III Advisors each meet the definition of an "investment adviser" and each breached their fiduciary duties to their clients, and with the requisite mental state.

Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person, who for compensation, engages in the business of advising others … as to the

value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). This definition includes the general partner or investment manager of a limited partnership who manages a Fund's investments for compensation. *See Abrahamson v. Fleschner*, 568 F.2d 862, 869-70 (2d Cir. 1977). To meet the definition of investment adviser, the SEC must establish that the putative adviser (i) provided advice to others regarding securities; (ii) was in the business of providing such services; and (iii) provided such services for compensation. *Id.* at 869.

First, Larmore, Fund II Advisors, and Fund III Advisors provided advice to Fund II and Fund III regarding "securities," as both of those Funds purchased significant investments in securities at the direction of those defendants, including limited partnership units in ArciTerra National REIT, LP ("National REIT") and preferred stock in a third-party venture held through ArciTerra NS Investment Co. A "security" under the Advisers Act "means any note, stock, … bond, debenture, evidence of indebtedness, … or participation in any profit-sharing agreement, … [or] investment contract," among other things. 15 U.S.C. § 80b-2(a)(18). The limited partnership units by which both Fund II and Fund III invested in National REIT, as well as preferred stock in a third-party venture, are classic examples of securities.[4]

---

[4] Stock is defined as a security under the Advisers Act, and LP shares qualify as an "investment contract" under the Advisers Act definition. The Supreme Court defined "investment contract" in *SEC v. S.J. Howey, Co.*, 328 U.S. 293, 301 (1943), as "(1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." Although *Howey* was a case brought under the Exchange Act, courts have defined "security" consistently under the various securities laws. *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) (observing that the Securities Act of 1933, the Exchange Act, and the Advisers Act use "virtually identical definitions" of "security"); *SEC v. Battoo*, 158 F. Supp. 3d 676, 685 (N.D. Ill. 2006) (applying *Howey* analysis to definition of an investment contract under both the Exchange Act and the Advisers Act). The Fund II and Fund III investments in ArciTerra National REIT readily meet these elements. First, Funds II and III invested $4.05 million and $390,000, respectively, in National REIT, clearly an investment of money. Second,

1    The final two prongs needed to establish that Defendants Larmore, Fund II

2    Advisors, and Fund III Advisors acted as "investment advisers" to Fund II and Fund

3    III, *i.e.*, that they were in the business of providing such advice, and did so for

4    compensation, are readily satisfied by Defendants' own materials provided to

5    investors in the Funds. Marlow Decl. Ex. 23 and Ex. 24 (Fund II POM and Fund III

6    POM). Fund II and Fund III's POMs expressly designate their "Advisor[s]" as Fund II

7    Advisors and Fund III Advisors (respectively), and further designate ArciTerra as the

8    "manager" of each Advisor and each Fund. *See* Marlow Decl. Ex. 23 and Ex. 24

9    (Fund II POM at 16-17 and Fund III POM at 17-18). The POMs for each Fund state

10   that "[t]he manager of the Company [Fund II and Fund III] has the ultimate authority

11   in all matters affecting the business and affairs of the Company, including the

12   responsibility for determining when to acquire and dispose of the Properties." Marlow

13   Decl. Ex. 23 and Ex. 24 (Fund II POM at 16 and Fund III POM at 18). The POMs

14   disclose that Larmore was the CEO of the manager, ArciTerra. Marlow Decl. Ex. 23

15   and Ex. 24 (Fund II POM at 17 and Fund III POM at 19). Those materials also

16   provide that each "Advisor and its affiliated entities and persons will receive

17   compensation in connection with the Offering, the acquisition of the Properties, and

18   the management of the Company and its assets." Marlow Decl. Ex. 23 and Ex. 24

19   (Fund II POM at 1 and Fund III POM at 1). Moreover, though Larmore received, as

20   expected, compensation through his ownership of the Fund Advisor entities, he also

21   _____

22   the Funds' respective investments in National REIT are part of a "common enterprise"
     because the Funds' money, like the other limited partners' money, was pooled and

