# EXHIBIT LIST INDEX

( In Order of Appearance )

Exhibit 1
Exhibit 2
Exhibit 3
Exhibit 4
Exhibit 5
Exhibit 6
Exhibit 23
Exhibit 24
Exhibit 27

# EXHIBIT 1

Page 1

1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:          )
4                             )  File No. SF-04532-A
5  ARCITERRA GROUP, INC.     )
6
7  WITNESS:  Kathleen Bouet
8  PAGES:   1 Through 235
9  PLACE:    Securities and Exchange Commission
10        San Francisco Regional Office
11        44 Montgomery Street, Suite 2800
12        San Francisco, CA 94104
13  DATE:    Thursday, September 28, 2023
14
15
16      The above entitled matter came on for hearing,
17  pursuant to notice, at 10:06 a.m.
18
19
20
21
22
23
24        Diversified Reporting Services, Inc.
25            (202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      HEATHER E. MARLOW, ESQ.
5      MICHAEL FOLEY, STAFF ACCOUNTANT
6      AMANDA STRAUB, STAFF, ESQ.
7      JOHN K. HAN, ESQ.
8      ERIC PEASE, STAFF PARALEGAL
9      Securities and Exchange Commission
10      San Francisco Regional Office
11      44 Montgomery Street, Suite 2800
12      San Francisco, CA 94104
13      (415) 705-2501
14      marlowh@sec.gov
15
16  On behalf of the Witness:
17      STEPHEN R. BOATWRIGHT, ESQ.
18      Gallagher & Kennedy,
19      2575 East Camelback Road
20      Phoenix, Arizona, 85016
21      (602) 530-8000
22
23
24
25

Page 3

1              C O N T E N T S
2

3  WITNESS                      EXAMINATION
4  Kathleen Bouet                   21
5
6  EXHIBITS:     DESCRIPTION          IDENTIFIED
7  1    Form 1662                     9
8  9    Excel spreadsheet file name          66
9  11   Subpoena                     11
10  12   Intercompany loan matrix, 6/30/2023,    150
11      Bates ArciTerra_0007155
12  15   2006 Operating and REIT, Inc. Excel      156
13      spreadsheet, Bates ArciTerra_0007133
14  16   ArciTerra REIT Advisors MRI excerpt,    159
15      Bates ArciTerra_0007182
16  17   MRI export balance sheet, Bates        163
17      ArciTerra_0007144
18  18   ASI Advisors balance sheet excerpt     165
19      December 2022, Bates ArciTerra_0007181
20  19   ASR Advisors balance sheet excerpt     167
21      December 2022, Bates ArciTerra_0007235
22  20   March 31, 2022 check, Bates           174
23      SEC-KSSB-OP-E-0002701
24  21   March 31, 2022 check, Bates           175
25      SEC-KSSB-OP-E-0026492

Page 4

1              C O N T E N T S (CONT.)
2

3  EXHIBITS      DESCRIPTION          IDENTIFIED
4  22  Daystar Property Services, LLC/ArciTerra    104
5      Company Services Agreement
6  23  09.22 CF PROPS, Bates SEC-BouetK-E-0000393 202
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 13

1 involved in any role in collecting documents
2 responsive to the requests that are asked for in
3 the subpoena?
4       THE WITNESS:  Yes.  I compiled these
5 documents and sent them to my counsel.
6       MS. MARLOW:  Okay.  Okay.  Is there
7 any where that you think that there's still
8 documents that you didn't look?
9       THE WITNESS:  I provided what I could
10 find.
11       MS. MARLOW:  Okay.  And when you
12 looked for documents where did you look?
13       THE WITNESS:  Primarily through e-
14 mail.  That's where most of this was going to be
15 found.
16       MS. MARLOW:  Okay.  And were those e-
17 mails that were, like, your personal e-mails or
18 what -- what e-mails were you looking at?
19       THE WITNESS:  E-mail to ArciTerra.
20       MS. MARLOW:  I'm sorry, I'm just
21 having a hard time hearing you.
22       THE WITNESS:  My ArciTerra e-mail.
23       MS. MARLOW:  Okay.  So, your -- so,
24 you looked at your -- you had a -- you had an e-
25 mail address at ArciTerra when you worked there

Page 14

1 and that's -- those are the e-mails that you
2 searched for documents that were responsive?
3       THE WITNESS:  That's correct.
4       MS. MARLOW:  Okay.  Did you look at
5 any personal e-mails?  Like, do you have a Gmail
6 account or something like that?
7       THE WITNESS:  I -- I did look in my
8 business e-mail as well and went through that as
9 well.
10       MS. MARLOW:  Okay.  When you say
11 business e-mail, what is that?
12       THE WITNESS:  It's my
13 @DaystarProperty.com e-mail which is the e-mail
14 I use for consulting.
15       MS. MARLOW:  Okay.  Did you look in
16 any of the personal e-mails?  Like, do you have
17 a personal e-mail account?
18       THE WITNESS:  I didn't look in my
19 personal e-mail.  I strictly use that for
20 personal reasons.  I've never sent anything
21 through that for business or work.
22       MS. MARLOW:  Okay.  Okay.  So, you've
23 never sent -- like, you never sent an e-mail
24 from, like, your ArciTerra work account to,
25 like, your personal e-mail to maybe, like, work

Page 15

1 on later, something like that?
2       THE WITNESS:  No.
3       MS. MARLOW:  No?
4       THE WITNESS:  I -- I always had a
5 laptop.  So, I can always work from home --
6       MS. MARLOW:  Okay.
7       THE WITNESS:  -- if I need to.
8       MS. MARLOW:  Perfect.  Thanks.
9       Okay.  Besides looking at your e-
10 mails, is there anywhere else you looked for
11 documents that would be responsive to the
12 subpoena?
13       THE WITNESS:  I think some of the
14 requests were for financials.  So, I did access
15 the ArciTerra accounting system MRI and pulled
16 those reports that were requested.  I looked in
17 SharePoint, which is their document storage
18 server, and pulled reports or documents out of
19 that as well for other requests.
20       MS. MARLOW:  Okay.  And is SharePoint,
21 is that -- is that like a Cloud-based program?
22       THE WITNESS:  Yes.  Yes.
23       MS. MARLOW:  Okay.  Besides just
24 looking at your e-mails and looking at MRI and
25 the SharePoint, was there anything else you

Page 16

1 looked at to find documents?
2       THE WITNESS:  I don't believe so.
3       MS. MARLOW:  Okay.
4       MR. FOLEY:  Ms. Bouet, I know you --
5 you had mentioned something called MRI.  Can you
6 just give us -- tell us what MRI is.
7       THE WITNESS:  It's, basically, an
8 accounting software for business -- it's more
9 for property management companies.  So, it
10 encompasses accounting as well as lease
11 administration for lease -- for commercial
12 leases.
13       MR. FOLEY:  Okay.  Is MRI the system
14 where ArciTerra records its financial
15 transactions?
16
17       THE WITNESS:  Yes.
18       MR. FOLEY:  Okay.  Is there any other
19 systems that records the financial transactions?
20       THE WITNESS:  For one of its interests
21 the financials are completed by a third party
22 and we import the information that they provide.
23 I don't know where -- what accounting system
24 they perform it in, but they provide us with the
25 financials and we import that -- that in.

1    Q    And did anyone report to you during
2 that time period?
3    A    No, not really.
4    Q    Okay. And when you say, Not really,
5 was there just, like, an admin that you're
6 thinking about?
7    A    There was an accounts payable clerk.
8 So, she would ask for my help from time to time,
9 but I wasn't in charge of reviewing her job
10 performance or anything of that nature.
11    Q    Okay. And in accounts payable was she
12 just paying, like, vendors or something for
13 property management or --
14    A    Processing all of the invoices and
15 cutting checks.
16    Q    Okay. Who was her direct supervisor
17 then?
18    A    Who was mine?
19    Q    No. Who -- who was -- who was the
20 person who was doing the accounts payables that
21 you just talked about?
22    A    It would be Kevin Gulbranson.
23    Q    Oh, as well, okay.
24        And let me ask you, so, was Kevin
25 Gulbranson your -- your supervisor during your

1 whole tenure there?
2    A    Yes.
3    Q    Okay. Even when you were assistant
4 controller in 2021?
5    A    Yes.
6    Q    Okay. And who was -- who was -- who
7 did Kevin report to?
8    A    Kevin reported to Jon I believe, but
9 he did deal with Blaine a lot as well. I don't
10 know who would have been more in charge. I
11 would imagine Jon, but that's just speculation.
12    Q    Okay. And who is Shawn?
13    A    Jon. Jon Larmore, I'm sorry.
14    Q    Oh, Jon I'm sorry. It's hard on the
15 Webex because I can't, like, see you as well
16 because, like, normally -- so, it's -- like, I
17 apologize for, like, not catching everything you
18 say.
19        Okay. So, Kevin reported to Jon
20 Larmore?
21    A    Yes.
22    Q    Okay.
23        BY MR. FOLEY:
24    Q    During that period of time that you
25 just described through -- from your start date

1 through '21 who was principally responsible for
2 recording bank transactions into the MRI system?
3    A    That would have been one of my jobs as
4 well. Sometimes we did have another accountant
5 from time on time. So, that could have been
6 their job as well. We traded off sometimes.
7    Q    Okay. And then --
8    A    I was not a full-time employee for
9 that entire duration either from 2013 to 2021.
10    Q    Okay. And then, in addition to that
11 as part of your -- what you described as your
12 preparation of the financials, did that include
13 performing reconciliations of the -- of the
14 different bank accounts at each entity?
15    A    Yes. Yes.
16    Q    And did you -- was -- was that
17 done on a regular basis? And -- and I guess I'm
18 just trying to understand your level of
19 confidence that all bank activity is recorded in
20 MRI and all -- and vice versa, that actually
21 bank transactions recorded in MRI also occurred
22 at the -- at the bank.
23    A    I'm fairly confident that everything
24 is recorded. I'm completely confident that
25 everything was recorded if I completed the bank

1 reconciliation myself. Some of the bank
2 reconciliations may have been completed by
3 another accountant. Kevin did review all bank
4 reconciliations as well. We printed out those
5 for him to review, but if something was missing,
6 we probably would have found it and it would
7 have been reported. It's unlikely that there's
8 anything missing though.
9    Q    Okay. Thank you.
10        BY MS. MARLOW:
11    Q    And so, when -- when you started Kevin
12 Gulbranson was already there working at
13 ArciTerra?
14    A    Yes. He hired me.
15    Q    And was there anyone else in the -- in
16 the accounting group? Was it just you and Kevin
17 and then the individual who you said did the
18 accounts payable? Was there anybody else?
19    A    That was all that was there when I did
20 start to begin with.
21    Q    Okay. And then, when you left how
22 large was the group?
23    A    They added another accountant at some
24 point. I don't recall exactly when.
25    Q    Okay. But do you -- who was that

Page 53

1  through each one just really quickly.  So -- and
2  then we'll kind of just, like -- like, see the
3  vertical structure going up for each one of
4  those groupings.  Does that sound okay?
5      A   Sure.
6      Q   Okay.  So, why don't we start -- we'll
7  just start with the single property.
8      So, how did -- if there's a single
9  property -- and if you could give me -- and I
10 can ask, like, there's a -- is it Belleville --
11 like, there's a Belleville property, would that
12 be a single property?
13     A   So, originally when that was created
14 as a REIT it was two properties.  So, it's
15 Belleville In Line and Belleville Outlaw and
16 they went up to ArciTerra Strategic Retail
17 Income Corp. which is what the investors
18 contributed to and owned the two properties.
19 And then, the Belleville Outlaw was sold out of
20 that REIT and Jon purchased it.  And it now is
21 owned by Spike Holdings, LLC which is owned by
22 Jon personally.
23     Q   And what was the LLC, I'm sorry?
24     A   The LLC that now owns Belleville
25 Outlaw?

Page 54

1      Q   Yes.
2      A   It's now called -- it's Spike
3  Holdings.
4      Q   Spine Holdings?  I'm sorry.
5      MS. STRAUB:  Spike.
6  A   Spike.
7      Q   Spike, sorry.  S-P-I-K-E?
8      A   Correct.  Yes.
9      Q   I couldn't hear you, okay.
10     BY MS. STRAUB:
11     Q   And Spike Holdings is wholly owned
12 by -- by Jon you said?
13     A   Yes.
14     MS. MARLOW:  Okay.
15     BY MR. FOLEY:
16     Q   And, sorry, when did that transaction
17 occur with Belleville?
18     A   2018 I believe, but I could be wrong.
19 That's off the top of my head.
20     BY MS. MARLOW:
21     Q   Okay.  So, maybe Belleville wasn't the
22 best example because that had two, but -- so, if
23 there is a single property then there would
24 be -- there would be a company -- what would be
25 the entity that's on top of the single property?

