Andrew Dean (NY Bar)
Monique C. Winkler (Cal. Bar No. 212031)
John K. Han (Cal. Bar No. 208086)
  hanjo@sec.gov
Marc D. Katz (Cal. Bar No. 189534)
  katzma@sec.gov
Neal Jacobson (NY Bar)
Heather E. Marlow (Cal. Bar No. 215261)
  marlowh@sec.gov
Amanda L. Straub (NY Bar)
  strauba@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Securities and Exchange Commission, | Case No.: 23-CV-2470-PHX-DLR |
|---|---|
| Plaintiff, | |
| v. | SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANT LARMORE'S (AND RELIEF DEFENDANT MARCIA LARMORE'S) EMERGENCY MOTION (ECF 99) AND STATUS REPORT (ECF 112) |
| Jonathan Larmore, *et al*. | |
| Defendants. | |

## I.      INTRODUCTION

Defendant Jonathan Larmore ("Defendant" or "Larmore") seeks by his March 8, 2024 "Emergency Motion To Partially Modify the Temporary Restraining Order, Receivership Order, and Asset Freeze," modified by his "Status Report" filed two days ago, to be granted an ever-increasing, large sum of money from the Receivership established to protect investors and other creditors. Defendant's request for millions of dollars, offered without sufficient basis and despite failing to provide the accounting ordered by the Court, would deplete funds owed to the victims of his fraud and should be denied.

Defendant filed his Emergency Motion asking for a panoply of changes to the asset freeze he had previously agreed to, and for other relief, on the grounds that it should never have been ordered in the first place. The Court declined Defendant's invitation to pre-litigate the scheduled preliminary injunction ("PI") motion and ordered the parties, including the SEC, Larmore, and the Receiver, to meet and confer as to how the specified amount of funds Larmore sought—precisely $200,000 in legal fees and $80,000 in other funds, purportedly to cover two months of Larmore's expenses—were to be paid, and to jointly report to the Court by March 19, 2024. In response to the Court's Order, the SEC and the Receiver agreed to provide these funds for the two-month period, which they told Larmore's counsel on March 15, 2024 during a teleconference, and in a draft joint report emailed on March 17, 2024. However, after being indicted by the grand jury in the Southern District of New York last week, Defendant has changed his mind again, and now seeks a $1 million "retainer" for his lawyer; $480,000 *per month* for legal fees; and $80,000 per month for mostly unspecified and unsubstantiated "living expenses." Status Report (ECF 112) at 8-9.

Defendant makes his requests to modify the asset freeze ordered by the Court without offering the Court any evidence. Larmore's filings treat the Receivership estate as though it were a giant pot of money to which he, and he alone, is entitled, and he ignores entirely the fact that the "asset freeze" about which he complains is directed at *the property he currently owns and controls*, not the assets under Receivership. As the party seeking to modify the Court's Order, he should be required first to identify *the assets to which he currently has*

*access*, such as houses, timeshares, automobiles, watercraft, financial accounts, jewelry, art, and other valuables, to determine whether a limited lift of the freeze could be accomplished without harm to defrauded investors. Larmore named a number of valuable assets, such as multiple houses, expensive cars, and art in his "Perfect Storm Sale" email of April 2023 (*see* ECF 6-2 Ex. 8), and in an Agreement in his divorce proceedings (*see* ECF 6-2 Ex. 10). The Court should refuse to order cash to be drained from Receivership assets, which are not Larmore's personal property—they include commingled assets from investor Funds from which Larmore has already misappropriated millions of dollars. As the party seeking to modify the Court's Order, Larmore should be required first to identify *his own assets*, including non-Receivership assets, and non-Receivership income streams, to determine whether a limited lift of the freeze could be accomplished without harm to defrauded investors. This he has failed to do. Accordingly, the Court should deny his motion.

