Andrew Dean (NY Bar)
Monique C. Winkler (Cal. Bar No. 212031)
John K. Han (Cal. Bar No. 208086)
  hanjo@sec.gov
Marc D. Katz (Cal. Bar No. 189534)
  katzma@sec.gov
Neal Jacobson (NY Bar)
  jacobsonn@sec.gov
Heather E. Marlow (Cal. Bar No. 215261)
  marlowh@sec.gov
Amanda L. Straub (NY Bar)
  strauba@sec.gov

44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>      Plaintiff,<br><br>  v.<br><br>Jonathan Larmore, *et al.*,<br><br>      Defendants and Relief Defendants. | Case No.: 23-CV-2470-PHX-DLR<br><br>SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES |

# TABLE OF CONTENTS

MOTION FOR PRELIMINARY INJUNCTION ..........................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................2

I.      INTRODUCTION ...........................................................................2

II.     FACTS ............................................................................................3

        A.      Larmore Controlled the ArciTerra Entity Defendants......................3

        B.      Larmore Directed Commingling of Investor Funds ...........................4

        C.      Defendants Siphoned Approximately $35 Million From
                the Note Funds ..................................................................................6

        D.      Larmore Directed Payments from Pooled Money for His
                Personal Expenses.............................................................................7

        E.      Larmore and Cole Capital Schemed to Manipulate
                WeWork, Inc. Stock ..........................................................................8

III.    ARGUMENT ................................................................................10

        A.      Standard for Preliminary Injunctions in SEC
                Enforcement Casess .........................................................................10

        B.      Larmore Defrauded and Breached His Fiduciary
                Duty to the Note Funds ....................................................................11

                1.      Larmore and the Fund Advisors Violated the Advisers
                        Act ........................................................................................13

                2.      Larmore's Arguments in Recent Filings Are Without
                        Merit .....................................................................................14

                3.      ArciTerra, ASR Advisor, and Larmore Aided and
                        Abetted the Violations ........................................................18

        C.      Larmore and Cole Capital Committed Fraud Under
                the Exchange Act ............................................................................18

i

1. Defendants Violated the Antifraud Provisions of the Exchange Act ..................................................................... 18

2. Defendants Violated Exchange Act Section 14(e) and Rule 14e-8 Thereunder ............................................. 21

D.   Defendants Are Likely to Violate the Securities Laws If Not Enjoined ................................................................. 22

E.   The Receivership Should Be Maintained While the Action Is Pending ................................................................. 23

1. Continuation of the Receivership Is Essential to Protect Investors ....................................................... 23

2. The Court Should Continue to Impose the Anti-Litigation Injunction .............................................. 28

F.   The Court Should Maintain the Current Asset Freeze ..................... 29

G.   The Court Should Renew Its Order for a Verified Accounting ......................................................................... 31

IV.   CONCLUSION ............................................................................ 31

## **TABLE OF AUTHORITIES**

**CASES**

*Abramason v. Flescherner*, 569 F.2d 862 (2d Cir. 1977) ....................................... 12

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ...................................................... 19

*Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837 (9th Cir. 2009) ...........................24, 25, 26

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3rd Cir. 1993). .....................................29-30

*ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471 (9th Cir. 2015) ............................ 18, 20

*Cooper v. Pickett*, 137 F.3d 616 (9th Cir. 1997) ................................................. 19

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), .............................................. 19

*Financial Planning Ass'n v. SEC,* 482 F.3d 481 (D.C. Cir. 2007) ............................... 12

*FTC v. Consumer Defense, LLC,* 926 F.3d 1208 (9th Cir. 2019) .................................. 10 n.5

*FTC v. Johnson,* 567 Fed. App'x 512, (9th Cir. 2014) ........................................... 27

*Gas Natural v. E.On AG*, 468 F. Supp. 2d 595 (S.D.N.Y. 2006) ................................. 21

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ............................... 19

*In re Alexander V. Stein,* 1995 WL 358127, S.E.C. Docket 1115
     (SEC op. June 8, 1995) .................................................................... 12-13

*In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir. 1993) .........................19

*In re San Vicente Medical Partners, Ltd.*, 962 F.2d 1402 (9th Cir. 1992) ....................... 27

*In re Software Toolworks Inc.*, 50 F.3d 615 (9th Cir. 1994) ..................................... 19

*Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135 (2011) ..................... 20

*Lorenzo v. SEC*, --- U.S. ---, 139 S. Ct. 1094 (2019) ………................................... 19

*Ponce v. SEC*, 345 F.3d 722 (9th Cir. 2003) ..................................................... 18

*Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir. 1988) .......................... 29

*Schauss v. Metals Depository Corp.*, 757 F.2d 649 (5th Cir. 1985) .............................. 29

*SEC v. Ahmed*, 308 F. Supp. 3d 628, (D. Conn. 2018) ..........................................16

*SEC v. Bolla*, 401 F. Supp. 2d 43 (D.D.C. 2005) ................................................ 17

*SEC v. Byers*, 609 F.3d 87 (2d Cir. 2010) ...................................................... 27

*SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) ........................... 23

iii

*SEC v. Capital Cove Bancorp LLC*, 2015 WL 9704076 (C.D. Cal. Sept. 1, 2015) .............. 11

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180 (1963) ..........................................12, 13

*SEC v. Champion-Cain*, Case No.: 3:19-cv-1628-LAB-AHG, 2019 WL 4686938
(S.D. Cal. Sept. 26, 2019) ....................................................................................................24, 27

*SEC v. Chiase*, 2011 WL 6176209 (D.N.J. Dec. 12, 2011) ........................................................13

*SEC v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488 (S.D.N.Y. 2022) .................................. 29

*SEC v. Criterion Wealth Mgmt. Services, Inc.*, 599 F. Supp. 3d 932 (C.D. Cal. 2022) ......... 12

*SEC v. Digital Licensing Inc.,* Case No. 2:23-cv-00482-RJS-DBP, 2024 WL 8283613
(D. Utah Nov. 30, 2023).......................................................................................................10 n.5

*SEC v. Eadgear, Inc.*, 2014 WL 6900938 (N.D. Cal. Dec. 8, 2014) ..................................... 10

*SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429 (5th Cir. 1981) ................................................. 24

*SEC v. Hardy*, 803 F.2d 1034 (9th Cir. 1986) ....................................................................23, 25

*SEC v. Homestead Props., L.P.*, 2009 WL 5173685 (C.D. Cal. Dec. 18, 2009) ................... 11

*SEC v. Infinity Grp.*, 212 F.3d 180 (3d Cir. 2000) ................................................................. 29

*SEC v. Int'l Swiss Invests. Corp.*, 895 F.2d 1272 (9th Cir. 1990) ........................................ 29

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ................................................. 10

*SEC v. Private Equity Mgmt. Group, Inc.*, 2009 WL 2488044
(C.D. Cal. Aug. 10, 2009) ...................................................................................................... 27

*SEC v. Schooler*, 902 F. Supp. 2d 1341 (S.D. Cal. 2012) ...................................................... 11

*SEC v. Sells*, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2011) ................................................. 18

*SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338 (5th Cir. 2011) ...................................... 29

*SEC v. Sunwest Mgmt., Inc.*, 2009 WL 10700900 (D. Or. Mar. 10, 2009) ........................... 27

*SEC v. Sztrom*, 538 F. Supp. 3d 1050 (S.D. Cal. 2021) ........................................................ 18

*SEC v. Trabulse*, 526 F. Supp. 2d 1008 (N.D. Cal. 2007) …....................................11, 17, 22

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ............................................................. 29

*SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195 (11th Cir. 1999) ........................... 10

*SEC v. United Fin. Grp., Inc.*, 474 F.2d 354 (9th Cir. 1973) ............................................11, 23

*SEC v. Wencke, et al.*, 622 F.2d 1363 (9th Cir. 1980) ...................................................... 23, 29

*SEC v. Wencke, et al.,* 783 F.2d 829. (9th Cir. 1986) ............................................................ 23

*Simon v. American Power Conversion Corp.*, 945 F. Supp. 416 (D.R.I. 1996) .................... 17

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ........................................................ 30

*Transam. Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11 (1979) ................................ 12

*United States v. First Nat'l City Bank,* 379 U.S. 378 (1965) ................................. 29

*United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir.1987) ................ 11

*Varjabedian v. Emulex Corp.,* 888 F.3d 399 (9th Cir. 2019) ................................. 21

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ............................................ 12, 17

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................... 10 n.5

**REGULATIONS**

17 C.F.R. § 240.10b-5 .................................................................... 18

17 C.F.R. § 240.14(e)-8 ................................................................. 21

**STATUTES**

15 U.S.C. § 78j(b) ....................................................................... 18

15 U.S.C. § 78u(d) ..................................................................... 1, 10

15 U.S.C. § 78u(d)(5) .................................................................... 29

15 U.S.C. § 80b-2(a)(11) ................................................................. 12

15 U.S.C. § 80b-2(a)(18) .............................................................. 12 n.6

15 U.S.C. § 80b-6(1) ..................................................................... 11

15 U.S.C. § 80b-6(2) ..................................................................... 11

15 U.S.C. § 80b-9(d) .............................................................. 1, 10, 18

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Securities and Exchange Commission (the "SEC") hereby moves for a preliminary injunction during the pendency of this action to restrain and enjoin Defendants Jonathan Larmore ("Larmore"); ArciTerra Companies, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisor, LLC; and Cole Capital Funds, LLC (collectively, "Defendants") from violations of the federal securities laws. In particular, the SEC moves the Court for an Order: (1) preliminarily enjoining Defendants from violating specific federal securities laws and from engaging in specified conduct; (2) appointing the Receiver through the pendency of this action or until further order of this Court, and maintaining the litigation injunction against any new bankruptcy, foreclosure, receivership, or other actions by or against the Defendants under receivership and their affiliates; (3) freezing Defendant Larmore's assets; and (4) requiring a verified accounting from Defendant Larmore and Relief Defendant Marcia Larmore.

