Dan W. Goldfine (AZ Bar # 018788)
Cameron C. Stanley (AZ Bar #036605)
DICKINSON WRIGHT PLLC
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
dgoldfine@dickinson-wright.com
cstanley@dickinson-wright.com
(602) 285-5000 Phone
(844) 670-6099 Facsimile

Seth B. Waxman (DC Bar #456156)
(Admitted *Pro Hac Vice*)
DICKINSON WRIGHT PLLC
1825 Eye Street N.W. Suite 900
Washington, DC 20006
swaxman@dickinson-wright.com
(202) 466-5956 Phone
(844) 670-6009 Facsimile

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>Plaintiff,<br><br>v.<br><br>Jonathan Larmore; ArciTerra Company, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisors, LLC; Cole Capital Funds, LLC,<br><br>Defendants, and<br><br>Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC,<br><br>Relief Defendants. | Case No.: 2:23-cv-02470-DLR<br><br>**DEFENDANT JONATHAN LARMORE'S AND RELIEF DEFENDANT MARCIA LARMORE'S MOTION TO REMOVE STONETURN GROUP, LLP AS RECEIVER** |

Defendant Jonathan Larmore and Relief Defendant Marcia Larmore (hereinafter referred to collectively as the "Defendants"), by and through their attorneys, Dickinson Wright, PLLC, hereby move to remove Stone Turn Group, LLP ("StoneTurn" or the "Receiver") as the Receiver in this matter based on three grounds: (1) the Receiver's repeated violations of its duties to this Court and the Defendants' Constitutional Due Process rights; (2) the Receiver's improper billing practices, which have remarkably amounted to more than $4 million in fees in just the first three months of this case; and (3) the Receiver's conduct with regard to Shannon Waltchak's offer to purchase the ArciTerra conglomerate for the equivalent of approximately $450 million ($106 million in equity and $350 million in debt assumption).

I.  **The Receiver's Repeated Violations of Its Duties to this Court and The Defendants' Constitutional Due Process Rights Requires Removal**

This motion is first, and foremost, based upon StoneTurn's absolute refusal to engage the Defendants on any of the substantive allegations at issue in this case. Time and again, through phone calls and pleadings filed with the Court making clear the defense theories of the case, defense counsel has asked the Receiver to consider and investigate the defense theories of the case to no avail. Instead, the Receiver has improperly, and through more than twenty *ex parte* communications with the SEC, solely advanced the SEC's theories of the case, in direct violation of the Receiver's duties to this Court and the Defendants' Constitutional due process rights. The result has been an entirely biased and one-sided star-chamber like process, resulting in false and misleading information being submitted to this Court, as detailed in the following two sub-sections.

   A.   **The Receiver's Violations of Its Duties to this Court Requires Removal**

The Receiver has not executed its duties with the impartiality required of it and in breach of its fiduciary duties owed to the Defendants. See, e.g., Sovereign Bank v. Schwab, 414 F.3d 450, 454 (3d Cir. 2005) ("A receiver owes a fiduciary duty to the owners of the property under his care."). A SEC receivership case, SEC v. Schooler, No. 12-CV-2164, 2015 WL 1510949, at *2 (S.D. Cal. Mar. 4, 2015), provides an instructive discussion of the legal and ethical standards governing a receiver's duties to a court:

2

Generally, a federal equity receiver is an "officer of the court." In re San Vicente Med. Partners Ltd., 962 F.2d 1402, 1409 (9th Cir. 1992). District courts, therefore, have extremely broad authority to supervise and determine the appropriate action to be taken in a federal equity receivership. Sec. and Exch. Comm'n v. Capital Consultants, LLC, 397 F.3d 733, 738 (9th Cir. 2005). Though the "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors," Sec. and Exch. Comm'n v. Hardy, 803 F.2d 1034, 1038 (9th Cir. 1986), federal equity receivers have multiple duties, including: (1) preserving receivership assets, (2) administering receivership property suitably, and (3) assisting in any equitable distribution of those assets if appropriate. See Liberte Capital Grp., LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006) (citation omitted). A district court may therefore institute "reasonable procedures" to effect these purposes. Hardy, 803 F.2d at 1038.

