Dan W. Goldfine (AZ Bar # 018788)
Cameron C. Stanley (AZ Bar #036605)
DICKINSON WRIGHT PLLC
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
dgoldfine@dickinson-wright.com
cstanley@dickinson-wright.com
(602) 285-5000 Phone
(844) 670-6099 Facsimile

Seth B. Waxman (DC Bar #456156)
(Admitted *Pro Hac Vice*)
DICKINSON WRIGHT PLLC
1825 Eye Street N.W. Suite 900
Washington, DC 20006
swaxman@dickinson-wright.com
(202) 466-5956 Phone
(844) 670-6009 Facsimile

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Jonathan Larmore; ArciTerra Company, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisors, LLC; Cole Capital Funds, LLC,<br><br>　　　　　Defendants, and<br><br>Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC,<br><br>　　　　　Relief Defendants. | Case No.: 2:23-cv-02470-DLR<br><br>**DEFENDANT JONATHAN LARMORE'S AND RELIEF DEFENDANT MARCIA LARMORE'S REPLY TO THE SEC'S AND RECEIVER'S OPPOSITIONS TO THE DEFENDANTS' MOTION TO REMOVE STONETURN GROUP, LLP AS RECEIVER** |

1       Defendant Jonathan Larmore and Relief Defendant Marcia Larmore (hereinafter referred
2  to collectively as the "Defendants"), by and through their attorneys, Dickinson Wright, PLLC,
3  hereby reply to the Receiver's and SEC's oppositions to the Defendants' motion to remove the
4  Receiver.  This reply addresses the Receiver's and SEC's contentions that the Receiver should not
5  be removed based upon the Receiver's:  (1) Constitutional and related violations; (2) improper
6  billing practices; (3) handling of Shannon Waltchak's offer to purchase the ArciTerra
7  conglomerate; and (4) other miscellaneous points.
8       To facilitate the transition to a new Receiver, the defense has consulted with Trigild, Inc.
9  ("Trigild"), which has been working as the Receiver over certain ArciTerra entities in the United
10 States District Court for the Western District of Louisiana since May 2023 in First Guaranty Bank
11 v. Larmore et al., 5:23-cv-00683 (DEW) (MLH).  Trigild's familiarity with the ArciTerra
12 conglomerate and extensive work as a Receiver in a related matter makes Trigild a good
13 replacement for StoneTurn.  On June 6, 2024, the Trigild Receiver (Christopher Neilsen) stated
14 that TriGild is prepared to step into StoneTurn's shoes as the Receiver in this matter.  Mr. Neilsen
15 also assured the defense that he would consider **both** the SEC's and Defendants' positions in this
16 matter as he performed his duties and conducted a thorough forensic accounting.

**I.    The Receiver's Constitutional Due Process Violations, Failures to Perform His Duties to this Court, and Fundamental Fairness Require His Removal as Receiver**

19     The Receiver's refusal to substantively engage the Defendants on their theories of the case
20 and pervasive *ex parte* contacts with the SEC require the Receiver's removal.  When the
21 Defendants suggested StoneTurn as the Receiver in December 2023, the Defendants could not
22 have predicted that the Receiver would substantively shut the Defendants out and refuse to
23 consider their theories of the case.  From the Defendants' perspective in December 2023, the most
24 critical aspect of the proposed Receiver's work was the forensic accounting.  The Defendants
25 contended then, and continue to contend to this day, that an honest, independent forensic
26 accounting will prove that Jonathan Lamore ("J. Larmore") engaged in no wrongdoing.
27     Despite almost six months of work, the Receiver has not done the necessary forensic
28 accounting investigation to get to the truth in this matter, and has certainly not considered the

1

defense theories of the case as part of that forensic accounting work. As stated in the Defendants' moving papers, forensic accounting is as much art as it is science. If a forensic accounting investigation is based on faulty premises or proceeds with only one view in mind, then the work product will be inherently skewed and flawed. Thus, the Receiver's refusal to discuss, or provide any insight into, the forensic accounting work is inextricably intertwined with their refusal to engage the Defendants' on their substantive theories of the case. Together, these two critical failures require the Receiver's removal.