23   invested in the REIT, and the limited partners share proportionately in the profits of
     the REIT. Third, and finally, the limited partnership units held by Fund II and Fund III

24   also carry the expectation of profits to be derived from the managerial efforts of the
     managing partner of National REIT. As described in the POM of ArciTerra National

25   REIT, Inc., "the Operating Partnership is structured to make distributions with respect
     to regular partnership interests that are equivalent to the dividend distributions made

26   to the [REIT]'s stockholders." And these profits are derived from the managerial

27   efforts of others—namely, the managerial efforts of National REIT's advisory entity,
     ArciTerra, and Larmore.

28

obtained compensation through his misappropriation of Fund assets. *See In the Matter of Alexander V. Stein*, 59 S.E.C. Docket 1115, 1995 WL 358127, at *2, n.13 (SEC op. June 8, 1995) (a person receives "compensation" if it fraudulently converts client funds to its own use). Accordingly, each of these Defendants are "investment advisers."

Acting as investment advisers, Defendants Larmore, Fund II Advisors, and Fund III Advisors, each breached their fiduciary duty to Fund II and Fund III in at least two substantial ways. First, Larmore, using these entities, misappropriated millions of dollars from investor-related entities to pay for his personal expenses and to fund his personal accounts. As discussed above, Larmore—who made the ultimate decisions for all the entity defendants—moved investor funds from Fund II and Fund III, through intermediary entities, to the account of ASR Advisor, where he commingled those funds with money from other ArciTerra entities. He then freely used the commingled money in ASR Advisor's account to pay his personal expenses and to make transfers of millions of dollars to his personal accounts, JMMAL and JML. By the end of 2022, Larmore's misappropriation of these funds to his personal accounts amounted to over $17 million. There is "no question" that an investment adviser's misappropriation of client's funds constitutes a violation of Sections 206(1) and (2) of the Advisers Act. *See SEC v. Chiase*, No. 10 Civ. 5110, 2011 WL 6176209, at *5, *13 (D.N.J. Dec. 12, 2011). *See also SEC v. Olsen*, 243 F. Supp. 338, 339 (S.D.N.Y. 1965) (granting temporary injunction where the defendant violated the Advisers Act by, among other things, "misappropriated client funds").

Second, these Defendants' diversion of millions of dollars away from the entities in which the investor Funds had invested—that is, Glenrosa 32, LLC and ATG RSC, LP—had further negative consequences to the Funds. By diverting millions, without any benefit in return to Fund II or Fund III, Defendants deprived those entities of money that should have been used for operating costs, further investments, or paying down debt. Larmore and the two, entity investment-adviser defendants failed

1   to act in the best interest of Fund II and Fund III when they transferred millions of

2   dollars from these two investment vehicles and commingled them with other funds in

3   ASR Advisor's account.

4           Finally, the actions of Larmore, Fund II Advisor, and Fund III Advisor are the

5   best proof of these Defendants' scienter. Larmore had full knowledge of his fraud,

6   having orchestrated it: he directed money transfers from Fund II and Fund III assets

7   which were then commingled with funds from other ArciTerra entities, and siphoned

8   millions of investor dollars out of the Funds and other ArciTerra entities for his

9   personal use. Larmore's "fire sale" email further evidences his intent to continue

10  treating funds he obtained from investors as his own as he advertised the sale of

11  ArciTerra proprieties along with his personal assets and made clear that he would use

12  the sale proceeds in the division of assets in his divorce proceeding. Because Larmore

13  controlled Fund II Advisors and Fund III Advisors, as well as ArciTerra, Larmore's

14  mental state can be imputed to those entities. *See SEC v. Manor Nursing Ctrs.*, 458

15  F.2d 1082, 1089 n.3 (2d Cir. 1972) (awareness of securities law violations is imputed

16  from individual who exercised blanket authority over securities transactions to

17  companies he controlled); *SEC v. Life Wealth Mgmt., Inc*., CV 10–4769 RSWL, 2012

18  WL 12919299, at *4 n.2 (C.D. Cal. Nov. 9, 2012) (same, in a case involving Advisers

19  Act claims). Larmore also acted negligently, as his actions fell well below the

20  standard of reasonable care that he owed to the investor Funds, and his negligence is

21  likewise imputed to the Fund II Advisors, Fund III Advisors, and ArciTerra.