Page 55

1      A   Yes.  For example, Plaza, and it's
2  the -- Plaza is the shopping center, a/k/a
3  Plaza.  It's owned by ASR Plaza.  And that is
4  the parent entity that owns that single shopping
5  center and that is an investor-owned entity.
6      Q   And that's an LLC?
7      A   Yes.
8      Q   Okay.  So, you have the single
9  property which is a shopping mall.  Then on top
10 of it you have this LLC.  And that's the entity
11 that's owned by the investors?
12     A   Yes.
13     Q   And then, what's on top of that --
14 that entity?
15     A   There would be nothing.  So, it's
16 just -- all of the funds would be -- would flow
17 to the investors personally on their tax
18 returns.  So, they'd get K-1s.
19     Q   Okay.
20     BY MS. STRAUB:
21     Q   But just so I understand, is there --
22 is -- does the REIT -- do one of the 10 REITs
23 have ownership of the ASR Plaza, LLC or is that
24 a separate structure all together?
25     A   The ASR Plaza is technically a REIT

Page 56

1  because it's investor owned.
2      Q   Got it, okay.
3      A   But it's just -- it's just one
4  property that they own.  There are other parties
5  that own multiple properties.
6      Q   Okay.
7      BY MS. MARLOW:
8      Q   Okay.  So, it goes in the single
9  property up to the LLC.  And then, what is above
10 the LLC?  I know you said that's investor-owned
11 and the investors -- there's K-1s that flow out
12 from that LLC, but what sits on top of that LLC?
13     A   Nothing that I'm aware of.
14     Q   Nothing?
15     A   Correct.
16     Q   Okay.  There's no management company
17 or anything for the -- for the single property
18 LLC -- single property LLCs?
19     A   I guess the somebody would be
20 ArciTerra as far as I'm aware.
21     Q   It would be ArciTerra.  And then,
22 which -- is it ArciTerra Company, ArciTerra
23 Group, do you know?
24     A   It depends when it was created.  I
25 mean, all of these REITs were done way back

Page 57

1 in -- you know, before 2012 for the most part.
2 And we didn't do any REITs much after that. So,
3 all of these predated. So, it would have been
4 under ArciTerra Group.
5       It's possible he also made the
6 management -- the manager on the -- the
7 investment docks as ASR Advisors. I am not
8 sure. I don't look at the org structure or the
9 investment docks. So, it's just, if I happen to
10 see one. I honestly didn't deal with them very
11 often.
12    Q    Okay. So, what is -- who -- you
13 said -- you mentioned ASR Advisors. Who are
14 they?
15    A    So, ASR Advisors is an entity that
16 owns a lot of the shopping centers directly.
17 And ASR Advisors is owned by Jon and Marsha
18 Larmore through their -- through their LLCs,
19 basically, but they do a lot of the loans as
20 well. The loans run through that entity. So,
21 you'll see that due from/due to ASR Advisors on
22 of the REITs and property financials.
23    Q    Okay. I'm going to go back to the
24 loans in one second. I want to keep going
25 through it because we're only on the single

Page 58

1 property vertical slice. So, I'm trying to --
2 and let me ask you, so, with -- before I get to
3 that, the ArciTerra Group and ArciTerra Company,
4 is that kind of a -- can you interchange that
5 name or are they two separate entities or do the
6 names change as well?
7    A    Yeah. They're technically two
8 separate entities, but ultimately, it was the
9 management company. So, it's just a change in
10 entity, but ultimately it was -- it is
11 ArciTerra.
12    Q    Okay. When you say it is, I know -- I
13 hate to be so specific and, like, drill down on
14 this, but we've had a really hard time figuring
15 this out. So, really, like, we were hoping that
16 you would be the person that would help us work
17 through it all.
18    A    Sure.
19    Q    So, that's why we're kind of pushing
20 you a little bit on it.
21       So, ArciTerra Company, ArciTerra Group
22 are both managers. Did they ever -- did they
23 coexist at the same point in time or are they,
24 like, one ended and one began?
25    A    So, ArciTerra Group was ArciTerra

Page 59

1 originally. And it was owned by Jon Larmore and
2 his mother, Marsha Larmore. And, at some point
3 they ended it during the time that I was gone
4 and converted it and created -- well, not
5 converted I should say, but instead they ended
6 that and created ArciTerra Companies which flows
7 up solely to him. So, he, basically, cut out
8 his mother.
9    Q    Okay. So, ArciTerra Group was the mom
10 and Jon Larmore. And then, ArciTerra Company
11 was just Jon?
12    A    Correct.
13    Q    Okay. And some time in 2015 to 2018
14 when you left and went to do some other jobs
15 before you came back, that's the time that they
16 changed the ownership and changed the company
17 name?
18    A    Yes.
19    Q    Okay. And ArciTerra Group and
20 ArciTerra Company have always been, like, the
21 main manager that -- so they sit on the top of
22 everything, all of the ArciTerra entities below
23 it?
24    A    They manage all of the entities, yes.
25 They don't own them, but they manage them.

Page 60

1    Q    Okay. Okay, thank you. That -- that
2 is very helpful.
3       So, ASR Advisors would be underneath
4 ArciTerra Companies?
5    A    In a different section. So, ASR
6 Advisors is owned half and half by him and his
7 mother. And then, it owns many shopping
8 centers. And because it owns so many shopping
9 centers, that's where I -- for some reason, they
10 decided to have it be the -- the main holder of
11 the due to and due from loans.
12    Q    Okay. And are there any investor
13 assets in the ASR Advisors?
14    A    No.
15    Q    Okay. And these shopping -- so, the
16 shopping centers that are owned by ASR Advisors,
17 there's no investor money in those shopping
18 centers?
19    A    Correct.
20    Q    Okay. Okay. So then, if we go to the
21 next batch that we were looking at, the
22 properties where you said there was, like, 10
23 plus properties. Can you tell me what is the
24 vertical slice for that. So, I'm at the bottom
25 right now with the shopping center, the 10 plus

Page 69

1    Q    Okay.  So then -- so, the two
2  structures that we just went through like the
3  single property groupings and then the larger
4  property groupings, those are the two that
5  would -- those are the two slices where the
6  investors assets would be held?
7    A    Correct.
8    Q    Okay.  And when you said it could
9  go -- one question.  When you said it could go
10 up to ASR Advisors in talking about the larger
11 grouping, the 10 plus properties, you said it
12 could either go up to ArciTerra Management
13 Company or you said -- oh, it could also maybe
14 go to ASR Advisors.  So, did ASR Advisors ever
15 act as a manager for these REITs and funds?
16   A    Did they act as a manager?  Well,
17 ArciTerra would have been the management
18 company.  So, what -- when they raise the
19 offering information I don't -- I can't say
20 because I haven't looked at that.
21   Q    Okay.  So then, how would ASR Advisor
22 be -- when you said it could be -- it could go
23 to them too, like, how would they be involved in
24 this vertical slice then?
25   A    If -- if they called ASR Advisors the

Page 70

1  management company I'm not sure.
2    Q    Okay.
3    A    I've seen that on some -- on some of
4  the entities that he owns.  So, I'm not sure
5  it's on others or -- or not.
6    Q    Okay.  So, there are times where ASR
7  Advisors could be named as the manager for one
8  of these vertical slices, either in the REITs or
9  their funds?
10   A    Probably, but I'd rather get the
11 organizational documents to you guys or -- or
12 the org chart so that I can say for -- you know,
13 for sure.
14   Q    Okay.  And who would make the
15 determination of who is going to be, like, the
16 management company for a -- one of these REITs?
17   A    That -- that would be Jon Larmore.
18   Q    And do you know if his mom still owns
19 half of ASR Advisor?
20   A    Yes, she should.
21   Q    Okay.  And let me ask you, so for
22 the -- the properties that Jonathan and his mom
23 own together, how does that -- how does that
24 vertical slice work?
25   A    So, there's going to be certain

Page 71

1  shopping center properties that have their own
2  LLC.  Some of them will flow up to one of their
3  entities.  Either, for example -- I wish I had
4  it in front of me.
5       So, for example, Jon's entities that
6  he owns some shopping centers on is called CSL
7  Investments and that flows up to him.  And his
8  mother's entity is MML Investments and that
9  flows up to her.  And they -- the CSL and MML
10 will own 50 percent of the property entity.
11   Q    And then, is there any entity that
12 sits above CSL Investments or MML Investments?
13   A    I don't have that information.
14   Q    Okay.  Would -- would that be in those
15 charts as well, the organizational charts or no?
16   A    Possible.  If they have one made up.
17   Q    Okay.  And then, what about the ones
18 that he owns personally, Jon Larmore, how does
19 that -- how does that vertical slice go?
20   A    For the most part he owns them either
21 under Spike Holdings, he can own them under CSL
22 Investments or him, his name, personally.
23   Q    Okay.  And do you know if there's any
24 companies, like, above any of those Spike
25 Holdings, CSL Investments or his own name?

Page 72

1    A    Those are the main ones I'm familiar
2  with.
3    Q    Okay.  So, they don't -- do they flow
4  up into any other company -- I mean, any other
5  entity?  Like, up into, like, ASR Advisors or
6  ArciTerra Company, do you know if they flow up
7  in any of those entities?
8    A    They flow up to him on his tax returns
9  as far as I know.  That's how I provide them to
10 the tax company.
11   Q    Okay.  And they flow -- they flow up
12 to -- to who?  I'm sorry, I missed that.
13   A    To Jon personally.
14   Q    Okay.
15   A    CSL, Spike, those flow up to Jon --
16 flow up to Jon.
17   Q    Okay.
18       BY MS. STRAUB:
19   Q    Then, just to clarify, CSL, that's C
20 as in cat, S-L?
21   A    Yes.
22       BY MS. MARLOW:
23   Q    Okay.  And then, the last bucket you
24 said Jon and other individuals.  So, how -- how
25 does that -- how does that structure work?

Page 117

1    A    For the most part -- for the most part
2  all of the day-to-day stuff is going to be
3  handled by Trigild, the new management company.
4  So, what she's handling is most likely the
5  Fishvile property, the Hawaii property, which
6  is not part of the Trigild managed properties.
7  And then, if she's handling any ArciTerra stuff,
8  yeah, she probably is handling the office
9  expense type stuff.
10   Q    Would she have the capacity to move
11 money between accounts for different entities?
12   A    I -- I can't say.  I don't know what
13 she has access to.
14   Q    And then, the next one on the -- it
15 says:  Complete all charts, rec, allocations
16 against properties for both insurance and AmEx
17 costs in 2022 and YTD 2023.  Do you see that?
18   A    Yes.
19   Q    Can you just tell me what that means
20 real quick?
21   A    So, the insurance for all of the --
22 all of the properties is in one, big --
23 basically, one big policy.  And then, what we
24 have to do is allocate that big -- one big
25 policy to all the different properties.

Page 118

1        So, ultimately, this big policy is
2  paid by -- paid out of ArciTerra Company's bank
3  account and we have to bill back all of the
4  properties for their share.
5        And then, same thing with the AmEx.
6  The AmEx bill is paid out of ArciTerra Company's
7  bank account.  And some of those charges may be
8  for those properties or they may be for Jon's
9  personal expenses.  And we have to charge back
10 those transactions to the properties or Jon
11 personally.
12       BY MR. FOLEY:
13   Q    How does that process work?
14   A    The AmEx?  For the most part when they
15 --
16   Q    Sorry.  Sorry.  Just more
17 specifically, Larmore's personal usage, how --
18 how does, you know -- how does that process
19 work?
20   A    So, he his own personal cards.  His
21 kids had their own personal card.  His wife had
22 her card.  So, for the most part if it was a
23 transaction hitting any one of those cards I
24 knew it was his personal expense.  So, it would
25 get recorded on his personal entity and it would

Page 119

1  be -- you know, we recorded it as a due to/due
2  from.
3    Q    And so, how -- just generally
4  speaking, was there -- was the -- was the -- the
5  payment was always done by ArciTerra Company; is
6  that right?
7    A    Yes.  ArciTerra Company's would get an
8  AmEx and then it would bill back the respective
9  entities.
10   Q    Okay.  So, there -- there would be a
11 entry recorded where ArciTerra Companies would
12 make the payment, but then have a receivable on
13 the books of ArciTerra Companies from Jon
14 Larmore individually?
15   A    Yes.
16   Q    Okay.  And -- and -- sorry.
17       Did -- to the extent his -- his
18 wife -- sorry.
19       You -- did you say that -- that his
20 wife had an AmEx card as well for personal use?
21   A    Yes.
22   Q    Okay.  And then, his children, to the
23 extent their personal cards were used, did they
24 all go under Jon Larmore's name for -- at
25 ArciTerra Companies as a pseudonym for him, or

Page 120

1  did they have a separate caption item I guess
2  as -- as a due from account on ArciTerra
3  Companies.
4    A    We would record all of his family
5  expenses as a due to/from Jon Larmore.  So --
6    Q    Okay.  Got it.  Thank you.
7    A    -- we didn't differentiate.
8        BY MS. MARLOW:
9    Q    And have you completed all the charge
10 back allocations against properties for both
11 insurance and AmEx costs for 2022?  Are you done
12 with that?
13   A    Yes, I have.
14   Q    Okay.  And then -- okay.
15       The next bullet is:  Complete any,
16 slash, all interest calculations and accruals.
17 Could you explain what that is?
18   A    So, because of these insurance and
19 AmEx charges, you know, flowing -- you know,
20 being charged back, we'd have to run them
21 through the due to/due from.  And then also, any
22 cash transactions that are due to/due from,
23 those all have to be record.  And then we put
24 them all in a spreadsheet and do -- you know,
25 accrue interest on these loans.  So, that all

Page 121

1 has to be tracked.
2   Q   Okay.  Okay.  So, the due to/due from,
3 they're accruing interest?  So, there -- someone
4 is paying interest on those loans?
5   A   Yes.  So, if we loan money to one of
6 the REIT properties or the REIT property is
7 loaning money to one of Jon's entities, that's
8 all tracked and it accrues interest.
9   Q   Okay.  And the -- so, the interest
10 calculations, are they -- where would we find
11 that?  Is that something that we could get a
12 schedule of historically?
13   A   Yes.  I believe I provided that to
14 Greenberg Traurig.  If I didn't --
15       THE WITNESS:  Did I not provide it to
16 you?
17       MR. BOATWRIGHT:  No, I think --
18   A   So, Greenberg Traurig or --
19       MR. BOATWRIGHT:  It is Greenberg
20 Traurig.
21   A   Greenberg should have had it, but I
22 can report it again if you need it.  It -- it
23 would have been needing to be revised anyway for
24 2022 since we have these last adjustments.
25   Q   So, now you're complete in doing that