## II.    COURT-ORDERED ASSET FREEZE

The SEC filed this action alleging fraud under the securities laws against Defendant Jonathan Larmore and numerous companies associated with Larmore. The Complaint alleges that Larmore misappropriated millions of dollars from two investor Note Funds to pay for the cash needs of other ArciTerra entities, as well as his own lavish lifestyle. ECF 1 ¶¶ 36-47. Then, in April 2023, Larmore fired most of his employees and virtually abandoned ArciTerra, leaving the Note Funds without an acknowledged fiduciary and the company in turmoil. *Id.* ¶¶ 48-54. The Complaint also alleges that Larmore purchased a large quantity of out-of-the money WeWork, Inc., call options, then published a press release riddled with false and misleading statements to manipulate the price of the securities of WeWork, Inc. *Id.* ¶¶ 55-66.

Upon filing the action, the SEC sought a temporary restraining order (TRO). During and after the hearings on the SEC's motion, Defendant Larmore agreed, among other things, to the appointment of the Receiver, and separately, to the asset freeze. *See* Order Appointing Temporary Receiver and Temporarily Freezing Assets and Imposing Litigation Injunction (ECF 77) at 2:10-11 ("Defendants and Relief Defendants have consented to entry of this

1  Order pending the Court's determination of the SEC's motion for a preliminary injunction").

2  The "Asset Freeze" in the Order provides, in part:

> Except as otherwise specified herein or in other orders of this Court, all assets of
> Larmore, all Receivership Assets, and all Recoverable Assets held by the Entity
> Relief Defendants are frozen, except for assets in the Receiver's control or which
> come under the Receiver's control, whose disposition is governed by other provisions
> of this Order including but not limited to the use of such assets needed to continue the
> ordinary course operations of the Receivership Entities for the benefit of investors as
> determined by the Receiver as set forth in Paragraph 6.G of this Order.

8  Order (ECF 77) ¶ III.3. *See also* Joint Status Report (ECF 76) ¶ 5.c.[1]

9  In addition, in the TRO (ECF 78) ¶ IV, Defendant Larmore was ordered to provide a

10  verified accounting of his assets, and of his use of assets of the entities in the Receivership.[2]

11  In the Joint Status Report (ECF 76), ¶ 2, Larmore informed the Court: "Defendants do not

12  oppose the SEC's request for a verified accounting with respect to Defendant Larmore and

13  Relief Defendant Marcia Larmore, and do not object to the language of the proposed order

14  regarding the accounting."

15  Despite repeated written and oral requests from the SEC, Larmore never provided the

16  accounting, in full or in part. In addition, after initially providing American Express

17  statements requested by the SEC, Larmore did not provide the other documents the SEC

18  requested (as outlined in the parties' Joint Status Report, ECF 76). Defendant also simply did

19  _____

20  [1]  Paragraph 5.c. provides in relevant part: "the parties agreed that the asset freeze should

21  include Larmore's assets with an accommodation for reasonable living expenses. From the
    entry of the asset freeze order to January 12, 2024, one of Larmore's bank accounts (Park

22  Nation Bank with account ending in x7227) will be excluded from the asset freeze and
    contain no more than $52,000. Larmore shall record his expenses paid from the account

23  during this time and produce it to the SEC upon request. By January 9, 2024, Larmore shall
    submit a detailed proposal for living expenses to the SEC. …" On January 9, 2024, Larmore

24  moved to modify the freeze, with the SEC's consent, to address a problem he encountered in
    obtaining the original $52,000 check (ECF 85), which the Court granted (ECF 86).

25

26  [2]  Para. IV provides: "IT IS FURTHER ORDERED that pending a hearing and determination
    of Plaintiff's Application for a Preliminary Injunction, Defendant Larmore and Relief

27  Defendants Marcia Larmore and Michelle Larmore shall file with this Court and serve upon
    Plaintiff, by no later than January 26, 2024, a verified written accounting signed under

28  penalty of perjury, of their assets and their use of the Receivership Entities' assets, by email
    … on Plaintiff's counsel."

not respond to the SEC's requests to schedule Larmore's deposition. Finally, Larmore has not answered the Complaint, though he was required to do so by February 9, 2024. *See* Waiver (ECF 59). Larmore claims that he does not have access to the documents and records that were kept at ArciTerra to prepare his accounting, but he has been provided access by the Receiver to ArciTerra's accounting system, MRI, and its Sharepoint. In any event, nothing should prevent Larmore from being able to identify non-Receivership assets that he owns, such as houses, cars, and art; non-Receivership income streams, such as rental income from houses; and personal liabilities, such as mortgages on his residences.