The SEC moves pursuant to Section 21(d) of the Securities Exchange Act of 1934 and Section 209(d) of the Investment Advisers Act of 1940, which authorize the SEC to obtain against any person a preliminary injunction "[u]pon a showing that such person has engaged, is engaged, or is about to engage" in acts or practices that violate provisions under those federal securities laws. *See* 15 U.S.C. §§ 78u(d) and 80b-9(d). The SEC's motion is supported by the attached Memorandum of Points and Authorities; the attached Declarations of Michael Foley, Heather E. Marlow, Kevin Gulbranson, and Kathleen Bouet, with exhibits thereto; and the pleadings and other papers filed in this action.

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.     INTRODUCTION

3       From at least 2017 to 2023, Jonathan Larmore ("Larmore") commingled investor-

4  fund-owned assets with non-investor property, misappropriated such assets to benefit other

5  parts of his business, and siphoned off tens of millions of dollars from the commingled funds

6  for his personal enrichment. As CEO of ArciTerra Companies, LLC ("ArciTerra"), he

7  controlled an array of entities involved with commercial real estate, while also acting as the

8  investment adviser to investor-owned funds, ArciTerra Note Fund II, LLC ("Note Fund II")

9  and ArciTerra Note Fund III, LLC ("Note Fund III") (together, the "Note Funds"), to which

10  he owed a fiduciary duty of utmost good faith and full and fair disclosure of material facts.

11  But in breach of his fiduciary duties, Larmore withdrew at least $35 million of Note Fund

12  assets and commingled them with those of other ArciTerra-related entities through ArciTerra

13  Strategic Retail Advisor, LLC ("ASR Advisor") to meet cash needs across his businesses.

14  Larmore also directed the ArciTerra accounting staff to pay his personal expenses from the

15  ASR Advisor–commingled funds, treating the whole ArciTerra complex as his personal

16  piggy bank. As of June 2023, the transfers to Larmore's personal accounts from ASR

17  Advisor amounted to over $17 million. In the spring of 2023, Larmore fired most of

18  ArciTerra's staff, and announced that he was selling all the assets in ArciTerra's portfolio

19  (including holdings and real property held by the Note Funds), as well as his personal

20  property, to divide assets with his wife who had filed divorce proceedings the previous

21  month.

22       By September 2023, Larmore resigned as manager of ArciTerra, and the two co-

23  managers appointed in his wake denied they were fiduciaries to the Note Funds. By

24  November 2023, aware that he was being investigated by the SEC, Larmore, in a desperate

25  attempt to generate a cash windfall, engaged in a blatant effort to manipulate the price of the

26  stock of WeWork, Inc. ("WeWork") shortly before that company announced its bankruptcy,

27  purchasing numerous call options on WeWork's stock, then publishing a press release

28

announcing a tender offer. Larmore's press release was false and misleading in that there was no *bona fide* tender offer for WeWork stock.

On November 29, 2023, the SEC filed this action, seeking a Temporary Restraining Order ("TRO"), including the appointment of a receiver and an asset freeze. On December 21, 2023, the Court entered the requested TRO, and appointed the Receiver. ECF 77, 78. In repeated filings before and after the Court's hearings on the SEC's TRO motion, Larmore agreed to the emergency injunctive relief requested on a temporary basis. He also proposed the Receiver candidate who was ultimately appointed by the Court, Allen D. Applbaum. It is the SEC's understanding that the Receiver intends to file a Report of his initial findings.

On March 14, 2024, Larmore was arrested on a two-count federal indictment originating out of the U.S. District Court for the Southern District of New York for his efforts to manipulate the price of WeWork stock. Larmore's federal criminal trial is scheduled for October 2024.

It is clear from these facts, and the sum of the evidence developed to date, that Larmore intentionally breached his fiduciary duties, including by blatantly misappropriating Note Fund assets; that he repeatedly violated the antifraud statutes of the federal securities laws; and that, absent a preliminary injunction, Larmore would likely repeat his violations. Accordingly, the Court should order a preliminary injunction, order the Receiver to continue his work to unwind the fraud to protect investors and other creditors, and maintain the freeze on Larmore's own assets to ensure that a likely judgment can be collected for the benefit of investors.

## II.    FACTS

### A.    Larmore Controlled the ArciTerra Entity Defendants.

As described in the SEC's filings in support of its TRO motion, and incorporated herein, from the mid-2000's until 2023, Larmore managed ArciTerra as a real estate and management company, headquartered in Phoenix, Arizona, with properties in dozens of states. Declaration of Heather E. Marlow in Support of SEC's Motion for TRO (ECF 6) ("Marlow Decl. I") ¶¶ 12-14, Exs. 4, 5, 27. The ArciTerra complex of entities comprises

1   literally hundreds of affiliates, including as many as nineteen investor vehicles such as real

2   estate investment trusts (REITs).[1] Among ArciTerra-related entities with outside investors

3   are Note Fund II and Note Fund III. Marlow Decl. I ¶¶ 17, 19, Exs. 23 and 24 (Private

4   Offering Memoranda for the Note Funds). Note Fund II raised approximately $20 million in

5   2006 and 2007 through the offering of secured notes from approximately 466 investors, and

6   Note Fund III raised approximately $25 million in 2008 and 2009, also by selling secured

7   notes to 579 investors. Marlow Decl. I ¶¶ 17-20. The Private Offering Memorandum

8   ("POM") for Note Fund II identifies Defendant ArciTerra Note Advisors II, LLC ("Fund

9   Advisor II") as its "advisor," and further provides that Note Advisors II is "managed" by

10  ArciTerra. Marlow Decl. I ¶ 17, Ex. 23 at 1. Note Fund III is structured similarly, with

11  Defendant ArciTerra Note Advisors III, LLC ("Fund Advisor III") as its "advisor," also

12  managed by ArciTerra. Marlow Decl. I ¶ 19, Ex. 24 at 1. (Note Advisors II and Note

13  Advisors III are hereinafter referred to together as the "Fund Advisors.")

14       Larmore controlled ArciTerra as its CEO, and in an interview with the SEC during an

15  investigation preceding the filing of the case, acknowledged that he made the ultimate

16  decisions regarding the use of the amounts raised from both investor Note Funds, including

17  acquiring and selling real properties, investments in securities, and use of tenant proceeds.

18  Marlow Decl. I ¶ 21. Larmore, as well as the Fund Advisors, which he controlled, were

19  investment advisers and had fiduciary duties to the Note Funds. *See infra*, section III.B.

20  **B.    Larmore Directed Commingling of Investor Funds.**

21       For more than ten years, Kevin Gulbranson ("Gulbranson") served as ArciTerra's

22  controller, overseeing ArciTerra's accounting functions and accounting staff. Declaration of

23  Kevin L. Gulbranson ("Gulbranson Decl.") ¶¶ 3, 4. When Gulbranson joined ArciTerra,

24

25  [1] ArciTerra has "created 19 investment offerings, raised approximately $187 million in

26  capital and owns approximately 83 properties in 26 states." Marlow Decl. I ¶ 14, Ex. 27
    (LinkedIn page). In a 2023 contract between ArciTerra and a consultant, ArciTerra attached

27  a non-exhaustive "entity list" that contained over 200 ArciTerra entity "affiliates."
    Declaration of Heather E. Marlow in Support of Plaintiff SEC's Motion for Preliminary

28  Injunction ("Marlow Decl. III"), ¶ 5, Ex. A.

Larmore directed him to pay invoices and to transfer funds among the ArciTerra entities' accounts according to Larmore's pre-existing structure or protocol. Gulbranson Decl. ¶ 7. This structure results in ArciTerra properties each typically being owned by a single-purpose entity (which the accounting staff called a "kid" entity) and these are, in turn, owned by another entity (a "parent"). Gulbranson Decl. ¶ 5. Parent entities own individual kid entities or multiple kid entities, and each entity typically has its own bank account. *Id.*

To pay the expenses of each property, such as utilities, property taxes, and mortgage payments, the accounting staff would issue a check from an entity's bank account, or its parent's account. However, when those entities lacked sufficient funds, according to Larmore's instructions, the accounting staff would look to any and all ArciTerra entities to see which ones had a positive balance of funds, and would transfer money from those entities to ASR Advisor. Gulbranson Decl. ¶¶ 6, 8, 9. The accounting staff would then transfer the money to the entity that needed the funds. *Id.* ¶¶ 8-9. The accounting staff recorded these transactions. Typically, once a week, the accounts payable staff would compile all open invoices and review them with either Larmore, the CEO, or Blaine Rice ("Rice"), who was the Chief Operating Officer. Gulbranson Decl. ¶ 6. Larmore or Rice identified which invoices to pay, and which to delay paying. *Id.*

On a daily basis, the accounting staff moved money among the ArciTerra entities to make sure that there were sufficient funds in the bank accounts from which checks were issued to avoid overdraft. Gulbranson Decl. ¶ 10. Any cash held in the multitude of ArciTerra entity bank accounts was essentially used as a fungible resource to meet the cash needs of ArciTerra entities. Declaration of Kathleen Bouet ("Bouet Decl.") ¶ 5. This included taking cash from investor-funded entities. *Id.* ¶¶ 5, 8. Under this protocol— designed by Larmore—money was moved between as many as 350 ArciTerra entities. Receiver's Statement (ECF No. 115) at ¶ 16.