\*         \*         \*

Though the SEC requests a receiver's appointment and often initiates the engagement, the receiver is still an "officer of the court" and not an arm of the SEC. In re San Vicente Med. Partners, 962 F.2d at 1409. **As such, a receiver should be impartial between the parties and avoid the appearance of impropriety**. See CODE OF CONDUCT FOR UNITED STATES JUDGES Canons 2, 3(A)(1) (2014); MODEL CODE OF JUDICIAL CONDUCT R. 1.2, 2.2 (2010). However, such impartiality does not extend to his relationship with the receivership estate. The receiver owes a "fiduciary duty to the owners of the property under his care" and thus must "protect and preserve" the receivership estate's assets "for the benefit of the persons ultimately entitled to it." Sovereign Bank v. Schwab, 414 F.3d 450, 454 (3d Cir. 2005) (citation omitted); Cty. of Oakland by Kuhn v. City of Detroit, 784 F. Supp. 1275, 1286 (E.D. Mich. 1992) ("A receiver appointed by the court becomes a fiduciary of the court and any person interested in the estate of which he has been made a receiver."). In an SEC enforcement action, "the persons ultimately entitled" to the receivership estate's assets are either one of two distinct groups: (1) if the SEC does not prove its case, the defendants may retake their property, or (2) if the SEC does prove its case and investor restitution is deemed appropriate, the investors in the investment scheme may lay claim to the assets. Sovereign Bank, 414 F.3d at 454. As the receiver owes a fiduciary duty, the receiver cannot be impartial towards the receivership estate and is obligated to advocate to the court what he or she believes to be the best course of action to protect, preserve, administer, and distribute the receivership estate's assets. See Liberte Capital Grp., 462 F.3d at 551.

> Upon review of the case law surrounding receivers, the duties of receivers, judicial ethical canons, and the interaction between receivers and the court, the Court concludes that, in this case, [the Receiver] should abide by the following ethical standards:
>
> 1.  The receiver owes a fiduciary duty to the court and to the eventual owners of the receivership estate's assets, see Sovereign Bank, 414 F.3d at 454;
>
> 2.  The receiver thus has a duty to protect, preserve, administer, and distribute appropriately the receivership estate's assets and must advocate, to the court, courses of action that are consistent with these duties, see Liberte Capital Grp., 462 F.3d at 551;
>
> 3.  The receiver may engage in appropriate *ex parte* communication with the parties where necessary to either carry out the receiver's duties or effectuate discovery, contra Cobell, 237 F. Supp. 2d at 74 n. 2;
>
> 4.  **The receiver, however, is obligated to remain unbiased between the parties in the litigation and must not take positions or advocate for actions primarily for the benefit of one party** unless such positions or actions are consistent with the receiver's fiduciary duties, see CODE OF CONDUCT FOR UNITED STATES JUDGES Canon 3(A)(4) (2014); MODEL CODE OF JUDICIAL CONDUCT R. 2.9 (2010); and
>
> 5.  **The receiver must also avoid the appearance of impropriety so as to maintain confidence in the impartiality of the judiciary**, see CODE OF CONDUCT FOR UNITED STATES JUDGES Canon 2(A) (2014); MODEL CODE OF JUDICIAL CONDUCT R. 1.2 (2010).
>
> Though [the] Court does not contend this list to be exhaustive, it does articulate a standard by which [the Receiver] should act and provides a reference point for discussing the allegations of bias in this case. Finally, in reviewing a receiver's conduct, courts must always balance the equities involved to determine the appropriate action, if any, to be taken. Private Equity Mgmt. Group, 2009 WL 2019747, at *6.

Schooler, 2015 WL 1510949 at *1-4 (emphasis added).

In Schooler, the defendants sought to remove the receiver on the following seven grounds:

> 1.  Collaboration with the SEC in drafting motions;

4

|   |   |
|---|---|
| 2. | Identifying arguments favorable to the [General Partnerships] and then withholding those arguments from the Court; |
| 3. | Providing documents, analysis, and data to the SEC outside of discovery; |
| 4. | Sharing investor communications with the SEC but not Defendants; |
| 5. | Providing detailed reports to the SEC but not Defendants; |
| 6. | Plotting case strategy with the SEC; and |
| 7. | Spoliation of evidence. |

Id. at 4.

In considering those arguments, the Court determined that the receiver acted inappropriately in several important respects, including: (1) consistently seeking input from the SEC on the receiver's filings; and (2) refusing to have anything more than "limited communication" with the defendants because of the "adversarial position" taken by the defendants. Id. at *6. With regard to the latter point, the Schooler Court stated:

> Even though Defendants have chosen to take an adversarial position towards [the Receiver], that does not mean that [the Receiver] can decide to only seek input from the SEC. The Receiver is an officer of the court and thus must not only act impartially, but appear impartial as well. See In re San Vicente, 962 F.2d at 1409; see also CODE OF CONDUCT FOR UNITED STATES JUDGES Canons 2(A), 3(A)(4) (2014); MODEL CODE OF JUDICIAL CONDUCT R. 1.2, 2.9 (2010). **Failure to do so undermines the faith placed by the public in the fairness of the judicial system**.

Id. at 7 (emphasis added).

Here, the Defendants seek to remove StoneTurn on the following five grounds.