### A. The Receiver Refused to Substantively Engage the Defense on All Key Points

The Receiver's opposition is replete with irrelevant and misleading examples of supposed engagements with the defense. Dispositively, the Receiver offers no response to the key allegation that he refused to engage defense counsel on all substantive points presented by the Defendants for consideration, including:

- J. Larmore's Legitimately Earned Fees;
- Non-Investor Revenue Generated by ArciTerra Entities; and
- Thefts by ArciTerra Employee.

See Defendants' Motion to Remove the Receiver at 6-7 [Doc. 161].

Moreover, these three examples are only representative of the types of substantive information that the Receiver refused to discuss. There were (and still are) numerous other substantive points that the defense needs considered, including the following six points.

First, J. Larmore injected over $35 million into the ArciTerra conglomerate by replacing existing mortgages on certain properties with larger mortgages and using the cash difference between the two mortgages (*i.e.*, what the industry calls a "cash-out refinancing") to purchase new properties. Since 2017, these cash-out refinancings have generated the $35 million in funds, which J. Larmore legitimately re-injected into the ArciTerra conglomerate.

Second, J. Larmore sold certain investment properties that he acquired prior to ArciTerra being formed and swapped those properties multiple times for new properties that were purchased for investment purposes. Section 1031 of the Internal Revenue Code allowed J. Larmore to defer capital gains taxes on these sales. The newly acquired properties, which were purchased with non-

2

investor 1031 exchange funds, are held by ArciTerra Walcent Portfolio I, LLC, an entity that was formed July 14, 2005. This entity reported taxable income of approximately $13 million for the years 2017 to 2021, prior to amortization and depreciation. This income was confirmed by T&M USA, LLC, an independent firm staffed with former IRS auditors, as detailed in Exhibit A attached hereto.

Third, J. Larmore sold numerous non-investor assets during the relevant time period, resulting in nearly $8.9 million in funds being reinvested into the ArciTerra conglomerate. Fourth, the Receiver claims he found no evidence of theft by Dan DeCarlo ("DeCarlo"). Had the Receiver engaged with the defense, he would have learned that on August 25, 2023, J. Larmore wired $200,000.00 of his personal money to an ArciTerra bank account to pay for certain ArciTerra operating expenses. However, on the next business day, DeCarlo illegally wired those same funds to his personal bank account. Attached hereto as Exhibit B is a Park National Bank account statement showing those two fund transfers.

Fifth, the Receiver's Factual Update presents an incomplete summary of the flow of funds through AcriTerra Strategic Retail Advisors, LLC ("ASRA"). Attached hereto as Exhibit C is a chart showing ASRA's ownership structure, which resulted in ASRA earning significant, legitimate fees, including fees relating to acquisitions, financing, property management, asset management, leasing commissions, tenant improvements, and construction management and dispositions fees. ASRA was also lawfully permitted to make use of up to 50% of the operating cash flow and a special distribution of 50% of the capital proceeds, as more fully described in the Private Offering Memoranda. These funds were then lent to other entities to purchase other properties and generate additional fees and profits.

Sixth, the Receiver's description of neglect to various properties fails to recognize that ArciTerra's then-Chief Operating Officer, Blaine Rice ("Rice"), was responsible for nearly two decades for overseeing ArciTerra's operations, including the ArciTerra personnel who maintained the properties. The following excerpt from Rice's Linked-in page describes these responsibilities:

> **Chief Operating Officer**
> Arciterra Companies
> Jan 2015 - Apr 2023 · 8 years 4 months
> Phoenix, AZ
> Oversaw daily operations, and the management of the long and short-term goals of the company, including employee relations, budget management, market forecasting and analysis, tenant relations, lease negotiation, and managing financing structures and lender relationships.

In short, the Receiver has stonewalled the Defendants' substantive inquiries at every turn, thereby improperly omitting the Defendants' theories of the case from the investigation. These significant omissions undermine and de-legitimize the one-sided, biased findings the Receiver has already made, and will continue to be make, in this case.

The Receiver's misdirection and failure to respond to the Defendants' key allegation is borne out by the fact that the undersigned knows exactly the substantive inquiries that were made to the Receiver because the undersigned made those inquires. The Receiver refused to engage with the undersigned and rebuffed every entreaty. Attached hereto as Exhibit D is a declaration by the undersigned to that effect.