22          Although there is ample evidence that Larmore is a primary violator, in the

23  alternative, the Court can find that Larmore, as well as ArciTerra and ASR Advisor,

24  are liable for aiding and abetting violations of the Advisers Act. 15 U.S.C. §80b-9(d)

25  and (f). To establish liability under an aiding and abetting theory, the SEC must

26  establish: (1) a primary or independent securities violation committed by another

27  party; (2) knowledge by the alleged aider and abettor of the primary violation and of

28  his or her own role in furthering it; and (3) substantial assistance by the defendant in

the commission of the primary violation. *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *SEC v. Sztrom*, 538 F. Supp.3d 1050, 1062 (S.D. Cal 2021). Here, Fund II Advisors and Fund III Advisors' primary violations are established as discussed above, and Larmore's knowledge is imputed to all the Defendants because of his control over those entities. *See Manor Nursing Ctrs.*, 458 F.2d at 1089 n.3.

Larmore provided substantial assistance for commission of the primary violations by directing how to use investor funds and how to move money among the ArciTerra entities. ASR Advisor provided substantial assistance by allowing the other Defendants, particularly Larmore, to use its bank account as a central holding account in which to deposit funds from investor-related entities and from which to pay Larmore's personal expenses. ArciTerra provided substantial assistance by allowing the other Defendants, including Larmore, to utilize its central accounting staff and central accounting system to transfer funds between accounts, culminating in over $17 million in payments to Larmore's personal accounts. Under the Advisers Act, an aider and abettor is liable to the same extent as the primary violator. *See* 15 U.S.C. § 80b-9(d) and (f).

### 2. WeWork Stock Manipulation: Defendants Larmore and Cole Capital Engaged in Fraud in Connection with Securities

#### a. Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, make it unlawful for any person to make any untrue statement of material fact, or to employ any scheme to defraud or to engage in any course of business to defraud, in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The language of the statute and rule is "expansive," and these antifraud provisions "capture a wide range of conduct." *Lorenzo v. SEC*, --- U.S. ---, 139 S. Ct. 1094, 1101 (2019). Indeed, the antifraud provisions prohibit misrepresentations of material fact, and to prohibit a scheme to defraud, where a person "commits a

1  manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137

2  F.3d 616, 624 (9th Cir. 1997). However, the provisions in the statute and rule are not

3  mutually exclusive, and conduct may violate more than one subpart of the rule.

4  *Lorenzo*, 139 S. Ct. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375,

5  383 (1983), for the proposition that "it is hardly a novel proposition that" different

6  portions of the securities laws "prohibit some of the same conduct").

7        Whether cast as an untrue statement, or a scheme to defraud, the SEC must

8  establish that the information was "material," meaning that there is a substantial

9  likelihood that a reasonable investor would consider it important in making an

10  investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Finally,

11  violations of the antifraud provisions under the Exchange Act require proof of scienter

12  – a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*

13  *v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Hollinger v. Titan Capital Corp.*, 914

14  F.2d 1564, 1569 (9th Cir. 1990) (scienter demonstrated where a defendant acts

15  recklessly, engaging in misconduct that is "so obvious that the actor must have been

16  aware of it"). Scienter may be inferred from circumstantial evidence suggesting an

17  obvious risk of misleading investors that is so great that it is simply implausible that

18  the defendant did not know about it. *In re Software Toolworks Inc.*, 50 F.3d 615, 627

19  (9th Cir. 1994).