Page 122

1 for 2022?
2   A   Yes.
3   Q   And have you been doing that for 2023
4 up-to-date or where does that stand?
5   A   That would be part of the 2023
6 reconciliation.
7   Q   Okay.  So, you don't kind of do it as
8 you go along, like, you wouldn't -- you're not
9 completed up through, like, August or something?
10   A   No, not yet.
11   Q   Okay.  Do you have any of 2023 done?
12   A   Some of them are done, yes.  The ones
13 that I needed to get done for the REITs, those
14 ones were completed.
15   Q   Okay.  And are you -- are you also
16 charged with tracking the repayment of this --
17 the repayment of the money back to the REITs or
18 --
19   A   From the investors you mean?
20   Q   -- repaying the loans?
21   A   Do you mean the due to/due from loans?
22   Q   Yeah.  The due to/due from loans.  Go
23 ahead, sorry.
24   A   Yeah.  It's all part of the same
25 spreadsheet.  It's the repayments of the

Page 123

1 advances.
2   Q   Are -- are these due to -- due to/due
3 from, are these being repaid?  Is that, like, a
4 common practice that you've seen since you've
5 been there?
6   A   I have not seen that they make an
7 attempt to repay them, no.
8   Q   And when you say they, again, is --
9 are you talking about Mr. Larmore?
10   A   Correct.
11   Q   Anybody else or just Larmore?
12   A   That's who I would include.
13   Q   Okay.  The next one down is:  Provide
14 guidance for ArciTerra cost, expenditures and
15 forecasts.  Could you just tell us what that is?
16   A   That was something -- these bullet --
17 bullet points were all something that Dan had
18 included me in an e-mail that he wanted me to
19 help on.  I don't believe I really helped much
20 on that.  But, for instance, they did recently
21 ask me for a cash flow on one of the properties
22 to see if it could cover mortgage.  And that
23 would be something, I guess, would be under that
24 bullet point.
25   Q   What property was it, do you remember?

Page 124

1   A   It was the Fort Wayne portfolio.  So,
2 not -- not a REIT.  A first lien -- first lien
3 owned one.
4   Q   Okay.  And what about the next bullet:
5 Gather and provide documentation as requested by
6 the SEC?
7   A   So, that was to provide all the
8 information that you requested from Greenberg
9 Traurig in the sense that I could provide it if
10 I had access to it.
11   Q   Okay.  Did you -- it seems like you --
12 you entered into this agreement July 16th, 2023.
13 Did you enter into this agreement because of the
14 SEC asking for documents or was this something
15 that you were doing prior to us even ever asking
16 for documents, these services?
17   A   That was something -- this is because
18 they reached out and needed me to start
19 providing information.  So, it was mostly
20 because of this issue.
21   Q   But before this issue were you
22 providing any of the services in the other
23 bullets, like, reconciling, completing the books
24 for ArciTerra prior to?
25   A   I was --

Page 125

1    Q   Prior to --
2    A   I was not assisting them for several
3 months doing that.  So, February is about the
4 last time I was doing anything to do with the
5 financials.
6    Q   And did you have any sort of agreement
7 with them then, like, a written agreement, or
8 was this the first time you had a written
9 agreement with them to provide services?
10   A   This is the first time I had done a
11 written agreement.
12       BY MR. FOLEY:
13   Q   Yeah.  Sorry, just wanted to follow-up
14 real quickly on something a little bit off what
15 we've been discussing.
16       With respect to MRI, do you know who
17 has access to MRI presently?
18   A   I am not an admin on the account
19 anymore.  So, I can't pull the user list.  So, I
20 can't say exactly who has access.
21   Q   Okay.  And then, that was going to be
22 my next question.  Do you know who the -- who
23 has administrator rights?
24   A   I believe the -- the controller that
25 they hired back in December, he became the

Page 126

1 administrator -- the administrator when he
2 was -- when he was hired -- after he was hired.
3 And, I don't know who else is an administrator
4 besides him, but he's no longer working there,
5 so.
6        BY MS. MARLOW:
7    Q   And who was that?  Was that Robert
8 Crook?
9    A   Yes.
10       BY MR. FOLEY:
11   Q   Okay.  So, I mean, I -- I -- I get
12 that it's kind of a small pool of employees, but
13 to your understanding, you don't know if there
14 are actually any employees that have
15 administrator rights at this point?
16   A   I -- not that I know of.
17   Q   Okay.
18   A   I mean, it's possible, but I -- I just
19 don't know.
20   Q   Okay.  And, sorry, it sounds like you
21 did at one point have admin rights.  So, you
22 could look at the user list, is that -- did I
23 get that correctly?
24   A   Yes.  I did up until Robert became the
25 admin and then he took me off.

Page 127

1    Q   Okay.  What -- did Jon Larmore have
2 access to MRI.
3    A   Yes, but I don't believe he used it
4 very often.
5    Q   Understood.  But he did have the
6 ability to access it?
7    A   Yes.  Yes.
8    Q   Yes.  Okay.
9        MS. MARLOW:  I think we can take a
10 break now.
11       MS. STRAUB:  Let's go off the record
12 then.
13       MS. MARLOW:  Yeah.  I'm just trying to
14 get --
15       MR. BOATWRIGHT:  Okay.  How long of a
16 break do you guys want?
17       MS. MARLOW:  Why don't we do -- is 30
18 minutes.  Is that okay?
19       Okay.  So, why don't we go -- we'll go
20 off the record at 12:40.  (Lunch recess taken at
21 12:40 p.m. Pacific Time.) A F T E R N O O N
22 S E S S I O N
23       MS. MARLOW:  Okay.  We're going to go
24 back on the record in the testimony of Kathleen
25 Bouet 1:19 p.m.

Page 128

1        BY MS. MARLOW:
2    Q   And, Ms. Bouet, during the break, did
3 you have any substantive conversations with
4 Commission staff about this case?
5    A   No, I did not.
6    Q   Okay.  I wanted to go on and just
7 follow-up on one thing that you said before.  We
8 were talking about the -- the loans to, the due
9 from -- to and from loans that we talked about
10 that you were recording in the financials and
11 you made a comment about how there hasn't been
12 an attempt by Mr. Larmore to pay those back; is
13 that correct?
14   A   Correct.
15   Q   Okay.  Was there something that you --
16 was there anyone there who was following up with
17 Mr. Larmore to have those loans paid back?
18   A   Not to my knowledge.
19   Q   Okay.  And then, why do you have the
20 understanding or -- or the sense that there was
21 not enough attempts by him to pay them back?
22   A   Well, when the properties would be
23 refinanced and the equity pulled out of certain
24 properties, those funds were always spent in
25 other areas and not towards repayment of

1 existing loans.
2    Q    You were saying that the funds were
3 spent in other areas?
4    A    Correct.
5    Q    Okay.  Oh, in other areas and they
6 were not used to pay back the loans?
7    A    Correct.
8    Q    Okay.  Sorry.
9        MS. STRAUB:  What were they spent on?
10    Q    Yeah.  Do you know what they were
11 spent on?
12    A    It various.  Like, sometimes they were
13 paid towards property taxes for some properties
14 that were delinquent on property taxes.  It
15 could be anything really.  Paying back vendors.
16    Q    Was any -- do you know if any money
17 was taken out by Mr. Larmore to be used for
18 personal expenses?
19    A    I'm sure some of it was used towards
20 personal expenses, yes.
21    Q    Okay.  And when do you say -- why do
22 you say that?
23    A    Because most of the funds that came
24 from -- that came to -- paid for his personal
25 expenses came from the properties.

1    Q    And when you say the properties,
2 are -- are any of those properties in those
3 funds or REITs that we talked about earlier?
4    A    Yes, it could be.  A lot of the
5 property he owned personally.  So, that was not
6 a problem obviously, but some of the funds may
7 have come from REIT-owned properties.
8    Q    Do you know if any of them did?  Like,
9 did you see that happen while you were there?
10    A    Coming from the -- the REIT properties
11 go towards paying Larmore expenses.
12    Q    Yes, personal expenses.
13    A    Yes.  All -- all of it, if booked
14 correctly, none of the expenses are booked on
15 the property level obviously, but they were
16 advanced to pay for Jon's expenses through
17 intercompany loans.
18    Q    Okay.  And would we be able to -- and
19 I know you've provided documents to us and I
20 haven't gone too deep in the weeds on all of the
21 financial statements.  I leave that to Mike, but
22 would be able to trace out, like, money that
23 came -- was taken from one entity and then trace
24 it out through going to Larmore personally to
25 one of his bank accounts?

1    A    Yes.
2    Q    Okay.
3    A    Yes.
4    Q    Can we do that with the information
5 you've given us so far or do you think we would
6 need more information from you to do that?
7    A    Well, you'd probably need to give me
8 specific dates to look at or specific refinances
9 just because, you know, funds move daily all
10 over the place, so.
11        BY MR. FOLEY:
12    Q    So, let me -- let me ask slightly
13 differently then.  So -- so, to trace a specific
14 transaction we'd have to give you a specific
15 date and -- and see if you could trace it
16 through from, for example, a -- a property at
17 the REIT -- owned by the REIT up through.
18 That -- that's something that we'd -- okay.
19        But generally, and sort of more of a
20 general sense, to the extent that funds have
21 originated down at entities owned by the -- by
22 the REITs, but then passed up, those are sort
23 of -- that -- that's sort of collectively
24 gathered in the -- in the due to and due from
25 accounts in the general ledger?

1    A    Yes, exactly.
2    Q    Okay.
3    A    Yes, exactly.
4        BY MS. MARLOW:
5    Q    Was there any --
6        MS. MARLOW:  Oh, sorry.  Go ahead,
7 Stephen.
8        MR. BOATWRIGHT:  When you -- when you
9 use the term personal expenses, is that personal
10 expenses that he's using for company purposes,
11 like, fuel for corporate jets that he's using
12 for company purposes?  Is that what you mean by
13 personal expenses or --
14        THE WITNESS:  Personal expenses I took
15 as to mean for his personal home or his --
16        MR. BOATWRIGHT:  Okay.
17        THE WITNESS:  His personal -- yeah.
18        MR. BOATWRIGHT:  Okay.  Okay.
19        MS. MARLOW:  Yeah.  No.  Thanks for
20 that clarification.
21        BY MS. MARLOW:
22    Q    And when you just said something about
23 intercompany loans, have you ever heard of
24 something, like, an intercompany loan like a
25 hard copy like a book that they would keep track

1    Q    But now currently, like, if there was
2  intercompany transfers, like, who would -- who
3  would be the person who's initiating those
4  transfers?
5    A    At this point I'm not sure who has the
6  access to do the bank transfers.  I would have
7  to -- I would have to ask.  I don't know, but I
8  would see it on the bank statements.
9    Q    So, again, you'd have to do the same
10  thing, you'd have to parse it through the bank
11  statements currently, like, today to see it?
12   A    Yes.  Exactly.
13   Q    Okay.
14       BY MS. STRAUB:
15   Q    Would they put any memo or notation
16  about the purpose of a loan, you know,
17  accompanying the -- the bank transaction?
18   A    No.  If you look at the bank
19  statements most of them are just going to say,
20  due from/due to, that's all.  Or -- or
21  investment in, investment -- or distribution,
22  that sort of a thing.
23       BY MS. MARLOW:
24   Q    Do you know if there's a hard copy
25  book?  Have you ever seen this hard copy book

1  that holds the intercompany loans?
2    A    I saw it back in 2013, 2014 when I
3  worked there.  They had it in the office.
4    Q    Do you know if it still exists?
5    A    I don't know.  A lot of the older
6  stuff was moved into storage.
7    Q    Do you know if that storage is still
8  there?
9    A    It was back at the end of the year.
10  Most of the storage was held at Iron Mountain.
11  And then, the office when it was closed up,
12  everything was moved to Jon's hanger, his
13  airport hanger, as far as I know.  Whether or
14  not they still have the Iron Mountain storage
15  location, I'm not sure.
16   Q    Okay.  And he has a hanger for --
17  like, it's his own personal hanger that he owns?
18   A    He rents it.
19   Q    Okay.  And does he have a plane?
20   A    He did.  I don't know if he still
21  does.
22   Q    Okay.  Like it was a personal -- like,
23  a personal jet I guess?
24   A    Yes.
25   Q    Okay.  And why -- you don't know if he

1  does anymore.  You just don't know because you
2  haven't talked to him or --
3    A    Yeah.  I'm not in contact.  So, I
4  don't pay the bills.  So, I don't see the -- I
5  don't see the mortgage payment or the -- the
6  loan payment or whatever.
7    Q    Did you ever pay any of the loan
8  payments or anything for the -- for, like, his
9  jet or his, like, rental payment on the hanger?
10   A    Yes.  All of his personal payables
11  came and were paid by our AP.
12   Q    Okay.
13       BY MR. FOLEY:
14   Q    Do you know if Mr. Larmore ever --
15  excuse me -- received any reports or periodic
16  schedules of -- of how much money he owed?
17   A    I would provide him reports as he
18  requested them.  As to what he received from
19  other people I can't say.
20   Q    Well, let me just ask maybe a little
21  bit more generally.  Was there any sort of,
22  like, regular month end or quarterly or annual
23  financial reporting process that would -- sorry,
24  we spoke over each other.
25   A    Oh, sorry.