## III.   ARGUMENT

### A.  The Asset Freeze Was Properly Ordered, With Defendant's Consent

Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") each authorize the SEC to obtain preliminary injunctive relief against any person "[u]pon a showing that such person has engaged, is engaged, or is about to engage" in acts or practices that violate provisions under either of those securities acts. *See* 15 U.S.C. §§ 78u(d) and 80b-9(d). Among the relief the Courts may grant in exercise of its equitable powers are asset freezes. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (an interlocutory freeze order is an ancillary equitable remedy, which "may be granted[] even in circumstances where the elements required to support a traditional SEC injunction have not been established"). Further, an asset freeze is appropriately ordered against a defendant, or even against a non-defendant, such as a relief defendant, where the SEC shows that the person "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998). An asset freeze serves "to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp.*, 212 F.3d 180, 197 (3d Cir. 2000). An asset freeze may be properly ordered against an individual defendant to ensure the ability to pay any disgorgement judgment for the benefit of harmed investors. *See SEC v. Lee*, 2019 WL 4934181, at *6 (S.D. Cal. Oct. 7, 2019) (and cases cited therein).

To obtain an asset freeze, the SEC is required to show either a likelihood of success

on the merits, or that an inference can be drawn that the defendant had violated the federal securities laws, a lesser showing than that required for a preliminary injunction. *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). The current asset freeze against Larmore is warranted to prevent him from dissipating the assets that remain, which could be used to pay an eventual disgorgement judgment for the benefit of defrauded investors.

Larmore's extremely high rate of personal spending, and his ever-increasing demands, render it likely that absent a freeze he will squander millions of dollars of money potentially owed to investors before a judgment can be reached in this matter. In December 2023, Larmore informed the Court, and the SEC, that he needed approximately $52,000 to be released from the freeze. *See* Joint Status Report (ECF 76) ¶ 5.c. Claiming that he now needs to double his expense requests because of his obligation in his divorce proceedings, Larmore now demands that he receive $80,000 per month in "living expenses." Status Rpt (ECF 112) at 8-9.

**B. Defendant's Unsupported Request to Lift the Freeze Is Meritless**

Defendant makes baseless claims, none of which are supported by evidence, to suggest that the Court should never have ordered the asset freeze and should now dissolve it. He is wrong on the facts, and on the law. Defendant's principal argument, though at times difficult to follow, amounts to an assertion that there is a pot of money worth $450 million. He argues that the SEC has made a claim against that pot of money that amounts to no more than $17 million. *See, e.g.*, ECF 112 at 5:2-3 (Defendant: "The SEC unlawfully froze the entire ArciTerra conglomerate (valued at $450 million) to satisfy a potential $17 million judgment."). He argues, as a result, that the Court should modify "the freeze" so that he has access to all but $17 million of the purported pot. Defendant's entire theory is baseless for at least five reasons.

*First*, there is not a $450 million pot of money. Rather, there is a Receivership estate, which has *not* been valued at $450 million. (Separately, there is some unknown amount of property belonging to, or under the control of, Defendant or his mother, Relief Defendant