The accounting staff referred to the daily transferring of cash between accounts to avoid overdrafts as the "2 O'Clock Shuffle." Bouet Decl. ¶ 12. Generally, at approximately 2:00 p.m. daily, the accounting staff reviewed the balance of the bank accounts of the

ArciTerra entities to identify which accounts were in danger of being overdrawn and moved money to those accounts from entities with positive funds. To do so, they transferred the cash up through the parent entity, to ASR Advisor's account, where those funds were combined with cash from other entities. *Id.* ¶ 7, 12. The accounting staff then used the combined pool of money in the ASR Advisor's account to fund the entities that needed the cash. *Id.* ¶ 7.

On a weekly basis, Larmore directed from which entities to take money to make up for shortfalls with other entities. Gulbranson Decl. ¶ 11. And on an approximately quarterly basis, Larmore reviewed a spreadsheet detailing the net transfers of funds among the ArciTerra entities, which reflected the amounts due to or from the various companies and ASR Advisor, based upon Larmore's protocol. *Id.*

Larmore was also provided, and reviewed, financial reports of the companies. *See* Gulbranson Decl. ¶ 16. For example, in approximately August 2021, in response to questions from Larmore about ArciTerra's cash situation, Gulbranson prepared a report of unpaid bills and bank balances, showing that ArciTerra was in a poor financial situation, and Larmore became angry. *Id.* Gulbranson reminded Larmore that Gulbranson had repeatedly informed him about ArciTerra's poor financial situation. *Id.*

## C.    Defendants Siphoned Approximately $35 Million From the Note Funds.

Using the process described above in which ASR Advisor pooled money from various ArciTerra-related entities to fund the current cash needs of other properties, Larmore and the investment adviser defendants (ArciTerra, Note Fund II Advisors, and Note Fund III Advisors) defrauded the investor-owned Note Funds. In short, and as set forth particularly below (Section III.B.), millions were transferred in the fashion described above from properties in which the Note Funds held substantial stakes. The Declaration of Michael Foley in Support of SEC's Motion for Preliminary Injunction ("Foley Decl. II") details how Larmore and the investment adviser defendants used the money raised from outside investors to make significant investments in specific, ArciTerra-related properties; those specific properties were then drained of their funds to meet cash shortfalls elsewhere in the ArciTerra

complex. As a result, Larmore and the investment adviser defendants diverted a total of approximately $35 million from those properties into which the Note Funds had deployed investor money to meet needs in other parts of the business. *See also* TRO Mot. (ECF 4) at 5-9 (and support cited, incorporated herein).

ArciTerra stopped making payments to public investors, including Note Fund investors, in early 2020, and $100 million or more in principal and interest may be owed to the Note Fund investors. Receiver's Statement (ECF 115) at 7, ¶ 16. At the same time, and despite the Note Funds' failure to make interest payments, the transfer of cash from Note Fund assets to ASR Advisor continued through at least June 2023. Foley Decl. II ¶ 22 (activity of relevant general ledger account shows a balance of money owed by ASR Advisor to Glenrosa 32, LLC, one of the properties owned by the Note Funds, growing by hundreds of thousands of dollars from December 2022 to June 2023).[2]

**D.     Larmore Directed Payments from Pooled Money for His Personal Expenses.**

Larmore also instructed the accounting staff to pay his personal expenses out of ArciTerra funds. Gulbranson Decl. ¶ 12. Some of these expenses were paid through the account of ASR Advisor, Bouet Decl. ¶¶ 15, 17, which contained the pooled funds drawn from ArciTerra entities. Among those expenses were Larmore's and his family's American Express bills, property taxes for his personal residences, his life insurance policy, his country club dues, his Rolls Royce airplane engines, his transportation by private helicopter from the airport to his lake house residence, and his airplane for personal trips. Gulbranson Decl. ¶ 12.

Larmore made clear that the accounting staff should prioritize payment of his personal expenses. Gulbranson Decl. ¶ 14. In approximately August 2018, Larmore called Gulbranson into his office and told Gulbranson that if Larmore's American Express bills were not paid, Larmore would fire Gulbranson. *Id.* The accounting staff processed and paid Larmore's personal expenses in two principal ways: (1) by paying vendors for Larmore and his family's

---

[2]  In addition, as described in the TRO motion (ECF 4) at 9 (and incorporated herein), Larmore transferred funds from ASR Advisor to entities that he or his immediate family owned, including Relief Defendants CSL Investments, LLC and MML Investments, LLC.

personal expenses through ArciTerra's invoice and accounts payable processing; and (2) by paying Larmore and his family's American Express charge card activity that was personal in nature. Bouet Decl. ¶ 14. The accounting staff recorded all of Larmore's personal expenditure activity funded with transfers from ASR Advisor—Larmore's designated clearinghouse for transfers among ArciTerra entities, including monies siphoned from Note Fund assets—as amounts owed between ASR Advisor and two "entities" associated with Larmore, JML and JMMAL. *Id.* ¶ 15. The accounting records indicate that amounts of approximately $17 million are due *from* JML and JMMAL *to* ASR Advisor. Foley Decl. II ¶ 44. As the Receiver indicated in his recent Statement, "[i]t appears that significant sums were used to pay [Larmore] and his family's expenditures while creditor and investor obligations went unpaid." ECF 115, at 7 ¶ 16.

In approximately spring 2023, Larmore began to proclaim publicly his intent to dissolve ArciTerra and liquidate its assets and his own personal assets, and he has taken significant steps towards this goal. In March 2023, Larmore fired nearly all of ArciTerra's employees, shut down its headquarters in Phoenix, Arizona, and moved the remaining business operations to a small office in Florida. Marlow Decl. I ¶¶ 21, 23. On April 17, 2023, Larmore sent an email to a large group of people in which he listed for sale the portfolio of ArciTerra properties and his personal property. *Id*. On September 1, 2023, Larmore resigned as manager of ArciTerra, but left no one in place at ArciTerra who acknowledged a role as an investment adviser or a fiduciary to the Note Funds. *See* Marlow Decl. I ¶ 10, Ex. 2 (Investigative Testimony Transcript of Dan DeCarlo at 18:7-14).

**E.** **Larmore and Cole Capital Schemed to Manipulate WeWork, Inc. Stock.**

In October 2023, when aware that he was under investigation by the SEC, Larmore formed Cole Capital Funds, LLC ("Cole Capital"). Marlow Decl. I ¶ 31, Ex. 11; ¶ 33, Ex. 13. On November 1 and 2, 2023, Larmore purchased 72,846 call option contracts for WeWork, Inc. common stock, the vast majority expiring on November 3 at 4 p.m. ET and a small number expiring on November 10. *Id.* ¶ 35. He also bought 343,641 shares of WeWork

1  stock. *Id.* The strike price of the call options ranged from $2 to $5, at a time when the trading
2  price of WeWork's stock ranged between $1.11 and $1.23. *Id.* ¶ 38, Ex. 16.

3       On the morning of November 3, Larmore emailed a Schedule TO[3] to the SEC's
4  Shareholder Proposal mailbox and, likewise on that date, submitted a press release to a wire
5  service. *Id.* ¶ 36, Ex. 28; *id*. ¶ 40. Both the Schedule TO and the press release contained the
6  text of a letter that Larmore indicated he had sent to WeWork's CEO and board of directors
7  that morning, stating that Cole Capital was launching a tender offer for "51% of all the
8  outstanding [WeWork] shares owned by minority shareholders at a price of $9.00 per share."
9  *Id.* ¶ 36, Ex. 28. The letter further represented, among other things, that Cole Capital "ha[d]
10 received feedback from City National Bank and JP Morgan regarding the financing for this
11 acquisition and expect[ed] to select a lender and have a financing commitment prior to
12 execution of a definitive agreement." *Id*.

13      Larmore submitted the Cole Capital press release to the wire service hours before the
14 close of regular NASDAQ trading hours at 4 p.m. ET, *id*. ¶ 40, but it was not ultimately
15 published by business news outlets until 5:12 p.m. ET. *See, e.g.*, *id*. ¶ 37, Ex. 15
16 (MarketWire publication of press release). Immediately after that time, the stock jumped
17 from $.85 to $1.45 and continued to rise, reaching $2.14 at 6:31 p.m. *Id.* ¶ 38, Ex. 16.
18 Larmore was unable to profitably exercise his call options after the Cole Capital press release
19 was publicly posted because they expired at 4:00 p.m. ET that day, an hour before the news
20 outlets circulated the press release. *Id*. ¶ 35. Larmore's small quantity of November 10
21 options expired underwater, and his stock price gains went unrealized.[4]

22      On March 12, 2024, for this same conduct, Larmore was indicted by the grand jury in
23 the U.S. District Court for the Southern District of New York for fraud in connection with a
24 tender offer under Securities Exchange Act of 1934 ("Exchange Act") Section 14(e) and

25

26 [3] A Schedule TO is an SEC filing required for a person or entity making a tender offer that
27 would result in more than 5% ownership of a class of a company's securities.