**1.    Failure to Consider Defense Theories of the Case:** Since the outset of this case, and every day since, the Receiver has summarily refused to consider or include in his analyses any of the defense theories of the case, which negate the SEC's allegations and prove Jonathan Larmore's ("J. Larmore") innocence.  The following examples are illustrative:

5

a. **J. Larmore's Legitimately Earned Fees:** The defense repeatedly asked the Receiver to consider the fact that J. Larmore was legally entitled to receive millions of dollars in various types of fees from ArciTerra, including acquisition fees and management fees, during the nearly two decades he served as ArciTerra's investment adviser. See Note Funds II & III Private Offering Memoranda ("POM") at 19 and 21, respectively, attached hereto as Exhibits 1 and 2.[1]

The Receiver refused to consider this critical point or properly include this factor in his analyses and submissions to the Court. Instead, the Receiver has moved in lock-step with the SEC's complaint to falsely contend that every dollar that was transferred from ArciTerra to J. Larmore or private entities he controlled was ill-gotten gains. See Receiver's Factual Update dated April 1, 2024 at ¶¶ 42-50 [Doc. 125] (falsely stating that J. Larmore improperly transferred $1.02 billion by, and among, ArciTerra entities between 2019 and 2022). That contention is entirely false, misleading, and wrong, and the Receiver's unwillingness to even consider an alternate theory of the case is a prime example of his entirely biased and one-sided investigation.

b. **ArciTerra Entities Generated Non-Investor Revenue:** Beginning in 2005, and continuing through 2016, the ArciTerra conglomerate engaged in twelve deal-specific private offerings through which ArciTerra Strategic Retail Advisors ("ASRA") legitimately collected millions of dollars in fees, cash flows (such as rents), and profits. Those non-investor fees, cash flows, and profits were subsequently (and legitimately) used to purchase additional real property, which in turn, generated more fees, cash flows, and profits. This process of reinvesting legitimately earned, non-investor funds was repeated over-and-over again to exponentially grow the ArciTerra conglomerate. However, the Receiver has refused to consider this factual reality to improperly conclude, like the SEC, that any funds flowing through ASRA were improperly manipulated. See Receiver's Factual Update dated April 1, 2024 at ¶¶ 42-50 [Doc. 125] (claiming $1.02 billion was improperly manipulated through ASRA).

---

[1] The term "ArciTerra" is used globally in this motion to represent all ArciTerra entities that J. Larmore managed during his nearly two decades of service.

J. Larmore also acquired multiple properties before ArciTerra was formed in 2005. Using Section 1031 of the Internal Revenue Code, J. Larmore legitimately sold those properties and used the proceeds to purchase additional properties for the same purposes to take advantage of Section 1031, which allowed him to legally defer the capital gains tax to a future date. J. Larmore then refinanced the newly purchased properties, which allowed him to extract tens of millions of dollars in non-investor money. Those funds were then loaned to ArciTerra entities to be re-invested into the ArciTerra conglomerate to purchase additional real property. By doing so, J. Larmore further expanded the ArciTerra real estate portfolio through legitimately earned, non-investor funds.

In contrast, the Receiver's rudimentary analysis, which entirely tracks the SEC's complaint and position throughout this litigation, ignores these critical points to falsely make it appear as though there was one, linear flow of money directly from investors to J. Larmore and the private entities he controlled. The truth is far more complex and requires an investigation and understanding that the Receiver has been unwilling to consider or undertake.

    **c.**  **Thefts by ArciTerra Employees**: StoneTurn further refused to consider the fact that ArciTerra's then-employees likely stole significant amounts of money from ArciTerra. For example, StoneTurn contends that from 2019 to 2022, J. Larmore improperly transferred over $1.2 billion from, and among, various ArciTerra companies. See Receiver's Factual Update dated April 1, 2024 at ¶¶ 42-50 [Doc. 125]. However, a review of Kansas State Bank records would have alerted StoneTurn to the fact that the transactions were conducted using a corporate stamp of J. Larmore's name, not his actual signature.

Members of ArciTerra's accounting department, including Chief Operating Officer Blaine Rice, consummated these transactions, not J. Larmore. Indeed, J. Larmore had no involvement in these transactions. It seems that members of ArciTerra's accounting department created new ArciTerra entities with corporate names that were similar to the ArciTerra entities J. Larmore formed. Without regard for these critical facts, StoneTurn blindly adhered to the SEC's narrative and adopted the false information and omissions that have been advanced by ArciTerra's then-employees.

        **d.**     **Refusal to Engage with J. Larmore:**  To counter the false narratives described above, defense counsel repeatedly offered to make J. Larmore available to the Receiver for questioning to assist the Receiver in his investigation and analysis, but those requests were summarily rejected as well.  It defies reason that a fair-minded (or any) investigator would refuse an opportunity to question and gain insight from the accused unless, of course, the investigator has a pre-set conclusion in mind and does not want to be challenged in that endeavor.