Just as troubling is the fact that instead of acknowledging this communication gap and committing to working with the Defendants moving forward, the Receiver doubles down in his Opposition, claiming that he has "engaged with Mr. Larmore or his counsel, **as appropriate**." Applbaum Declaration at ¶ 16 (emphasis added). In other words, not only does the Receiver contend that he has done nothing wrong, he has no intention of modifying his conduct in the future; yet again, showing that the Defendants cannot get a fair shake with StoneTurn in place as the Receiver.

As cover for his position, the Receiver claims that his work thus far, and the resulting submissions to the Court, are just "a snapshot, not a set of actionable conclusions." Receiver's Opposition at ¶ 34; see also Applbaum Declaration at ¶¶ 12 and 18 (asserting that the Receiver has not made any "conclusions in any final or actionable way" and the "Receiver has not come to any conclusions regarding any of the assertions made by Mr. Larmore and continues to analyze the information . . . ."). The Receiver's position is that the Defendants should be forced to wait until

the Receiver has completed his investigation and issued his final report before the Defendants can raise any concerns about the process.

The Receiver misses the obvious point. By the time the Receiver completes his one-sided investigation, the die will be improperly cast against the Defendants in a way that cannot be undone. Like any legal proceeding, the process employed by the Receiver is just as important – if not more important – than the result. No independent, fair-minded arbiter would contend that a one-sided investigation that refused to consider any sort of counter-narrative could produce a legitimate result, but that is exactly the Receiver's stance.

The SEC takes the same wrongheaded position, stating:

> Defendants claim that the Receiver breached his duties to the Court by failing to consider defense theories of the case, such as fees supposedly due Larmore, the purported extent of legitimate revenue flowing through ArciTerra Strategic Retail Advisors, LLC ("ASR Advisors"), and supposed thefts by ArciTerra employees. **These matter, however, involve ultimate issues of liability that will be determined at a later stage by the trier of fact in this litigation and not by the Receiver.**

SEC Opposition at 1 (emphasis added); see also id. at 8 (stating same).

In essence, the Receiver and SEC both claim that it does not matter how the cake is baked by the Receiver because the Defendants will have an opportunity to challenge the Receiver's conclusions at some unknown point down the road. However, given the factual complexities in this case and the stay that has been implemented, it could be a year or more before the Receiver completes his work. Nonetheless, the Receiver and SEC still nonsensically claim the Defendants will receive due process because they will have a voice at the end of the road, at a time when all of the assets may already be sold.

The obvious hypocrisy of their position is further demonstrated by the fact that if the Defendants did not object at this point in time and waited until the Receiver's work is complete, the Receiver and SEC would certainly argue that the Defendants waived their right to complain

because they knew throughout the investigation how the Receiver was proceeding. It is this type of doublespeak that the Defendants have been contending with throughout this matter.

Perhaps, the best example of this doublespeak is the Receiver's and SEC's claim the Receiver's work thus far is merely "preliminary." In truth, the Receiver has made several one-sided findings that are in no way "preliminary." For example, the Receiver stated the following in his factual update that was filed with the Court on April 1, 2024:

> As a result of this analysis for the years 2019, 2021 and 2022, the Receiver **found** that, of the funds that flowed from many entities including the Funds and some of their investments through ASRA, in general, only a fraction was paid in interest to the Funds' investors in 2019. The [Note Fund II] and [Note Fund III] investors did not receive anything in 2021 and 2022 . . . ."

Receiver's Factual Update at ¶ 46 (emphasis added) [Doc. 125].

This "finding" was followed by a lengthy one-sided analysis in the Factual Update that concluded that approximately $1.2 billion improperly flowed through a single ArciTerra entity. See id. at ¶¶ 46(a)-(d) and 47. The Receiver also included a full page chart depicting the supposed improper flow of funds. See id. at ¶ 47.

In his Opposition, the Receiver goes on to state:

> It appears so far that thousands of investors are owed millions of dollars. That is so without advancing to theories that potentially other parties are or were due obligations as well. It appears that money was moved about and through the plethora of entities in an undisciplined manner, through a central entity, and the Receiver so observed in the Factual Update.

Receiver's Opposition at ¶ 52.