20        Larmore founded and named himself as the CEO of Cole Capital. By publishing

21  the press release relating to WeWork on public news websites, Larmore and Cole

22  Capital knowingly and recklessly caused the issuance of untrue and misleading

23  statements of material fact that Larmore and Cole Capital: (1) "received feedback

24  from City National Bank and JP Morgan" on financing for a WeWork tender offer;

25  (2) "expect to have a financing commitment prior to execution"; (3) consulted with

26  "financial and other advisors to assist us with this transaction"; and (4) had the ability

27  or intent to execute the tender offer as stated by affirmatively offering $9 a share for

28  51% of the minority-ownership shares. Although the press release was issued by Cole

Capital, Larmore—as the CEO—was the person "with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011). Larmore's scienter can be imputed to Cole Capital because he is an officer of the entity and exercised control over it. *See, e.g., ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476-79 (9th Cir. 2015); *SEC v. Manor Nursing Ctrs*., 458 F.2d 1082, 1096 n.16 (2d Cir. 1972).

Larmore schemed to pump up the price of WeWork stock, as his actions during the approximately one-month period demonstrate. On October 6, 2023, Larmore created Cole Capital. On November 1 and 2, 2023, Larmore purchased a huge number of call options on WeWork stock with expiration dates of November 3 and 10, 2023, in addition to over 343,000 shares of WeWork common stock. Larmore sought to profit by buying the stock and call options, the latter of which he either could have sold at a profit or exercised profitably if the market price of WeWork stock exceeded the call options' strike prices. On November 3, 2023, the date on which a large portion of his call options were set to expire, Larmore attempted to file a form with the SEC to give an appearance of legitimacy to his fake tender offer, and later that day, issued the press release on behalf of Cole Capital announcing that it would make a tender offer of $9.00 per share, when the price at that time was approximately $1.00 per share. Larmore's sensational press release had the desired effect on the price of the stock, and this price increase is evidence that it was material to investors. Business news outlets published the press release at 5:12 p.m. Eastern Time ("ET") and the price of WeWork stock rose in afterhours trading 150%. Fortunately, most websites that had posted the press release took it down overnight. Larmore's surreptitious plan to profit from his call options was foiled, however, because he mistimed when the wire service would publish his press release, and his November 3 call options had expired earlier that day.

Larmore and Cole Capital never intended to pursue a legitimate tender offer for WeWork stock, as neither had the means to do so. Thus, despite being served with SEC investigative subpoenas, Larmore failed to produce documents to support the claims in the press release, which were untrue. It is implausible that Larmore was sincere in pursuing a tender offer in which he would pay $9.00 a share, a premium of over 900% over the then-current price of the stock for a non-control stake in WeWork. Indeed, Larmore's theft from Funds II and III, and his more recent attempts to liquidate everything, imply a serious shortfall in his cash and net worth. The Court should conclude that the press release was false and misleading, and that Larmore and Cole Capital knowingly conducted their scheme to profit from securities trades by artificially inflating the price of WeWork securities. *See, e.g., In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 966 (2d Cir. 1993) (schemes affecting "the integrity of the securities markets" satisfy Section 10(b)'s "in connection with" requirement).

**b.      Violations of Section 14(e) of the Exchange Act and Rule 14e-8 Thereunder**

Section 14(e) of the Exchange Act prohibits the making of any untrue statement of a material fact, or omission of any material fact necessary in order to make the statements made not misleading, or engagement in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer. *Gas Natural v. E.On AG*, 468 F. Supp. 2d 595, 608-09 (S.D.N.Y. 2006). In the Ninth Circuit, Section 14(e) requires only a showing of negligence.[5] *Varjabadian v. Emulex Corp.,* 888 F.3d 399, 401 (9th Cir. 2019). Rule 14e-8 provides that it is a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) to publicly announce a plan to make a tender offer if (a) the person announcing the plan is making the announcement without the intention of commencing the offer within a reasonable time

---

[5] Several other Circuits require a showing of scienter, but the Commission believes it can meet either standard here due to the (at very least) recklessness of Larmore's conduct.

and completing the offer; (b) such person intends (directly or indirectly) for the announcement of a tender offer to manipulate the market price of the stock of the bidder or subject company; or (c) such person does not have the reasonable belief that it will have the means to purchase the securities to complete the offer. *Gas Natural*, 468 F. Supp. 2d at 609-10 (citing 17 C.F.R. § 240.14e–8).