1        No, there was not an established month
2  end reporting distribution list that we would
3  send to him.
4    Q    Okay.  When is the last time you
5  recall that Mr. Larmore received information
6  that you would understand reflected how much
7  money he owed?
8    A    From me personally, I know I sent him
9  a big spreadsheet back in probably October or
10  November and it was a year-to-date cash flow up
11  through September of 2022.  And, it was detailed
12  out how his money was getting spent for that
13  year-to-date period.
14   Q    Okay.  Was this a like a one-off
15  schedule that you created or something that was
16  sort of standard?  I'm just trying to see if we
17  can figure out how we can get -- how we can
18  identify it if we wanted to see it.
19   A    It was a one-off, yes.
20   Q    Okay.  Do you know if that was
21  something that was produced to us?
22   A    Yes, it was.
23   Q    Okay.  If we're to --
24   A    It's included in an e-mail I forwarded
25  to you.

Page 141

1    Q   Okay.
2        BY MS. MARLOW:
3    Q   You forwarded it to us or you
4 forwarded it to Greenberg?  Sorry.
5    A   I forwarded it to my counsel and he
6 should have forwarded it to you.
7    Q   Okay.  Okay.  Just because there's,
8 like, information comes from two -- like,
9 from -- from you guys and then from Greenberg.
10 So, it -- it goes into our main system in D.C.
11 So, we have to, like, go in this other thing and
12 find all the data.  So, that's why we're asking.
13       BY MR. FOLEY:
14   Q   And -- and then, I'm going to ask one
15 more pressing question because we have a lot of
16 documents and an electronic repository.  Is
17 there anything, if there's a search term or
18 something that you'd recall that would help us,
19 like, literally just go right to it?
20   A   I would search for 09.23-Cash Flow All
21 Props.  I probably called the spreadsheet
22 something like that.
23   Q   Okay.  Thank you.
24       BY MS. MARLOW:
25   Q   And I wanted -- so -- and when we were

Page 142

1 talking about how you paid the personal expenses
2 for Jon Larmore, do you ever recall any money
3 being taken out -- taken out of any of the
4 investor entities and using those personal
5 expenses to pay for, like, the -- the jet, the
6 plane or the hanger?
7    A   Well, like I said, we would pay his
8 personal expenses out of his personal entities
9 that we record on MRI.  But if we needed
10 funds to pay for these because cash was coming
11 out of the bank and his accounts weren't funded,
12 we would have to do loans from other properties.
13       BY MR. FOLEY:
14   Q   And -- and was there a hierarchy or --
15 of properties that you would -- that you could
16 go through -- I mean, sorry.  Let me rephrase
17 the question.
18       What was the process through which
19 you'd identified that there were funds available
20 in -- in one of the properties?
21   A   Well, we would just see which one
22 actually had the funds in the account.  That was
23 the biggest issue obviously.  Some of -- we
24 would try and first fund from properties he
25 owned personally that was always the main target

Page 143

1 because those were also the ones that typically
2 actually had some funds.
3    Q   Okay.  And -- and, sorry, I'm going --
4 I'm going to try to be a little bit more
5 specific.  And, I apologize, because we've been
6 sort of saying we and -- and you.  And so, let
7 me -- let me try to be a little bit more
8 specific.
9        Was -- was it your general
10 understanding that Mr. Larmore had personal
11 bills that needed to be paid on -- on his
12 behalf?
13       Just as a general understanding of --
14 of how this -- I guess, what I'm trying to get
15 to is, how did you get instructions as to how
16 this process was meant to work -- meant to work?
17 I mean, were -- were you getting -- were you
18 being given specific instructions as bills arose
19 that -- that they needed to be paid and you were
20 specifically told to go do something or -- or
21 was it the byproduct of sort of a general
22 understanding of -- of the way the organization
23 worked and -- and, you know, took it from there
24 or -- or something all together different.  Just
25 trying to understand just, you know, from a

Page 144

1 process and procedures standpoint, you know, how
2 the information originated, how the instructions
3 were given and how the -- the tasks were
4 completed, if you will.
5    A   Okay.  Sure.
6        So, as bills came into Jon personally,
7 he would forward those to AP and sometimes some
8 other accountant, sometimes me, sometimes Kevin,
9 but usually primarily to the AP person.  And his
10 e-mail would typically say, Pay this; or, Pay
11 this now; or, Pay this today.  And that's how we
12 would come to get his bills that he received
13 personally.
14       A lot of his personal bills also came
15 into the office and were processed, you know,
16 with the normal AP process of paying them.  But
17 it was my understanding from when I started, and
18 Kevin introduced me and trained me into how this
19 all worked is, we always processed his bills.
20 And we always had to pay his plane bills first.
21       Sometimes we would not process them as
22 quickly as he would have liked and we would get
23 an e-mail with instructions to pay it
24 immediately.  Sometimes the pilot would come
25 into the office and wait until we cut the check.

Page 145

1 And we would receive a call from Mr. Larmore to
2 cut it immediately.
3       So, that's kind of how his personal
4 expenses went, but like I said, we would always
5 pay it out of his personal entities or whatever
6 entity owned the plane.  But, yes, the -- the
7 priority was always his personal expenses and
8 that was kind of engrained in our training.
9    Q    Okay.  And then, I guess, where I'm
10 going from there, to the extent that there's not
11 funds available at that entity level to -- to
12 facilitate paying those outstanding invoices,
13 what was the process from there to go find
14 available cash in -- in an account to -- to make
15 those payments?
16    A    So, we'd have to review all of the
17 bank accounts and see which properties had a
18 surplus and then make the -- the loan or the
19 distribution, depending on which -- how the
20 ownership was, and -- and pull the funds from
21 those accounts to pay and cover his personal
22 expenses.
23    Q    Okay.  And -- and again, sorry to put
24 you on the spot, but when you say we, you're
25 referring to -- to whom?

Page 146

1    A    Whoever was doing the transfers.  So,
2 Kevin would do the transfers most days.  I know
3 Chris did a lot of the transfers when he was
4 working there.  I did some of the transfers as
5 well, but that was -- that was the established
6 procedure was to move money via due to/due from.
7    Q    Okay.  And so, let me just ask
8 generally.  I mean, were all the bank accounts
9 within the ArciTerra structure just viewed as
10 widely available to -- to facilitate paying --
11 paying Mr. Larmore's bills?
12    A    To the extent that the -- we could
13 access the funds, yes.
14    Q    Okay.
15       BY MS. MARLOW:
16    Q    So, there was no bank accounts off
17 limits to be able to draw from to cover the
18 personal expenses?
19    A    There were -- there are some REITs
20 that have cash management accounts.  So, their
21 funds are not readily available.
22       BY MR. FOLEY:
23    Q    But those are -- those are -- but
24 that's by virtue of the -- the bank putting --
25    A    Yes.

Page 147

1    Q    -- restrictions on it?
2    A    Yes.
3    Q    Okay.  But to the extent that they're
4 not restricted by banking agreements, that
5 whatever cash is available could be used for --
6 for purposes of paying Mr. Larmore's expenses?
7    A    Correct.
8    Q    Okay.  And then again, sorry to keep
9 going back to -- but then, those -- to the
10 extent that -- that available cash was
11 identified, it would then be moved up through a
12 hierarchy of -- of -- of entities and reflected
13 as dues -- due to/due from, is that -- is that a
14 fair statement?
15    A    Yes, that's correct.
16    Q    Okay.
17    A    Yes.
18       MS. MARLOW:  Oh, sorry.
19       BY MS. MARLOW:
20    Q    And the cash management accounts, are
21 those like the lockboxes where the tenant pays
22 their rent specifically to an account where only
23 the lender can get the money out?
24    A    Correct.  Yes.
25    Q    And what would you say is the

Page 148

1 percentage of REITs that had those?
2    A    I would say the percentage was 25
3 percent.
4    Q    Okay.  Is that something that comes up
5 during the life of the loan or is that something
6 that is usually a condition when you get the
7 loan?
8    A    This one in particular was because the
9 debt service coverage ratio was not met for a
10 couple of quarters.  And so, it came into
11 noncompliance and they enacted the cash
12 management account as a hard lockbox.
13    Q    Okay.
14       BY MS. STRAUB:
15    Q    Which one -- you said this particular
16 one.  Which one are you thinking of?
17    A    That would be the REIT I Number loan.
18       BY MS. MARLOW:
19    Q    Okay.  So, what do you -- like, what
20 do you think just, like, generally, how much do
21 you think Jon Larmore owes back in due froms
22 from any of his entities and him personally or
23 his wife?  Like, how much money do you think is
24 owed back from him or his family or his entities
25 back to ArciTerra?

1        What we're seeing in cell A 104, does
2 that mean due to National REIT Advisor?
3     A    That's correct.
4     Q    Okay.  And the amount is
5 $10,489,291.00 and change.  And -- and again --
6     A    Correct.
7     Q    -- sorry for being repetitive, but ASR
8 Advisor owes that amount back to National REIT
9 Advisor?
10     A    Correct.
11     Q    Okay.  And there's a whole -- there
12 are a number of these -- if -- you starting at
13 row 89 and go down to -- I'm just going to go --
14 end at row 113.  But, generally speaking, did
15 those -- the positive amounts reflect amounts
16 owed back to the entities in the -- in the
17 captions in column A, is that a fair
18 understanding?
19     A    All of those listed are going to be
20 due to those entities.
21     Q    Okay.  And just in summary, is that --
22 when we had looked at Exhibit -- which exhibit
23 was it?  Exhibit 12 which was the spreadsheet
24 that -- that -- that had been manually created,
25 just -- it's -- is it more or less just

1 aggregating across the different entities
2 these -- you know, these amounts that are due to
3 in some cases, from one entity to another, and
4 then on the other side we see the due from?  Is
5 that -- is that more or less what Exhibit 12
6 is -- is capturing?
7     A    Was 12 the matrix?
8     Q    Yes, it was.  I can bring it back up
9 if you want me to, but, yes, 12 was the --
10     A    Yeah.  The -- the matrix is
11 essentially just pulling these numbers.
12     Q    Okay.  Okay.  And so, I'm going to go
13 further up the page.  If we started on line --
14 line 23, it says:  Due FR JML.  And then there's
15 an amount there next to it, $6,241,733.00 and
16 change.  What -- what does that caption
17 represent?
18     A    That represents loans to Jon
19 personally to pay his personal expenses or
20 whatever expenses he has.
21     Q    Okay.  And so, that's the aggregation
22 of -- of sort of the -- the outlays that were
23 made for his personal usage that we were -- I
24 think we were discussing at some length before
25 and after the -- the lunch break?

1     A    Correct.
2     Q    Okay.  And then, below that there's a
3 caption, Due FR JMMAL with an amount of
4 $11,542,468.00 and change.  What -- what does
5 that caption mean?
6     A    That is amounts due from JMMAL
7 Investments.
8     Q    Okay.  And what is JMMAL Investments?
9     A    It owns several properties I believe
10 and ultimately is owned by Jon I believe.
11     Q    Okay.  So, there's -- to the best of
12 your knowledge, that's a wholly owned entity
13 of Mr. Larmore's?
14     A    Correct.
15     Q    Okay.
16     A    Correct.
17     Q    Okay.  And so --
18     A    Oh, I'm sorry.  No, I'm -- I'm
19 mistaken.  No, that's wrong.
20        It flows up to -- hold on.  Wawasee
21 Family Investments, that's what it flows up to.
22     Q    And, sorry, that was Wawasee?
23     A    Yes, Wawasee Family Investments.
24     Q    All right.  And because we're probably
25 going to have to spell that at some point, do

1 you know the proper spelling of Wawasee?
2     A    Sure.  It's W-A-W-A-S-S or S-E-E.
3     Q    Okay.  And -- and who owns that
4 entity?
5     A    I -- I would have to check my notes.
6 I -- I barely deal with that at all.  It has
7 minimal activity.  It -- it has something to do
8 with his family.  I -- I -- I can't recall
9 exactly.
10     Q    Okay.  Well, let me -- let me try to
11 retrace our steps here.
12        So, the amount that's -- that's in the
13 caption, Due FR JMMAL, for $11 million, is --
14 did -- did some portion of that flow directly or
15 indirectly to Jon Larmore?
16     A    I would hazard a guess, but if -- if
17 you look at JMMAL Investments, there's probably
18 close to an equal loan to JML.  So, yes, I would
19 guess that most of that went to Jon.
20     Q    Okay.  And then again, just -- I mean,
21 I don't want to go through each of these one by
22 one, but the -- the rows that are 23, that is
23 the due from JML, down to row 40, Due FR ASR
24 Centreville, those -- those -- those reflect
25 cash outlays that were made to those -- those

Page 205

1  for vendor payments or utility invoices or
2  mortgage payments.  It wouldn't have included
3  the loan payments or the intercompany loan
4  companies.
5      Q    Okay.  So, if we wanted to figure out,
6  like, how much he owed in intercompany loan
7  payments, where would we find that?
8      A    The balance sheet.
9      Q    Okay.  And then, when's the last time
10  that you, like, ran a balance sheet?  I guess
11  what's the most --
12      A    And provided it to Jon?
13      Q    Or just -- yes, provided it to Jon or
14  ran it for yourself or ran it at the direction
15  of somebody else.
16      A    I've run the balance sheet numerous
17  times to tie out the financials for year end
18  just in the last few days.
19      Q    Okay.
20      A    But in order to give it to Jon, I
21  can't recall.
22      Q    Okay.  In the last few days with the
23  balance sheet, who -- who did you run it for?
24  For yourself or was it for somebody else?
25      A    For myself, yes.  For myself.