Marcia Larmore. However, Defendant has refused to provide an accounting of his assets to disclose his properties and assets.) Defendant's presumption of a $450 million liquid valuation for the Receivership estate—or "the entire ArciTerra real estate portfolio" (ECF 99 at 3:8)—is based entirely on his assertion that one buyer was supposedly willing to purchase all of ArciTerra's assets for $450 million. *Id.* at 3:7-11. This "sale offer" would have required the buyer to assume ArciTerra's debt to investors and mortgage holders (*see* ECF 99 Ex. 1)—hardly an argument that ArciTerra has $450 million in available value to monetize. Moreover, the Receiver's Initial Statement to the Court in response to the Defendant's Emergency Motion (ECF 99) completely debunked Larmore's basis for his proffered valuation. *See* ECF 103. In fact, the interested party did not want to purchase all ArciTerra assets but identified thirteen it "would like to go after." *Id.* ¶ 7. Indeed, Larmore's own counsel acknowledged to the Receiver on February 23, 2024, in an email that the interested party was then only interested in twelve properties; but eight of those properties were not under the Receiver's control, having been sold or lost to state Receiverships. *Id.* ¶¶ 9-10; Ex. 2, Email of Seth Waxman.[3]

*Second*, Defendant's theory presumes that only he would have a claim to the purported $450 million pot of money, aside from $17 million that he describes as the SEC's "damages" claim. ECF 112 at 3, 5. Defendant ignores entirely all of the other claimants to the Receivership estate, notably including the two investor Note Funds from which he purchased assets but then diverted millions, and all other creditors of the estate, including taxing authorities. Indeed, Defendant's submissions make no distinction between ArciTerra's assets and his own, stating with respect to his request for funds: "This request can be accomplished through either: (a) the Receiver finding and/or liquidating ArciTerra assets totaling $1 million plus $480k per month, meaning the first month's distribution would be

---

[3] Despite the email to the Receiver acknowledging the limited interest of the party (in properties that are not available), Defendant persists in claiming in his Status Report that "ArciTerra's assets were recently valued at $450 million through an arms-length purchase offer submitted by an independent real estate investment firm, Shannon Walchack, to the Receiver on January 15, 2024." ECF 112 at 3:7-9. No such valuation of the Receivership estate was made.

$1.48 million followed by monthly distributions of $480,000.00; or (b) the Receivership and asset freeze being reduced to the legally justifiable amount of $17 million, meaning J. Larmore would handle paying his legal fees and expenses out of the released assets." ECF 112 at 6:27-7:4.

Defendant also inappropriately conflates the asset freeze—which applies to him and his own property—with the entirety of the Receivership estate, though the Court clearly distinguished the two, and Defendant acknowledged the distinction when he agreed to both the asset freeze and the Receivership. *Compare* Order (ECF 77) ¶ III. ("Asset Freeze") *with* ¶ II., IV-XIV (Receivership provisions). Larmore's argument misconstrues the purpose of the Receivership. The ArciTerra entities are under receivership to prevent further investor assets from being diminished or destroyed, to recover investor assets that have been commingled with those of other properties and entities, and to work out a fair recovery for all investors and creditors, not to preserve a potential disgorgement judgment against Larmore personally. Indeed, a receivership would be warranted in these circumstances even if Larmore did not also have personal liability for disgorgement of ill-gotten proceeds. In contrast, the freeze applied to Larmore's personal assets is also necessary as he is likely to owe millions in disgorgement, which based upon his historical spending, would likely be practically unrecoverable if the freeze were not in place. Nevertheless, Defendant's arguments to the Court in his Status Report appear consistent with his historical treatment of investor-owned funds and other ArciTerra properties as his own, or freely available to him to use as he pleased.

*Third*, in response to Larmore's unsupported assertion that there is, in essence, $450 million in Receivership assets that can be tapped for his personal living expenses and personal attorneys' fees, the Court-appointed Receiver provided information to the Court about the current conditions of the Receivership assets and obligations. ECF 115. The Court should look to the Receiver as the reliable source on this issue.

*Fourth*, Defendant's request, including his continued reliance on a vague letter of interest that the Receiver found facially "discordant" with Receivership assets (*see* ECF 103,

¶ 2), appears to suggest that the Receiver should conduct a fire sale of all ArciTerra assets simply to fund Defendant's current, claimed needs without regard to the Receiver's (or the Defendant's own) fiduciary duties owed to the ArciTerra investors. Defendant's personal living expenses and attorney fees should not be financed at the expense of investors or other creditors. To do so would only compound Defendant's original fraud and further harm investors.