28 [4] The facts relating to Larmore's WeWork manipulation are discussed at more length in the
SEC's TRO Mot. (ECF 4) at pp.11-13; that discussion is incorporated herein.

1  Rule 14e-9, and securities fraud under Exchange Act Section 10(b) and Rule 10b-5. Marlow
2  Decl. III, ¶ 9, Ex. E.

3     **III.  ARGUMENT**

4  **A.   Standard for Preliminary Injunctions in SEC Enforcement Cases**

5          Section 21(d) of the Exchange Act and Section 209(d) of the Investment Advisers Act
6  of 1940 ("Advisers Act") both authorize the SEC to obtain a preliminary injunction against
7  any person "[u]pon a showing that such person has engaged, is engaged, or is about to
8  engage" in acts or practices that violate provisions under either of those securities acts. *See*
9  15 U.S.C. §§ 78u(d) and 80b-9(d). Because the SEC appears before the Court "not as an
10 ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in
11 enforcing the securities laws," *SEC v. Mgmt. Dynamics, Inc*., 515 F.2d 801, 808 (2d Cir.
12 1975), courts recognize a variation of the traditional, four-part test under Federal Rule of
13 Civil Procedure 65.[5]

14         In SEC enforcement actions, courts have required the SEC to establish: (1) a *prima*
15 *facie* case that a violation of federal securities laws has occurred; and (2) a reasonable
16 likelihood that the violation will be repeated. *See SEC v. Unique Financial Concepts, Inc.*,
17 196 F.3d 1195, 1199 n.2 (11th Cir. 1999). The Ninth Circuit has not "expressly adopted" this
18 two-part standard. *SEC v. Eadgear, Inc.*, Case No. 3:14-CV-04294-RS, 2014 WL 6900938,
19 at *1 (N.D. Cal. Dec. 8, 2014). However, the Ninth Circuit has repeatedly distinguished
20 cases brought pursuant to a federal agency's statutory powers from those by private litigants.

21

22 [5] *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (The four-part test
23 applied in non-enforcement actions under Rule 65 requires the movant show "that he is
   likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of
24 preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the
   public interest."). "On the other hand, in a case involving statutory enforcement, where the
25 applicable statute authorizes injunctive relief, the traditional irreparable injury showing is not
26 required." *FTC v. Consumer Defense, LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019). A district
   court in a recent SEC enforcement action outside of the Ninth Circuit, however, declined to
27 follow this authority and applied the more stringent four-part test from *Winter*. *See SEC v.*
   *Digital Licensing Inc.*, Case No. 2:23-cv-00482-RJS-DBP, 2024 WL 8283613, at *6-7 (D.
28 Utah Nov. 30, 2023).

*See United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987) ("The function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants."); *SEC v. United Fin. Grp., Inc.*, 474 F.2d 354, 358 (9th Cir. 1973) ("prima facie case of the probable existence of fraud and mismanagement . . . is sufficient to call into play the equitable powers of the court"). Consequently, several district courts in the Ninth Circuit have adopted the *Unique Financial* two-part test. *See SEC v. Capital Cove Bancorp LLC*, SACV 15-980-JLS, 2015 WL 9704076 at *5-6 (C.D. Cal. Sept. 1, 2015); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012); *SEC v. Homestead Props., L.P.*, SACV 09-01331-CJC, 2009 WL 5173685, at *2 (C.D. Cal. Dec. 18, 2009); *SEC v. Trabulse*, 526 F. Supp. 2d 1008, 1012 (N.D. Cal. 2007).

    The SEC's evidence readily meets the standard for granting a preliminary injunction, whether applying the shorter, two-part test or the traditional, four-part test. Defendants have violated the antifraud provisions of the Advisers Act and the Exchange Act, as more fully set forth below. Based on the record, their violations are highly likely to be repeated, with significant and irreparable harm to investors if not restrained. In addition to establishing that preliminary injunctions should issue, the SEC further sets forth below the bases for the additional injunctive relief sought—namely, the continued receivership and an asset freeze on the personal assets of Defendant Larmore—in order to protect investors and other creditors from further loss and to maintain the status quo through the pendency of this case.

**B.    Larmore Defrauded and Breached His Fiduciary Duty to the Note Funds.**

    Defendant Larmore and the Fund Advisors are directly liable for violations of Sections 206(1) and 206(2) of the Advisers Act (and, as discussed *infra* section III.B.3, ArciTerra and ASR Advisor aided and abetted such breaches). These antifraud provisions prohibit investment advisers—who are "fiduciaries" to their clients—from, directly or indirectly, employing any device, scheme, or artifice to defraud any client or prospective client; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. 15 U.S.C. §§ 80b-6(1) and (2). A person

violates these provisions if (1) acting as an investment adviser, (2) he breaches a fiduciary duty owed to his client. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194 (1963). To establish a violation of Section 206(1), "scienter"—or a "mental state embracing intent to deceive, manipulate, or defraud"—is required. *Id.* Scienter may be proven by either "knowing or reckless conduct." *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003). However, to prove violations of Section 206(2), scienter is not required, and instead negligence—or the failure to use ordinary care—will suffice. *Capital Gains*, 375 U.S. at 195; *SEC v. Criterion Wealth Mgmt. Services, Inc.*, 599 F. Supp. 3d 932, 947 (C.D. Cal. 2022). Defendants Larmore and the Fund Advisors acted as investment advisers and knowingly or recklessly (and negligently) breached their fiduciary duties to their clients, the Note Funds.

An "investment adviser" is "any person, who for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). This is a "broad definition," *Financial Planning Ass'n v. SEC*, 482 F.3d 481, 484 (D.C. Cir. 2007), and includes persons, such as general partners, "who manage[ ] the funds of others for compensation." *Abrahamson v. Fleschner*, 568 F.2d 862, 869-70 (2d Cir. 1977), *overruled in part on other grounds by Transam. Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11 (1979). Larmore and the Fund Advisors acted as investment advisers to the Note Funds; at the direction of these defendants, each of the Note Funds invested in securities.[6] Further, these defendants did so for compensation, both in terms of promised fees (*see* TRO Mot. (ECF 4) at 18-19, and supporting documents, incorporated herein by reference), and through their enrichment at the expense of the Note Funds. *See In re Alexander V. Stein*, 59 S.E.C. Docket

---

[6] Both Note Funds invested in limited partnership units in ArciTerra National REIT, LP ("National REIT") and preferred stock in a third-party venture held through ArciTerra NS Investment Co. The National REIT limited partnership units, as well as the preferred stock, are classic examples of securities. 15 U.S.C. § 80b-2(a)(18) (a "security" "means any note, stock, … bond, debenture, evidence of indebtedness, … or participation in any profit-sharing agreement, … [or] investment contract").

1115, 1995 WL 358127, at *2, n.13 (SEC op. June 8, 1995) (a person receives "compensation" if the person fraudulently diverts client funds to his or her own use).

### 1. *Larmore and the Fund Advisors Violated the Advisers Act.*

The fiduciary duty owed by an investment adviser is the duty of "utmost good faith, and full and fair disclosure of material facts," and "an affirmative obligation to employ reasonable care" for the benefit of the adviser's clients. *Capital Gains Research Bureau*, 375 U.S. at 194. There is "no question" that an investment adviser who misappropriates a client's funds breaches his fiduciary duty and thereby violates Advisers Act Sections 206(1) and (2). *See SEC v. Chiase*, 10-cv-5110, 2011 WL 6176209, at *5, *13 (D.N.J. Dec. 12, 2011).

Larmore and the Fund Advisors breached their fiduciary duties through the misappropriation and misuse of their clients' funds in two principal ways (and, as discussed *infra* section III.B.1-3, ArciTerra and ASR Advisor aided and abetted such breaches). First, Larmore and ArciTerra, who controlled the Fund Advisors, established the system Gulbranson and Bouet describe, to pool funds from among the various ArciTerra-related entities, including from assets owned by the Note Funds, in the account of ASR Advisor. ASR Advisor acted as the hub through which commingled funds were then transferred to, or used to pay expenses of, other ArciTerra-related entities.

Larmore and the Fund Advisors used his system to defraud the two Note Funds. Each of the Note Funds raised millions of dollars from investors (over $20 million by Note Fund II and over $24 million by Note Fund III) with the promise that they would provide regular payments at a fixed rate of interest, and that, upon redemption, investors would recoup their principal. Declaration of Michael Foley in Support of SEC's Motion for TRO ¶ 5; Marlow Decl. I ¶ 17, Ex. 23; ¶ 19, Ex. 24 (POM Note Fund II and POM Note Fund III). The expectation created by Larmore in the Note Funds' respective offerings was that the Note Funds' investments would produce returns to generate interest payments to investors. But that expectation was thwarted by Larmore and ArciTerra's misappropriation from Note Fund assets. Among the significant assets of both Note Funds were investments in two other ArciTerra-related entities: ATG REIT RSC, LP and ATR 32, LLC. Foley Decl. II ¶¶ 6-8.