        Defense counsel also offered to make J. Larmore available for questioning to assist the Receiver in locating records, understanding ArciTerra's business, and narrowing the Receiver's efforts to the key questions.  By doing so, the Receiver would have been in a position to conduct a far more efficient and thorough investigation.  However, as evidenced by the Receiver's extraordinary fee request and submissions to the Court, the Receiver opted to attempt to recreate ArciTerra's business records from scratch and engage in an unfocused investigatory path that has resulted in the biased, one-sided work product that has been submitted to the Court.

        **2.**     **Improper *Ex Parte* Contacts:**  The Receiver has engaged in pervasive, improper *ex parte* contacts with the SEC, which has greatly contributed to the Receiver's biased, one-sided investigation.  According to the Receiver's billing records, the Receiver engaged in 22 separate *ex parte* conversations with the SEC, totaling over 18 hours, as follows:

|   | Date | Description |
|---|---|---|
| 1 | 1/2/24 | Call with the SEC and Allen Kadish |
| 2 | 1/8/24 | Emails with the SEC to answer questions, and emails with Team regarding SEC questions |
| 3 | 1/10/24 | Meeting with SEC |
| 4 | 1/18/24 | Call with the SEC Neal Jacobson and John Han |
| 5 | 1/31/24 | Discussion with SEC and counsel (Kadish), Applbaum, Curley, Holley, Migone, Oustalniol |
| 6 | 2/9/24 | Call with SEC to discuss document production requests - Curley, Holley, Cona, Fuller, Cecala, Applbaum, Yachnik, Breakstone & SEC personnel |
| 7 | 2/12/24 | Call with SEC to discuss Dataprise doc collection |
| 8 | 2/13/24 | Call with SEC and Dataprise to discuss doc collection |

| | | | |
|---|---|---|---|
| 1 | 9 | 2/21/24 | Call with SEC – Applbaum, Kadish, Holley, LaRue |
| 2 | 10 | 2/22/24 | Call with SEC related to production of ASR GL and transactions |
| 3-4 | 11 | 2/22/24 | Catch-up meeting with SEC regarding MRI data - Applbaum, Kadish, Oustalniol, Yachnik, Soha, Holley, Cona, Ratto, LaRue, Dennis |
| 5 | 12 | 2/26/24 | Catch-up meeting with SEC regarding MRI data - Yachnik, Soha, Ratto |
| 6 | 13 | 2/28/24 | Call with SEC - Oustalniol, Curley, LaRue, Applbaum, Kadish, Migone |
| 7 | 14 | 3/6/24 | Call with SEC |
| 8 | 15 | 3/8/24 | Meeting with SEC to discuss status - Scheck, Cecala, Curley, LaRue |
| 9-10 | 16 | 3/9/24 | Call with SEC and Archer (Kadish, Breakstone), to discuss emergency fi by J. Larmore. Applbaum, Holley, Curley, Migone, Coxworth, Oustalniol |
| 11 | 17 | 3/12/24 | Call with SEC related to emergency hearing and receiver's factual update |
| 12 | 18 | 3/15/24 | Call with SEC to discuss status - Curley, Migone, Scheck, LaRue |
| 13-14 | 19 | 3/18/24 | Conference call w M Katz (SEC) and A Kadish (as Counsel for the r) re obligations to court and joint report to court following conference |
| 15 | 20 | 3/19/24 | TC M Katz (SEC) and TC re request for retainers and allowance |
| 16-17 | 21 | 3/20/24 | Receiver Catch-Up Meeting w/ SEC - Migone, Cecala, Oustalniol, Curley, Applbaum, Kadish, LaRue |
| 18 | 22 | 3/27/24 | Call with the SEC – Applbaum, Kadish |

A copy of StoneTurn's "First Application of Receiver for Allowance and Payment of Professional Fees and Reimbursement of Expenses for the Period December 21, 2023 through March 31, 2023" (hereinafter referred to as the Receiver's "Fee Application") is attached hereto as Exhibit 3.

Notably, the Receiver's work from December 2023 to March 2024, covered a total of 71 business days, which included holiday time periods such as the week between Christmas and New Year's. Per the chart above, on 22 of those 71 business days (*i.e.*, 31%), the Receiver had *ex parte* discussions with the SEC, totaling more than 18 hours. While four of those *ex parte* contacts seemingly related to document production, the remainder appear to have been improper substantive discussions between the Receiver and SEC.

9

In Schooler, the Court concluded that certain *ex parte* contacts between the Receiver and SEC were proper because the contacts related to document production, which the Court concluded was a necessary part of the Receiver's work. Here, in contrast, the vast majority of the *ex parte* contacts appear to have covered substantive topics. To the extent this Court deems it necessary to learn more about these *ex parte* contacts, the Defendants respectfully request that the Court Order the Receiver to produce: (1) all electronic external communications with the SEC; and (2) all internal communications among StoneTurn employees relating to discussions with the SEC.