The Receiver's claim that these findings are merely "preliminary" is not credible. Not surprisingly, the SEC uses the Receiver's "findings" to advance its own conclusions:

> The Receiver has provided the Court with its preliminary **findings** that, among other things, show that there was significant commingling of investor funds in the ArciTerra companies.
>
> \*          \*          \*
>
> The Receivership Entities liabilities' to the Note Funds could be approximately $165.5 million.

6

> \* \* \*
>
> As a result of these funds flowing through ASR Advisor, the Receiver estimates that entities controlled or owned by Larmore and his family received at least approximately $12.7 million on a net basis for the years 2019, 2021, and 2022.

SEC's Opposition at 1 and 5 (emphasis added).

The bottom line is that simply labeling something "preliminary" does not make it so. There can be no doubt that after almost six months of work, the Receiver has firmly established a one-sided narrative against the Defendants in a way that unequivocally demonstrates his belief that J. Larmore has engaged in significant wrongdoing. The fact that this narrative has been formed without any substantive input from the defense completely undermines the fundamental fairness and due process that should be attendant to every legal proceeding.

The Defendants will also likely seek leave of Court to supplement this Reply with additional information from the Receiver's first report that is due on June 7, 2024. That report will assuredly contain further one-sided "findings" and damaging information designed to improperly impugn the Defendants.

The Receiver's misdirection is also borne out by the examples he provides of supposedly engaging with the defense – all of which focus on non-substantive issues. For example, the Receiver states in his Opposition:

> [A]s set forth in the Applbaum Declaration, the Receiver has time and again communicated with and provided for the Defendants. Some of these requests and communications have even resulted in stipulations and orders of this court, release of funds, and cooperation to release rights over assets in favor of the Larmores.

Receiver's Opposition at ¶ 33.

> The Receiver also promptly responded to the requests of Mr. Larmore including providing access to records, personal effects, sources of funds despite the Receivership having limited liquidity, and releasing rights to property, where appropriate.

Applbaum Declaration at ¶ 16.

7

As specific examples – none of which go to the substance of the case – the Receiver points to the following engagements with the defense:

- Granting access to databases;
- Extracting certain data;
- Providing access to email boxes;
- Releasing certain funds from the Receivership Estate;
- Discussing extraction of living expenses from Receivership Estate;
- Providing documents relating to a specific ArciTerra project: AT Sandersville;
- Releasing two properties from the asset freeze; and
- Returning certain personal property.

Receiver's Opposition at ¶ 16.

The Receiver's tactic seems to be to fill his Opposition with irrelevant examples that have nothing to do with the Defendants' substantive complaint, so as to provide the Court with the false impression that the Receiver has been cooperating with and engaging with the defense. No such cooperation or engagement has ever taken place regarding the substance of the case.

The Receiver also self-servingly minimizes the "no notice" email that was sent to the undersigned on January 6, 2024, which expressly stated, "**Respectfully, the Receiver need give you or your client no heads up about his activities**." See Receiver's Opposition at ¶ 31. While it is true that this email was sent in the context of the Receiver taking control of ArciTerra's books and records, this email is illustrative of the Receiver's overall refusal to engage the defense on any substantive areas of the case, as attested to in the attached declaration filed by the undersigned (Exhibit D). The Receiver's spin is also misleading given the blanket nature of his statement that he is not required to give the defense a "heads up about his activities." This statement was not qualified or limited in any way, and it proved up to accurately reflect the Receiver's position with regard to all substantive matters since the inception of this case.

The Receiver concludes his misdirection with the following mind-numbing missive:

8

> The Defendants filed this motion because they no longer want a competent, objective investigation. What actually offends them here are the inconvenient facts found in their own books and records and included in the Factual Update.

Receiver's Opposition at ¶ 42 (emphasis added).

For nearly six months, the defense has been asking (indeed, pleading) for an audience with the Receiver regarding the substance of the case. The defense offered to make the Defendant available for questioning. The defense made it clear that the Receiver did not have to agree with the defense theories or give the defense any special attention. Rather, the defense simply wanted a fair opportunity to present and discuss the Defendants' theories of the case with the Receiver, so the investigation would include and consider both sides. But, those repeated entreaties were summarily and universally rejected.

Making matters worse is the fact that the Receiver now doubles down in his Opposition, making clear that he has no intention of engaging with the defense on any substantive matters throughout the remainder of his investigation. Constitutional due process, the Receiver's duties to this Court, and fundamental fairness require removing StoneTurn to allow this matter to proceed on a fair and even playing field.