Larmore and Cole Capital violated Section 14(e) and Rule 14e-8 by publishing a press release falsely claiming that Cole Capital was ready to make a tender offer for WeWork stock. As discussed above, Larmore's actions in October and November 2023 demonstrate that he and Cole Capital used the press release to manipulate the prices of WeWork stock so that Larmore could profit from his far-out-of-the-money call options. The evidence suggests Larmore never had the *bona fide* intention of purchasing a block of WeWork stock at nine times the then-current trading price. Even in the unlikely event that Larmore had a *subjective* belief that he could consummate a tender offer for a large block of WeWork stock such a belief would not be reasonable given the low trading price of the stock, his lack of legal and financial advisers and committed financing for such an acquisition, and the fact that Larmore already knew he was the subject of an SEC investigation, all of which would have made the prospect of acquiring the necessary financing even more grim. Therefore, Larmore, and Cole Capital, which Larmore controls, were at the very least negligent in their actions with respect to the purported tender offer.

### 3.    Defendants Are Likely to Continue Their Illegal Conduct

In assessing the likelihood of future violations, "[t]he existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). The Court must consider the totality of the circumstances including such factors as the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's

1   recognition of the wrongful nature of his conduct; and the likelihood, because of

2   defendant's professional occupation, that future violations might occur. *Id.*

3         Here, for years, Larmore and the ArciTerra-related Defendants have been

4   transferring funds between accounts, treating investor money as though it is their own,

5   and paying Larmore's personal expenses, and enriching him, without any expectation

6   of repayment. Larmore continues to violate his fiduciary duties to Fund II and Fund

7   III as he owes over $17 million to ASR Advisor, which in turn owes over $35 million

8   to investor-related entities. At the same time, Larmore is advocating liquidation of the

9   assets that belong to the Funds' investors, without regard to whether the sales are in

10   the investors' interests. Indeed, even as Defendants (and their agents) are actively

11   attempting to sell off properties, no one at ArciTerra is acting as a fiduciary to Fund II

12   and Fund III to ensure that the value of the sales are used to pay back investors rather

13   than divided between Larmore and his wife in the divorce proceedings.

14         Similarly, Larmore and Cole Capital are likely to continue to violate the

15   securities laws. As he and Cole Capital were manipulating WeWork's stock, Larmore

16   was aware that the SEC was investigating him and the ArciTerra entities. He was

17   nonetheless undeterred and schemed to pump up the price of WeWork stock with a

18   false and misleading press release, while purchasing a significant number of call

19   options to try to capitalize off that price increase. His brazen conduct shows that

20   Larmore does not recognize the wrongfulness of his conduct, a significant factor

21   suggesting the likelihood of future violations. *Murphy, supra*, 626 F.2d at 655.

22   Accordingly, temporary restraining orders against each of the Defendants are

23   warranted and necessary.

24         **B.**    **The Court Should Appoint a Receiver**

25         The Court has broad discretion to appoint an equity receiver in Commission

26   enforcement actions. *See SEC v. Wencke, et al.*, 622 F.2d 1363, 1365 (9th Cir. 1980)

27   ("*Wencke II*"). The breadth of this discretion "arises out of the fact that most

28

receiverships involve multiple parties and complex transactions." *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quoting *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)). A receiver plays a crucial role in preventing further dissipation and misappropriation of investors' assets. *SEC v. Wencke*, 783 F.2d 829, 836-37 n.9 (9th Cir. 1986) ("*Wencke III*"). As the Ninth Circuit described in *Wencke II*, a receiver can be the means to achieve the "ultimate goals of SEC intervention," which are "protection of innocent shareholders and enhancement of investor confidence in the securities markets." *Wencke II*, 622 F.2d at 1372.