Page 206

1      Q    Do you recall on the balance sheet
2  what the outstanding loans were for Mr. Larmore
3  back to the ArciTerra entities?
4      A    I can't recall the exact figure.
5      Q    Okay.  Do you have -- I'm sorry, go
6  ahead.  One more time.
7      A    I said, I can get that information to
8  you though if you request it.
9      Q    Okay.  Do you have just a -- a range
10  that you can remember, like, 5 million, 50
11  million?
12      A    It -- it -- I can't -- I can't say off
13  the top of my head.  You have the ASR Advisors
14  balance sheet there that you pulled up recently
15  as an exhibit.  So, it would be somewhere in
16  that range.
17      Q    Okay.  But there could be stuff
18  outside of what's on the ASR Advisors balance
19  sheet, correct, that he could owe back to the
20  ArciTerra Companies?
21      A    All of it is within that entity.  So,
22  all of the loans to Jon are solely on the ASR
23  Advisors balance sheet.
24      Q    Okay.  So, there's nothing to, like,
25  the JMMAL or account?

Page 207

1      A    That's a JMMAL account, correct, but
2  that is also tracked on ASR Advisors.
3          MR. FOLEY:  So, just let me --
4          MS. MARLOW:  Yes, thank you.
5      BY MR. FOLEY:
6      Q    ASR Advisor makes a loan to JML or
7  JMMAL.  So, those show their respective
8  treatments of that same cash transference.  Is
9  that -- so, on ASR Advisor it's a due from JML
10  and on JML it's due to ASR Advisor?
11      A    Yes.  Yes.  So, I guess if you want
12  the whole picture I should provide you with
13  Jon's personal entity financials and that
14  balance sheet would tell you.
15      Q    Yes.  So, just -- I believe -- and we
16  may come back to you if my recollection isn't
17  correct, but I believe we have for the entity
18  JML and JMMAL.  Are there any other sort of
19  personal entities if you -- you know, sort of
20  along the same lines that -- that we should be
21  looking for that sort of speak to him in his
22  personal capacity?
23      A    For him personally, those are the
24  ones.  CSL is also another one.
25      Q    Okay.

Page 208

1      A    That one entity.
2          BY MS. MARLOW:
3      Q    What was the last one?
4      A    CSL Investments.
5      Q    Oh, yes.  And then you said something
6  else.
7      A    Yeah.  That one flowed up to him
8  personally as well.  It owns his personal homes.
9  So, all of his -- I believe his Indiana home is
10  on there.  So, all the expenses associated with
11  that house are housed on the CSL Investments.
12  And the CSL Investments also have investment
13  interest in other properties as well.
14          Hold, please.
15      BY MR. FOLEY:
16      Q    Okay.  And then -- oh.
17          MS. MARLOW:  No, I'm just waiting for
18  her counsel.  Okay.  He's back.
19      BY MS. STRAUB:
20      Q    How about Spike Holdings, is that also
21  his personal?
22      A    Yeah.  That flows up to him personally
23  as well, Spike.
24      Q    Okay.
25          BY MS. MARLOW:

1                     C E R T I F I C A T E

2

3              I, SHAUNNA H. MORAN, a Certified Shorthand

4  Reporter and Registered Professional Reporter in the

5  States of New Jersey, New York, and The District of

6  Columbia, and Notary Public of the State of New Jersey,

7  do hereby certify that the foregoing is a true and

8  accurate transcript of the testimony as taken

9  stenographically by and before me at the time, place,

10  and on the date hereinbefore set forth.

11              I DO FURTHER CERTIFY that I am neither a

12  relative nor employee nor attorney nor counsel of any of

13  the parties to this action, and that I am neither a

14  relative nor employee of such attorney or counsel, and

15  that I am not financially interested in the action.

16

17

18              SHAUNNA H. MORAN, C.S.R.
                Certified Shorthand Reporter
19              License No. X100213700

20

21

22

23

24

25

# EXHIBIT 2

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:        )

4                          ) File No. SF-04532-A

5 ARCITERRA GROUP, INC. S    )

6

7 WITNESS:  Dan DeCarlo

8 PAGES:  1 Through 209

9 PLACE:    Securities and Exchange Commission

10        San Francisco Regional Office

11        44 Montgomery Street, Suite 2800

12        San Francisco, CA 94104

13 DATE:   Friday, September 15, 2023

14

15

16      The above entitled matter came on for hearing,

17 pursuant to notice, at 10:35 a.m.

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25          (202) 467-9200

Page 3

1           C O N T E N T S

2

3 WITNESS                    EXAMINATION

4 Dan DeCarlo                    15

5

6 EXHIBITS:    DESCRIPTION            IDENTIFIED

7  1    Form 1662                7

8  3    June 30, 2023 letter/subpoena       12

9  5    ArciTerra Group, LLC and D2 Consulting     90

10  9    Excel spreadsheet file name        170

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4    HEATHER E. MARLOW, STAFF COUNSEL

5    JOHN K. HAN, STAFF TRIAL COUNSEL

6    MICHAEL FOLEY, STAFF ACCOUNTANT

7    ERIC PEASE, STAFF PARALEGAL

8    Securities and Exchange Commission

9    San Francisco Regional Office

10    44 Montgomery Street, Suite 2800

11    San Francisco, CA 94104

12

13 On behalf of the Witness:

14    SHAWN J. ORGAN, ESQ.

15    LINDSEY WOODS, ESQ.

16    Organ Law, LLP

17    1330 Dublin Road

18    Columbus, OH 43215

19    (614) 481-0900

20

21

22

23

24

25

Page 4

1           P R O C E E D I N G S

2        MS. MARLOW:  This is the testimony of

3 Dan DeCarlo.  We're going on the record at 10:35

4 a.m. Pacific on September 15th, 2023.

5        Mr. DeCarlo, before I ask you to take

6 an oath to tell the truth I want to ask whether

7 you consent to taking a sworn oath to tell the

8 truth remotely via Webex rather than in person?

9        MR. DECARLO:  Yes.

10        MS. MARLOW:  And, Mr. DeCarlo, please

11 raise your hand.

12        Do you -- oh.

13        Do you swear to tell the truth, the

14 whole truth and nothing but the truth.

15        MR. DECARLO:  I do.

16 Whereupon,

17        DAN DECARLO

18 was called as a witness and, having been first

19 duly sworn, was examined and testified as

20 follows:

21        MS. MARLOW:  Okay.  And can you please

22 state and spell your full name for the record

23 including your middle name.

24        THE WITNESS:  Sure.  Daniel, D-A-N-I-

25 E-L.  Louis, L-O-U-I-S.  DeCarlo, D-E, capital

Page 17

1 degree if you obtained one.
2     A   Sure.  I went to the Ohio State
3 University with a degree in electrical
4 engineering.
5     Q   And when did you graduate?
6     A   1988.
7     Q   Did you do any graduate work?
8     A   I did not.
9     Q   Do you hold or have you ever -- ever
10 held any professional licenses?
11     A   I don't believe so.
12     Q   Do you think there's something that
13 might qualify as a professional license?
14     A   I had my own real estate company for
15 three years.  So, I don't know if I had, you
16 know, a -- oh, a general contractor license
17 maybe.
18         THE WITNESS:  Bless you.
19     Q   And when was that?
20     A   Those were the years from 2000 to
21 2003.
22     Q   Beyond maybe having a contractor's
23 license, do you have -- you have no other
24 professional licenses?
25     A   No.

Page 18

1     Q   Have you ever been registered with the
2 SEC in any capacity?
3     A   No.
4     Q   Any sort of state registration as an
5 investment advisor?
6     A   No.
7     Q   Have you ever acted as an investment
8 advisor?
9     A   No.
10     Q   Okay.  Ever held yourself out to be an
11 investment advisor?
12     A   No.
13     Q   Have you ever acted as a fiduciary?
14     A   No.
15     Q   I guess, have you ever managed a
16 portfolio of assets before?
17     A   Small assets in my business as a --
18 yeah.  When I had my own construction and real
19 estate company, yes.
20     Q   And that was back in 2000 to 2003?
21     A   Correct.
22     Q   And when you say small assets, what --
23 what were the assets?
24     A   Construction equipment, we had a
25 parcel of 100 acres in Dayton, Ohio.  We had

Page 19

1 a -- two commercial buildings, approximately
2 40,000 square feet each, that we were renovating
3 and trying to lease and/or sell.  I've owned a
4 nine-unit apartment building.  I've owned
5 condominiums just for personal use.  I think
6 that's the extent of it.
7     Q   Okay.  And -- and this -- your
8 construction company, did it have a name, your
9 real estate company?
10     A   Yeah.  D2 Properties and D2
11 Construction, LLC.
12     Q   Were there any investors in D2
13 Properties or D-2 Construction, LLC?
14     A   No.  There was a partnership, but no
15 investors.
16     Q   Okay.  And who was your -- okay, the
17 partnership.  How many partners did you have?
18     A   Just one.
19     Q   And who was that?
20     A   You asked me to quick here.  Jayee,
21 which is J-A-Y-E-E-E, last name Blair, B-L-A-I-
22 R.
23     Q   And it's -- this partnership dissolved
24 in 2003?
25     A   Correct.

Page 20

1     Q   Okay.  And why did it dissolve?
2     A   Because we were losing money.
3     Q   And then I want to talk to you -- so,
4 you -- you graduated in '88.  What was your --
5 I'm going to try and get a employment history
6 from you.
7     A   Sure.
8     Q   So, what was your, I guess, first job
9 getting out of college?
10     A   It was a sales engineer.
11     Q   And where was that?
12     A   The company was called Analogic, A-N-
13 A-L-O-G-I-C, Analogic Corporation.
14     Q   And what -- what years were you there?
15     A   '88 to -- '88 to '91.
16     Q   And then, why did you leave there?
17     A   Better opportunity.
18     Q   And then where did you go?
19     A   I went to a company called TTC which
20 was -- oh, God.  I can't remember what exactly
21 it stands for, telecommunications something
22 company.
23     Q   Okay.
24     A   Yeah.
25     Q   And then, what did you do there?  I'm

1  accountant, who -- who's accountant is she?
2     A   Well, she's contracted.  She works --
3  she's under a contract hourly basis for
4  ArciTerra.
5     Q   And what does she do for them?
6     A   Basic accounting, paying bills,
7  collecting rent, keeping the books.
8     Q   Okay.  And where is she located?
9         MR. FOLEY:  Hang on.  How is that
10 different from what Trigild is doing?
11    Q   That's what I wanted to ask you.
12    First, let me -- okay.  No, that's
13 fine.  Answer that.
14    A   I could -- yes, hang on.
15    So, in -- Carol works in Punta Gorda
16 in the offices at Fishermen's Village.
17 Fishermen's Village has maybe five or seven
18 offices in the -- on the property.  She
19 primarily -- she was hired as the accountant to
20 operate Fishermen's Village and Mauna Lani
21 because those are the two properties that
22 Trigild did not go across.  And Jon had -- when
23 Jon got rid of all of the ArciTerra employees,
24 he got rid of the accountants, he got rid, you
25 know, everybody.  So, there was nobody left to

1  do anything.
2         So, we had to rehire or go out and
3  interview and hire somebody to do the books for
4  Fishermen's Village and Mauna Lani.  So, we
5  interviewed several entities.  We ended up
6  contracting Carol.  She's still on a contract
7  basis.  She has one other person working for her
8  in the office.  I don't know -- I can't remember
9  her last name, but her first name is Angela.
10 And she primarily was just doing the accounting
11 for Fishermen's Village and Mauna Lani.  She
12 does do -- because Trigild -- Trigild doesn't
13 manage things very well.  At times she'll pick
14 up pieces for -- for the ArciTerra portfolio.
15    Q   Okay.  And is she full-time?
16    A   She's working 40 hours a week, yes.
17    Q   Okay.
18    A   But -- but she's not -- I mean, she's
19 not an employee.
20    Q   Yes.
21    A   And her -- her contract is hourly.
22 She bills hourly.
23    Q   Okay.  And when did she start working
24 for ArciTerra outside of Mauna Lani and
25 Fishermen's Village?

1     A   Oh, I don't know, 60 days ago.
2     Q   What was -- okay.
3         And then, what was the impetus for
4  hiring her on and working on the ArciTerra
5  portion of things?
6     A   It was just -- that was just the --
7  I'll say, a natural evolution because things
8  just weren't -- the books weren't being done
9  very well for -- and bills weren't getting paid.
10 Trigild wasn't getting back to vendors who were
11 calling to get paid, you know.  So, Carol was
12 just picking up the slack to help them pay
13 vendors, pay insurance and taxes.
14        Because again, Trigild, even though
15 they were hired to go across everything except
16 those two properties, it -- in reality they were
17 only effectively managing probably 20 or 24 of
18 the 80 properties because they just felt like
19 they didn't get a transition across all of them.
20 They only -- they -- they -- Trigild has hired
21 probably six to eight people over the course of
22 the last six months just to manage this
23 portfolio.  And every time they hire someone,
24 they've got to come up to speed and things are
25 falling by the wayside.  Things are moving so

1  fast.  So, we pick up the pieces where we can.
2     Q   Okay.  Okay.  So, you said it changed
3  a lot because a lot of the properties are in
4  receivership.  How many properties are in
5  receivership?
6         And, why don't you just tell me how
7  many properties are in receivership and how many
8  properties are not in receivership.
9     A   I'm going to give you a guess.  I
10 don't know, 14 I would say maybe are in
11 receivership.  Maybe 16 are in receivership
12 leaving, you know, 60 that are not in
13 receivership.
14    Q   60, 6-0?
15    A   Yeah.  Now, it's complicated because
16 sometimes the receivers get appointed -- instead
17 of on a certain property, they get -- they
18 get -- a receiver gets appointed on an entity
19 like an ArciTerra -- a higher level ArciTerra
20 entity that has three or four properties or
21 seven properties fall under.  So, it gets -- the
22 lawsuits get really confusing.  And, you know,
23 we're dealing with three to five new filings
24 every day.  And we have been for four months,
25 five months, you know.  So, we've got 15 to 18

1                    C E R T I F I C A T E

2

3            I, SHAUNNA H. MORAN, a Certified Shorthand

4    Reporter and Registered Professional Reporter in the

5    States of New Jersey, New York, and The District of

6    Columbia, and Notary Public of the State of New Jersey,

7    do hereby certify that the foregoing is a true and

8    accurate transcript of the testimony as taken

9    stenographically by and before me at the time, place,

10   and on the date hereinbefore set forth.