*Fifth*, Defendant's theory that the Court should look to the Receivership estate as a $450 million pot of money for his use also ignores the law. When determining whether to modify an asset freeze, courts require the parties subject to the freeze to identify property they own that is subject to the freeze; then, the Court may consider the reasonableness of the request in light of the equities. *See, e.g.*, *FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106, 110 (9th Cir. 2012) (appropriate for district court to permit access to frozen funds to pay only "reasonable sums" for attorney's fees); *SEC v. Humphries*, 2022 WL 4483143, at *3-4 (D. Nev. Sept. 27, 2022) (denying request to pay attorney's fees from income derived from a frozen asset that was involved in the commingling that gave rise to the fraud alleged); *SEC v. Santillo*, No 18-cv-5491, 2018 WL 3392881, at *3-4 (S.D.N.Y. July 11, 2018) (allowing a "modest sum" for reasonable living expenses be paid from frozen assets of the defendant); *SEC v. Stein*, No, 07 Civ. 3125, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) ("To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient fund to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial. …The defendant has not met his burden.").

Defendant has not even taken the first step to warrant modification of the asset freeze. Instead, the SEC's repeated requests to Defendant to identify his assets, consistent with the Court's order for a verified accounting of such assets, have been met with silence. Moreover, Defendant has similarly made no effort to establish how or why his request for $80,000 per month ($40,000 which he claims needs to be doubled pursuant to his divorce proceeding) could ever be considered a "reasonable" living expense. *Cf. Stein*, 2009 WL 1181061, at *2

1  ("Stein has shown no reason why funds necessary to repay the victims of his fraud should be

2  depleted in order to sustain his lifestyle and personal obligations at a rate of $20,000 per

3  month.").

4  **C. Defendant Misstates the SEC's Allegations**

5  Defendant misstates the allegations in the SEC's Complaint in several respects in his

6  Emergency Motion, in order to minimize the scope and nature of his fraud. To begin with,

7  Defendant inaccurately describes the $17 million dollars that the Complaint alleges he

8  diverted to his own accounts as the SEC's "damages claim." ECF 112 at 3, 5. It is not. The

9  $17 million is the net value of the cash that was ultimately transferred to bank accounts of

10  two of Larmore's personal entities. However, Larmore may ultimately be ordered to pay

11  significantly more than $17 million in disgorgement, especially because he has interests in

12  other ArciTerra entities to which investor funds of approximately $35 million were also

13  improperly diverted or commingled. *See CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79

14  (3rd Cir. 1993) (district court may maintain the asset freeze until it can make an informed

15  decision of the amount of unlawful proceeds; it can then decide to maintain, remove, or

16  modify the freeze).

17  Larmore further misconstrues the Complaint to argue in his Emergency Motion that

18  the two investor Note Funds, Note Fund II and III, could not have been defrauded.

19  According to Defendant, after investor money from the Note Funds was deployed to

20  purchase real estate in or around 2009, "there was nothing to 'siphon,' 'transfer,'

21  'commingle,' 'funnel,' or 'use'" after that date. ECF 99 at 9. This argument ignores the

22  structure and obligations of the Note Funds. Both Note Funds are obligated to pay out a set

23  interest rate (8.25% per annum for Note Fund II, 9.25% per annum for Note Fund III, 12% in

24  the event of a default) until the principal is returned to noteholders. *See* ECF 6-1 Exs. 23 and

25  24; Ex. A attached hereto (Larmore email acknowledging 12% default interest rate). The

26  Note Funds have failed to meet their interest-paying obligations for several years.[4] Note

27  ---

28  [4] Documents produced by ArciTerra, Bates nos. ARCITERRA_0002096 and
ARCITERRA_0001746, appear to show that the last interest payments were made in March

Fund investors are also entitled to the return of their principal. Larmore acknowledged in early 2022 that the two Note Funds owed over $91 million to noteholders as of that date, and that amount could only have increased since that point. *See* Ex. A (Larmore email). For the reasons described in the SEC's Motion for TRO, such diversions are fraudulent and violate the Investment Advisors Act of 1940. *See* ECF 4 at 16-21.