1  Note Fund II invested in those entities, through an intermediate vehicle, approximately $7.8

2  million and $6.3 million, respectively. Foley Decl. II ¶ 9. Note Fund III invested

3  approximately $15.2 million in ATG REIT RSC, LP and $4.5 million in ATR 32, LLC. *Id*. ¶

4  10. Those two entities (ATG REIT RSC, LP and ATR 32, LLC) also combined capital

5  totaling $10.9 million to provide the vast majority of capital for a third entity, Glenrosa 32,

6  LLC (the site of an assisted living facility). ArciTerra's records reflect cumulative transfers

7  of approximately $12.5 million and $22.5 million from Glenrosa 32, LLC and ATG REIT

8  RSC, LP, respectively, to ASR Advisor, for a combined total of approximately $35 million.[7]

9  Foley Decl. II ¶ 15. Both Note Funds ceased making interest payments to investors

10  altogether in 2020 (Receiver's Statement (ECF 115) ¶ 16), but all the while, Larmore and

11  ArciTerra's misappropriation from the Note Funds continued.

12  ### 2. *Larmore's Arguments in Recent Filings Are Without Merit.*

13  In his recent filings, Larmore makes the disingenuous argument that, because the Note

14  Funds had deployed investor money by 2009 "to purchase real estate assets," by 2017, "there

15  was nothing left to supposedly 'transfer' or 'divert.'" ECF 99 at 7. This argument completely

16  ignores the fact that the properties produced cash flows, which were supposed to support

17  interest payments to investors, who are also entitled to return of capital. It also attempts to

18  obscure the undeniable fact that the very same "real estate assets" into which investor funds

19  were deployed—namely, ATG REIT RSC, LP and Glenrosa 32, LLC—were entities from

20  which the $35 million was transferred to ASR Advisor, and has not been returned. The

21  general ledger kept by ArciTerra's accounting staff thus reflects the debt owed by ASR

22  Advisor. For instance, in his Declaration, SEC Accountant Foley describes a record in the

23  general ledger account called "Due to Glenrosa 32, LLC." "The net activity of that general

---

25  [7] Notably, the amounts recorded for ASR Advisor as "Due to Glenrosa 32, LLC" and "Due

26  to ATG REIT RSC," which together total $35 million, "represent sums diverted to ASR Advisor and away from investor entities related to Note Fund II and Note Fund III." Foley

27  Decl. II. ¶ 37. "The actual amounts owed to Note Fund II and Note Fund III investors is likely significantly in excess of these diverted funds based on the fact that the notes issued by

28  Note Fund II and Note Fund III have not been repaid and have been obligated to pay interest at a default rate of 12% since June 2010, according to ArciTerra documents." *Id*.

ledger account sums to a balance of $12,271,755.66 as of December 2022," and by June 30, 2023, accumulates to $12.5 million. Foley Decl. II, ¶ 22. Not only do ArciTerra's own records detail how the deployed capital was siphoned off, they show continued diversions over time.

Second, Larmore also enriched himself at the expense of all the ArciTerra-related entities—including the investor-owned Note Funds—by freely using the money pooled from the entities into the ASR Advisor account for himself and his family. Thus, ArciTerra's records show transfers recorded to Larmore's two personal accounts, JML and JMMAL.[8] As described by SEC Accountant Foley, "Transactions recorded in these general ledger accounts, 'Due fr JML' and 'Due fr JMMAL,' reflect regular, monthly activity ranging in amounts from hundreds to millions of dollars." Foley Decl. II ¶ 44. As of the last fully up-to-date records available to the SEC, the close of 2022, "JML" (Larmore) owed $6,241,733.42, and "JMMAL" (JMMAL Investments, LLC) owed $11,542,468.49, or together $17 million. *Id*. Both Bouet and Gulbranson describe how Larmore prioritized paying his own personal expenses from whichever entities appeared to have liquid assets, and they describe the ArciTerra accounting paper trail that reveals this improper corporate-to-personal funds flow. Bouet Decl. ¶¶ 5-15; Gulbranson Decl. ¶¶ 12-14.

Though Larmore's misappropriation is well established by his own records, he has recently denied it, claiming that "Larmore was still lawfully entitled to fees for the services he provided Note Fund II's and Note Fund III's investors." ECF 99 at 9:17-18. In particular, Larmore has cited to a POM for a Note Fund, that states: "The Advisor and its Affiliates may receive compensation for services they will perform for the Company. The Advisor and its Affiliates could receive fees and commissions related to, and be reimbursed for costs arising from, this Offering, and the acquisition, development, property management, construction,

---

[8]  The first account simply bears Larmore's initials, "JML," and the SEC has not found indication that it is an incorporated entity. The second account, "JMMAL," is the name used for the entity owned by Larmore called JMMAL Investments, LLC, which has been named a Relief Defendant.

repair, and sale of the Properties." *Id*. at 9.[9] Significantly, however, none of the $17 million set forth above and recorded by ArciTerra as "due fr" Larmore's two personal accounts was described as a "fee," "commission," or any earned sum. Quite the opposite: the entirety of it is recorded as a debt "due" from Larmore.

It appears from ArciTerra's records, as well as the recollection of its accounting staff, that ArciTerra did make some attempts to estimate certain "fees" that could be related to asset management, property management, or loans. Gulbranson Decl. ¶ 15. Although ArciTerra maintained some such records, they apparently did not record any such fees in the general ledger where they would hit ArciTerra's bottom line, including its income or expenses. Foley Decl. II ¶ 53, Ex. C. According to Gulbranson, this was by design, as Larmore did not want to collect fees (Gulbranson Decl. ¶ 15):

> I had a discussion in which Larmore stated that he did not want to collect the fees because that would be considered income and have tax consequences to the management entities and for himself. In addition, if fees were collected, it might trigger cash distributions to Larmore as well as to other owners. My understanding is that there are no asset management fees associated with ArciTerra Note Fund II or ArciTerra Note Fund III.

Gulbranson further explains that the entity, ASR Advisor, that served as the hub for cash transfers among ArciTerra entities, including the $35 million removed from the Note Funds, and which transferred the cumulative $17 million to the two Larmore accounts (JML and JMMAL), is not an entity with a management or advisory role to the Note Funds. *Id*. It would accordingly not be entitled to fees from the Note Funds. Nothing in the POMs permits Larmore to freely use the assets or cash generated by the Note Funds' investments for personal expenses, in effect treating their assets as his own.

Such conversion of clients' assets is the antithesis of an investment adviser's fiduciary duty. *See, e.g., SEC v. Ahmed*, 308 F. Supp. 3d 628, 655 (D. Conn. 2018) ("[t]his fiduciary

---

[9] The "fee" provision further places limitations on such fees, stipulating: "These fees . . . will generally be on terms and conditions *no less favorable to the Company than could be obtained from independent third parties for comparable services*." *Id*. at 9 (emphasis added). The provision also limits fees or commissions for property acquisitions or sales to "not exceed 3% of the purchase price for each Property." *Id*.

duty requires advisors to act for the benefit of their clients, and precludes them from using their clients' assets to benefit themselves"). In *Trabulse*, 526 F. Supp. 2d at 1016, the court granted the SEC's motion for preliminary injunction based on evidence of diversions of cash for personal expenses from a private fund managed by the defendant, and the court rejected a similar "fee" argument as contrary to the duties owed by an investment adviser:

> As a fiduciary, Trabulse should be able to account for exactly how he calculated the $50 million. This Court has no faith in the idea that Trabulse was ever entitled to withdraw the millions that he has in "compensation." He has been utterly unable to show that there ever were "net profits" of sufficient magnitude.

Moreover, if Larmore supposedly chose to rely on the "fee" provisions in the POMs as the basis for his self-serving system to pay all his personal expenses and otherwise enrich himself with Note Fund investor money, he and the entity defendants had a duty to the investors to disclose that practice. *See SEC v. Bolla*, 401 F. Supp. 2d 43, 70 (D.D.C. 2005) ("a duty to disclose also arises where a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information") (quoting *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 424 (D.R.I. 1996)).

Larmore's decision to treat ArciTerra as his piggy bank, rather than collect legitimate "fees" for services, is more indicative of Larmore's purposeful and knowing misconduct, or scienter. Indeed, this evidence—the continued use and diversion of Note Fund assets for Larmore's personal benefit, including at a time when the Note Funds had ceased making interest payments to the investors—shows Larmore's knowing elevation of his own interests above those of his clients. *See Vernazza*, 377 F.3d at 860-61 (upholding Commission decision finding scienter, and finding lack of knowledge "implausible," where investment advisers failed to accurately disclose their fees); *Trabulse*, 526 F. Supp. 2d at 1014 (finding scienter, in ordering preliminary injunction, where adviser exaggerated the value of a fund to serve as cover for his large withdrawals).