3. **Receiver's Stated "No Notice" Policy:** Strikingly, the Receiver expressly told the Defendants that they had no right to *any* notice of the Receiver's activities. Specifically, on January 6, 2024, in response to a discussion relating to access to one of ArciTerra's databases, the Receiver stated in an email to defense counsel, "**Respectfully, the Receiver need give you or your client no heads up about his activities**." A copy of the Receiver's email is attached hereto as Exhibit 4 (emphasis added).

Since the time that email was sent on January 6, 2024, the Receiver has adhered to his "no notice" policy. Time and again, defense counsel asked (indeed, pleaded) for information regarding the Receiver's activities to no avail. Several of the defense entreaties were for the sole purpose of facilitating the Receiver's activities in a cost-efficient, time-appropriate way, but the Receiver has been a black box, refusing any input whatsoever.

4. **The Receiver's Grossly Negligent Investigation:** Not only has the Receiver refused to consider any of the defense theories of the case, he has also failed to engage in the most basic investigatory efforts. Specifically, during the course of the SEC's year-long investigation leading up to the filing of the instant Complaint in November 2023, the SEC interviewed or deposed the following three key ArciTerra employees, who oversaw or managed all of ArciTerra's financial affairs and reporting:

- Chief Operating Officer Blaine Rice;
- Controller Kevin Gulbranson; and
- Assistant Controller Kathleen Bouet.

The interviews resulted in written memoranda memorializing the questioning and the depositions resulted in transcripts. Strikingly, the Receiver informed defense counsel that he and his team have not reviewed the interview memoranda or transcripts. How can an investigator conduct a fair and thorough investigation without reviewing statements from the three most important witnesses? The Receiver has certainly dedicated an inordinate amount of time and resources to supposedly investigating this matter. The Receiver's fee application lists 1,213.30 hours of work in the area of forensic accounting, totaling an incredible $652,817.00 in fees; yet, they did not take the time to read the testimony and statements from the three most important witnesses in the case.

**5.    False Submissions to the Court**: In addition to the inherently false narratives submitted to the Court, the Receiver also directly submitted false information to the Court. Specifically, the Receiver falsely claimed that J. Larmore interfered with the Receiver's efforts to take control, possession, and management of the Receivership entities and assets by attempting to find a tenant for the property located at 900 West Marion Street, Punta Gorda, Florida. See Receiver's Factual Update dated 4/1/23 [Doc. 125] at ¶53(b).

However, the Receiver conspicuously omitted from his submission to the Court that the Receiver, members of the Receiver's team, defense counsel, and J. Larmore all participated in a joint conference call where J. Larmore informed the Receiver and his team that there were steps he could take to increase the cash flow and value of the Receivership assets by doing things such as finding tenants for properties. The Receiver and his team consented to such efforts. Notwithstanding, in the Receiver's 4/1/24 update to the Court, the Receiver improperly included an account of these events that was designed to paint J. Larmore in a false and unfair light by accusing him of improperly attempting to interfere with the Receiver's activities. See Receiver's Factual Update dated 4/1/23 [Doc. 125] at ¶53(b).

The five points discussed above demonstrate that the Receiver has engaged in a fundamentally unfair and biased investigative process that has resulted in significant misstatements and omissions to this Court. It is also important to note that because the Defendants have had no transparency into the Receiver's work, the points contained in this submission are restricted to

only the limited information that can be gleaned from the outside and a review of the Receiver's submissions to the Court. To the extent the Court deems it necessary to learn more about the Receiver's work, the Defendants respectfully request an opportunity to seek discovery from the Receiver.

Finally, StoneTurn's conduct in the instant case is far more egregious than the receiver's conduct in Schooler, especially given the short period of time StoneTurn has been in place. The receiver in Schooler had been in place for more than two years when the defendants in that case first moved to remove the receiver. See Schooler Docket Entries 10 (appointing the receiver on 9/6/12) and 860 (motion to remove the receiver dated 12/22/14) attached hereto as Exhibits 5 and 6. Ultimately, the Schooler Court declined to remove the Receiver on March 4, 2015, nearly 2 ½ years after the Receiver was appointed. See Schooler at *7. The receiver's lengthy tenure was a critical factor in the Court's decision in Schooler to keep the receiver in place.

Here, StoneTurn has only been in place for a little more than four months, and this case is set to be stayed for at least the next 6 months, and possibly longer, if J. Larmore's criminal trial is adjourned to a later date. Thus, the circumstances in the instant case are far different than Schooler and entirely warrant StoneTurn's removal. Moreover, StoneTurn's stated and pervasive bias against the Defendants makes crafting any future restrictions on StoneTurn's activities unworkable. Forensic investigative work is an art, not a science. Complex financial records can be sliced in various ways to support a particular narrative. Faulty premises lead to improper results. A receiver's self-serving claim that he has supposedly considered defense theories of the case is difficult, if not impossible, to contest. If StoneTurn is to continue as Receiver, the Defendants will be faced with the impossible task of combatting not only the SEC, but also a biased and unfair Receiver.