**B.    The Receiver's Pervasive *Ex Parte* Contacts with the SEC Supports StoneTurn's Removal as Receiver**

The Receiver and SEC begin their Oppositions with regard to their *ex parte* contacts by improperly citing to this Court's Receivership Order as somehow endorsing or authorizing widespread, pervasive *ex parte* contacts. See Applbaum's Declaration at ¶ 14 ("the Receiver has engaged with the SEC as appropriate, consistent with the authority and responsibilities of the Receiver's duties spelled out in the Receivership Order"); SEC Opposition at 1 ("But the Orders appointing the Receiver (ECF Nos. 77, 154), which Larmore consented to, specifically permit the Receiver to engage in ex parte contacts with the SEC and with Larmore . . . ."). This Court's Receivership Order provided no such *ex parte* authority.

Paragraph 25 of the Receivership Order permitted the Receiver to "[c]onsult with the SEC staff, counsel for the Defendants, creditors, and investors regarding any Receivership Estate

9

1  matters." This authorization said nothing about *ex parte* contacts, and certainly did not authorize
2  the Receiver to engage in a pervasive pattern and practice of *ex parte* contacts with the SEC to the
3  full exclusion of any substantive discussions with the defense. It is far more accurate to say that
4  Paragraph 25 of the Receivership Order contemplated the Receiver's equal consultation with the
5  SEC and counsel for the Defendants – something that has certainly not occurred.
6  　　　Even more telling are the non-responses offered by the Receiver and SEC for their conduct.
7  In his Opposition, the Receiver blithely states that "all communications were proper pursuant to
8  the Receiver's duties and obligations under the Receivership Order." Receiver's Opposition at ¶
9  28. The Receiver also states that the "Receiver's engagement with the SEC was at all times
10 appropriate, necessary, and consistent with the requirements of the Receivership Order."
11 Applbaum Declaration at ¶ 14. These non-responses offer no justification or context for the
12 Receiver's *ex parte* communications whatsoever. It is as if the Receiver's claim of no wrongdoing
13 should be accepted on its face alone.
14 　　　The SEC's response is even more perplexing. The SEC claims that the "Defendants have
15 provided no evidence of any inappropriate conduct between the Receiver and the SEC." SEC
16 Opposition at 3; see also id. at 8. *Ex parte* contacts are by definition one-sided and to the exclusion
17 of the Defendants. How are the Defendants supposed to provide evidence of inappropriate conduct
18 regarding conversations that they were not involved in? That is why *ex parte* contacts are generally
19 barred in adversarial proceedings in the first place; because it is impossible to know what is being
20 said. At a minimum, the Receiver and SEC should both be ordered to produce all internal and
21 external electronic communications between, and among, the two sides, so a proper assessment
22 can be made regarding the propriety of their discussions.
23 **II.    The Receiver's Billing Practices Support Removal**
24 　　　The Receiver and SEC focus their opposition on a claim that the Defendants failed to object
25 to the Receiver's billing practices. However, they ignore the extensive, substantive objections the
26 Defendants lodged in a timely manner in their motion to remove the Receiver. To the extent those
27 objections need to be recounted in a separate pleading, the Defendants are submitting a pleading
28 herewith that adopts and incorporates by reference those objections.

1    Substantively, the Receiver points solely to the SEC's billing instructions to justify his exorbitant fee request. See Applbaum Declaration at ¶ 18. The Receiver's response provides no justification for the excessive number of meetings involving 10 or more StoneTurn employees on almost 60% of the days that they have been working, the fact that StoneTurn has billed more than $4 million in fees in just the first three months of this case, and the other specific allegations of improper billing set forth in the Defendants' motion to remove the Receiver.

**III.    Shannon Waltchak**

The Receiver spent the most effort in his opposition and accompanying declarations addressing the allegations relating to Shannon Waltchak, but he again, misses the point. The Defendants do not contend that the Receiver engaged in per se improper conduct with regard to Shannon Waltchack. Rather, the Defendants contend that the circumstances surrounding Shannon Waltchak's letter of intent and decision to walk away from the ArciTerra offer raise concerns regarding the Receiver's conduct.