Critical to the determination of federal courts in weighing the need for a receiver are facts putting at issue the integrity of management, and thus the likelihood of future misuse of assets. *See SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981) ("The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunction action was brought."); *SEC v. Fifth Ave. Coach Lines, Inc.*, 289 F. Supp. 3, 42 (S.D.N.Y. 1968), *aff'd* 435 F.2d 510 (2d Cir. 1970); *SEC v. Credit First Fund*, No. 05-cv-8741-DSF-PJWx, 2006 WL 4729240, at *15 (C.D. Cal. Feb. 13, 2006).

The Court should appoint a receiver over Defendants ArciTerra, Fund II Advisors, Fund III Advisors, ASR Advisor, and their known and unknown "Affiliates" (collectively, the "Receivership Entities").[6] A non-exhaustive list of Receivership Entities is attached as Exhibit 18 to the Marlow Declaration.

---

[6] "Affiliate" should be given the meaning ascribed to it in Rule 405 of the Securities Act of 1933, 17 C.F.R. §230.405 ("An affiliate of, or person affiliated with, a

A court-appointed receiver is needed here for several compelling reasons. First, the former and current managers of ArciTerra are absent or unsuitable. Larmore used his managerial authority to misappropriate over $17 million for his personal expenses and has since resigned. The co-managers, appointed through Larmore's divorce proceeding, are serving as the agents of Larmore and his wife, and they have each acknowledged that they are not acting as fiduciaries to the investor Funds. *See SEC v. First Financial Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981) ("The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public."). Second, the corporate structure of the ArciTerra entities is complicated and obtuse. It will take a professional and experienced financial receiver to untangle the labyrinth of entities and bank accounts to rectify the fraud caused by Defendants. Third, a court-appointed (and unbiased) receiver will have the credibility to help restore confidence with investors, as such a person will have the ability to preserve and marshal assets, investigate claims by and against the estate, and potentially distribute those assets to harmed investors and other creditors. *See Wencke II*, 622 F.2d at 1372 (receiver was necessary to "conduct [an] independent investigation of claims the entities might have," among other things).

Because posting of a bond by the receiver would only serve to deplete further the resources available to investors, the SEC requests that the Court not require the receiver to post a bond. *See SEC v. Universal Fin.*, 760 F.2d 1034, 1039 (9th Cir. 1985).

The SEC has vetted potential receiver candidates, and suggests to the Court the appointment of Keith Bierman of MCA Financial Group as the federal court receiver and W. Scott Jenkins, Jr. of Dorsey & Whitney LLP as receiver's counsel. Messrs.

---

specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.").

1   Bierman and Jenkins are currently serving as the state court receiver and receiver's
2   counsel over several ArciTerra entities in *TMI Trust Company v. ArciTerra Note Fund*
3   *II, LLC, et al.*, Case No. CV2023-008887 (Ariz. Super. Ct., Maricopa Cty. filed June
4   13, 2023). They are highly experienced in receiverships and already have working
5   knowledge of the ArciTerra entities. Their brief biographies are attached as Exhibits
6   19 and 20 to the Marlow Declaration. Messrs. Bierman and Jenkins are willing and
7   able to serve, respectively, as the federal receiver and receiver's counsel if appointed
8   by the Court.[7]

9           In support of the appointment of a receiver, a federal court may issue stays of
10  pending cases, including state court receiverships, and "such a stay can be made
11  effective against persons not parties to the SEC action who have notice of the stay."
12  *Wencke II*, 622 F.2d at 1371. In the proposed order appointing the receiver, the SEC
13  requests that the Court stay pending litigation against the Receivership Entities and
14  receivership assets, and enjoin further litigation against them. "It is axiomatic that a
15  district court has broad authority to issue blanket stays of litigation to preserve the
16  property placed in receivership pursuant to SEC actions." *SEC v. Stanford Int'l Bank*
17  *Ltd.*, 424 F. App'x 338, 340-41 (5th Cir. 2011) (citing *Schauss v. Metals Depository*
18  *Corp.*, 757 F.2d 649, 654 (5th Cir. 1985) and *Wencke II*, 622 F.2d at 1372).