11           I DO FURTHER CERTIFY that I am neither a

12   relative nor employee nor attorney nor counsel of any of

13   the parties to this action, and that I am neither a

14   relative nor employee of such attorney or counsel, and

15   that I am not financially interested in the action.

16

17

18                    SHAUNNA H. MORAN, C.S.R.
                      Certified Shorthand Reporter
19                    License No. X100213700

20

21

22

23

24

25

# EXHIBIT 3

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:        )

4                          ) File No. SF-04532-A

5 ARCITERRA GROUP, INC.    )

6

7 WITNESS:  Michelle Larmore

8 PAGES:    1 Through 164

9 PLACE:    Securities and Exchange Commission

10        San Francisco Regional Office

11        44 Montgomery Street, Suite 2800

12        San Francisco, CA 94104

13 DATE:     Wednesday, November 1, 2023

14

15

16     The above entitled matter came on for hearing,

17 pursuant to notice, at 10:00 a.m.

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25            (202) 467-9200

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     AMANDA STRAUB, ESQ.

5     HEATHER E. MARLOW, ESQ.

6     ERIC PEASE, PARALEGAL

7     MICHAEL FOLEY, ACCOUNTANT

8     Securities and Exchange Commission

9     San Francisco Regional Office

10     44 Montgomery Street, Suite 2800

11     San Francisco, CA 94104

12

13 On behalf of the Witness:

14     LEE STEIN, ESQ.

15     ANNE CHAPMAN, ESQ.

16     Mitchell, Stein, Carey, Chapman, P.C.

17     2600 N Central Avenue, Suite 1000

18     Phoenix, AZ 85004

19

20

21

22

23

24

25

Page 3

C O N T E N T S

1

2

3 WITNESS                    EXAMINATION

4 Michelle Larmore                14

5

6 EXHIBITS:    DESCRIPTION            IDENTIFIED

7  1     Commission Supplemental Information Form   12

8  24    Cover Letter              12

9  25    Emergency Application for Appointment of   41

10       a Receiver

11  26    Rule 69 Agreement              80

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

P R O C E E D I N G S

2     MS. STRAUB:  We are going on the record

3 at 10 -- approximately 10:00 a.m. on November 1,

4 2023.  Ms. Larmore, before I ask you to take an

5 oath to tell the truth, I want to ask whether you

6 consent to taking a sworn oath to tell the truth

7 remotely via Webex rather than in person.

8     Do you consent to do so?

9     MS. LARMORE:  I do.

10     MS. STRAUB:  Okay.  Please raise your

11 right hand.

12 Whereupon,

13          MICHELLE LARMORE

14 was called as a witness and, having been first

15 duly sworn, was examined and testified as follows:

16     MS. STRAUB:  Okay.  Please state and

17 spell your full name for the record.

18     THE WITNESS:  Michelle Anne Larmore, M-

19 I-C-H-E-L-L-E, A-N-N-E, L-A-R-M-O-R-E.

20     MS. STRAUB:  Okay.  My name is Amanda

21 Straub, and also appearing with me are Heather

22 Marlow, John Han, and Michael Foley.  We are all

23 officers of the commission for purposes of this

24 proceeding.  This is an investigation by the

25 United States Securities & Exchange Commission in

1 But no, I have not received it.
2      MS. MARLOW: So this original -- the
3 50,000 that was terminated, was that on a credit
4 card?
5      THE WITNESS: Correct.
6      MS. MARLOW: So how would it work?  It
7 would just be -- it would be a prepaid credit
8 card?
9      THE WITNESS: Yes, you just have a limit
10 on a credit card.
11      MS. MARLOW: Okay.  And then it just got
12 paid off at the end of the month?
13      THE WITNESS: Yes.
14      MS. MARLOW: And then who was -- who was
15 making the payment at the end of the month?
16      THE WITNESS: I'm assuming Jon.
17      MS. MARLOW: Okay.  Who did you send --
18 where did the bill go to?
19      THE WITNESS: I don't know.
20      MS. MARLOW: Oh, I -- sorry to ask so
21 many questions.
22      Was it a joint card between the two of
23 you that you held?
24      THE WITNESS: Correct.
25      MS. MARLOW: Okay.  So you had a joint

1 card with him and it had a $50,000 limit for you
2 to spend on?
3      THE WITNESS: Correct.
4      MS. MARLOW: Okay.  Was he using the
5 same card?
6      THE WITNESS: I would assume it's a
7 different number, but.
8      MS. MARLOW: Okay.  But it was under the
9 same, like, account?
10      THE WITNESS: Yes.
11      MS. MARLOW: Okay.
12      MR. HAN: This is John.
13      Is that account in your name, or is the
14 account under an ArciTerra entity's name?
15      THE WITNESS: I think it was under an
16 ArciTerra entity name, but it was under Jon's
17 credit.
18      MR. HAN: Did you get the invoice mailed
19 to you personally?
20      THE WITNESS: No.
21      MR. HAN: Did you ever see an invoice?
22      THE WITNESS: I don't know if I ever
23 received an invoice.
24      MR. HAN: So if I understand correctly,
25 correct me if I'm wrong -- the card is --

1      (Cross-talk.)
2      MS. MARLOW: If you know, you know, if
3 you don't know.
4      THE WITNESS: No.
5      MR. HAN: Go ahead and finish answering.
6 I think we were talking over each other so please
7 finish your thought or repeat your last couple
8 sentences.
9      THE WITNESS: No, I did not receive a
10 copy of a bill.
11      MR. HAN: All right.
12      MS. MARLOW: Did you log on to see the
13 copy of the bill?
14      THE WITNESS: I could log onto American
15 Express on your app and see how much you've spent
16 on purchases?
17      MR. HAN: Let me repeat that just to
18 make sure I understand it.  The credit card you're
19 talking about is an American Express.
20      Correct?
21      THE WITNESS: Yes.
22      MR. HAN: And that card is actually
23 issued to an ArciTerra company, is that correct?
24      THE WITNESS: I don't know if it was an
25 ArciTerra company or Jon personally.

1      MR. HAN: Okay.  But you never got the
2 invoice directly, correct?
3   A   Correct.
4      MR. HAN: Were your children issued
5 credit cards also?
6   A   Yes.
7      MR. HAN: And same question, were those
8 issued to them directly or to an ArciTerra
9 company?
10   A   I believe directly.
11      MR. HAN: So directly to them, the kids?
12   A   I think so.
13      MR. HAN: Have you ever seen an invoice
14 or a bill going to your residence with the charges
15 for the American Express charges to your children?
16   A   No.
17      MR. HAN: What makes you think that they
18 were issued to your children directly as opposed
19 to your situation where the card was issued to
20 either ArciTerra Company or to Jon directly?
21   A   They were sent a credit card.
22      MR. HAN: Okay.  Is it fair to say you
23 don't know for sure one way or another who it's
24 issued to?
25   A   I guess so.

Page 125

1  some sort, or was it less structured than that?
2      A   Less structured.
3          MS. MARLOW:  So was the $50,000 for the
4  Amex limit, was that only -- that only came about
5  when you did the Rule 69 Agreement?
6          THE WITNESS:  Correct.
7          MS. MARLOW:  And that was after you
8  filed the -- in February or March of 2023, filed
9  for separation?
10          THE WITNESS:  Yeah.  I believe I filed
11  in February, and he wasn't served until March.
12          MS. MARLOW:  Prior to that, if you
13  used -- like, say you used an Amex card, would you
14  use the same Amex card, or did you get a different
15  Amex card once you did the Rule 69 Agreement.
16          THE WITNESS:  Prior to that, I wasn't
17  using the Amex card at all.
18          MS. MARLOW:  Okay.  Did you actually
19  have possession of it before that, though?
20          THE WITNESS:  Yes.
21          MS. MARLOW:  Like, you just didn't use
22  it, or is it just a brand-new card to you?
23          THE WITNESS:  No.  I had possession of
24  it.  I didn't use it.
25          MS. MARLOW:  Okay.  How long have you

Page 126

1  had the card for?
2          THE WITNESS:  I don't know how long I've
3  had that specific card for.
4          MS. MARLOW:  Okay.  But, I guess, maybe
5  not that specific actual physical card, but, like,
6  had an account that you had access -- I'm sorry?
7          THE WITNESS:  Are you saying with
8  American Express?
9          MS. MARLOW:  I guess in that same -- I
10  didn't know if when you were answering, like, that
11  specific card, but you actually had, like, a card
12  under that account.  I'm assuming -- I think you
13  said before your understanding was that the
14  account was under ArciTerra?
15          MR. STEIN:  I think she said she wasn't
16  sure.
17          MS. MARLOW:  Okay.  So the account that
18  you had -- the card that you've had -- that you
19  have -- I don't want to get this more confusing.
20  The card that you were using for the $50,000
21  credit during the Rule 69 motion, how long have
22  you had that card?
23          THE WITNESS:  I don't know.
24          MS. MARLOW:  Okay.  You think it was,
25  like, one year, five years?

Page 127

1          THE WITNESS:  It's very confusing.
2          MR. STEIN:  Yeah.  I don't -- let me see
3  if I can help.  So the Amex that you used pursuant
4  to the Rule 69 Agreement.
5          THE WITNESS:  Yes.
6          MR. STEIN:  That card or another card
7  under that account, do you know long you had that
8  you -- you had a card associated with that
9  account?
10          THE WITNESS:  Years.
11          MS. MARLOW:  Okay.  You said years?
12          THE WITNESS:  Years.
13          MS. MARLOW:  I can't hear her.
14          MS. STRAUB:  She said years.
15          MS. MARLOW:  Oh, years, okay.  But
16  you're not sure if it was five years or ten years?
17          THE WITNESS:  No.
18          MS. MARLOW:  Okay.  But you never used
19  it until the Rule 69 Agreement came into place?
20          THE WITNESS:  Well, so from about the
21  end of December until the Rule 69 Agreement, he
22  cut off the card, so it didn't work.
23          MS. MARLOW:  Okay.  And prior to that,
24  you hadn't used it before?
25          THE WITNESS:  No, prior to that, I had.

Page 128

1          MS. MARLOW:  Okay.  So prior to -- so
2  when did you first start using this Amex card that
3  we're talking about now that you used also during
4  the Rule 69 Agreement?
5          THE WITNESS:  I mean, I may have lost a
6  card and gotten a different one, but using, like,
7  American Express in general, ten years.
8          MS. MARLOW:  Okay.  And did you have
9  different account numbers at American Express,
10  like different cards during those ten years?
11          THE WITNESS:  I don't know.
12          MS. MARLOW:  Okay.  So I guess I'm
13  asking, like, did you have different -- like, so
14  did you have different -- you don't know if you
15  had different credit cards during that time period
16  for Amex?  I understand that you can have
17  different cards for the same account, like if you
18  lose it or it expires, they send you a new one in
19  the mail.
20          So I'm not asking about specific
21  physical card for, like, the account, but in that
22  account, had you been using account for that --
23  for that ten years?
24          THE WITNESS:  Exact same card?
25          MR. STEIN:  I think she's asking whether

Page 129

1  you used a card associated with that account.
2        THE WITNESS: Yes.
3        MS. MARLOW: Okay.
4        MR. STEIN: Is that what you're asking?
5        MS. MARLOW: Thank you. Yes, exactly.
6  So you used the card associated with that account
7  for at least ten years?
8        THE WITNESS: Yes.
9        MS. MARLOW: Okay. Could it have been
10 longer than ten years?
11       THE WITNESS: It could have been.
12       MS. MARLOW: Okay. And when you were --
13 when those cards are paid, the invoices on those
14 cards, who pays the invoices on the card?
15       THE WITNESS: Someone in the accounting
16 department at ArciTerra.
17       MS. MARLOW: So someone from the
18 accounting department from ArciTerra pays those
19 cards, the invoice to those cards?
20       THE WITNESS: Yes.
21       MS. MARLOW: And how would they get the
22 invoice?
23       THE WITNESS: I don't know.
24       MS. MARLOW: Okay. Was there ever a
25 situation where the card wasn't paid?

Page 130

1        THE WITNESS: Not to my knowledge.
2        MS. MARLOW: Was there a credit limit on
3  the card, do you know?
4        THE WITNESS: I don't know.
5        MS. MARLOW: You never encountered it in
6  shopping or using the cards?
7        THE WITNESS: No.
8        MR. HAN: This is Jon. Before you filed
9  for legal separation, what type of charges would
10 you put on this Amex account -- card?
11       THE WITNESS: Normal charges, grocery,
12 clothing.
13       BY MS. STRAUB:
14  Q   Did you have other cards, credit cards?
15  A   A Nordstrom Visa, a MasterCard --
16  Q   Which was --
17  A   Hmm?
18  Q   Sorry, go ahead and repeat that last
19 part. I talked over you.
20  A   That's okay. I said a MasterCard.
21  Q   Which was your primary card for putting
22 your expenses?
23  A   American Express.
24  Q   Did you have a personal accountant for
25 your family and your family's expenses?