Larmore also argues that transfers to him were proper because he was entitled to fees for services (though he admits that "ArciTerra's accounting department may not have accounted for Larmore's fees in a manner that is consistent with generally accepted accounting principles"). *See* ECF 99 at 9-11. Indeed, as discussed in the SEC's support for the TRO, the transfers from Note Fund properties were accounted for as amounts "due from" those properties, not fees actually earned. *See* Foley Decl. (ECF 5) ¶¶ 18, 20. Larmore proffers no actual evidence from any quarter rebutting ArciTerra's characterization of the transfers as "due from" transactions—essentially, undocumented loans. Nor does he explain on what basis he, a fiduciary to the Funds, was entitled to take out tens of millions of so-called "fees," including during periods where the Funds were not paying their noteholders a penny. Notably, Larmore has refused to respond to written requests for a deposition in which he would be asked to explain, among other things, what he claims he was entitled to as "fees."

Finally, Larmore argues that the Private Offering Memoranda for the Note Funds "granted J. Larmore, as ArciTerra's investment advisor, great flexibility as to how ArciTerra achieved its investment objectives, including authorizing J. Larmore to loan funds between ArciTerra affiliated properties to purchase properties, refinance assets, and reinvest proceeds from the sale of properties." ECF 99 at 12. There is no indication that the transfers the SEC cites in its Complaint were used to purchase properties, refinance assets, and reinvest sale proceeds, and no indication that the transfers were done in a manner respecting the obligations of the Note Funds or the interests of their investors. Rather, as discussed in the

2020. This document contains the names of the note purchasers which the SEC will redact and might present at a hearing on this motion.

SEC's TRO Motion (ECF 4 at 5-9) the transfers appear to have been made to meet cash needs of other parts of the ArciTerra complex, or for Larmore's personal benefit, which are also directly contrary to Larmore's fiduciary duties.

### D.  Larmore Should Be Required to Account for Assets to Receive Funds

In entering the TRO, the Court found that "an order requiring Defendants and Relief Defendants to provide a verified accounting of their assets, including the use of the Receivership Entities' assets, is necessary to effectuate and ensure compliance with the freeze imposed on their assets and to locate assets for the benefit of investors." ECF 78 at 3, ¶ 2. The Court further ordered Larmore (and Relief Defendant Marcia Larmore) "to file with this Court and serve upon Plaintiff, by no later than January 26, 2024, a verified written accounting signed under penalty of perjury, of their assets and their use of the Receivership Entities' assets." ECF 78 at 6, ¶ IV. But Larmore has failed to do so despite several written requests by the SEC.

Without an accounting by Larmore of his own, personal assets, including a listing of all such assets and their respective valuations, the Court cannot determine the appropriate source for any release of funds from the asset freeze. Courts have refused to modify an asset freeze where, as here, there is "no information as to the totality of the assets available" to defendants. *SEC v. Bivona*, 2016 WL 2996903, at *3 (N.D. Cal. May 25, 2016); *Am. Metals Exch. Corp.*, 991 F.2d at 79-80 (defendant not entitled to funds from asset freeze to pay for attorneys' fees where defendant had access to unfrozen funds and has been slow to produce financial records). For instance, Larmore broadly claims he needs $80,000 per month to pay mortgages and for related expenses on properties he owns. Larmore should be required to identify those assets for which he is paying expenses, to ensure, among other things, that the expenses are reasonable. If, for instance, one or more of the many properties that Larmore claims has a mortgage that must be paid has significant equity, a sale or rental of such property may well be the most appropriate means for him to meet his cash needs.

1
2
### E.  The Issue of Receivership Funds for Michelle Larmore's Living Expenses Is Not Yet Ripe

3       As noted in the Joint Status Report filed by the SEC and Receiver (ECF 111 at 4),

4   Defendant Larmore did not raise the issue of Receivership funds for his soon-to-be-ex-wife

5   Michelle Larmore in either his Emergency Motion or during the March 11 telephonic

6   hearing. But now—in addition to the stratospheric increase in requested funds purportedly

7   related to the recently filed criminal case—Defendant Larmore also asks this Court to *double*

8   the amount of Receivership funds he wants, supposedly so that he can allocate half the

9   amount to Michelle Larmore pursuant to an agreed-upon state court divorce filing.