### 3. *ArciTerra, ASR Advisor, and Larmore Aided and Abetted the Violations.*

Defendants ArciTerra and ASR Advisor are liable to the same extent as the investment adviser defendants (*i.e.*, Larmore, Fund Advisor II, and Fund Advisor III), for knowingly or recklessly aiding and abetting the investment adviser defendants' primary violations of Sections 206(1) and (2) of the Advisers Act. *See* 15 U.S.C. § 80b-9(d). To establish aiding and abetting liability, the SEC must show: (1) the primary violation; (2) knowledge by the aider and abettor of its role in furthering the violation; and (3) substantial assistance by the defendant in the violation. *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003); *SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1062 (S.D. Cal. 2021). ArciTerra, led by Larmore, was the operating entity for the enterprise; Larmore's knowledge is imputed to it, and it thus knowingly assisted the investment advisers' violations by facilitating the commingling and misappropriation of assets from the Note Funds. *See ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015); *SEC v. Sells*, 2012 WL 3242551, at *8 (N.D. Cal. Aug. 10, 2011). ASR Advisor, also led by Larmore, knowingly assisted the investment advisers' violations by acting as the conduit for commingling and transferring money from the Note Funds' assets to other ArciTerra entities, as well as to the JML and JMMAL accounts to enrich Larmore. Accordingly, ArciTerra and ASR Advisor are similarly liable, as aiders and abettors, for Larmore's and the other advisers' violations of Sections 206(1) and (2) of the Advisers Act. Finally, to the extent Larmore is not liable as a primary violator, he is liable as an aider and abettor of the violations by Fund Advisor II and Fund Advisor III due to his knowing assistance with all of the violations at ArciTerra.

## C. Larmore and Cole Capital Committed Fraud Under the Exchange Act.

### 1. *Defendants Violated the Antifraud Provisions of the Exchange Act.*

Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, make it unlawful for any person to make any untrue statement of material fact, or to employ any scheme to defraud or to engage in any course of business to defraud, in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The language of the statute and

1  rule is "expansive" and "capture[s] a wide range of conduct." *Lorenzo v. SEC*, --- U.S. ---,
2  139 S. Ct. 1094, 1101 (2019).

3       The antifraud provisions of the Exchange Act prohibit misrepresentations of material
4  fact, and likewise prohibit a scheme to defraud, where a person "commit[s] a manipulative or
5  deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.
6  1997). A fact is material if there is a substantial likelihood that a reasonable investor would
7  consider it important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S.
8  224, 231-32 (1988). The conduct must also have occurred "in connection with the purchase
9  or sale of securities." False statements affecting "the integrity of the securities markets"
10 satisfy this "in connection with" requirement. *In re Ames Dep't Stores Inc. Stock Litig.*, 991
11 F.2d 953, 966 (2d Cir. 1993). Finally, violations of the Exchange Act antifraud provisions
12 require proof of scienter—a "mental state embracing intent to deceive, manipulate, or
13 defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Hollinger v. Titan
14 Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (scienter demonstrated where a
15 defendant acts recklessly, engaging in misconduct that is "so obvious that the actor must
16 have been aware of it"). Scienter may be inferred from circumstantial evidence suggesting an
17 obvious risk of misleading investors that is so great that it is simply implausible that the
18 defendant did not know about it. *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir.
19 1994).

20      Defendants Larmore and Cole Capital caused a press release relating to WeWork to
21 be published on public news websites via a wire service, and thereby knowingly and
22 recklessly made untrue and misleading statements of material fact. Among those falsehoods
23 are their claims that Larmore and Cole Capital: (1) "received feedback from City National
24 Bank and JP Morgan" on financing for a WeWork tender offer; (2) "expect to have a
25 financing commitment prior to execution"; (3) consulted with "financial and other advisors
26 to assist us with this transaction"; and (4) had the ability or intent to execute the tender offer
27 as stated by affirmatively offering $9 a share for 51% of WeWork's minority-ownership
28 shares. Marlow Decl. I, ¶ 36, Ex. 28. Although the press release was issued by Cole Capital,

1  Larmore, as its CEO, is a maker of those statements, as he was the person "with ultimate

2  authority over the statement[s]" including their "content and whether and how to

3  communicate" them. *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142

4  (2011). Larmore's scienter can be imputed to Cole Capital because he is an officer of the

5  entity and exercised control over it. *See ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d at 476

6  ("In the context of Rule 10b-5, we have adopted the general rule of imputation and held that

7  a corporation is responsible for a corporate officer's fraud committed within the scope of his

8  employment[.]") (quotations omitted).

9     Larmore's actions reveal his scheme to manipulate and pump up the price of WeWork

10  stock. In October 2023, Larmore created Cole Capital. On November 1 and 2, 2023, Larmore

11  purchased 72,846 call option contracts on WeWork stock with expiration dates of November

12  3 and 10, 2023, in addition to WeWork common stock. (Call options give the buyer the right,

13  but not the obligation, to buy the underlying stock.) Larmore sought to profit by buying the

14  stock and call options, the latter of which he either could have sold at a profit or exercised

15  profitably if the market price of WeWork stock exceeded the call options' strike prices. On

16  November 3, 2023, the date on which the vast majority of his call options were set to expire,

17  Larmore attempted to file a form with the SEC to give an appearance of legitimacy to his

18  fake tender offer, and later that day, issued the press release on behalf of Cole Capital

19  announcing that it would make a tender offer of $9.00 per share, when the price of WeWork

20  stock at that time was approximately $1.00 per share. Larmore's sensational press release

21  had the desired effect on the price of the stock, and this price increase is evidence that it was

22  material to investors; when business news outlets published the press release, the price of

23  WeWork stock rose 150% in afterhours trading. Larmore's plan to profit from his call

24  options was derailed, however, because he mistimed when his press release would be

25  published, and his November 3 call options had expired earlier that day.

26     Neither Larmore nor Cole Capital had the actual intention to pursue a legitimate

27  tender offer for WeWork stock. There is no evidence to date that Larmore actually discussed

28  financing for a tender offer with the entities he named in the press release, much less

"expected to have a financing commitment prior to execution" of his tender offer. Larmore was not sincere in pursuing a tender offer in which he would pay $9.00 per share, a premium of more than 900% over the then-current price of the stock for a non-control stake in WeWork. The obvious conclusion is that Larmore and Cole Capital knowingly conducted their scheme to profit from securities trades by issuing a false press release to artificially inflate the price of WeWork securities.

### 2. Defendants Violated Exchange Act Section 14(e) and Rule 14e-8 Thereunder.

Section 14(e) of the Exchange Act prohibits the making of any untrue statement of a material fact, or omission of any material fact necessary in order to make the statements made not misleading, or engagement in any fraudulent, deceptive, or manipulative acts or practices in connection with any tender offer. *Gas Natural v. E.On AG*, 468 F. Supp. 2d 595, 608-09 (S.D.N.Y. 2006). In the Ninth Circuit, Section 14(e) requires a showing of negligence.[10] *Varjabadian v. Emulex Corp.,* 888 F.3d 399, 401 (9th Cir. 2019). Rule 14e-8 provides that it is a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) to publicly announce a plan to make a tender offer if (a) the person announcing the plan is making the announcement without the intention of commencing the offer within a reasonable time and completing the offer; (b) such person intends (directly or indirectly) for the announcement of a tender offer to manipulate the market price of the stock of the bidder or subject company; or (c) such person does not have the reasonable belief that it will have the means to purchase securities to complete the offer. *Gas Natural*, 468 F. Supp. 2d at 609-10 (citing 17 C.F.R. § 240.14e-8).

Larmore and Cole Capital violated Section 14(e) and Rule 14e-8 by publishing a press release falsely claiming that Cole Capital was ready to make a tender offer for WeWork stock. As discussed above, Larmore and Cole Capital used the press release to pump up the price of WeWork stock so that Larmore could profit from his far out-of-the-money call

---

[10] Several other Circuits require a showing of scienter, but the SEC believes it can meet either standard here due to the (at very least) recklessness of Larmore's and Cole Capital's conduct.

1   options. The evidence suggests Larmore never had the *bona fide* intention of purchasing a

2   block of WeWork stock at nine times the then-current trading price. Even in the unlikely

3   event that Larmore had a *subjective* belief that he could consummate a tender offer for a

4   large block of WeWork stock, such a belief would not be reasonable given the low trading

5   price of the stock and his lack of legal and financial advisers and committed financing for

6   such an acquisition. Larmore, and Cole Capital, which Larmore controls, were accordingly—

7   at the very least—negligent in their actions with respect to the purported tender offer.

8   **D.    Defendants Are Likely to Violate the Securities Laws If Not Enjoined.**

9          Based on the ample evidence of two distinct fraudulent schemes conducted by

10  Larmore, one for years, and the other even as he knew he was being investigated by the SEC

11  for possible securities law violations, the Court should conclude that if not subject to a

12  preliminary injunction, it is likely that Larmore and the entity Defendants would again

13  violate the securities laws. Further, it is also clear that without the requested injunctions

14  against further violations, public investors, including those who purchased interests in both

15  Note Funds, would suffer harm through the continued wasting and dissipation of the assets

16  belonging to the funds. Indeed, Larmore's brazen efforts to manipulate the market for

17  WeWork stock on the eve of the SEC's filing of this action further suggest that the injunctive

18  relief is necessary, and very much in the public's interest.