This pleading was not filed in haste. Defense counsel toiled for months to try to work with the Receiver, accepted his apologies for supposed "miscommunications," and attempted to bridge the obvious gap in the substance of the Receiver's work product. Defense counsel also realizes that this pleading will inflame the Receiver, further widening the already deep chasm between the two sides. Nonetheless, there comes a time in the rarest of circumstances when defense counsel

is left with no choice but to bring glaring wrongs to the Court's attention and ask that a supposed independent party be removed, as opposed to admonished or instructed to "do better." There is simply no way at this point to fairly un-ring the bell that has been rung by the Receiver's misconduct.

The most obvious way to evaluate StoneTurn's conduct is to view it in the context of a court. If a judge entirely refused to hear or consider a Defendant's theory of a case during the first four months of litigation, engaged in more than 20 *ex parte* communications with investigators, and partook in the various other improper activities described herein, there could be little doubt that that particular judge could no longer sit in judgment of the accused. The fact that a receiver has engaged in this exact type of misconduct should yield no different result. Failure to remove StoneTurn at this stage, especially in light of the significant stay that is in place and will continue for at least the next six months, risks the very danger that the Schooler Court warned against; namely, undermining "the faith placed by the public in the fairness of the judicial system." Schooler at *7.

**B.     The Receiver Violated the Defendants' Constitutional Due Process Rights Requiring Removal**

The five violations described above also constitute violations of the Defendants' Constitutional Due Process rights. It is firmly established that court-appointed receivers act under color of law, triggering the Defendants' Constitutional Due Process rights. See, e.g., Lebbos v. Judges of Superior Court, Santa Clara County, 883 F.2d 810, 818 n. 10 (9th Cir. 1989) ("Because [the receiver] was acting in his capacity as court-appointed receiver, he was acting under color of state law."); New Alaska Development Co. v. Guetschow, 869 F.2d 1298, 1305 (9th Cir. 1989) ("[Receiver] does not dispute that he acted under color of state law in functioning as a court-appointed receiver . . . ."); ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund, 754 F.3d 754, 759 (9th Cir. 2014) (stating that the appointment of a receiver is a part of "'the core of' California's court system"); Johns v. Leavitt, CV-01510, 2009 WL 3052230 at *4 (D. Nev. Sept. 21, 2009) ("Plaintiff correctly asserts that a court-appointed receiver acts under color of state law . . . ."); Scutieri v. Estate of Revitz, 683 F. Supp. 795, 801 (S.D. Fla. 1988) ("Plaintiffs correctly

point out that a court-appointed receiver acts under color of state law . . . ."); Hohensee v. Grier, 373 F. Supp. 1358, 1363-1364 (M.D. Pa. 1974) (concluding that a court appointed receiver acts under color of state law because the receiver was the "hand or arm of the court" and was "subject to the court alone"), aff'd, 524 F.2d 1403 (1975), cert denied, 426 U.S. 940 (1976); City Partners, LTD v. Jamaica Savings Bank, 454 F. Supp. 1269, 1276 (E.D.N.Y. 1978) ("There can be no doubt that Simone, as a court-appointed receiver, acted under color of state law.").

The Eleventh Circuit, in SEC v. Elliott, 953 F.2d 1560 (11th Cir. 1992), sets forth a thorough discussion of the Defendants' due process rights in the context of a SEC receivership case:

> Due process requires notice and an opportunity to be heard. Cleveland Bd. Of Education v. Loudermill, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493, 84 L.Ed.2d 494, 503 (1985); Greene v. Lindsey, 456 U.S. 444, 102 S. Ct. 1874, 72 L.Ed.2d 249 (1982). Due process essentially requires that the procedures be fair. In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625, 99 L. Ed. 942 (1955). The process that is due varies according to the nature of the right and to the type of proceedings. Mathews v. Eldridge, 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L.Ed.2d 18 (1976). In Eldridge, the Supreme Court applied a balancing test to determine what type of procedure was required. The Court looked at the strength of the private interest, the risk of erroneous deprivation, the probable value of additional or substitute safeguards, and the government interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail." 424 U.S. at 335, 96 S. Ct. at 903. **Generally, if government action will deprive an individual of a significant property interest, that individual is entitled to an opportunity to be heard**. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L.Ed.2d 113 (1971). However, a hearing is not required if there is no factual dispute. Codd v. Velger, 429 U.S. 624, 97 S. Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (a discharged employee had no right to a hearing since he did not challenge the fact upon which the dismissal was based).
>
> With these factors in mind, we must decide whether the summary procedure the district court used violated the appellants' due process rights. Rule 56 of the Federal Rules of Civil Procedure gives the district court summary jurisdiction over all the receivership proceedings and allows the district court to disregard the Federal Rules. The district court has broad powers and wide discretion to determine relief in an equity receivership. SEC v. Safety Finance Service, Inc., 674 F.2d 368, 372 (5th Cir. 1982); SEC v. Lincoln