It certainly cannot be disputed that had Shannon Waltchak purchased the ArciTerra conglomerate and accompanying debt, there would have been far less work for StoneTurn, which in turn, would have necessarily meant that StoneTurn would earn far less in Receivership fees. The fact that StoneTurn had a financial incentive to reject Shannon Waltchak's offer or scrutinize it in such a way to discourage Shannon Waltchak's pursuit is an economic reality.

These points fairly raise the question of whether StoneTurn engaged in improper behavior. The Defendants should not be forced to rely on StoneTurn's self-serving statements that no impropriety occurred. A fair and thorough inquiry requires, at a minimum, an opportunity to review: (a) StoneTurn's electronic communications with Shannon Waltchak; and (b) StoneTurn's internal electronic communications regarding Shannon Waltchak. If nothing untoward occurred, then StoneTurn should have no objection to such a review.

The Receiver also conspicuously avoids addressing the fact that the Receiver took no issue with Shannon Waltchak's financial capacity to complete the deal or the fact that Shannon Waltchak had a proven track record of executing similar deals in the past. To any objective observer, these two points – capacity and track record – far outweigh the procedural hurdles the Receiver raised

in January 2024 and now reiterates throughout his Opposition and the accompanying declarations to justify his conduct.

### IV.     Miscellaneous Points that Warrant No Consideration

The SEC contends that the Defendants' motion somehow lacks merit because the Defendants "proposed and vouched for StoneTurn Group, LLP ("StoneTurn") to be appointed as the Receiver." SEC Opposition at 2. While it is true that under the circumstances at the time, which included responding to an emergency TRO motion and the patently conflicted Receiver proposed by the SEC, the Defendants proposed StoneTurn as the Receiver. However, that proposal did not somehow waive the Defendants' rights to question the Receiver's conduct or file the instant motion to remove the Receiver.

The reality was that the Defendants worked in a very short time frame in December 2023 to find an independent, fair-minded Receiver that the Defendants thought would be helpful to all parties involved in these proceedings. There was no way the Defendants could have known that the Receiver would refuse to engage the defense on the substance of the case or charge over $4 million in fees in just the first three months. It would be entirely improper to penalize the Defendants for the Receiver's misconduct or the fact that StoneTurn was originally proposed by the defense.

## CONCLUSION

Contrary to the Receiver's and SEC's assertions, the Defendants have every right to bring to the Court's attention the facts and circumstances raised in the motion to remove the Receiver and this reply. Defense counsel went to great lengths over a period of months to work with the Receiver. It was only when those efforts were completely exhausted that the Defendants were left with no choice but to file the instant motion to remove the Receiver. The Defendants simply want a fair opportunity to present their side of the case to a Receiver that engages with the defense in a real and meaningful way.

Anything less than removal at this point is no remedy at all. If the Receiver is admonished to engage and consider the defense on the substantive points raised herein moving forward, it will be virtually impossible for the Defendants to judge whether the Receiver is truly considering the

Defendants' position or just providing lip service to check the box that the Receiver followed the Court's instruction.

While there will certainly be some cost to transitioning to a new Receiver, those relatively marginal costs cannot compare to the Defendants' Constitutional and other critical rights discussed herein. The Defendants do not have any objection to StoneTurn continuing to operate ArciTerra and its affiliates during the transition period to allow for a smooth transfer of responsibilities, but no further investigatory work should be done by StoneTurn.

Dated: June 7, 2024.                     DICKINSON WRIGHT PLLC

By: /s/ Seth Waxman
Seth B. Waxman (DC Bar #456156)
(Admitted *Pro Hac Vice*)
DICKINSON WRIGHT PLLC
1825 Eye Street N.W. Suite 900
Washington, DC 20006
swaxman@dickinson-wright.com

Dan W. Goldfine (AZ Bar # 018788)
dgoldfine@dickinson-wright.com
Cameron C. Stanley (AZ Bar #036605)
cstanley@dickinson-wright.com
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004

*Attorneys for Defendant Jonathan Larmore and Relief Defendant Marcia Larmore*

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 7, 2024, I electronically transmitted the foregoing document with the Clerk of the Court using the CM/ECF systems, which will provide electronic mail notice to all counsel of record.

                                      */s/ Seth B. Waxman*
                                      Seth B. Waxman