19          An anti-litigation injunction that stays pending litigation and enjoins the filing
20  of any new bankruptcy, foreclosure, receivership, or other actions by or against the
21  Receivership Entities and receivership assets is required here to ensure the Court's
22  jurisdiction over assets and the Defendants is not hampered. In particular, it would
23  prevent potentially disparate actions in different courts that could affect the
24  receivership assets subject to this Court's jurisdiction and control. Here, there are

25

26  [7] TMI Trust Company is the Indenture Trustee for Note Fund II, LLC. Messrs.
27  Bierman and Jenkins have advised the SEC staff that TMI Trust Company will
    consent to the stay of its action and the appointment of Messrs. Bierman and Jenkins
28  in the SEC case. Marlow Decl. ¶ 42.

1   approximately thirty-four pending lawsuits involving Larmore and/or the ArciTerra

2   entities, Marlow Decl. Ex. 21 (Lawsuits list SEC-DeCarloD-E-3) and receivers have

3   been appointed in several state court actions (*see, e.g.*, *TMI Trust Co. v. ArciTerra*

4   *Note Fund II, LLC*, Case No. CV2023-008887 (Ariz. Super. Ct., Maricopa Cty. filed

5   June 13, 2023)) and in a federal court action (*First Guaranty Bank v. Larmore, et al*.,

6   Case No. 5:23cv683, (W.D. La. filed May 22, 2023)). Such an injunction is also

7   necessary in light of the likelihood of additional actions that may be filed as a result of

8   the many properties at issue in multiple states and the many investors in Fund II and

9   Fund III. An anti-litigation injunction will preserve the Court's jurisdiction over the

10  receivership assets and permit the receiver to marshal assets to prevent a race to the

11  courthouse by different investors that could result in inequitable distribution of the

12  assets, that would potentially remove assets from the receivership estate, and that

13  would also require the receiver to spend resources defending litigation.

14

15          **C.      The Court Should Order an Asset Freeze**

16          Where the Court has jurisdiction over the defendants, "the District Court has

17  authority to order [defendants] to 'freeze' property under [their] control, whether the

18  property be within or without the United States." *SEC v. Int'l Swiss Invests. Corp*.,

19  895 F.2d 1272, 1276 (9th Cir. 1990) (*citing United States v. First Nat'l City Bank,* 379

20  U.S. 378, 384 (1965) and *Republic of the Philippines v. Marcos,* 862 F.2d 1355,

21  1363–64 (9th Cir. 1988) (*en banc*)). Federal courts in Commission enforcement

22  actions have the authority to impose asset freezes as an exercise of their general

23  equitable powers. *See* 15 U.S.C. § 78u(d)(5). The purpose of such an asset freeze is to

24  ensure that "any funds that may become due can be collected," *SEC v. Unifund SAL*,

25  910 F.2d 1028, 1041 (2d Cir. 1990), and "to preserve the status quo by preventing the

26  dissipation and diversion of assets," *SEC v. Infinity Grp.*, 212 F.3d 180, 197 (3d Cir.

27  2000). The Commission's burden of proof in connection with a motion for an asset

28  freeze is substantially lower than its burden of proof in seeking a preliminary

1    injunction. *See Unifund SAL*, 910 F.2d at 1041. To obtain an asset freeze at this stage,

2    the Commission need only show either a likelihood of success on the merits, or that an

3    inference can be drawn that the party has violated the federal securities laws. *Smith v.*

4    *SEC*, 653 F.3d 121, 128 (2d Cir. 2011).