Page 131

1   A   There were tax accountants.
2   Q   What about, like -- how was the family
3  expenses paid, such as, like, say, the mortgages
4  on your house or the vehicles that you had for
5  your family?
6   A   I don't know. They were paid in the
7  office.
8   Q   Sorry, can you repeat that one more
9  time?
10  A   I said I don't know they were paid out
11 of the office.
12  Q   Was there any family expenses or
13 personal expenses that were paid by you directly?
14  A   Housekeeper. Landscaper.
15  Q   So generally speaking, your family and
16 personal expenses were paid out of the ArciTerra
17 accounting department, is that what I'm hearing
18 you say?
19  A   Yes.
20       MS. MARLOW: What about, like, the kids'
21 college tuition? Where is that paid out of?
22       THE WITNESS: Well, that just started
23 last year, so I don't know where he's paying it
24 out of.
25       MS. MARLOW: So Mr. Larmore pays their

Page 132

1  tuition for college?
2   A   Yes.
3        MS. MARLOW: Okay. And when did your
4  son start? He's 20, so did he start -- when did
5  he start college?
6        THE WITNESS: He's a sophomore.
7        MS. MARLOW: Okay. So he started in, I
8  guess, fall of 2022?
9   A   Uh-huh.
10       MS. MARLOW: I'm sorry, I can't hear
11 you.
12  A   Yes.
13       MS. MARLOW: Okay. And then your
14 daughter, when did she start college, this year in
15 the fall?
16       THE WITNESS: Next year. She's a
17 senior.
18       MS. MARLOW: Oh, okay. I thought you
19 said -- oh, she's at the high school, I got it,
20 okay.
21       So you're not sure who is paying the
22 tuition for your son?
23       THE WITNESS: No. Jon is paying it.
24 You asked me how he was paying it. I don't know.
25       BY MS. STRAUB:

1                    REPORTER'S CERTIFICATE

2

3          I, Elizabeth Kelly, reporter, hereby certify

4 that the foregoing transcript is a complete, true, and

5 accurate transcript of the testimony indicated, held on

6 Wednesday, November 1, 2023, at San Francisco,

7 California in the matter of:

8

9 ArciTerra Group, Inc.

10

11         I further certify that this proceeding was

12 taken in shorthand by me was thereafter reduced to type-

13 written form, and that the foregoing constitutes a true

14 and correct transcript.

15

16

17

18              Date:  November 01, 2023

19      Official Reporter:  Elizabeth Kelly

20

21

22

23

24

25

# EXHIBIT 4



ACC

Search for an Entity Name 🔍 | eCorp | Search | File | FAQ

# ENTITY INFORMATION

Search Date and Time: 11/26/2023 9:59:42 AM

## Entity Details

| | | | |
|---|---|---|---|
| Entity Name: | ARCITERRA GROUP, LLC | Entity ID: | L11916794 |
| Entity Type: | Domestic LLC | Entity Status: | Active |
| Formation Date: | 3/30/2005 | Reason for Status: | In Good Standing |
| Approval Date: | 3/30/2005 | Status Date: | |
| Original Incorporation Date: | 3/30/2005 | Life Period: | Perpetual |
| Business Type: | | Last Annual Report Filed: | |
| Domicile State: | Arizona | Annual Report Due Date: | |
| Original Publish Date: | 5/2/2005 | Years Due: | |

## Statutory Agent Information

| | | | |
|---|---|---|---|
| Name: | JONATHAN M LARMORE | Appointed Status: | Active |
| Attention: | | | |
| Address: | % ARCITERRA GROUP LLC 2701 E CAMELBACK RD STE 150, PHOENIX, AZ 85016, USA | | |
| Agent Last Updated: | 6/20/2016 | E-mail: | |
| Attention: | | Mailing Address: | % ARCITERRA GROUP LLC 2701 E CAMELBACK RD STE 150 , PHOENIX, AZ 85016, USA |
| County: | | | |

# EXHIBIT 5




ACC

Search for an Entity Name          🔍   eCorp   Search   File   FAQ

## ENTITY INFORMATION

Search Date and Time: 11/26/2023 10:12:16 AM

### Entity Details

| | | | |
|---|---|---|---|
| **Entity Name:** | ARCITERRA COMPANIES, LLC | **Entity ID:** | L13981323 |
| **Entity Type:** | Domestic LLC | **Entity Status:** | Inactive |
| **Formation Date:** | 10/1/2007 | **Reason for Status:** | Administrative Dissolution - No Stat Agent/No Valid Agent Address |
| **Approval Date:** | 10/3/2007 | **Status Date:** | 9/6/2023 |
| **Original Incorporation Date:** | 10/1/2007 | **Life Period:** | Perpetual |
| **Business Type:** | | **Last Annual Report Filed:** | |
| **Domicile State:** | Arizona | **Annual Report Due Date:** | |
| **Original Publish Date:** | 10/17/2007 | **Years Due:** | |

### Statutory Agent Information

| | | | |
|---|---|---|---|
| **Name:** | JONATHAN M LARMORE | **Appointed Status:** | Active 6/20/2023 |
| **Attention:** | | | |
| **Address:** | 2701 E CAMELBACK ROAD SUITE 150 , PHOENIX, AZ 85016, USA | | |
| **Agent Last Updated:** | 9/6/2023 | | |
| **Attention:** | | **E-mail:** | |
| | | **Mailing Address:** | 2701 E CAMELBACK ROAD SUITE 150 , PHOENIX, AZ 85016, USA |
| **County:** | Maricopa | | |



# EXHIBIT 6

ACC

Search for an Entity Name 🔍    eCorp    Search    File    FAQ

# ENTITY INFORMATION

Search Date and Time: 11/26/2023 10:35:59 AM

## Entity Details

| | | | |
|---|---|---|---|
| **Entity Name:** | ARCITERRA STRATEGIC RETAIL ADVISOR, LLC | **Entity ID:** | L16192669 |
| **Entity Type:** | Domestic LLC | **Entity Status:** | Active |
| **Formation Date:** | 8/5/2010 | **Reason for Status:** | In Good Standing |
| **Approval Date:** | 8/16/2010 | **Status Date:** | |
| **Original Incorporation Date:** | 8/5/2010 | **Life Period:** | Perpetual |
| **Business Type:** | | **Last Annual Report Filed:** | |
| **Domicile State:** | Arizona | **Annual Report Due Date:** | |
| **Original Publish Date:** | 9/1/2010 | **Years Due:** | |

## Statutory Agent Information

| | | | |
|---|---|---|---|
| **Name:** | JONATHAN M LARMORE | **Appointed Status:** | Active |
| **Attention:** | | | |
| **Address:** | % ARCITERRA GROUP LLC 2701 E CAMELBACK RD STE 150, PHOENIX, AZ 85016, USA | | |
| **Agent Last Updated:** | 6/24/2016 | | |
| **Attention:** | | **E-mail:** | |
| | | **Mailing Address:** | % ARCITERRA GROUP LLC 2701 E CAMELBACK RD STE 150 , PHOENIX, AZ 85016, USA |
| **County:** | | | |

# EXHIBIT 23

### ARCITERRA NOTE FUND II, LLC

$12,500,000                                                                                          8.25% Secured Notes

### CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

ARCITERRA NOTE FUND II, LLC, an Arizona limited liability company (the "Company"), is offering for sale $12,500,000 in aggregate principal amount (the "Offering") of 8.25% secured notes (the "Notes"), a form of which is attached as <u>Exhibit A</u> hereto, upon the terms and conditions set forth in this Confidential Private Offering Memorandum (this "Memorandum"). The Company will issue the Notes pursuant to an indenture (the "Indenture"). The Notes will bear interest at the rate of 8.25% per annum, payable monthly in arrears on the fifteenth day of each month. The Notes will mature three years from the date of issuance of the first of the Notes to be issued, with the Company having the option to extend the term of the Notes for up to two additional years. The Notes will bear interest at the rate of 8.75% per annum during the first year of any such extension and 9.25% per annum during the second year of any such extension. The Company may redeem all or part of the Notes after December 31, 2007 at the principal amount plus all accrued and unpaid interest. The Company will assign, pledge, and grant a security interest in its ownership interest in ArciTerra Note Fund II Investment Company, LLC ("ArciTerra Investments"), which has been formed to acquire certain commercial real estate (each a "Property" and collectively the "Properties"), pursuant to the Indenture, to secure its obligations under the Notes. In addition, the payment of principal and interest on the Notes by the Company will be guaranteed by ArciTerra REIT Advisors, LLC ("ArciTerra Guarantor").

AN INVESTMENT IN THESE NOTES IS HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS. SEE "RISK AND OTHER INVESTMENT FACTORS" BELOW.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ENTITY ISSUING THESE NOTES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE NOTES ARE BEING OFFERED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (COLLECTIVELY, THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, IN ACCORDANCE WITH THE PROVISIONS OF SECTION 4(2) AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER BY THE SEC, AND STATE SECURITIES LAWS. THESE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

**ArciTerra Note Fund II, LLC**
**2720 East Camelback Road**
**Suite 220**
**Phoenix, Arizona 85016**
**(602) 840-6800**

| | Price to Investors | Sales Commissions[1] | Proceeds to the Company[2] |
|---|---|---|---|
| Per Note[3] ....................................... | $25,000 | $1,250 | $23,750 |
| Minimum Offering Amount ........................... | $1,500,000 | $75,000 | $1,425,000 |
| Maximum Offering Amount[4][5] ................... | $12,500,000 | $625,000 | $11,875,000 |

(See footnotes next page)

The date of this Confidential Private Offering Memorandum is November 17, 2006.

## SUMMARY OF THE OFFERING

The following summary is qualified in its entirety by the detailed information appearing elsewhere in this Memorandum.

| | |
|---|---|
| The Company: | The Company was formed on October 18, 2006 as a limited liability company under the name "ArciTerra Note Fund II, LLC" in accordance with the laws of the state of Arizona to acquire and operate certain commercial real estate (each a "Property" and collectively the "Properties"). |
| The Advisor: | The sole member of the Company is ArciTerra Note Advisors II, LLC, an Arizona limited liability company (the "Advisor"). The Company and the Advisor are each managed by ArciTerra Group, LLC. The principal place of business of the Company and the Advisor is located at 2720 East Camelback Road, Suite 220, Phoenix, Arizona 85016; telephone (602) 840-6800 and facsimile (602) 956-4494. See "Management." The Advisor and its affiliated entities and persons (the "Affiliates") will receive fees and compensation in connection with this Offering, the acquisition of the Properties, and the management of the Company and its assets. |
| The Notes: | The Company is offering a maximum of $12,500,000 in aggregate principal amount of 8.25% secured notes (the "Notes"). The Company has the option to offer additional Notes in the aggregate principal amount of $7,500,000. The minimum required purchase of Notes is $25,000, unless the Advisor, in its sole and absolute discretion, waives or lowers the minimum purchase requirement. The Company is issuing the Notes pursuant to an indenture (the "Indenture"). The Notes will bear interest at the rate of 8.25% per annum, payable monthly in arrears on the fifteenth day of each month. The Notes will have a term of three years from the date of issuance of the first of the Notes to be issued (the "Term"). The Company may, in its sole and absolute discretion, extend the Term for up to two additional years. The Notes will bear interest at the rate of 8.75% per annum during the first year of any such extension and 9.25% per annum during the second year of any such extension, payable monthly in arrears on the fifteenth day of each month. After December 31, 2007, the Company may redeem all or part of the Notes at the principal amount of the Notes plus all accrued and unpaid interest. The Company will assign, pledge, and grant a security interest in its ownership interest in ArciTerra Investments, pursuant to the Indenture, to secure its obligations under the Notes. In addition, the payment of principal and interest on the Notes by the Company will be guaranteed by ArciTerra Guarantor. |
| Purchase Period: | A minimum of $1,500,000 in aggregate principal amount of Notes must be sold no later than December 31, 2006, which date may be extended for up to 120 days at the option of the Company. These funds will be held in escrow until the minimum purchase requirement is met. While in escrow, the funds will bear interest at a rate equal to the then money market rate of interest. If the minimum purchase requirement is met, the escrowed funds will be released to the Company and it will issue the Notes. The Offering will then continue for up to one year thereafter until the maximum offering amount has been sold or the Offering has terminated. The Company reserves the right to cancel or modify the Offering, to reject any offer to purchase the Notes in whole or in part, and to waive conditions to the purchase of the Notes for any reason. See "Risk and Other Investment Factors" and "Plan of Distribution." |
| Method of Purchase: | Each person desiring to purchase the Notes must execute and deliver to the Company, or, if applicable, to his broker-dealer, the Note Purchase Agreement attached as Exhibit D to this Memorandum, the appropriate Prospective Purchaser Questionnaire, and, if necessary, the Purchaser Representative Questionnaire (collectively, the "Note Purchase |

1

Documents"). The executed Note Purchase Documents must be submitted together with a check payable to "Bank of Arizona – ArciTerra Note Fund II Escrow" in the aggregate principal amount of the Notes being purchased. See "Plan of Distribution."