10       The SEC believes that the Court need not address Michelle Larmore's expenses at this

11   time. Ms. Larmore is represented by counsel in this matter, and her counsel is currently

12   meeting and conferring with the Receiver and the SEC on this very issue. Notably, and in

13   direct contrast with Defendant Larmore who now seeks millions of dollars in Receivership

14   funds without even a cursory sworn declaration or the Court-mandated accounting of assets,

15   Ms. Larmore, through counsel, has agreed to provide a full accounting of her assets. The

16   SEC understands that prior to the Receivership, virtually all of Ms. Larmore's expenses were

17   paid through ArciTerra entities, which is exactly part of the problem and a foundational issue

18   of this case.

19       The SEC will continue to meet and confer with the Receiver and Ms. Larmore's

20   counsel in good faith and will seek Court intervention if and when the issue is ripe.

21   ### F.  Defendant's Theories About the SEC's Motives Are Specious

22       Defendant spends most of his Status Report spinning a further theory that the SEC

23   somehow convinced prosecutors from the United States Attorney's Office for the Southern

24   District of New York to convince a grand jury to indict Larmore for crimes, so that the SEC

25   would not need to file a brief in response to his Emergency Motion. *See* ECF 112 at 4.[5]

26   Defendant's theory of collusion is wholly without basis and untrue.

27   _____

28   [5]  Defendant asserts as the basis for his theory: "This is not mere conjecture; the Defense
     team is comprised of former federal prosecutors and a former SEC Enforcement lawyer who

1   Similarly, in his Emergency Motion (and referenced in his Status Report) Defendant
2   mischaracterizes an email from SEC counsel asking for more information about the
3   ownership structure of eleven properties not owned by the Investor Funds, from which
4   Larmore had requested an income stream for his living expenses and attorney's fees. *See*
5   ECF 99 at 4-5. Larmore attempts to twist the staff's inquiry into a statement "that [the SEC]
6   sought and obtained from this Court extraordinary pretrial restraints without knowing
7   whether *any* investor funds have been misused or whether J. Larmore even owns *any* of the
8   assets." *Id.* Larmore's characterization of the SEC's request for information on several
9   specific properties as somehow encompassing *all* ArciTerra properties is patently false, as
10  his own excerpt of the email shows. The SEC's Complaint and TRO filings also belie
11  Larmore's accusations that the SEC does not have information on the ownership of the key
12  entities and assets (*see, e.g.,* ECF 1 ¶¶ 15-18, 31, 34) or cannot detail the misuse of investor
13  funds (*see, e.g.*, ECF 1 ¶¶ 36-47). And the Receivership justifiably comprises many other
14  ArciTerra affiliates on the basis of the extensive commingling evidenced in ArciTerra's
15  books, and on the basis of common control of the affiliates by ArciTerra/Larmore.

16  **IV.    CONCLUSION**

17      For the foregoing reasons, the SEC respectfully requests that the Court deny
18  Defendant Larmore's current "Emergency Motion," and order Larmore to first submit an
19  accounting, as previously ordered, and supporting documents for his claimed living expenses
20  and attorney fees as a prerequisite to any further requests for modifications to the asset freeze
21  including for living expenses or attorneys' fees.

22  Dated:  March 21, 2024          Respectfully submitted,

23                                  */s/ John K. Han*
24                                  John K. Han, Marc D. Katz
                                    Neal Jacobson, Heather E. Marlow,
25                                  Amanda L. Straub
                                    Attorneys for Plaintiff
26                                  SECURITIES AND EXCHANGE COMMISSION

27

28  _____
recognize how easily the SEC could manipulate the process." *Id*. If Defendant had any basis
other than the mere conjecture of counsel, Defendant should have submitted *evidence*.