19         In similar situations, courts have found it meaningful that a defendant continued to

20  engage in his violative conduct even as he was aware of an SEC investigation into

21  misconduct. *See Trabulse*, 526 F. Supp. 2d at 1017 n.9 (discussing record of fund adviser's

22  misuse of fund assets for personal expenses, and noting that he has continued "even when the

23  legitimacy of this conduct is being questioned by the SEC and the Court"). Here, as well,

24  Larmore continued siphoning assets from the Note Funds after the SEC had contacted him in

25  its investigation. And he blatantly engaged in a market-manipulation scheme even months

26  thereafter. Furthermore, Larmore's most recent assertions in his quest to obtain funds from

27  the receivership estate to pay his personal bills reveal his ongoing lack of recognition that the

28  assets of the various companies within the ArciTerra complex are not his personal slush

fund. *See, e.g.,* Emergency Mot. (ECF 99) at 4 ("It is as if the SEC alleged that the Pepsi Company engaged in $17 million of fraud, but froze all of Pepsi's assets (currently valued at $232.54 billion)."); Status Rpt. (ECF 112) at 7 (requesting "the Receivership and asset freeze being reduced to the legally justifiable amount of $17 million, meaning J. Larmore would handle paying his legal fees and expenses out of the released assets"). Accordingly, preliminary injunctions are critical to protecting investors and preventing irreparable harm to them, and are also in the public interest.

**E.      The Receivership Should Be Maintained While the Action Is Pending.**

On December 21, 2023, by consent of the parties, the Court appointed Allen D. Applbaum as Receiver over ArciTerra, ASR Advisor, the Note Funds, the Fund Advisors, and a large number of other ArciTerra-related entities (collectively referred to as the "Receivership Entities") in an Order Appointing Temporary Receiver and Temporarily Freezing Assets and Imposing Litigation Injunction ("Receivership Order"). ECF 77. The Court also imposed an anti-litigation injunction staying pending litigation (with identified exceptions) and enjoining the filing of any new bankruptcy, foreclosure, receivership, or other actions by or against the Receivership Entities and receivership assets. The Court properly appointed the Receiver, and the anti-litigation injunction should remain in place.

**1.   *Continuation of the Receivership Is Essential to Protect Investors.***

As part of its broad equitable powers, the Court has discretion to appoint and to maintain an equity receiver in SEC enforcement actions. *See SEC v. Wencke*, 622 F.2d 1363, 1365 (9th Cir. 1980); *United Fin. Grp.*, 474 F.2d at 358-59 (when fraud and mismanagement are shown by the SEC, "[t]he district court has broad powers and wide discretion to frame the scope of appropriate equitable relief," including the appointment of a receiver). The breadth of the Court's discretion "arises out of the fact that most receiverships involve multiple parties and complex transactions." *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (quoting *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)). A receivership plays a crucial role in "prevent[ing] further dissipation of defrauded investors' assets." *SEC v. Wencke,* 783 F.2d 829, 837 n.9 (9th Cir. 1986).

1    While there is "no precise formula" to be applied to determine when to appoint a

2 receiver, according to the Ninth Circuit:

3       [F]ederal courts consider a variety of factors in making this determination,
        including, for example: (1) whether [the party] seeking the appointment has a
4       valid claim; (2) whether there is fraudulent conduct or the probability of fraudulent
        conduct, by the defendant; (3) whether the property is in imminent danger of being
5       lost, concealed, injured, diminished in value, or squandered; (4) whether legal
        remedies are inadequate; (5) whether the harm to plaintiff by denial of the
6       appointment would outweigh injury to the party opposing appointment; (6) the
        plaintiff's probable success in the action and the possibility of irreparable injury to
7       plaintiff's interest in the property; and, (7) whether [the] plaintiff's interests sought
        to be protected will in fact be well-served by receivership.
8

9 *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (citations and internal

10 quotation marks omitted). Further, "no one factor is dispositive." *Id*. at 845. Nevertheless,

11 facts putting at issue the integrity of management, and thus the likelihood of future misuse of

12 assets, are critical. *See SEC v. First Fin. Grp. of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981)

13 ("The district court's exercise of its equity power in this respect is particularly necessary in

14 instances in which the corporate defendant, through its management, has defrauded members

15 of the investing public; in such cases, it is likely that, in the absence of the appointment of a

16 receiver to maintain the status quo, the corporate assets will be subject to diversion and waste

17 to the detriment of those who were induced to invest in the corporate scheme and for whose

18 benefit, in some measure, the SEC injunctive action was brought."); *SEC v. Champion-Cain*,

19 Case No.: 3:19-cv-1628-LAB-AHG, 2019 WL 4686938, at *4 (S.D. Cal. Sept. 26, 2019).

20    While the SEC brings this action in the public interest, potentially lessening the

21 burden to establish the need for a receivership, in this case, *all* of the *Canada Assurance*

22 factors justifying continuation of the receivership are present. The showing required for

23 factors (1), (2), and the first half of (6)—the existence of a valid claim, whether there has

24 been fraudulent conduct, and whether the SEC is likely to succeed on the merits of its

25 action—have been addressed *supra*, Section III.B. The SEC has set forth a prima facie case

26 of fraud and breach of fiduciary duty under Sections 206(1) and (2) of the Advisors Act

27 against Larmore, ArciTerra (the operating entity of the whole complex, which employed all

28 its staff and kept its books), and the other ArciTerra defendant entities. For instance, the

evidence, including ArciTerra's own corporate records, amply demonstrates that investor assets from the Note Funds were extensively commingled with other ArciTerra assets and diverted to non-investor ArciTerra entities, as well as to Larmore's personal use. These facts fully support the SEC's fraud claims and justify maintaining the Receiver.

With respect to factor (3) in *Canada Assurance*, "whether the property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered," the practical need for the receivership is also even clearer now than when the SEC initially filed its case. In his March 21, 2024 Statement, the Receiver described the sad state in which Larmore and his (briefly tenured) successors had left ArciTerra and its affiliates. Note Fund investors had not been paid interest since 2020. ECF 115, at 4 ¶15. Additionally, thirty former ArciTerra properties have already been lost to lender or tax foreclosure or sale. Furthermore:

> The Receiver discovered that more than several commercial and residential properties suffered significant disrepair. Certain commercial properties were completely or partially vacant, lacking in basic compliance (such as fire safety compliance which the Receiver remedied), neglected (such as with no snow removal over the winter and serious pothole problems, which the Receiver remedied), and left behind by a national property management entity that resigned due to non-payment of their property management fees with no transition to a new property manager. Certain vendors suffered significant arrears. Dozens of commercial tenants had not paid rent in months, protesting over broken promises or premises conditions, or out of confusion or lack of direction.

ECF 115, at 4 ¶ 6 (footnote omitted). Significantly, but for the Receiver, ArciTerra would *no longer have management* to oversee ArciTerra's assets for the benefit of investors and other creditors. Indeed, the co-managers who were briefly in place when the SEC's action was filed never considered themselves fiduciaries to the investor Note Funds, and they resigned. Marlow Decl. III ¶¶ 10-11, Exs. F, G. And Larmore, who defrauded ArciTerra's investors, abandoned management of ArciTerra in 2023. Now he is additionally subject to federal criminal indictment for his fraudulent tender offer and manipulation of WeWork stock. "[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). Here, the receivership is needed to act as a steward of ArciTerra to preserve the value of its properties until harmed investors and other creditors are compensated.

Other *Canada Assurance* factors include (4) the inadequacy of legal remedies, and (6) the possibility of irreparable injury to plaintiff's interest in the property. The SEC brings this action for the benefit of investors, and both factors are amply met. If additional ArciTerra properties are lost to foreclosure or neglect, or if ArciTerra falls under self-interested management that returns to past practices of ignoring investor interests and treating ArciTerra as a personal piggy bank, investor assets would be squandered permanently, with little hope of recovery via a legal damages judgment. The Receiver is tasked with preserving such investor assets, whether they are currently held by the Note Funds, or have been commingled with other ArciTerra assets.

As to factor (5), "whether the harm to plaintiff by denial of the appointment would outweigh injury to the party opposing appointment," the harm to investors is clear. Without the Receiver's preservation of ArciTerra's remaining assets, they might lose the accrued interest and principal they are due, totaling as much as $100 million or more. Receiver's Statement (ECF 115) at 7 ¶ 16. In contrast, Larmore's sole complaint has been the denial of access to ArciTerra assets to fund his supposed immediate cash needs. But using ArciTerra as a personal ATM is not a legitimate use of the assets. *See* SEC Resp. to Emergency Motion (ECF 116). Notably, any excess value remaining in ArciTerra after investors and other creditors are compensated may revert to its owners. Indeed, at the outset of this action, Larmore did not object to the appointment of the current Receiver, who appears to be improving the value of ArciTerra's assets.

Finally, with respect to *Canada Assurance* factor (7), "whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership," investor interests have been, and will likely continue to be, well served by the Receiver's stewardship of ArciTerra's assets. The SEC looks forward to the Receiver's forensic accounting work to sort out the mess of commingling and misappropriation of investor funds; its fielding of investor inquiries; and, eventually, its creation of a fair and orderly plan of distribution to investors and other creditors.