> Thrift Ass'n, 577 F.2d 600, 609 (9th Cir. 1978); SEC v. United Financial Group, Inc., 474 F.2d 354, 358 (9th Cir. 1973). This discretion derives from the inherent powers of an equity court to fashion relief. Safety Finance, 674 F.2d at 372.
>
> \* \* \*
>
> **We must look at the actual substance, not the name or form, of the procedure to see if the claimants' interests were adequately safeguarded.** Wencke, 783 F.2d at 836.

SEC v. Elliott, 953 F.2d at 1566-1567 (emphasis added).

Here, the Defendants' property interests are directly at stake. StoneTurn's flawed work has formed the basis for the Receiver to petition the Court to sell Receivership assets (*i.e.*, ArciTerra assets), which are entirely owned by the Defendants, such as the Receiver's recent request to sell assets owned by ATA Palencia St. Augustine FL, LLC and ATA Mercado St. Augustine FL, LLC. These two entities contributed over $2.5 million to the Arciterra conglomerate in 2017, alone, through cash-out refinances, the sale of a parcel of land (called an "outparcel") surrounding one of the properties, and cash flow in the form of tenant rents, facts that StoneTurn blindly avoided. There are numerous other similar examples of non-investor funds contributing tens of millions of dollars to the ArciTerra conglomerate.

StoneTurn's work will also almost certainly form part of the basis for the SEC to try to prove its case against the Defendants, which could result in a significant money judgment against the Defendants. In either case, the Defendants' property interests are directly at stake, in that, they own the vast majority of the ArciTerra conglomerate and the assets it holds, thereby implicating their Constitutional Due Process rights. See Boddie v. Connecticut, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L.Ed.2d 113 (1971) (if government action will deprive an individual of a significant property interest, that individual is entitled to an opportunity to be heard).

StoneTurn's refusal to engage the Defendants whatsoever on their theories of the case and the other areas of misconduct discussed above demonstrate that the Defendants have not, and cannot in the future, be afforded their Constitutional rights to be heard with StoneTurn as the Receiver. Moreover, any transition costs incurred in empaneling a new receiver are far outweighed by the Defendants' Constitutional right.

The Defendants also respectfully request that their Constitutional Due Process rights require an in-person hearing before this Court on this motion. Defense counsel has had a very difficult time hearing and responding to the Court's questions during prior telephonic hearings. The issues presented in this motion are complex and rise to a Constitutional level. Given these circumstances, and the fact that there will not likely be a need for another in-person hearing until at least after J. Larmore's criminal case is concluded, the Defendant's respectfully request an in-person hearing on this motion.

## II. The Receiver's Alarming $4 Million Fee Request Also Supports Removal

StoneTurn's refusal to engage with the Defendants is further exacerbated by the remarkable $4 million fee request that StoneTurn submitted for just the first three months of work in this case. See StoneTurn's Fee Application Exhibit 2(b) attached hereto as part of Exhibit 3.

Of note, StoneTurn's fee request includes billing records showing:

- 19 calendar days where there are over 100 time entries on a single day;

- 33 calendar days where individual StoneTurn employees submitted 10 or more time entries on the same calendar day;

- 41 calendar days where large group meetings of 10 or more StoneTurn employees took place. For example, on March 20, 2024, nineteen StoneTurn employees met to discuss "progress of tasks of Construction and Real Estate workstream." These numbers are remarkable given that StoneTurn has only been in place for a total of 71 business days, meaning there have been meetings of 10 or more StoneTurn employees on 58% of the days StoneTurn has been working on this matter, which includes holiday periods such as the time between Christmas and New Year's (meaning the percentage is likely much higher);

- Dozens of calendar days where individual StoneTurn employees entered multiple time entries for the same exact work. For example, on 15 calendar days, StoneTurn employee Charlotte Finney entered multiple time entries on the same day, describing work as:

  - Background investigative research
  - Asset Analysis on Larmore's vehicles
  - First review of emails and documents uploaded to Reveal
  - Corporate information for asset tracker

16

On March 12, 2024, alone, Charlotte Finney entered five time entries for "identifying corporate records for ArciTerra/Larmore entities," as shown in the excerpt below from StoneTurn's billing records:

| Name | Date | Matter | Task | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| | | | | | 0.50 | 750.00 | 375.00 |
| Charlotte Finney | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 0.40 | 295.00 | 118.00 |
| Charlotte Finney | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 0.80 | 295.00 | 236.00 |
| Charlotte Finney | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 1.30 | 295.00 | 383.50 |
| Charlotte Finney | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 1.70 | 295.00 | 501.50 |
| Charlotte Finney | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 2.30 | 295.00 | 678.50 |
| Zoe Montgomery | 3/12/2024 | Receivership | Asset Analysis | Identifying corporate records for ArciTerra/Larmore entities. | 2.00 | 325.00 | 650.00 |

Id.