5            The Court should order an asset freeze against defendants Larmore, Fund II

6    Advisors, Fund III Advisors, ArciTerra, ASR Advisor, and Cole Capital. As

7    demonstrated above, Larmore and the entity Defendants have relied upon a system

8    which enables them to move millions of dollars from any of their entities quickly, but

9    they have made no effort to rectify the system or pay back the millions siphoned from

10   the investor-owned Funds. A freeze over their assets and accounts is necessary to

11   prevent any further harm by these defendants, and to preserve the remaining assets for

12   the benefit of investors and other creditors. In addition, an asset freeze is critical now

13   because Larmore and ArciTerra are actively attempting to sell properties without an

14   appropriate fiduciary in place to protect the interest of investors. Finally, an asset

15   freeze with respect to Larmore is necessary, given his recent manipulation of the

16   securities market, and to prevent him from taking unwarranted, and illegal, risks using

17   money he owes to investors.

18           The SEC may obtain equitable relief from relief defendants who are not

19   charged with wrongdoing where they have (1) received ill-gotten funds, and (2) do not

20   have a legitimate claim to those funds. S*EC v. World Capital Market, Inc.*, 864 F.3d

21   996, 1003-04 (9th Cir. 2017) (citing *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.

22   1998)). It is not necessary for the person holding the property to have themselves

23   violated the securities laws, and courts may "exercise their broad equitable powers to

24   order disgorgement from non-violating third parties who have received proceeds of

25   others' violations to which the third parties have no legitimate claim." *World Capital*

26   *Market,* 64 F.3d at 1003; *see also SEC v. Baccam*, 2017 WL 5952168, at \*6 (C.D.

27   Cal. June 14, 2017).

28

Accordingly, the SEC also seeks an asset freeze against the entity Relief Defendants. Based on the SEC's review of available ArciTerra records (which are incomplete), the currently-known amounts of their unjust enrichment are: CSL Investments (approximately $9.7 million); MML Investments (approximately $4.9 million); Spike Holdings (approximately $131,000); and JMMAL Investments (approximately $11.5 million). Each of these entities are owned, wholly or in part, by Larmore and his family members, Relief Defendants Michelle Larmore and Marcia Larmore. These entities all have received, and could continue to receive, transfers of cash from the ArciTerra entities. Despite the payments made to them, it appears that none of the relief defendants provided services to ASR Advisor entitling them to those payments, and they do not have a legitimate claim to these money transfers. Because these entities are so closely related to Larmore (and his family members), an asset freeze is necessary to prevent ArciTerra from improperly transferring funds to these accounts and to prevent the dissipation of assets of these entities.

Therefore, the Court should find that, based on the record in these proceedings, asset freezes are necessary and appropriate for the purposes of marshaling and preserving all assets of the Receivership Entities, and to preserve those assets of the Receivership Entities held in constructive trust for the Receivership Entities that were fraudulently or improperly transferred out of the Receivership Entities to CSL Investments, Spike Holdings, MML Investments, and JMMAL; and/or may otherwise be includable as assets of the estates of the Receivership Entities (collectively, the "Recoverable Assets").

**D.    The Court Should Order Other Ancillary Relief**

In support of the above requests, the SEC further asks the Court to order an accounting by the Defendants and Relief Defendants, expedited discovery and a prohibition on document destruction. The Court should require the entity Defendants and Relief Defendants to prepare an accounting, so the SEC can identify all funds they

received, and what available assets remain, to ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against them. *See Wencke II*, 622 F.2d at 1369; *Int'l Swiss*, 895 F.2d at 1276 (ordering an accounting); *SEC v. Billion Coupons, Inc.*, No. 1:09-cv-00068-JMS-KSC at Dkt. No. 12 (D. Haw. Feb. 18, 2009) (same).

## IV.    CONCLUSION

For the foregoing reasons, as well as those set forth in the accompanying declarations and exhibits thereto, the SEC respectfully requests that the Court grant its application for emergency relief as set forth in the proposed orders.

Dated:  November 28, 2023                    Respectfully submitted,


                                             */s/ John K. Han*
                                             John K. Han
                                             Heather E. Marlow
                                             Amanda L. Straub
                                             Attorneys for Plaintiff
                                             SECURITIES AND EXCHANGE
                                             COMMISSION