| | |
|---|---|
| Suitability of Investors: | The purchase of the Notes is suitable only for persons of substantial financial means who have no need for liquidity in their investment. The Notes will be offered and sold only to persons who meet these and other requirements and who can represent that they are accredited investors within the meaning of the Securities Act. See "Who May Invest." |
| Risk Factors: | The Offering involves certain significant risks. See "Risk and Other Investment Factors." |
| Objectives of the Company: | The objective of the Company is to: (i) acquire and operate the Properties; (ii) obtain a return on investment through leasing and distributions of available cash flow; and (iii) realize appreciation upon the eventual sale, exchange, or other disposition of the Properties. See "Investment Objectives and Operating Policies." |
| Management of the Company: | The Advisor has the exclusive right to manage the business and affairs of the Company, including, without limitation, the exclusive right to make all decisions of the Company relating to the Properties and the Notes. Those persons holding Notes (the "Noteholders") shall have no right to vote on or to affect or direct any decision or action of the Company. |
| Advisor's Compensation and Fees: | The Advisor and its Affiliates will receive certain fees and other payments in connection with the operation of the Company and the acquisition, development, and operation of the Properties. See "Compensation of Advisor and its Affiliates." |
| Tax Advice: | The written tax advice set forth below in "Risk and Other Investment Factors – Tax Risks" and "Tax Aspects of the Offering" is not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties that may be imposed on the taxpayer. The advice was written to support the promotion and marketing of the transaction or matter addressed by the written advice. The taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor. |

# EXHIBIT 24

## ARCITERRA NOTE FUND III, LLC

$15,000,000                                                                              9.25% Secured Notes

### CONFIDENTIAL PRIVATE OFFERING MEMORANDUM

ARCITERRA NOTE FUND III, LLC, an Arizona limited liability company (the "Company"), is offering for sale $15,000,000 in aggregate principal amount (the "Offering") of 9.25% secured notes (the "Notes"), a form of which is attached as Exhibit A hereto, upon the terms and conditions set forth in this Confidential Private Offering Memorandum (this "Memorandum"). The Company will issue the Notes pursuant to an indenture (the "Indenture"). The Notes will bear interest at the rate of 9.25% per annum, payable monthly in arrears on the fifteenth day of each month. The Notes will mature four years from the date of issuance of the first of the Notes to be issued, with the Company having the option to extend the term of the Notes for up to one additional year. The Notes will bear interest at the rate of 10.5% per annum during any such extension. The Company may redeem all or part of the Notes after December 31, 2008 at the principal amount plus all accrued and unpaid interest. The Company will assign, pledge, and grant a security interest in its ownership interest in ArciTerra Note Fund III Investment Company, LLC ("ArciTerra Investments"), which has been formed to acquire commercial real estate (each a "Property" and collectively the "Properties"), pursuant to the Indenture, to secure its obligations under the Notes. In addition, the payment of principal and interest on the Notes by the Company will be guaranteed by ArciTerra Note Advisors II, LLC and ArciTerra Whitefish Advisors, LLC. (collectively, the "ArciTerra Guarantors"). In addition, CSL Investments, LLC, which is owned and controlled by Jonathan M. Larmore, CEO and President of ArciTerra Group, will guarantee up to 20% of the aggregate principal balance of the Notes (applied pro rata among all the Notes).

AN INVESTMENT IN THESE NOTES IS HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS. SEE "RISK AND OTHER INVESTMENT FACTORS" BELOW.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ENTITY ISSUING THESE NOTES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE NOTES HAVE NOT BEEN APPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE NOTES ARE BEING OFFERED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (COLLECTIVELY, THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE UPON EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, IN ACCORDANCE WITH THE PROVISIONS OF SECTION 4(2) AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER BY THE SEC, AND STATE SECURITIES LAWS. THESE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

**ArciTerra Note Fund III, LLC**
**2720 East Camelback Road**
**Suite 220**
**Phoenix, Arizona 85016**
**(602) 840-6800**

|  | Price to Investors | Sales Commissions[1] | Proceeds to the Company[2] |
|---|---|---|---|
| Per Note[3] ..................................... | $25,000 | , $1,500 | $23,500 |
| Minimum Offering Amount ........................... | $1,500,000 | $90,000 | $1,410,000 |
| Maximum Offering Amount[4][5] ................... | $15,000,000 | $900,000 | $14,100,000 |

(See footnotes next page)

The date of this Confidential Private Offering Memorandum is March 10, 2008,
as amended through March 21, 2008.

## SUMMARY OF THE OFFERING

The following summary is qualified in its entirety by the detailed information appearing elsewhere in this Memorandum.

| | |
|---|---|
| The Company: | The Company was formed on February 20, 2008 as a limited liability company under the name "ArciTerra Note Fund III, LLC" in accordance with the laws of the state of Arizona to acquire and operate commercial real estate (each a "Property" and collectively the "Properties"). |
| The Advisor: | The sole member of the Company is ArciTerra Note Advisors III, LLC, an Arizona limited liability company (the "Advisor"). The Company and the Advisor are each affiliated with and managed by ArciTerra Group, LLC. The principal place of business of the Company and the Advisor is located at 2720 East Camelback Road, Suite 220, Phoenix, Arizona 85016; telephone (602) 840-6800 and facsimile (602) 956-4494. See "Management." The Advisor and its affiliated entities and persons (the "Affiliates") will receive fees and compensation in connection with this Offering, the acquisition of the Properties, and the management of the Company and its assets. |
| The Notes: | The Company is offering a maximum of $15,000,000 in aggregate principal amount of 9.25% secured notes (the "Notes"). The Company has the option to offer additional Notes in the aggregate principal amount of $10,000,000. The minimum required purchase of Notes is $25,000, unless the Advisor, in its sole and absolute discretion, waives or lowers the minimum purchase requirement. The Company is issuing the Notes pursuant to an indenture (the "Indenture"). The Notes will bear interest at the rate of 9.25% per annum, payable monthly in arrears on the fifteenth day of each month. The Notes will have a term of four years from the date of issuance of the first of the Notes to be issued (the "Term"). The Company may, in its sole and absolute discretion, extend the Term for up to one additional year. The Notes will bear interest at the rate of 10.5% per annum during any such extension, payable monthly in arrears on the fifteenth day of each month. After December 31, 2008, the Company may redeem all or part of the Notes at the principal amount of the Notes plus all accrued and unpaid interest. The Company will assign, pledge, and grant a security interest in its ownership interest in ArciTerra Investments, pursuant to the Indenture, to secure its obligations under the Notes. In addition, the payment of principal and interest on the Notes by the Company will be guaranteed by ArciTerra Guarantors. In addition, CSL Investments, LLC ("CSL"), which is owned and controlled by Jonathan M. Larmore, CEO and President of ArciTerra Group, will partially guarantee payment of principal on the Notes, in the aggregate amount equal to 20% of the aggregate principal balance of all the Notes (to be applied pro rata among all the Notes in accordance with their then outstanding principal balances.) CSL has agreed that it will at all times maintain a net worth of at least 20% of the then outstanding principal amount of the Notes. |
| Purchase Period: | A minimum of $1,500,000 in aggregate principal amount of Notes must be sold no later than April 30, 2008, which date may be extended for up to 120 days at the option of the Company. These funds will be held in escrow until the minimum purchase requirement is met. While in escrow, the funds will bear interest at a rate equal to the then money market rate of interest. If the minimum purchase requirement is met, the escrowed funds will be released to the Company and it will issue the Notes. The Offering will then continue for up to one year thereafter until the maximum offering amount has been sold or the Offering has been terminated. The Company reserves the right to cancel or modify the Offering, to reject any offer to purchase the Notes in whole or in part, and to waive conditions to the purchase of the Notes for any reason. See "Risk and Other Investment Factors" and "Plan of Distribution." |

| | |
|---|---|
| Method of Purchase: | Each person desiring to purchase the Notes must execute and deliver to the Company, or, if applicable, to his broker-dealer, the Note Purchase Agreement attached as <u>Exhibit E</u> to this Memorandum, the appropriate Prospective Purchaser Questionnaire, and, if necessary, the Purchaser Representative Questionnaire (collectively, the "Note Purchase Documents").  The executed Note Purchase Documents must be submitted together with a check payable to "Bank of Arizona – ArciTerra Note Fund III Escrow" in the aggregate principal amount of the Notes being purchased.  See "Plan of Distribution." |
| Suitability of Investors: | The purchase of the Notes is suitable only for persons of substantial financial means who have no need for liquidity in their investment.  The Notes will be offered and sold only to persons who meet these and other requirements and who can represent that they are accredited investors within the meaning of the Securities Act.  See "Who May Invest." |
| Risk Factors: | The Offering involves certain significant risks.  See "Risk and Other Investment Factors." |
| Objectives of the Company: | The objective of the Company is to: (i) acquire and operate the Properties; (ii) obtain a return on investment through leasing and distributions of available cash flow; and (iii) realize appreciation upon the eventual sale, exchange, or other disposition of the Properties.  See "Investment Objectives and Operating Policies." |
| Management of the Company: | The Advisor has the exclusive right to manage the business and affairs of the Company, including, without limitation, the exclusive right to make all decisions of the Company relating to the Properties and the Notes.  Those persons holding Notes (the "Noteholders") shall have no right to vote on or to affect or direct any decision or action of the Company. |
| Advisor's Compensation and Fees: | The Advisor and its Affiliates will receive certain fees and other payments in connection with the operation of the Company and the acquisition, development, and operation of the Properties.  See "Compensation of Advisor and its Affiliates." |
| Tax Advice: | The written tax advice set forth below in "Risk and Other Investment Factors – Tax Risks" and "Tax Aspects of the Offering" is not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties that may be imposed on the taxpayer.  The advice was written to support the promotion and marketing of the transaction or matter addressed by the written advice.  The taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor. |

PHX 328,116,026V 7

# EXHIBIT 27

## Arciterra Companies

Commercial Real Estate Investment & Development

Arciterra

Phoenix, Arizona, United States · Contact info

500+ connections

Connect Message More

### About

Based in Phoenix, Arizona, Arciterra is a real estate investment, development, and management company established in 2005. In an industry clouded with complexity Arciterra offers the highest quality and innovative retail investment opportunities while effectively managing those opportunities throughout ownership.

Arciterra clients are provided the highest level of service supported by a system of trust, professional integrity, and dedication. With a proven track record of success, our highly skilled real estate professionals navigate the market with clarity and confidence. Arciterra has created 19 investment offerings, raising approximately $187,000,000 in capital and we currently own approximately 83 properties in 26 states.

The principals of Arciterra have more than 50 years of hands-on real estate experience and have been involved in the successful development, leasing, acquisition and disposition of properties in multiple real estate sectors.

Arciterra and its principals have been investing together in commercial real estate since 2003. Arciterra's first offering launched in the fall of 2005.

In the peak of the real estate recession Arciterra continued to acquire sound investments proving its expertise in the retail sector and dedication to its clients and their success.

### Featured

Link

**Website**
Arciterra
Innovative Strategies. Quality Real Estate. Exceptional Locations.

### Activity

705 followers

**Arciterra hasn't posted yet**
Recent posts Arciterra shares will be displayed here.

Show all activity →

### Experience

**Commercial Real Estate**
Arciterra
Jan 2005 - Present · 18 yrs 11 mos

Promoted

Special Offer
Gain Trusted Insights on Today's Biggest Stories. Only 50¢/Week.

Easy Integrations
Join 50,000+ companies accelerating deals with PandaDoc.

Mailchimp, now with SMS
Target customers on the channels they're most likely to convert.

### People also viewed

- **Stephanie Stuckey** · 3rd+ — Chair, Stuckey's Corporation — Follow
- **Sean Moynahan** · 3rd+ — Investment Advisor Representative at King Wealth... — Connect
- **Blaine Rice** · 3rd+ — Real Estate Executive — Connect
- **Mitchell Green** · 3rd+ — Property Manager at Arciterra Group, LLC — Connect
- **William Hoag** · 3rd+ — Principal/Co-Founder at Tether Advisors — Follow

Show all

### People you may know

- **Jessica Matelis** — Associate General Counsel at FTI Consulting — Connect
- **Kyle DeYoung** — Partner at Kirkland & Ellis — Connect
- **Yolanda González Lavery** — Attorney/CPA | SEC Whistleblower Attorney |... — Connect
- **Jonathan Jacobs** — Attorney and Author — Connect



## Skills

Commercial Real Estate

1 endorsement

Real Estate

1 endorsement

Show all 5 skills →

## Interests

Companies Groups

CBRE
1,247,100 followers
+ Follow

Cushman & Wakefield
1,167,831 followers
+ Follow

Show all companies →

Adam Eisner
Senior Counsel at U.S. Securities and Exchange...
Connect

Show all

LEARNING

Add new skills with these courses

HR as a Strategic Business Partner
354,362 viewers

Connecting and Collaborating in a Virtu...
26,758 viewers

Nonprofit Fundraising: A Beginner's Guide
7,162 viewers

See my recommendations

Promoted

Trial Firm Now Hiring
Join our team in Houston, Dallas, Austin, San Antonio, or Corpus Christi.

Make a Great Impression
Write clearly and professionally on every job application. Get Grammarly.

United for Business
Our travel programs are here for you, even when others let you down.

About
Community Guidelines
Privacy & Terms
Sales Solutions
Safety Center
Accessibility
Careers
Ad Choices
Mobile
Talent Solutions
Marketing Solutions
Advertising
Small Business

Questions?
Visit our Help Center.

Manage your account and privacy
Go to your Settings.

Recommendation transparency
Learn more about Recommended Content.

Select Language
English (English)

LinkedIn Corporation © 2023