The scope of the receivership is likewise fully justified here. It is common in cases with complex accounting schemes involving broad numbers of entities or transactions for courts to appoint receivers to trace the extent of commingling and misappropriation. *See, e.g., SEC v. Byers*, 609 F.3d 87, 90 (2d Cir. 2010) (noting that receiver had been "tasked with ascertaining the financial condition of the . . . [e]ntities, including the extent to which the funds were co-mingled between the various affiliates"); *SEC v. Sunwest Mgmt., Inc*., 09-cv-6056-TC, 2009 WL 10700900, at *2 (D. Or. Mar. 10, 2009) (appointing a receiver to, *inter alia*, "ascertain the financial condition of the Receivership Entities and the disposition of investor funds" and "determine the extent of commingling of funds, if any, between the Defendants, Relief Defendants and all Receivership Entities"); *Champion-Cain*, 2019 WL 4686938, at *5 ("the receiver is better-equipped than the Court to sort out the competing claims to a limited set of funds"). Indeed, the Ninth Circuit, and district courts in this Circuit, have found it appropriate for a receivership to include entities on the basis of common control by the receivership defendants in question. *See, e.g., In re San Vicente Medical Partners, Ltd.*, 962 F.2d 1402, 1405 (9th Cir. 1991) (affirming district court's order that included within a receivership a subsidiary of named defendant where named defendant controlled the subsidiary); *FTC v. Johnson*, 567 Fed. App'x 512, 514 (9th Cir. 2014) (affirming district court's order to include assets under receivership because, *inter alia*, they "were controlled by the receivership defendants"); *Champion-Cain*, 2019 WL 4686938, at *4  (noting that receivership order covers "*res* that is currently within the ownership, control, possession, or management of Defendants"); *SEC v. Private Equity Mgmt. Group, Inc.*, cv 09-2901 (PSG), 2009 WL 2488044, at *3-6 (C.D. Cal. Aug. 10, 2009) (extending receivership to cover a number of commonly controlled affiliates of named defendants).

Larmore, through ArciTerra, controlled the entire ArciTerra complex of entities until mid-2023. But the factual predicate for a broad receivership here far exceeds mere common control: ArciTerra's accounting staff has indicated that money was moved among ArciTerra entities to meet cash needs with no regard to corporate structure, as described *supra*, section II.B. And the Receiver's work to date has discovered money movement "*between as many as*

*350 [commonly controlled] entities*" at ArciTerra. ECF 115 at 6, ¶16 (emphasis added). There is accordingly more than sufficient basis on this record for the Court, with its broad equitable powers, to approve a continuation of the receivership over the full panoply of ArciTerra-related entities.

In his "Emergency Motion" of March 8 (ECF 99), Larmore improperly conflates the receivership with the asset freeze (discussed *infra*, section III.F), and has maintained that the SEC should modify the receivership to the extent it covers more than $17 million in assets, the amount on the face of ArciTerra's corporate books that Larmore personally owes back to the company. As explained more fully in the SEC's Response (ECF 116 at pp. 5-9, which the SEC incorporates here by reference), Larmore's argument totally misconstrues the purpose of the receivership. The ArciTerra entities are under receivership to prevent further investor assets from being diminished or lost, to recover investor assets that have been commingled with those of other properties and entities, and to work out a fair recovery for investors and creditors—not solely to preserve a potential monetary judgment against Larmore personally, or even the Defendant ArciTerra entities. Accordingly, the Court should maintain the receivership to continue its important work.

### 2. *The Court Should Continue to Impose the Anti-Litigation Injunction.*

The anti-litigation injunction is likewise still warranted and has served an important role in preserving the receivership property from additional foreclosure actions and other litigation so that the Receiver can tend to ArciTerra's assets. The injunction, whose purpose is to centralize all claims to receivership assets before one Court and is a common feature of federal equity receiverships, has worked smoothly in this case, as the SEC has made accommodations for certain existing actions. At the outset, the SEC negotiated a stipulation (Exhibit C to the Order Appointing Receiver (ECF 004-7)) with a group of secured-creditor intervenors who already had pending foreclosure and/or receivership actions against certain ArciTerra properties and entities to permit their actions to continue, with the Receiver's right to intervene to protect the receivership estate. A federal court may stay pending cases, and "such a stay can be made effective against persons not parties to the SEC action who have

notice of the stay." *Wencke*, 622 F.2d at 1371. "It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC actions." *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340-41 (5th Cir. 2011) (citing *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985), and *Wencke*, 622 F.2d at 1372). The anti-litigation injunction preserves the Court's jurisdiction over the receivership assets, permits the Receiver to marshal assets in an orderly fashion, and prevents the Receiver from spending resources defending litigation. The Court should therefore continue to impose the injunction.

**F.    The Court Should Maintain the Current Asset Freeze.**

Where the Court has jurisdiction over the defendants, "the District Court has authority to order [defendants] to 'freeze' property under [their] control, whether the property be within or without the United States." *SEC v. Int'l Swiss Invests. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990) (*citing United States v. First Nat'l City Bank,* 379 U.S. 378, 384 (1965) and *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363–64 (9th Cir. 1988) (*en banc*)). Federal courts in SEC enforcement actions have the authority to impose asset freezes as an exercise of their general equitable powers. *See* 15 U.S.C. § 78u(d)(5). The purpose of such an asset freeze is to ensure that "any funds that may become due can be collected," *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) (upholding a freeze of the potential disgorgement amount plus funds sufficient to cover a potential civil penalty of three times the profit), and "to preserve the status quo by preventing the dissipation and diversion of assets," *SEC v. Infinity Grp.*, 212 F.3d 180, 197 (3d Cir. 2000). The SEC's burden of proof in connection with a motion for an asset freeze is substantially lower than its burden of proof in seeking a preliminary injunction. *See Unifund SAL*, 910 F.2d at 1041. It is not required that the SEC prove that the frozen assets are tainted by the alleged fraud. *SEC v. Collector's Coffee Inc.*, 602 F. Supp. 3d 488, 494 (S.D.N.Y. 2022) (citing *Unifund SAL*, 910 F.2d at 1035, 1041). A court may maintain an asset freeze until it can make an informed determination of the amount of unlawful proceeds retained by the defendant, and then decide to maintain, remove, or modify the freeze. *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79

1   (3d Cir. 1993). To maintain the asset freeze, the SEC need only show either a likelihood of

2   success on the merits, or that an inference can be drawn that the defendant has violated the

3   federal securities laws. *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). Both of these prongs

4   are well supported by the evidence and require the continued freeze of Larmore's assets.

5       As discussed above, the SEC has shown a likelihood of success on the merits. The

6   Court should continue the asset freeze on all Larmore assets to preserve the status quo and

7   prevent the dissipation of his assets. Larmore has demonstrated an excessively high rate of

8   spending to fund his lavish lifestyle. In his "Perfect Storm Email" of April 17, 2023,

9   Larmore lists for sale his personal assets including: high-end cars (*e.g.*, Aston Martin, Range

10  Rover, Cadillac Escalade); his watercrafts (*e.g.*, two 13-foot Boston Whalers, a pontoon boat,

11  five jet skis, a sail boat); jade art pieces; jewelry; and multiple residence. Marlow Decl. I, Ex.

12  8. In a filing in his divorce proceeding, Larmore acknowledged that he had owned, or owns,

13  a private airplane that was worth over $2 million; a yacht; multiple residences, including a

14  lake house; and a timeshare in Telluride, Colorado. Marlow Decl. I, Ex. 10. Additionally,

15  Larmore's personal charges on his American Express cards for 2020 and 2021 (two years in

16  which there are detailed records of how ArciTerra accountants coded specific American

17  Express charges) totaled about $1.6 million. Foley Decl. II ¶ 50. Larmore's accounting staff

18  recalled paying his personal expenses for country club dues, his Rolls Royce airplane

19  engines, his transportation by private helicopter to his lake house residence, and his airplane

20  for personal trips. Gulbranson Decl. ¶ 12.

21      More recently, Larmore has requested at least $40,000 per month in personal

22  expenses (doubled to at least $80,000 because of his purported obligations in his divorce

23  proceedings)—on top of millions of dollars for legal fees—that he wants funded by the

24  receivership. Status Rpt (ECF 112) at 7. Similarly, Larmore claims that the asset freeze has

25  left "[him] without any money to pay for basic necessities such as food, shelter, clothing,

26  attorneys' fees, and all other aspects of his life," ECF 99 at 4, even though just eight weeks

27  earlier he received a $52,000 check as an agreed-upon exception to the asset freeze. *See* ECF

28  85, 86 (stipulated motion and order modifying asset freeze). It is thus clear that, without an

asset freeze, based on Larmore's historical spending pattern and his ongoing demands, Larmore would quickly dissipate any assets that remain, leaving an eventual order of disgorgement uncollectible.

**G.     The Court Should Renew Its Order for a Verified Accounting.**

In the TRO Order [ECF 78, at 6], the Court ordered Defendant Larmore and Relief Defendants Marcia Larmore and Michelle Larmore to provide a verified accounting of their assets and their use of the Receivership Entities' assets. Despite several written requests by the SEC, Larmore and Marcia Larmore have refused to provide their verified accounting. *See* Marlow Decl. III, Exs, B, C. D. Counsel for Michelle Larmore has informed the SEC that she intends to produce an accounting. The SEC renews its motion for an accounting from Defendant Larmore and Relief Defendant Marcia Larmore.

**IV.     CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion for preliminary injunctive relief, including maintaining the current receivership, litigation injunction, asset freeze, and verified accounting.

Dated:  March 28, 2024                          Respectfully submitted,


                                                */s/ John K. Han*
                                                John K. Han
                                                Attorney for Plaintiff
                                                SECURITIES AND EXCHANGE COMMISSION