Thus, not only did StoneTurn bill in excess of $4 million without devoting any of that extraordinary amount of time to even consider the defense theories of the case, StoneTurn seemingly treated ArciTerra and J. Larmore as an open spigot for what appears to be entirely improper, unjustified, and excessive billing. StoneTurn's excessive and improper billing also cuts directly into the Larmores' ownership and property interests, in that, StoneTurn's fees will reduce the amount of proceeds that are available to the Larmores when ArciTerra assets are sold, thereby implicating their Constitutional Due Process rights.

**III.    The Receiver's Interactions with Potential ArciTerra-Buyer Shannon Waltchack Raise Serious Questions about the Receiver's Conduct**

The Defendants have serious concerns about the Receiver's actions with regard to the Letter of Intent ("LOI") that was submitted by Shannon Waltchack ("SW") to the Receiver in mid-January 2024, to purchase the entire ArciTerra conglomerate for the equivalent of approximately $450 million ($106 million in equity and $350 million in debt assumption). When SW presented that offer in mid-January 2024, the Receiver repeatedly complained about the following procedural issues: (a) the offer expired in four days; (b) required confidentiality and exclusivity; (c) identified a broker; (d) contemplated offeror due diligence; (e) was conditioned by third party lenders; and (f) only proposed a $250k deposit. See Receiver's Initial Statement in Response to Emergency Motion [ECF 103] at ¶ 2 (memorializing these complaints).

Tellingly, however, the Receiver also noted that he substantively investigated SW's "bona fides" and "potential wherewithal" and made no negative comments. See id. at ¶ 3. The absence of any negative comments gives every indication that the Receiver knew that SW had the financial wherewithal to consummate the deal and a well-established track record of purchasing assets such as the ArciTerra conglomerate. Indeed, no such complaints could have been levied given SW's backing by a billion dollar endowment fund and lengthy track record of engaging in similar real estate purchases. However, during the ensuing weeks, the Receiver told SW that its offer was not packaged correctly and failed in other respects, resulting in SW initially reducing its offer to a subset of ArciTerra assets, and then, ultimately walking away from the deal entirely.

These circumstances raise the question of why this deal failed. Was it because SW could not fundamentally complete the deal, or was there another reason? The Receiver's personal and firm-wide financial incentives should certainly be considered in this analysis. For example, if the Receiver had consummated SW's deal, then the ArciTerra conglomerate would have been sold to SW and there would have been no need for the Receiver to operate, manage, or engage in the vast majority of activities that led to the Receiver's current $4 million fee application. There can also be no doubt that the Receiver stands to gain many more millions of dollars in revenue for additional work that will be performed during the remainder of the Receivership, if the Court allows StoneTurn to continue in its role as Receiver.

On the other hand, if the Receiver worked to create procedural barriers, real or imaginary, that forced SW to walk away from the deal, then the Receiver put himself and his firm in a position to reap the financial rewards it now seeks in its first fee application and similar fee applications that will certainly be submitted in the future.

It is difficult to say at this time which of these scenarios guided the Receiver's conduct. However, further examination into this area is certainly called for given the financial incentives involved, the extraordinary nature of the Receiver's fee request, and the other facts and circumstances surrounding SW's offer. To that end, to the extent the Court deems it appropriate to learn more about StoneTurn's interactions with SW, then the Defendants respectfully request that the Court Order StoneTurn to produce the following documents:

(1) All external electronic communications with SW;

(2) All internal electronic communications by, and among, StoneTurn's officers, directors and employees relating to SW; and

(3) All other electronic communications relating to SW in any way.

## **CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that the Court remove StoneTurn as the Receiver, and set a schedule whereby the parties can present alternative choices to the Court for a new Receiver to be put in place.

Dated: May 14, 2024.                    DICKINSON WRIGHT PLLC

By: */s/ Seth Waxman*
Seth B. Waxman (DC Bar #456156)
(Admitted *Pro Hac Vice*)
DICKINSON WRIGHT PLLC
1825 Eye Street N.W. Suite 900
Washington, DC 20006
swaxman@dickinson-wright.com

Dan W. Goldfine (AZ Bar # 018788)
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
dgoldfine@dickinson-wright.com

*Attorneys for Defendants Jonathan Larmore and Marcia Larmore*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I electronically transmitted the foregoing document with the Clerk of the Court using the CM/ECF systems, which will provide electronic mail notice to all counsel of record.

*/s/ Seth B. Waxman*
Seth B. Waxman