ARCHER & GREINER, P.C.
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 682-4940
Allen G. Kadish[1]
Harrison H.D. Breakstone[2]
Email:  akadish@archerlaw.com
          hbreakstone@archerlaw.com

*Counsel for Allen D. Applbaum as Receiver*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States Securities and Exchange Commission, | Case No. CV-23-02470-PHX-DLR |
| Plaintiff, | **NOTICE OF FILING OF ARCITERRA RECEIVER'S FIRST STATUS REPORT** |
| v. | |
| Jonathan Larmore, et al., | |
| Defendants, and | |
| Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC, | |
| Relief Defendants. | |

---

[1]  Admitted *pro hac vice.*
[2]  Admitted *pro hac vice.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Allen D. Applbaum, as receiver for ArciTerra Companies, LLC, and related entities, by and through his counsel, Archer & Greiner, P.C., hereby files this *Notice of Filing of ArciTerra Receiver's First Status Report,* as follows:

1.    Filed herewith, pursuant to paragraph 38 of the *Order Appointing Receiver, Freezing Assets, and Imposing Litigation Injunction* [ECF No. 154], is the *ArciTerra Receiver's First Status Report.*

Dated:  June 7, 2024                                    ARCHER & GREINER, P.C.

By: _____
     Allen G. Kadish[1]
     Harrison H.D. Breakstone[2]
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 682-4940
Email: akadish@archerlaw.com
         hbreakstone@archerlaw.com

*Counsel for Allen D. Applbaum as Receiver*

228957988 v2



# ArciTerra Receiver's First Status Report

**Case No. 2:23-cv-02470-PHX-DLR**

**United States District Court for the District of Arizona**

June 7, 2024



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

## RECEIVER'S FIRST STATUS REPORT

Allen D. Applbaum, in his capacity as Receiver (the "Receiver") of the ArciTerra Companies, LLC; ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisors, LLC; and Cole Capital Funds, LLC, in United States Securities and Exchange Commission v. Jonathan Larmore, et al, Defendants, and Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC; and JMMAL Investments, LLC, Relief Defendants (together the "Defendants"), pursuant to the to the *Order Appointing Temporary Receiver and Temporarily Freezing Assets and Imposing Litigation Injunction* [ECF No. 77], *Temporary Restraining Order* [ECF No. 78] and the *Order Appointing Receiver and Freezing Assets and Imposing Litigation Injunction* [ECF No. 154] (collectively the "Receivership Order") respectfully files his First Status Report, covering the period from December 21, 2023 through April 30, 2024.

The purpose of the First Status Report is to provide the Court with a report and accounting of Receivership Assets, as well as:

- A summary of the operations of the Receiver.
- The amount of cash on hand, the amount of administrative expenses, and the amount of unencumbered funds in the Receivership estate.
- A schedule of the Receiver's receipts and disbursements.
- A description of known Receivership Assets.
- A description of liquidated and unliquidated claims against, and held by, the Receivership Estate and approximate valuations of claims.
- The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.
- A recommendation on whether to modify the list of Receivership Entities.
- Additional facts pertinent to the Receiver's efforts to operate the ArciTerra Entities, and the efforts to make investors and creditors whole.

This First Status Report represents information for the period specified and as of the date submitted. This First Status Report draws no actionable conclusions beyond those, if any, as may expressly be stated herein. No direct relief is sought before the Court against anyone at this time. The Receiver intends to continue his activities and reserves all rights to amend or supplement the information set forth herein and to assert the rights of the Receivership as against any party, as may be appropriate.

# StoneTurn

United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

# Table of Contents

I.   **Background** ............................................................................................................. 5

   A.   **Procedural Background** .................................................................................. 5

   B.   **Executive Summary** ........................................................................................ 6

II.   **Actions Taken by the Receiver During the Reporting Period**.......................... 8

   A.   **Notice of Receivership** .................................................................................... 8

   B.   **Website/Ongoing Communications**................................................................. 8

   C.   **Litigation and Third-Party Claims** ................................................................. 8

   D.   **Receivership Operations** ................................................................................. 8

      i.   Bank Accounts and Cash Balances ............................................................. 9

      ii.   ArciTerra's Accounting Function ............................................................. 14

      iii.   Cash Management .................................................................................... 16

      iv.   Vendor Management................................................................................. 18

      v.   Significant Corporate Activities Not Performed Prior to the Appointment of the Receiver ............... 19

      vi.   Commercial and Residential Property Operations.................................... 20

      vii.   Property Management................................................................................ 24

   E.   **Record Preservation and Review** ................................................................. 26

      i.   Devices, Microsoft 365 Email Accounts, OneDrive and SharePoint ...... 27

      ii.   Physical Documents ................................................................................. 27

      iii.   Document Review Process ....................................................................... 28

   F.   **Investor Funds Analyses** .............................................................................. 28

      i.   Intercompany Loans and Commingling of Investor Funds ...................... 30

      ii.   Preliminary Observations from the Investor Funds Analyses.................. 35

III.   **Financial Status**................................................................................................. 41

   A.   **Cash on Hand – Receivership Assets**............................................................ 41

   B.   **Schedule of Receiver Estate Fund Receipts and Disbursements**................. 42

   C.   **Amount and Nature of Accrued Administrative Expenses**........................... 42

IV.   **Receivership Entities**........................................................................................ 42

V.   **Receivership Assets** .......................................................................................... 43

   A.   **Commercial & Residential Entities**.............................................................. 43

      i.   Commercial Properties ............................................................................. 43

# StoneTurn

United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

ii.    Residential Properties ..................................................................................................... 54

B.    Other Assets ........................................................................................................................ 59

VI.    Claims Against the Receivership ..................................................................................... 60

A.    Investor Claims .................................................................................................................. 60

B.    Vendor Claims ..................................................................................................................... 61

C.    Potential Liabilities to Creditors – Small Business Administration ................... 61

VII.    Litigation Claims of the Receivership ......................................................................... 64

VIII. Future Actions and Recommendations ......................................................................... 64



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

# I. Background

## A. Procedural Background

1. On December 21, 2023, Allen D. Applbaum was appointed Receiver in United States Securities and Exchange Commission v. Jonathan Larmore, et al. (No. 2:23-cv-02470-PHX-DLR) for the receivership estate of the Receivership Entities (the ArciTerra Funds, the Receivership Defendants, and the known and unknown Affiliates of the Receivership Defendants as defined in ECF No. 154) (the "Receivership Estate"), including the Receivership Assets. The Receivership Order authorizes the Receiver to:[1]

   a. Preserve the status quo to enable the Receiver to perform the duties specified hereunder.

   b. Ascertain the financial condition of the Receivership Entities and Receivership Assets (as defined in the Receivership Order).

   c. Oversee and manage, consistent with the relevant governing documents and applicable law, the Receivership Entities and Receivership Assets.

   d. Prevent the encumbrance or disposal of the Receivership Assets contrary to the Receiver's mandate.

   e. Preserve the books, records, and documents of the Receivership Entities and Receivership Assets.

   f. Manage litigation by and against the Receivership, the Receivership Entities and the Receivership Assets.

   g. Propose for Court approval a fair and equitable distribution of the remaining Receivership Assets.

   h. Be available to respond to investor inquiries.

2. The Receiver, Allen D. Applbaum, is a Partner with StoneTurn Group, LLP ("StoneTurn"), and has more than 30 years of experience in litigation, investigations, business intelligence, corporate governance, receiverships, monitoring, and compliance. In connection with his management of high-profile investigations, Mr. Applbaum draws on his public and private sector experience to integrate investigative skills with technology and financial expertise to provide clients with seamless approaches to critical problems. Mr. Applbaum is a leading expert in independent monitorships and receiverships, providing oversight to the government, regulators, law enforcement and the judiciary. StoneTurn employs over 150 professionals who the Receiver can call upon for appropriate work.

3. The Receivership Order authorizes the Receiver to retain personnel and legal counsel, including personnel and professionals of StoneTurn and Archer & Greiner, P.C. ("Archer" or "Counsel"), to assist

---

[1] Receivership Order at pages 2-3.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

in carrying out his duties and responsibilities ("Receivership Team").[2] StoneTurn's team includes investigative, forensic accounting, real estate, forensic technology, data analytics, and corporate controller professionals. Archer's team includes restructuring, tax, corporate, litigation, and real estate professionals. Since the appointment, at the direction of the Receiver, the Receivership Team has engaged in numerous tasks to fulfill its duties and responsibilities as authorized and directed by the Court.

## B. Executive Summary

4.      Following his appointment, the Receiver took immediate steps to assert control over the ArciTerra and Receivership Entities' books, records, and accounts, and to oversee their accounting and cash management processes. At the time of his appointment, the Receiver inherited a largely crumbling and neglected Receivership Estate, as Mr. Larmore largely abandoned ArciTerra in approximately April 2023, if not earlier. Mr. Larmore shut down ArciTerra's office in Arizona and fired most of the employees, leaving the bulk of the management of ArciTerra to two remote consultants (Blaine Rice and Dan DeCarlo), one non-employee part-time bookkeeper, and one non-employee part-time office staff person at Fishermen's Village in Punta Gorda, Florida.[3] Mr. Larmore officially resigned from his position as Manager of ArciTerra on September 1, 2023, and Messrs. Rice and DeCarlo left or stopped providing services to ArciTerra in October 2023 and December 2023, respectively.

5.      Since his appointment, the Receiver took the necessary steps to secure and preserve the Receivership Entities' information systems containing e-mails, electronic files, investor management, accounting systems, digital images of certain computers used by former ArciTerra employees, and incoming postal mail.

6.      In addition, the Receiver, with the assistance of the Receivership Team, including a professional serving as the Receiver's Chief Financial Officer, asserted dominion and control over dozens of bank accounts and ensured that the appropriate signatories were installed, and others removed, as appropriate, and opened new bank accounts to facilitate financial oversight over the Receivership Entities.

7.      The Receiver developed an operating model, processes, and procedures to manage entity and asset operations of the Receivership Entities, which include 257 ArciTerra-related entities and 48 properties. The Receivership Team implemented financial and operational controls, as well as day-to-day business processes to support financial, risk management, and ongoing business operations.

---

[2] Receivership Order at ¶44.
[3] Deposition of Kathleen Bouet by the Securities and Exchange Commission on September 28, 2023, at page 101, lines 22 – 23.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

8.  The Receiver identified and paid delinquent real estate taxes for a number of real properties and paid delinquent sales taxes to the Florida Department of Revenue on behalf of the Village Brewhouse operations.

9.  The Receiver took control of and is actively managing the 48 commercial and residential properties, including: collecting delinquent and previously ignored rents, as well as current rents from approximately 169 tenants across 15 states; attending to tenants' concerns and those of city, county and local governmental authorities; monitoring insurance coverage recently obtained on properties where coverage had lapsed prior to the commencement of the Receivership; and engaging with lenders and tax authorities to address delinquencies and achieve forbearances or pauses, and developing strategies for the maintenance or disposition of the properties.

10. The Receiver and Receivership Team are, and have been, identifying and locating assets, liabilities, creditors, and investors in the Receivership Assets to work toward protecting the value of such Assets to ultimately satisfy claims against and obligations of the Receivership Entities, where appropriate and in due course, and according to a plan to be presented to the Court at a later date.

11. The Receiver's ongoing work includes: analyzing the complex ownership structures related to various investment programs; analyzing related flow of funds between the many ArciTerra Entities (that could be identified to date) and assessing against the offering documents shared with brokers and potential investors; reviewing various fee calculations, payments, and allocation; searching for evidence to support transactions recorded in the books of the hundreds of ArciTerra Entities; analyzing the distribution of investor funds and "waterfall" calculations contemplated in investment offering documents and operating agreements; identifying and analyzing intercompany transactions, investor communications, accounting records, bank statements, loan agreements, and forbearance agreements; and independently verifying the ownership and clear title to Receivership Assets and Receivership Entities through public record review and analysis.

12. The Receiver assumed more than 100 active litigation proceedings across the United States. These lawsuits include claims against ArciTerra, Mr. Larmore and Receivership Entities, and seek monetary awards, foreclosure, and other damages, highlighting the fact that there are competing interests for the limited Receivership Estate. These matters generally are stayed, consistent with the Receivership Order.

13. To date, the Receivership Team has conducted interviews of 17 former ArciTerra employees, contractors and consultants, independently, impartially, and consistent with the Receiver's objectives to understand and take control over the Receivership Estate.

14. The Receivership is a complex and vast undertaking, potentially involving hundreds of millions in investor funds, outstanding loans, and other creditor obligations.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

## II. Actions Taken by the Receiver During the Reporting Period

### A.  Notice of Receivership

15.    The Receiver, in compliance with 28 U.S.C. § 754, submitted for filing notices of the Receivership in approximately 88 federal districts in the country.

16.    The Receiver issued notice of the Receivership to relevant parties including known pending litigation parties.

17.    The Receiver also issued a press release on January 10, 2024, informing the public of his appointment as Receiver of the Receivership Entities.

### B.  Website/Ongoing Communications

18.    The Receiver established a website, available at ArciTerraReceivership.com, containing key court documents, information, and updates regarding these proceedings. The website went live on January 8, 2024. The Receiver will continue to update this website with key court documents, news and updates, reports from the Receiver, answers to frequently asked questions, and other pertinent information including, in due course, the ability for investors, creditors and other stakeholders to submit claims. The Receiver has also established a telephone number (212-430-3488) and email address (receiver@arciterrareceivership.com) for inquiries and questions from employees of the Receivership Entities, investors, creditors, other stakeholders, and interested parties.

### C.  Litigation and Third-Party Claims

19.    The Receiver identified over 100 civil court cases pending against Receivership Entities, in which plaintiffs seek relief, including monetary damages. As set forth above, these cases highlight the risk that there are several interests competing for proceeds from the Receivership Entities. These litigations generally are stayed consistent with the Receivership Order. These matters, to date, generally fall under three categories: (i) personal injury claims, (ii) non-payment claims, and (iii) other actions. The Receivership Team is actively monitoring these matters to determine how the actions impact the Receiver's mission.

### D.  Receivership Operations

20.    In this section, the Receiver describes a) the process of identifying the bank accounts associated with the Receivership Assets and obtaining access and control of such accounts, b) the assessment of the state of ArciTerra's accounting function, and c) the establishment of cash, vendor, and property management functions to support the operations of the Receivership.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

###### i.    Bank Accounts and Cash Balances

21.    Upon appointment, the Receiver was provided with a non-exhaustive list of ArciTerra entities and affiliates. However, the Receiver was not initially provided with documentation listing all ArciTerra commercial properties. Through discussions with former ArciTerra associates and additional, independent research conducted by the Receivership Team, the Receiver identified, took control of, and now actively manages 39 commercial properties. These 39 commercial properties exclude approximately 30 properties lost to pre-existing receiverships, 6 properties lost to bank foreclosures, and 2 properties lost to a tax lien sale prior to the Receiver's appointment.

| Commercial Property Description | Count |
|---|---|
| Initial List of Known ArciTerra Properties | 77 |
| **Pre-Receivership:** | |
| Lost to Pre-Existing Receiverships | 30 |
| Lost to Bank Foreclosures | 6 |
| Lost to Tax Lien Sale | 2 |
| **Remaining Receivership Properties** | **39** |

22.    Of the 39 active, commercial properties in the Receivership Estate, 10 are single, or stand-alone, assets and 29 properties are cross-collateralized and syndicated with Commercial Mortgage-Backed Securities ("CMBS") within multi-property portfolios. Below is a list of the 39 commercial properties. See **Exhibit 1** for a map of the properties' locations and see **Exhibit 2** for a detailed list of all commercial and residential properties.

| Receivership Commercial Properties | | | |
|---|---|---|---|
| No. | Asset Group | ArciTerra Entity | Address |
| 1 | Single Property | ATA Mercado St. Augustine FL, LLC | 155, 159, 163, 167 Palencia Village Drive, St. Augustine, FL 32095 |
| 2 | Single Property | ATA Palencia St. Augustine FL, LLC | 7440 US Highway 1 North, St. Augustine, FL 32095 |
| 3 | Single Property | Glenrosa 32, LLC | 3200 E Glenrosa Avenue, Phoenix, AZ 85018 |
| 4 | REIT 3650[4] | AT Auburn Plaza IN II, LLC AT Auburn Plaza Member, LLC | 506 North Grandstaff Drive, Auburn, IN 46706 |
| 5 | REIT 3650 | ATA Lanier Fayetteville GA II, LLC ATA Lanier Fayetteville Member | 320 W. Lanier Avenue, Fayetteville, GA 30214 |
| 6 | REIT 3650 | AT HL Burlington IA II, LLC AT HL Burlington Member, LLC | 3351 Agency Street, Burlington, IA 52601 |
| 7 | REIT 3650 | AT Ville Platte LA II, LLC AT Ville Platte Member, LLC | 915 E. LaSalle Street, Ville Platte, LA 70586 |

---

[4] REIT 3650 properties include secondary "Member" entity owners, tied to a mezzanine loan on the portfolio.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

| No. | Asset Group | ArciTerra Entity | Address |
|---|---|---|---|
| Receivership Commercial Properties |
| 8 | REIT 3650 | AT Altus Cumberland GA II, LLC<br>AT ALTUS Cumberland Member, LLC | 2997 Cumberland Circle,<br>Atlanta, GA 30339 |
| 9 | REIT 3650 | AT Sweden NY II, LLC<br>AT Sweden Member, LLC | 1651 Nathaniel Poole Trail,<br>Brockport, NY 14420 |
| 10 | REIT 3650 | AT Eastman GA II, LLC<br>AT Eastman Member, LLC | 970 Indian Drive,<br>Eastman, GA 31023 |
| 11 | REIT 3650 | AT New Lenox IL-Inline II, LLC<br>AT New Lenox-IL Member, LLC | 2021 East Laraway Road,<br>New Lenox, IL 60451 |
| 12 | REIT 3650 | AT Longview TX II, LLC<br>AT Longview Member, LLC | 711 Estes Drive,<br>Longview, TX 75602 |
| 13 | REIT 3650 | AT Seven Hills Aurora CO II, LLC<br>AT Seven Hills Aurora Member, LLC | 18511 E. Hampden Avenue,<br>Aurora, CO 80013 |
| 14 | REIT 3650 | AT Mayodan NC II, LLC<br>AT Mayodan Member, LLC | 131 Commerce Drive,<br>Mayodan, NC 27027 |
| 15 | REIT 3650 | AT PT Danville IL II, LLC<br>AT PT Danville Member, LLC | 22 West Newell Road,<br>Danville, IL 31082 |
| 16 | Rialto | 5339 Elvis Presley Boulevard<br>Memphis TN, LLC | 5339 Elvis Presley Boulevard,<br>Memphis, TN, 38116 |
| 17 | Rialto | 700 North Grand Avenue Mt. Pleasant<br>IA, LLC | 700 North Grand Avenue,<br>Mt. Pleasant, IA 52641 |
| 18 | Rialto | 8001 Vaughn Road Montgomery AL,<br>LLC | 8001 Vaughn Road,<br>Montgomery, AL 36116 |
| 19 | Rialto | 601 Trenton Road McAllen TX, LLC | 601 Trenton Road,<br>McAllen, TX 78504 |
| 20 | Rialto | 60 Colonial Promenade Parkway<br>Alabaster AL, LLC | 60 Colonial Promenade Parkway,<br>Alabaster, AL 35007 |
| 21 | Rialto | 81 Jameson Lane Greenville AL, LLC | 81 Jameson Lane,<br>Greenville, AL 36037 |
| 22 | Rialto | 752 South Andy Griffith Parkway Mt.<br>Airy NC, LLC | 752 S. Andy Griffith Parkway,<br>Mt. Airy, NC 27030 |
| 23 | Rialto | 1921 Gallatin Pike Nashville TN, LLC | 1921 Gallatin Pike North,<br>Madison, TN 37115 |
| 24 | Rialto | 5450 US Highway 80 East Pearl MS,<br>LLC | 5450 US Highway 80 East,<br>Pearl, MS 39208 |
| 25 | Rialto | 412 Cross Oaks Mall Plainwell MI, LLC | 412 Cross Oaks Mall,<br>Plainwell, MI 49080 |
| 26 | Rialto | 2513 E. North Street Kendallville IN,<br>LLC | 2513-2521 E North Street,<br>Kendallville, IN 46755 |
| 27 | Rialto[5] | ATA Hiram Square GA, LLC | 5157 Jimmy Lee Smith Parkway,<br>Hiram, GA 30141 |
| 28 | KS State Bank | ArciTerra FD Greeleyville SC, LLC | 10000 US Highway 521,<br>Greeleyville, SC 29056 |

---

[5] The Hiram Square property is not cross-collateralized with other Rialto properties listed.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

| No. | Asset Group | ArciTerra Entity | Address |
|-----|-------------|------------------|---------|
|  | Receivership Commercial Properties |
| 29 | KS State Bank | ArciTerra VN Clarksville TN, LLC | 2135 Lowes Drive, Clarksville, TN 37040 |
| 30 | KS State Bank | ArciTerra VN Dickson TN, LLC | 100 Lowes Road, Dickson, TN 37055 |
| 31 | KS State Bank | ArciTerra WG Milwaukee WI, LLC | 8488 Brown Deer Road, Milwaukee, WI 53223 |
| 32 | Single Property | Walcent Elk/IN, LLC | 2719 Emerson Drive, Elkhart, IN 46514 |
| 33 | Single Property | 900 West Marion FL LLC | 900 W. Marion Avenue, Punta Gorda, FL |
| 34 | Single Property | ArciTerra BP Olathe KS, LLC | 12051 S Renner Boulevard, Olathe, KS 66061 |
| 35 | Single Property | AT Olathe Outlot 5, LLC* | 15085 W 119th Street, Olathe KS 66602 |
| 36 | Single Property | AT New Lenox IL-Outlots, LLC* | E. Laraway Road, New Lenox, IL 60451 |
| 37 | Single Property | 1000 WEST MARION PG FL LLC* | 1000 W. Marion Avenue, Punta Gorda, FL 33950 |
| 38 | 925 W. Marion/ 960 W. Olympia | 925 W. Marion/960 W. Olympia FL, LLC* | 925 W. Marion Avenue, Punta Gorda, FL 33950 |
| 39 | 925 W. Marion/ 960 W. Olympia | 925 W. Marion/960 W. Olympia FL, LLC* | 960 W. Olympia Avenue, Punta Gorda, FL 33950 |

*Indicates a non-revenue producing entity*

23. The Receivership Order provides that the Receiver is to "*have exclusive control of, and be made the sole authorized signatory for, all accounts at any bank, brokerage firm or financial institution that has possession or control of any Receivership Assets*" (Receivership Order IV 6. F.). While a "non-exhaustive list of known bank accounts" is set forth in Exhibit B to the Receivership Order, the Receiver identified and obtained "exclusive control" of bank accounts subject to the Receivership Order.

   *a.   Identifying and Obtaining Control of Bank Accounts*

24. The Receivership Team searched for bank account information in the ArciTerra SharePoint site, documents provided by the SEC, the MRI accounting system, and records maintained by ArciTerra's former bookkeeper. The Receivership Team initially identified 22 banks and financial institutions and over 400 individual accounts potentially associated with entities under the Receivership.

25. After developing an initial list of financial institutions and bank accounts, the Receiver conducted research to identify the appropriate point of contact at each financial institution to communicate the Receiver's appointment and control over the relevant bank accounts. The Receiver sent letters and



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

copies of the Receivership Order to each bank requesting immediate changes to the beneficial ownership, signatory authorities, and access to identified ArciTerra accounts held at their institution.

26.   While most banks were able to immediately freeze the relevant accounts, changing the signatory and obtaining access to the accounts took significantly more time.

### b.   Initial Cash Balances

27.   Of the initial population of banks and accounts identified through the procedures discussed above, the Receiver determined that ArciTerra primarily used accounts at five banks (89 accounts in total) as of the end of 2023 to operate many of the businesses and commercial properties.

### c.   Operating Businesses

28.   Village Brewhouse, a restaurant and bar, and Simply Sweet, a retail candy store, have separate management overseeing each business's day-to-day operations. Each business leases its premises from a third party. The Receiver provides each business with operational and financial oversight, including cash management. Village Brewhouse and Simply Sweet's bank accounts are designated solely for use by the respective entity's operations. As of December 21, 2023, the designated operating account balances of Village Brewhouse and Simply Sweet were approximately $55,300 and $58,600, respectively.

### d.   Commercial Properties

29.   Glenrosa 32, LLC ("Glenrosa") is an assisted living facility managed by a third-party operator, MorningStar Senior Living ("MorningStar"). Under its operating agreement, MorningStar is responsible for, among other activities, Glenrosa's cash management function. Under the operating agreement, the Receiver does not have the ability to access the operating funds of Glenrosa as they are restricted to the operation of the Glenrosa facility. As of December 21, 2023, the Glenrosa operating account balance was approximately $556,500.

30.   The REIT 3650 properties are subject to a cash management agreement in connection with their lender agreement. Tenants send rent payments to a lockbox account controlled by the lender. Funds in the lockbox are regularly transferred into a cash management account, also controlled by the lender. While the Receiver does not receive the rent payments directly, it is still required to operate and manage the properties, including the payment of all operating expenses. To make payments to vendors of the REIT 3650 properties, the Receiver must submit to the lender an expense distribution request that identifies vendor invoices requiring payment. Once the lender provides the requested funds to the Receiver, the Receiver makes the vendor payments and provides confirmation of payment to the lender. As a result



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

of this cash management process, the Receiver does not have excess funds available to the Receivership. As of December 21, 2023, the restricted cash balance for the REIT 3650 operating and lender's cash management accounts was approximately $186,400.

31.   The Rialto properties were subject to a cash management agreement like REIT 3650 until February 2024, when the Receiver was able to negotiate with the lender of the Rialto REIT to allow the Receiver to receive the rent payments directly from the properties' tenants. The funds received from tenant rent payments, however, are still restricted for use. Specifically, the Receiver must use the funds collected to pay operating expenses of the properties and loan interest and escrow charges to the lender. As the terms of the payment of interest and escrow charges are not finalized with the lender, the Receiver restricted the use of operating funds to the payment of operating expenses. As of December 21, 2023, the restricted cash balance for the Rialto REIT operating and lender's cash management accounts was approximately $120,500.

32.   The KS State Bank portfolio consists of five properties, three of which are vacant. The remaining two are single-tenant properties. These tenants remit their rent directly to the lender, KS State Bank, and are responsible for paying all their respective operating expenses. As a result, there is no cash flow or cash balances for the Receivership Estate associated with these properties.

33.   The remaining commercial properties include, Mercado Walk, Palencia Plaza, Bass Pro Shop, Walcent Elk, and 900 West Marion. The aggregate cash balance of these single properties as of December 21, 2023 was $66,200. As a result of the low balances in the cash accounts of the unrestricted and/or undesignated properties at the time of his appointment, the Receiver was not able to pay critical expenses (e.g., utilities, fire, and safety expenses) until the Receiver implemented an active cash management process, performed extensive outreach to tenants, and collected outstanding and current rent payments.

34.   Upon notification of his appointment to the banks, the Receiver worked with each bank to change the signatories on the accounts to the Receiver and his designee, and obtain access to the accounts to manage deposits, withdrawals, and cash transfers. Given the complexity of the Receivership, the banks' documentation requirements, and the number of accounts, obtaining access to the bank accounts took considerable time and effort. The banks took varying amounts of time to review the Receivership Order and to consult with their counsel to determine the course of action for the Receiver to access the accounts. While some bank requirements could be met remotely through email and e-signatures, other banks required documents to be notarized and/or completed in-person at a bank branch. This significant transition time complicated the Receiver's cash management processes, especially since



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

most accounts had very small available cash balances. In this respect, it was a challenge for the Receiver to proverbially "keep the lights on" at the property locations.

### ii.   ArciTerra's Accounting Function

35.   A critical initial task of the Receiver was to assess the accounting functions (e.g., accounting systems, financial books and records, and internal control and operating processes) supporting the operations of 30 commercial property entities[6] and 2 operating businesses. Upon appointment, the Receiver discovered that ArciTerra had no full-time employees remaining. Management of the ArciTerra entities and assets was left to two remote consultants, one non-employee part-time bookkeeper, and one non-employee part-time office staff person. The Receiver quickly discovered that ArciTerra's accounting operations and underlying books, records, and processes were disorganized or, in certain areas, non-existent and required immediate oversight.

#### a.   Commercial Property Accounting Function

36.   At a high level, the accounting for the operations of the commercial properties consists of two processes: the billing and collection of rents from tenants (i.e., cash inflows), and the payment of services and goods to support the day-to-day operations of the properties (i.e., cash outflows). The Receivership Team visited the former "management" offices of ArciTerra in Punta Gorda, Florida in January 2024. Procedures performed during the visit included a preliminary examination of the accounting records and corporate documents stored at the location, and discussions with the part-time office manager who previously performed bookkeeping for the ArciTerra companies. Based on these procedures, it became clear that prior to the Receiver's appointment, no appropriate accounting function was in place and little attention was given to managing the commercial properties, specifically the collection of rents and payment of vendor invoices and other obligations.

37.   ArciTerra historically used two systems to support the accounting for the commercial properties: MRI and AvidXchange.

38.   MRI is a web-based accounting and property management system that ArciTerra used since at least 2012. In addition to general ledger (i.e., accounting) functions, MRI has a commercial property management module for managing leasing-related activities, including issuing tenant rent invoices, tracking rent rolls, and administering lease agreements.

---

[6] Below we report 39 commercial properties in the Receivership. Nine commercial properties are excluded here: Glenrosa, for which MorningStar manages its business processes, five KS State Bank properties do not generate cash flow to the Receiver, and three Punta Gorda properties that are vacant and non-revenue producing.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

39. AvidXchange is a web-based accounts payable workflow processing system used to receive, process, and approve third-party invoices. The system contains a PDF copy of an invoice and once approved for payment, interacts with MRI to transfer the invoices from AvidXchange to MRI for payment processing and recording in the financial records of the applicable entity.

40. Prior to the Receiver's appointment, however, these systems were not fully utilized. For approximately the first nine months of 2023, management of the commercial properties, including the accounting function, was contracted to Trigild, a third-party commercial property management company. Trigild discontinued its work for ArciTerra in October 2023, alleging that ArciTerra had failed to pay for services performed. As a result, ArciTerra did not perform property management, accounting, and finance activities between October 2023 and the Receiver's appointment, including payment of operating expenses and resolution of property and tenant requirements. Upon his appointment, the Receiver discovered that ArciTerra did not maintain an effective repository to track tenant rent payments. Aside from reviewing and reconciling available bank account transaction history, the Receiver could not readily determine when, to what account, and with what frequency tenants had remitted rents prior to the commencement of the Receivership. Almost no accounting activities occurred during the last three months of 2023 and the standard accounting records and financial reports that would have provided management, or the Receiver, with a basic understanding of uncollected rent payments and open invoices did not exist. During visits to the Punta Gorda office, the Receivership Team discovered dozens of unopened envelopes containing vendor invoices dating back to at least June 2023, which were never logged or paid. This, paired with incomplete and inaccurate records, complicated the Receiver's efforts to perform a comprehensive, overall reconciliation of past due or unpaid rent and vendor invoices for all ArciTerra properties.

### b.   *Operating Businesses Accounting Function*

41. The three operating businesses—Glenrosa, Village Brewhouse, and Simply Sweet—do not use MRI for their accounting and financial reporting.

42. The third-party management for the Glenrosa senior living facility, MorningStar, performs the accounting processes and maintains the underlying records.

43. Village Brewhouse and Simply Sweet used a web-based accounting system, Restaurant365, until approximately January 2024 and transitioned to a specialized restaurant point-of-sale system (e.g., Toast) that integrates with QuickBooks. The individual management teams at Village Brewhouse and Simply Sweet are primarily responsible for maintaining the respective businesses' accounting and financial records. Since the Receiver's appointment, the Receivership Team has had access to these systems and monitors the operating performance and transactions recorded as part of its daily



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

management process. In addition to approving the businesses' weekly payroll, the Receivership's Chief Financial Officer manages the bank accounts, approves non-operating expenses, and oversees and discusses operations and financial performance with each management team on a weekly basis.

44.    After assessing the state of the accounting systems and financial books and records, as well as identifying the operating bank accounts for the individual entities, the Receiver established processes and procedures for cash management, vendor management, and property management.

45.    The Receiver categorized the Receivership Assets into groups ("Asset Groups") for management and operating purposes. For instance, the Receiver grouped Receivership Assets that are members of the same real estate investment trust ("REIT") into a single Asset Group. The Asset Groups, and the revenue producing Receivership Assets that comprise each group, are as follows:

| Commercial Property Entities | | |
| --- | --- | --- |
| REIT 3650 | RIALTO | KS State Bank Portfolio |
| • AT Altus Cumberland GA II, LLC<br>• AT Auburn Plaza IN II, LLC<br>• AT Eastman GA II, LLC<br>• AT HL Burlington IA II, LLC<br>• AT Longview TX II, LLC<br>• AT Mayodan NC II, LLC<br>• AT New Lenox IL-Inline II, LLC<br>• AT PT Danville IL II, LLC<br>• AT Seven Hills Aurora CO II<br>• AT Sweden NY II, LLC<br>• AT Ville Platte LA II, LLC<br>• ATA Lanier Fayetteville GA II, LLC | • 1921 Gallatin Pike Nashville TN, LLC<br>• 2513 E North Street Kendallville IN, LLC<br>• 412 Cross Oaks Mall Plainwell MI, LLC<br>• 5339 Elvis Presley Blvd Memphis TN, LLC<br>• 5450 US Highway 80 East Pearl MS, LLC<br>• 60 Col. Promenade Pkwy Alabaster AL, LLC<br>• 601 Trenton Road McAllen TX, LLC<br>• 700 North Grand Ave. Mt Pleasant IA, LLC<br>• 752 S. Andy Griffith Pkwy Mt Airy NC, LLC<br>• 81 Jameson Lane Greenville AL, LLC<br>• 8001 Vaughn Road Montgomery AL, LLC<br>• ATA Hiram Square GA, LLC | • ArciTerra FD Bowman SC, LLC<br>• ArciTerra FD Greeleyville SC, LLC<br>• ArciTerra VN Clarksville TN, LLC<br>• ArciTerra VN Dickson TN, LLC<br>• ArciTerra WG Milwaukee WI, LLC |
| Bass Pro Shop | Mercado/Palencia | StanCorp |
| • ArciTerra BP Olathe KS, LLC | • ATA Mercado St. Augustine FL, LLC<br>• ATA Palencia St. Augustine FL, LLC | • Walcent Elk/IN, LLC<br>• 900 West Marion FL, LLC |
| Operating Business Entities | | |
| Village Brewhouse | Simply Sweet | Glenrosa |
| • VBH PG, LLC | • Fudge Is US PG, LLC | • Glenrosa 32 LLC |

### iii.    Cash Management

46.    The Receiver's cash management activities are tailored to each Asset Group. Because certain Asset Groups are subject to lender cash management agreements, the receipt and disbursement of cash is based on agreements entered between the lenders and the Receiver. Below is a summary of the various cash management strategies implemented by the Receiver:



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

a. *REIT 3650.* Under a debt cash management agreement with the lenders of the REIT, the tenants remit rent payments to a lockbox account at PNC Bank controlled by the servicer of the REIT 3650 debt. As such, the Receiver does not receive funds from rent payments. As the Receiver is responsible for managing the vendor payables for this Asset Group, the Receiver must submit disbursement requests to the lender detailing the invoices requiring payment. The lender reviews and approves disbursement requests and remits funds to the Receiver to cover the disbursement requests. After receiving the funds from the lender, the Receiver pays the vendor invoices and records these transactions in the appropriate entity's general ledger. For each invoice payment, the Receiver provides the invoice and other supporting documentation (e.g., payment confirmations) to the lender. As a result of this arrangement, there is no excess cash flow to the Receiver from the operations of these commercial properties.

b. *Rialto REIT.* The Rialto REIT had a debt cash management agreement similar to REIT 3650 until February 2024. In February 2024, the Receiver began directing tenants to remit rent payments to the bank accounts established by the Receiver for each entity. Additionally, the Receiver is currently negotiating a forbearance agreement with the loan servicer and lender, whereby the rents received would be used to pay the lender interest on the outstanding debt and amounts necessary to cover escrow charges, such as property taxes, of the properties. Therefore, rental payments received are used to pay debt interest, property taxes, ongoing operating expenses, and outstanding accounts payable to the extent cash is available. As a result, there is minimal excess cash flow from the Rialto REIT properties.

c. *Non-REIT Commercial Property Entities.* For the non-REIT commercial property entities, the tenants remit rent payments to the Receiver who uses the rent receipts to pay day-to-day operating and necessary capital expenses. The Receiver established cash operating accounts for each entity and accounts for rental receipts and operating expenses at the individual entity level.

d. *Operating Business Entities.* Each of the three operating business entities – Glenrosa, Village Brewhouse, and Simply Sweet – have their own operating bank accounts that are used for the collection of business receipts (e.g., revenue) and payment of operating expenses. The manager of Glenrosa, MorningStar, is responsible for all business processes (e.g., cash management, vendor management, accounting). The Receiver has access to and monitors the Glenrosa operating accounts and reviews monthly financial and operating reports from MorningStar. Village Brewhouse and Simply Sweet have individual operating bank accounts that the Receiver manages and monitors. Village Brewhouse and Simply Sweet pay many



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

ordinary course vendors through automatic payments from the operating accounts, which the Receiver monitors. The Receiver approves and disburses non-recurring expenses (e.g., significant repairs and maintenance) and weekly payroll. The Receiver conducts weekly meetings with the general manager of each business and reviews the financial and operating reports on a regular basis.

47. The Receiver established a banking relationship with Western Alliance Bank ("Western Alliance") to streamline and improve the cash management process. Western Alliance has significant experience working with receivership, bankruptcy, and other similar matters involving fiduciaries, provides its banking services at no cost to the Receiver. The Receiver is currently in the process of closing the remaining "legacy" ArciTerra accounts and transferring the remaining funds to the Receivership's Western Alliance accounts.

### iv.   Vendor Management

48. Another critical initial task of the Receiver was to identify the vendors of the commercial properties used in their day-to-day operations, and the outstanding balances due to each vendor. The commercial properties collectively rely on approximately 150 vendors to provide necessary services, including fire and safety, utilities, snow removal, HVAC repairs, building repairs and maintenance, plumbing, landscaping, and property maintenance.

49. In the early stages of the Receivership, the lack of available cash and the infrequent and inconsistent rent collections required the Receiver to triage vendor accounts payable. The Receiver gave priority to utilities and fire and safety-related expenses. While the Receiver's efforts to increase incoming cash from rent collections allowed for more timely payments to vendors, the Receiver's ability to fund critical repairs and other expenses of the commercial properties, however, continued to be complicated by the neglect of these properties prior to the appointment of the Receiver.

50. As discussed above, the Receiver discovered a vast amount of unopened mail and learned that many vendors of the commercial properties continued to send their invoices to Trigild or the former main office of ArciTerra. These factors, among others, created significant delays in the Receiver's receipt of vendor invoices, and in some cases, resulted in critical life and safety situations. For example, in one situation shortly after the Receiver's appointment, a tenant of an Indiana commercial property notified the Receiver that the electric company planned to disconnect all electricity to the property that same afternoon due to several months of non-payment. The Receiver immediately contacted the utility provider to determine the amount owed and arrange for payment. While the Receiver was able to find the necessary funds to make the payment, the utility provider did not have the capability to receive wire



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

transfers or ACH payments and would not hold off disconnecting the power while waiting for a check to arrive overnight. The Receiver communicated with a tenant at the property and arranged to wire the money to the tenant's bank account to enable the tenant to deliver the check to the electric company by the shut-off deadline.

51.   The Receiver improved the efficiency of identifying, reviewing, approving, and paying vendor invoices. The Receivership Team created an accounts payable ledger for each Asset Group to track vendor invoice details and payment information. The Receiver redirected vendor invoices for delivery to the Receiver. Where possible, vendors send invoices by email to a dedicated "Receiver Accounting" email address. Upon receipt via email or postal mail, the Receivership Team uploads invoices to AvidXchange, then reviews and records the invoice to the proper entity's books and the proper expense account. The Receiver reviews and approves all invoices for payment.

### v.   Significant Corporate Activities Not Performed Prior to the Appointment of the Receiver

#### a.   ArciTerra Failed to Make Florida State Sales Tax Filings and Payments

52.   Prior to the commencement of the Receivership, ArciTerra was responsible for filing required corporate reports to various state governmental agencies and making any applicable payments required with the filings. These reporting requirements included filing monthly state sales tax returns and remitting required payments. As the Receiver gained access to the unattended and unopened mail, the Receiver learned that ArciTerra had failed to file and pay Florida state sales tax associated with the Village Brewhouse business for October and November 2023. The Receiver worked with the Florida Department of Revenue ("FL DOR") to file and pay the October and November 2023 sales tax returns. As a result of the late filing of the returns, Village Brewhouse incurred penalties and interest totaling approximately $22,200.

53.   The Receiver also learned that Florida sales tax returns associated with two of ArciTerra's commercial properties in Florida, AT Mercado and AT Palencia, were not filed with FL DOR for much of 2023. The Receiver is currently working with the FL DOR to file and remit the pre-Receivership sales tax due.

#### b.   Federal and State Income Tax Filings for ArciTerra Entities

54.   Many ArciTerra entities have not yet filed the required 2022 federal and state tax returns. The Receiver learned from discussions with ArciTerra's prior tax accountants, CliftonLarsonAllen ("CLA"), that ArciTerra did not provide CLA with the necessary documentation for the 2022 return and also did not pay CLA's outstanding fees, and as a result CLA did not complete or file ArciTerra's 2022 tax returns.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

The Receiver understands, however, that CLA prepared and sent the necessary 2022 Form K-1s to ArciTerra investors. See **Exhibit 3** for a list of the ArciTerra entities with outstanding 2022 federal and state tax returns provided to the Receiver by CLA.

55.    The IRS and various state agencies will likely assess significant penalties and interest fees against the ArciTerra entities for the unfiled 2022 federal and state tax returns. Furthermore, the lack of accurate and complete 2023 books and records require the Receiver to "reconstruct" the appropriate accounting records to prepare and file the 2023 tax returns.

56.    The Receiver is currently discussing possible retention with CLA and two other accounting firms to prepare and file the necessary tax returns for 2022 and 2023.

### c.   *2023 Corporate and State Business Registration Filings*

57.    ArciTerra did not make certain annual corporate business registration filings and the associated registration fee payments in 2023. The Receiver is identifying the entities and states requiring registration filings for 2023 and will work with the respective state agencies to file and pay past-due registration fees.

## vi.   Commercial and Residential Property Operations

### a.   *Commercial Property Operations*

58.    The Receiver's work continues in accordance with the duties defined in the Receivership Order. The Receiver is managing the Receivership Assets and stabilizing cash flows from income-generating assets, including streamlining the rent collection process, paying real estate taxes and property vendors, negotiating forbearances, and analyzing properties and assets for disposition or further action.

59.    The Receiver obtained insurance coverage for the properties for which insurance policy premiums were not paid and coverage had lapsed pre-Receivership.

60.    Exhibit A to the Receivership Order includes a non-exhaustive list of 300 Receivership Entities. Exhibit C to the Receivership Order contains a list of entities excluded based on the previous appointment of a different receiver, pre-existing sales, dispositions, and/or litigation. The Receiver understands these properties were "lost" prior to the Receiver's appointment, and that ArciTerra's previous failures to manage these properties led to significant neglect, necessitating the intervention of other parties to preserve their value and operations.

61.    The Receivership Team remains in contact with the other receivers to assist with coordination of "lost" assets while determining a disposition process for cross-collateralized properties in other receivers' control along with the Receivership's assets for the benefit of the Receivership. The Receiver has faced



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

setbacks and delays, particularly related to the operations of properties within cross-collateralized portfolios subject to different receiverships.

62.   **Lender Communications.** The Receiver identified and contacted lenders and lenders' counsel associated with the commercial properties and negotiated certain pauses or forbearances. The Receiver entered into 5 forbearance agreements applicable to 33 properties which allowed the Receiver to collect rents, pay property maintenance and other expenses, and direct excess receipts to lenders on account of interim "adequate protection."[7] These limited forbearances, and other informal "pauses" or "status quo" relationships with lenders on other properties, allow the Receiver to work to enhance tenant performance, conduct basic property maintenance, and create a more cooperative environment where the Receiver can work together with lenders to stabilize properties for the benefit of creditors and investors. To optimize communications with lenders, the Receiver developed an internal 150-day "Asset Plans" for commercial Receivership Assets that document the Receiver's tentative plan to stabilize and potentially dispose of the Receivership Assets.

63.   **Insuring Assets.** At the time of the Receiver's appointment, it was not clear whether there was active insurance coverage for the Receivership Assets.  Insurance documentation initially obtained by the Receiver included a property insurance policy declaration excerpt and a general liability insurance policy schedule of locations excerpt from The Chubb Corporation ("Chubb"). The property insurance policy included 57 addresses and the general liability insurance policy included 79 addresses, both commercial and residential properties. However, the Receiver discovered that ArciTerra never paid the Chubb insurance premiums.

64.   During discussions with commercial property lenders, the Receiver learned that force-placed property insurance policies[8] were bound for the 29 properties.[9] Three properties did not have force-placed insurance policies.[10] Two properties did not have active mortgages and therefore also did not have force-placed insurance policies.[11]

65.   The Receiver bound both general liability and property insurance policies through AssuredPartners for the REIT 3650, Rialto, and KS State Bank Asset Groups, and the Mercado Walk, Palencia Plaza,

---

[7] "Adequate protection" is a remedy that protects secured creditors from losses to their collateral.
[8] "Force-placed insurance" is an insurance policy placed by a lender, bank or loan servicer on a property when the property owners' own insurance is cancelled, has lapsed or is deemed insufficient, and the borrower does not secure a replacement policy. Force-placed insurance allows the lender to protect its financial interest in the property.
[9] Includes REIT 3650 Portfolio, Rialto Portfolio, KS State Bank Portfolio, ATA Hiram Square GA LLC, and 900 W. Marion FL LLC. Excludes properties subject to another receivership.
[10] ATA Mercado St. Augustine FL LLC, ATA Palencia St. Augustine FL LLC, and Walcent Elk/IN LLC.
[11] ArciTerra BP Olathe KS LLC and AT New Lenox IL-Outlots LLC.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

Northfield Plaza, and 900 W. Marion properties. Per the Bass Pro Shops lease agreement, the landlord is responsible for the general liability insurance and the tenant is responsible for the property insurance policy. The Receiver bound general liability insurance policies for Bass Pro Shops and New Lenox Outparcel. All insurance premiums were funded by rents collected by the Receiver, except for the REIT 3650 Asset Group, for which insurance premiums were funded by the insurance reserve held by the loan servicer and the portfolio's cash management account funds.

66.  **Asset Disposition or Further Action.** Paragraph 6(N) of the Receivership Order provides that the Receiver shall have the power and duty to:

> *"Sell, assign, transfer or otherwise dispose of any assets of the Receivership Entities either directly or through one or more Retained Personnel, subject to approval by this Court with respect to any material assets[.]"*

67.  Disposition or sale of assets by the Receiver is further governed by 28 U.S.C. §§ 2001, 2002, and 2004 and caselaw developed by federal courts. Section 2001 governs sales of real property and section 2004 governs sales of personal property. In addition to these statutory provisions, federal courts have some discretion in approving sale procedures and sale terms that will promote equity, efficiency, and cost-effectiveness in the receivership's administration.

68.  The decision to move forward with the disposition or sale of Receivership Assets is made by the Receiver, and if appropriate, upon consultation with the lender and lender's counsel, and with approval by the Court. The Receiver has the discretion to hire brokers and has made a concerted effort to engage with independent brokers regarding the disposition of Receivership Assets. The sale of any material Receivership Asset, including the engagement of any brokers for the sale of that asset, is subject to Court approval.

69.  While not expressly provided for statutorily, an order approving the sale of assets by a federal receiver may provide for the sale of property free and clear of liens, claims, encumbrances, and interests with all such encumbrances attaching to the proceeds of the sale. The Receiver conducted preliminary property records searches but has not yet expended the funds required to execute complete title searches for all known ArciTerra properties and thus, is not yet aware of all outstanding encumbrances.

### b.  Residential Property Operations

70.  As with the commercial properties, described above, there was no central documentation listing all ArciTerra residential properties. Through additional independent research, the Receiver identified and took control of nine residential properties, two of which are timeshare units with 1/20th ownership stake in each unit. These numbers exclude one property, as to which the Receiver acknowledged no rights as a Receivership Entity and reserved his rights, as described below.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

71.   See **Exhibit 1** for a map of the properties' locations and **Exhibit 2** for a detailed list of all commercial and residential properties.

| No. | Owner | Address | Property Type |
|---|---|---|---|
| 1 | 751 W Retta Esplanade FL, LLC | 751 W Retta Esplanade, Punta Gorda, FL 33950 | Residential |
| 2 | Spike Holdings LLC | 1001 West Marion Avenue, Unit 21, Punta Gorda, FL 33950 | Residential; Condominium Unit |
| 3 | Spike Holdings LLC | 880 West Marion Avenue, Punta Gorda, FL 33950 | Residential |
| 4 | Spike Holdings LLC | 150 Shreve Street, Punta Gorda, FL 33950 | Vacant Land |
| 5 | Jonathan Larmore | 11751 Black Point Road, Syracuse, IN 46567 | Residential |
| 6 | HV Gardens LLC | 8150 East Highland View Drive, Syracuse, IN, 46547 | Residential |
| 7 | Morrison Island LLC | 10507 N. Grand Boulevard, Syracuse, IN, 46567 | Residential |
| 8 | FK Telluride LLC | 567 Mountain Village Blvd, Unit 114-6 Telluride, CO, 81435 | Residential; Timeshare Unit |
| 9 | FK Telluride LLC | 567 Mountain Village Blvd, Unit 115-1, Telluride, CO, 81435 | Residential; Timeshare Unit |

*Receivership Residential Properties*

72.   **Lender Communications.** Initially, mortgage lenders and their respective counsel were identified and contacted to ascertain the outstanding mortgage balances. Of the nine residential properties, four have outstanding mortgage balances that have yet to be paid off. The team has engaged in discussions with three of these four mortgage holders, with ongoing conversations expected to provide an exact mortgage balance update from the remaining holder by early June 2024.

73.   In addition to addressing mortgage balances, the Receivership Team has worked to identify all known taxes, encumbrances, and liens associated with the residential properties. Through property tax searches and consultations with county assessor offices, the team uncovered instances of unpaid taxes and liens on the properties.

74.   **Insuring Assets.** The Receivership Team engaged AssuredPartners to place general liability insurance on all properties, which was bound by the Receiver effective as of May 8, 2024.

75.   **Asset Disposition or Further Action.** The process for disposition or sale of residential assets mirrors that described above for commercial assets, per Paragraph 6(N) of the Receivership Order. The decision to move forward with the disposition or sale of Receivership Assets is made by the Receiver, and if appropriate, upon consultation with the lender and lender's counsel, and with approval by the Court. The Receiver has the discretion to hire brokers and has made a concerted effort to engage with independent brokers regarding the disposition of Receivership Assets. The sale of any material Receivership Asset, including the engagement of any broker for the sale of that asset, is subject to Court approval.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

76. **Other Properties of Note.** JMMAL Mariposa LLC, an entity that is not defined as a Receivership entity, owns 5324 E. Mariposa Street ("Mariposa") in Phoenix, Arizona. The residence, spanning approximately 5,990 square feet, comprises five bedrooms and five bathrooms. City National Bank holds the current mortgage on the property. Upon appointment, the Receiver found that the Mariposa property was listed for sale on several real estate websites. The Receiver analyzed the rights of the Receivership Estate in this property. As a result, and given that the property is not a Receivership entity, the Receiver took no position on the offer and reserved rights.

77. Northeast Wawasee LLC, a Receivership entity, owns 11234-11227 Northeast Wawasee in Syracuse, Indiana, situated on 1.36 acres of land. The residence has 4,810 square feet with seven bedrooms and four bathrooms. The property does not have an active mortgage. Upon the request of Michelle Larmore to allow the sale of this property, the Receiver analyzed the rights of the Receivership Estate, did not object to the sale, and reserved his rights. See Stipulation and Order ECF Nos. 156 and 159.

### vii.  Property Management

#### a.  *Commercial Property Management*

78. The Receiver initially found that ArciTerra's general operations were disorganized and required immediate oversight, particularly commercial property management. Trigild previously performed the accounting and property management functions for approximately 30 commercial properties for the first nine months of 2023. In October 2023, prior to the Receiver's appointment, Trigild discontinued its work for ArciTerra, it said, because of ArciTerra's failure to pay Trigild its services. As a result, ArciTerra did not have basic property management, accounting, nor finance functions between October 2023 and the Receiver's appointment, including no process for the payment of operating expenses and the resolution of property and tenant requirements.

79. The Receivership Entities are lessors under real estate leases with approximately 169 active commercial and retail tenants. Upon appointment, it was challenging for the Receiver to identify and locate critical records needed to effectively manage the properties because property and tenant information was disorganized, incomplete, and/or missing. The Receiver could not readily determine when, to what account, and with what frequency tenants remitted rents prior to the Receivership. These factors complicated the Receiver's efforts to identify all current tenants and the associated active leases.

80. Notably, ArciTerra and Trigild did not perform or provide the required year-end Common Area Maintenance ("CAM") reconciliations to tenants for several years. CAM reconciliation is a crucial process required by leases to address the estimation and assessment of shared expenses between landlord



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

and tenants. Despite efforts to achieve accuracy, the unpredictable nature of CAM costs often leads to disparities between the actual expenses incurred and the tenants' payments. The primary purpose of year-end CAM reconciliation is to evaluate the accuracy of the estimated escrow charges paid by tenants throughout the lease term. By not providing year-end CAM reconciliations to the tenants throughout the entire portfolio, ArciTerra was not in compliance with lease agreements and limited the tenants' ability to verify that they were paying their appropriate share of the CAM costs.

81.   The Receiver installed professional third-party property management at 28 of 39 commercial properties. The Receiver entered into a property management agreement with SVN Elevate ("SVN") effective as of March 1, 2024, for the Rialto and KS State Bank Asset Groups. The Receiver initially engaged SVN as the project management firm at the recommendation of the Rialto lending team, which was discussed over several meetings. The Receiver entered into a property management agreement with Cushman & Wakefield ("Cushman") for the REIT 3650 Asset Group effective as of April 12, 2024. The Receiver is managing property management functions for the remaining 11 of 39 commercial properties.[12] See **Exhibit 2** for the detailed list of properties which, for commercial properties, includes their respective property managers.[13]

82.   SVN, Cushman, and the Receiver's inspections and monthly evaluations have aided in confirming all current tenants, identifying any vacant units, obtaining copies of active leases, and communicating important information such as updated rent remittance instructions. Further, dedicated property managers conducting recurring in-person visits to properties has improved communication between the Receiver and tenants, led to increased trust in the Receiver's operations, and strengthened the relationship between the parties. As a result, the Receiver is now collecting rents on a consistent basis.

83.   The long-term neglect affecting Receivership Assets proved initially challenging for effective property management. This was compounded by a lack of access to property operational expense funds, missing contact information of property vendors, hesitancy of vendors to work with the Receiver due to ArciTerra's poor payment history, and a backlog of concerns and requests from tenants. The Receiver, SVN, and Cushman have since addressed several significant tenant complaints related to longstanding, unresolved required repairs and neglected maintenance issues through a comprehensive inspection and maintenance program.

---

[12] With the exception of Glenrosa 32, LLC, which is managed by MorningStar.
[13] The KS State Bank Asset Group properties in Milwaukee, WI and Greeleyville, SC are vacant. The scope of property management services at these locations was reduced to periodic site visits and reporting to reduce fees for the Receivership Estate.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

84. A history of comprehensive inspection and ongoing monthly evaluations by dedicated property managers are crucial for maintaining the integrity and value of the properties and addressing maintenance issues promptly. Outsourcing of recurring services to specialized vendors for tasks such as landscaping, porter services, and life and fire safety system monitoring ensures that each property receives the required attention. Identification of urgent capital expenditures, particularly roofing and heating, ventilation, and air conditioning ("HVAC") repairs, is a proactive measure to safeguard the portfolio's value. Further, critical refurbishments, such as repairs to roofs and parking lots, illustrate the Receivership's commitment to enhancing the portfolio's aesthetics, functionality, and value.

85. ArciTerra did not provide CAM reconciliations for at least the past two years. Under the authority of the Receiver, the property managers, SVN and Cushman, and the Receivership Team will provide detailed year-end CAM reconciliations to each tenant on an ongoing basis.

### b.   Residential Property Management

86. The Receiver has not engaged any third-party providers for property management or property maintenance services for residential properties under the Receivership. The Receivership Team visited the properties in Punta Gorda, Florida to conduct high-level assessments of the physical status of the properties. The Receivership Team has not yet visited any residential properties in other locations but is not aware of any property conditions requiring attention.

## E.   Record Preservation and Review

87. The Receiver collected and preserved records associated with ArciTerra, related entities, operations, and associated personnel. The Receivership Team collected, preserved, imaged, and is in the process of reviewing, documents from various sources, including:

   a.   17 electronic devices.

   b.   ArciTerra's Microsoft 365 email, OneDrive, and SharePoint data.

   c.   Physical documents from several locations including ArciTerra offices and other properties in Punta Gorda, Florida; an airplane hangar storage facility in Scottsdale, Arizona, which held approximately 150 boxes of materials; and an Iron Mountain facility in Phoenix, Arizona that stored over 400 boxes of documents.

88. The current population of documents collected from the various sources noted above results in over 4.8 million documents.

89. The Receivership Team also took steps to have incoming physical mail for 56 properties forwarded to the Receiver's central office location.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

90.    The Receivership Team provided read-only access to or electronic copies of ArciTerra's SharePoint file system, MRI accounting system, and AvidXchange accounts payable system through December 21, 2023 to the SEC, Jonathan Larmore and his professionals and Michelle Larmore and her professionals. Accordingly, the SEC, Jonathan Larmore and Michelle Larmore had the same information available to the Receiver and each other through December 21, 2023. In addition, Jonathan Larmore's ArciTerra email account was provided to him and his professionals and Michelle Larmore's ArciTerra email account was provided to her and her professionals.

### i.    Devices, Microsoft 365 Email Accounts, OneDrive and SharePoint

91.    The Receivership Team collected a total of 17 devices from various ArciTerra offices and other ArciTerra owned properties during numerous site visits to Punta Gorda. The Receivership Team forensically imaged the devices and uploaded the imaged data to a document review platform for the Receivership Team's review.

92.    The Receiver gained access to and downloaded the ArciTerra Outlook mailboxes (i.e., email, calendar, contacts, and notes) and OneDrive storage sites for ArciTerra employees from the Microsoft environment. The Receivership Team preserved these mailboxes and OneDrive sites and added all documents to the document review platform.

93.    ArciTerra's SharePoint is a Microsoft cloud storage repository of ArciTerra documents (i.e., where ArciTerra former employees saved ArciTerra-related documents). The Receiver preserved the SharePoint repository and added all documents to the document review platform. Recently, without notice to the Receiver, SharePoint access was terminated by Microsoft but because the Receivership Team had initially created a forensic e-discovery export of the site, all data remains preserved and available, and no data was lost.

94.    The Receiver also received an electronic document production from the SEC. The Receivership Team added these documents to the document review platform.

### ii.    Physical Documents

95.    The Receivership Team located approximately 150 boxes of documents in the hangar for Mr. Larmore's former private airplane in Scottsdale. The Team inventoried the boxes, reviewed, indexed the box contents, and shipped boxes relevant to the Receiver's work to an e-discovery vendor. As a result, more than 39,000 documents were imaged and added to the document review platform.[14]

---

[14] Two boxes contained binders with black mold which could not be imaged.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

96.   The Receivership Team visited an Iron Mountain facility in Phoenix to inventory more than 400 boxes of ArciTerra documents. Prior to the Receiver's appointment, ArciTerra failed to pay over one year's worth of invoices to Iron Mountain (dating as far back as December 2022), which delayed the Receivership Team until May 2024 when the Receiver satisfied the outstanding debt to Iron Mountain. During the May 2024 visit, the Receivership Team replicated the review process described above and will have relevant documents imaged and added to the review platform in due course.

97.   The Receivership Team conducted site visits to ArciTerra offices and properties in Punta Gorda over the course of the initial weeks and months of the Receiver's appointment during which it retrieved a smaller population of physical documents. These documents were imaged and added to the document review platform.

### iii.   Document Review Process

98.   The Receivership Team uploaded to the review platform the documents collected and imaged during the various site visits and collection efforts.[15] To narrow the population of documents to be reviewed to a more relevant subset, the review platform electronically identified and excluded duplicates from the review queue. In addition, the Receivership Team developed specific search terms to apply to the remaining population to identify documents more relevant to the ongoing work of the Receivership Team to review and analyze.

99.   The Receiver also received a document production from the SEC. These documents were added to the review platform and their review is complete.

100.  The remainder of the document review is ongoing, and the Receivership Team is using findings from key documents discovered via the document review to support and enhance the Receiver's understanding of the state of ArciTerra at the time of the Receiver's appointment, and to assist the Receiver in running the ArciTerra businesses.

### F.  Investor Funds Analyses

101.  Section II.2. of the Receivership Order places responsibility on the Receiver to, among other things, ascertain the financial condition of the Receivership Entities and Receivership Assets, and to propose for the Court a fair and equitable distribution of the remaining Receivership Assets. To meet this mandate, the Receiver's work includes gaining an understanding of the structures, identifying investors,

---

[15] Before the Receivership Team began its review of documents received from any of the sources mentioned above, the Receiver queried the mailboxes to identify and isolate possible privileged communications of Mr. Larmore. The Receivership Team electronically filtered out and isolated potentially privileged documents from the rest of the document review population. These isolated documents have not been reviewed.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

lenders, and other creditors, evaluating fees, and assessing the overall flow of funds to third parties and between Receivership Entities and investment vehicles with third-party investors. In addition, these analyses may allow the Receiver to identify other potential sources of recovery for investors and creditors.

102. The Receivership Assets include 11 private investment vehicles through which capital was raised from third-party investors (referred to throughout this Report as "Investor Funds"), generally through brokers, including:

- ArciTerra National REIT, Inc.
- ArciTerra Note Fund II, LLC
- ArciTerra Note Fund III, LLC
- ArciTerra REIT, Inc.
- ASI Belleville Crossing IL, LLC
- ASR Briargate & Linden IL, LLC

- ASR Centerville & Colony GA, LLC
- ASR Plainfield Village IN, LLC
- ASR Trinity Place TN, LLC
- ASR Wheatland IL, LLC
- Whitefish Opportunity Fund, LLC

103. ArciTerra solicited funding for each of these Investor Funds through Private Offering Memorandums ("POMs") which provided prospective investors and brokers with the terms, disclosures, and other details regarding the investments. A summary of the dates of formation, the total amount raised, and the number of investors identified for these 11 Investor Funds is attached as **Exhibit 4**.

104. In addition to the analysis of the POMs, the Receivership Team reviewed and is reviewing contemporaneous documents, such as the operating agreements of investment structures; subscription agreements (i.e., investor purchase agreements); contemporaneous investor updates and communications; loan and forbearance agreements (when applicable); intercompany loan trackers; bank statements; general ledgers of investment and affiliated entities; and other financial records.

105. For each of these Investor Funds, the Receiver set out to understand and analyze:

a. The ownership structure and hypothetical waterfall calculations provided for in the POMs.

b. The specific investment strategy and/or planned acquisitions.

c. The calculation and payment of fees to managers and other parties.

d. The timing and amount of funds raised.

e. How ArciTerra deployed and invested investor money.

f. Potential distributions, interest or dividends paid or owed.

g. Outstanding loans and/or other debt.

h. Outstanding loans payable and/or receivable.

i. Current investor capital balances and amount due to investors.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

     j.    Identification of guarantees provided and source of guarantees.

106. As of the date of this First Status Report, the Receiver performed a preliminary analysis of five of the Investor Funds: ArciTerra Note Fund II, LLC ("Note Fund II"), ArciTerra Note Fund III, LLC ("Note Fund III"), ArciTerra National REIT, Inc ("National REIT"), ASR Wheatland IL, LLC ("ASR Wheatland"), and ASR Centerville & Colony GA, LLC ("ASR Centerville & Colony"). Aspects of the Receiver's analysis are still in process. The Receiver continues to investigate the flow of investor money to and from the Investor Funds to assess what was received from and is owed to investors in the respective investment vehicles of the Receivership Entities and creditors.

### i.    Intercompany Loans and Commingling of Investor Funds

107. As a preliminary observation, the ArciTerra entities' accounting was maintained on a cash basis, which was consistent with the accounting method described in many of the POMs the Receivership Team reviewed.[16]

108. Through discussions with former ArciTerra employees and a review of contemporaneous email communications and deposition testimony, the Receiver observed that it was common practice at ArciTerra to pay expenses based on their urgency, with cash from the bank account of an entity with sufficient funds at the time the payment was needed, without regard to which entity incurred the debt or whether the cash came from an account of one of the Investor Funds. The Receivership Team confirmed this pattern through a review of ArciTerra financial records, bank statements, email review and other documents.

109. In her deposition with the SEC on September 28, 2023, former ArciTerra Controller, Kathleen Bouet, testified that to the extent there was not enough money in the account of the entity owing the expense, *"we'd have to review all of the bank accounts and see which properties had a surplus and then make the loan or the distribution, depending on how the ownership was, and pull the funds from those accounts to pay and cover...expenses."*[17]

110. According to Ms. Bouet's testimony, for each funding need, rather than directly transferring the cash from the account of the entity with the surplus to the account of the entity with the deficit, Ms. Bouet and other ArciTerra employees would generally transfer the cash from one entity-level bank account to that entity's parent company's account, and then transfer the cash to ArciTerra Strategic Retail Advisors,

---

[16] Although cash basis of accounting or modified cash basis of accounting can be used for various purposes, it is not considered generally accepted accounting principles ("GAAP"), but rather another comprehensive basis of accounting.

[17] Deposition of Kathleen Bouet by the Securities and Exchange Commission dated September 28, 2023, at p. 145.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

LLC ("ASRA"). From ASRA, ArciTerra transferred the cash to the parent of the recipient entity, and then to the entity-level account, from where the expense was ultimately paid. ArciTerra recorded each of these cash transfers as intercompany loans and maintained a running balance of the amounts due between entities as it transferred cash back and forth between the entities, through ASRA.

111.   The POMs for the Investor Funds do not contemplate or disclose that Investor Fund cash flows would move to, from, and through ASRA; ASRA is not part of the Investor Fund ownership or distribution structures. ASRA owns several non-Investor Fund real estate entities and is owned by JMMAL, MML, and Spike Holdings, all of which are owned and controlled by Mr. Larmore and Marcia Larmore.

112.   **Figure 1** below is one example of this process and illustrates how $200,000 made available from an entity that is part of the Note Fund II, Note Fund III, and National REIT Investor is ultimately used to pay the expenses of entities in other Investor Funds, as well as non-Investor Fund entities owned by Mr. Larmore and/or members of his family.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona



Figure 1 – Illustration of Investor Fund Money Used to Pay Non-Investor Fund Expenses on April 19 and 20, 2022

113. As shown in **Figure 1** above, the Senior Living Facility owned by Glenrosa and an investment in the Note Fund II, Note Fund III, and National REIT Investor Funds, sent Glenrosa a $200,000 ownership distribution on April 19, 2022. On the same day, $200,000 received by Glenrosa is transferred to ASRA. The following day, April 20, 2022, ASRA transfers and distributes the $200,000 through at least 11 different entities to pay various expenses of entities that are part of separate Investor Funds, or for entities that are owned by Mr. Larmore and/or members of his family and not part of any Investor Fund.

114. This process was a consistent and standard practice from at least 2015 according to an analysis of contemporaneous ArciTerra intercompany loan tracking spreadsheets. This practice resulted in the



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

aggregation and commingling of "available" cash from dozens of ArciTerra entities into and out of ASRA's bank account.

115. The Receivership Team's review of ArciTerra bank accounts and financial records for the years 2019 to 2022 show the following aggregate flows commingled in and out of ASRA:[18]

**2019**: $373 million from 60+ ArciTerra entities → **ASRA** → $372 million to 70+ ArciTerra entities

**2020**: $408 million from 60+ ArciTerra entities → **ASRA** → $407 million to 60+ ArciTerra entities

**2021**: $258 million from 50+ ArciTerra entities → **ASRA** → $252 million to 60+ ArciTerra entities

**2022**: $413 million from 40+ ArciTerra entities → **ASRA** → $402 million to 50+ ArciTerra entities

116. The flow of money into and out of ASRA discussed above includes ArciTerra's "refinancing" of the intercompany loans at the end of each quarter, as follows:

   a. At the end of each quarter, ArciTerra entities that owed money to ASRA would settle their debt to ASRA. ArciTerra would deposit checks it drafted from these entities' bank accounts into ASRA's bank account.

   b. Likewise, ArciTerra would deposit checks it drafted from ASRA's bank account into the bank account of the ArciTerra entities to which ASRA owed money.

   c. On the same day, or the next day, to recognize the interest owed on the then pending loans (since the books were maintained on a cash basis the interest could not be accrued), ArciTerra would reverse the payment flow and increase the loans balances by 12% interest on the balance from the prior period.

   d. Effectively, because of this process, the intercompany loan balances owed to and from ASRA to ArciTerra entities would grow by the amount of the interest due as the new loan principal would increase by the interest from the previous period.

117. The ASRA trial balance shows that as of June 2023:

   a. ASRA had outstanding intercompany loans due to or due from with over 42 ArciTerra and affiliated entities and individuals.

   b. There were 19 ArciTerra and affiliated entities and individuals with balances **due to** ASRA totaling over $52.6 million.

---

[18] The analysis is ongoing, including reconciliation of the intercompany balances between the various entities and tracing of transactions to bank statements. As a result of the ongoing analysis the reporting of outflows to and inflows from ASRA may change but are not expected to vary by a significant amount.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

    c. There were 23 ArciTerra and affiliated entities and individuals with balances *due from* ASRA totaling over $108 million, including approximately $35 million to Glenrosa and ATG REIT RSC, which are entities within the Note Fund II, Note Fund III, and National REIT Investor Pools.

    d. The net impact of these intercompany loans and commingling of funds is a total of approximately $55.4 million *due from* ASRA to other entities.

118. Consequently, ArciTerra mixed money from operating entities owned by certain investors in Investor Funds with money from ArciTerra entities or affiliates unrelated to the Investor Funds. The Receiver's efforts to determine the amounts owed and available to distribute to investors are complicated by ArciTerra's cash commingling. This practice has caused the Receiver to have to unwind a vast number of transactions to determine to which entities and/or Investor Funds and creditors the cash and/or assets belong.

119. The Receiver has not yet identified any documented policy that would explain how the decisions were made to prioritize satisfying debts of certain entities or vendors, or other third parties, over making distribution to certain investors.[19]

120. Although the Receiver found that ArciTerra generally recorded the intercompany loans in the books of each respective lender and borrower, it is not clear at this stage of the Receiver's work whether, when ArciTerra created the loans, the lending entity received equivalent value from the borrowing entity, or that the transactions were conducted at arm's length. It is also unclear whether such loans had economic substance. For instance, although ArciTerra recorded the loan balances, it is not clear that when ArciTerra made a loan, it gave consideration as to whether the borrowing entity had the ability to repay without receiving funds from other ArciTerra companies.

121. This analysis, combined with the determination of income and profit distribution or liquidation "waterfalls" from the various investment structures, will allow the Receiver to propose a distribution plan in due course, which is likely to have to take into consideration the impact of the commingling of funds. The commingling of so many entities' funds will likely affect the determination of how the Receivership Estate will seek to satisfy future claims, though the Receiver is not yet in a position to approach a proposal to address creditors or investors.

---

[19] According to Ms. Bouet's deposition testimony, early in the existence of the Investor Funds, ArciTerra documented the intercompany loans but abandoned the practice around 2015 (See, Deposition of Kathleen Bouet by the Securities and Exchange Commission dated September 28, 2023, at pages 134-135).



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

### ii.    Preliminary Observations from the Investor Funds Analyses

#### a.    Payments to Investors

122.    Our analysis began with the review of Note Fund II and Note Fund III as these Investor Funds raised the most from third-party investors compared to other Investor Funds. The Receiver's review of Note Fund II and Note Fund III documentation indicates that investors received interest payments in connection with their investments up until approximately March 2020. The Receiver's analysis to date establishes that from fund inception to March 2020, investors in Note Fund II and Note Fund III received interest payments of approximately $12.6 million and $13.6 million, respectively. The Receiver reviewed investment update letters which show that ArciTerra suspended interest payments in April 2020, and by April 2022, ArciTerra informed investors in Note Fund II and Note Fund III that liquidation options were being considered.

123.    The Note Fund II and Note Fund III investors did not receive repayment of their principal contributions. According to a spreadsheet attached to a September 23, 2023 email from Mr. Larmore,[20] principal due to Note Fund II and Note Fund III investors was $20 million and $25 million, respectively (attached as **Exhibit 5**). The outstanding principal balances shown in the spreadsheet represent the total amount raised under Note Fund II and Note Fund III, demonstrating that as of September 2023, investors in these Investor Funds did not receive any return of their invested principal. The spreadsheet also indicates that Note Fund II and Note Fund III investors are due accrued interest of at least $24.9 million and $31.2 million, respectively.

124.    The POMs for Note Fund II and Fund III contain a specific structure for how cash flows from investment properties rental income would flow up from the investment entities through ArciTerra Note Fund II Investment Company, LLC ("Note Fund II Investment Co.") and ArciTerra Note Fund III Investment Company, LLC ("Note Fund III Investment Co."), which respectively served as the "feeder" entities between the investment entities and Note Fund II and Note Fund III. Interest was to flow from Note Fund II Investment Co. and Note Fund III Investment Co. up to Note Fund II and Note Fund III, respectively, and then out to investors (through the Funds' third-party administrator). See **Exhibit 6** for the flow charts from the POMs of Note Fund II and Note Fund III.

125.    Through the commingling process described above, interest paid to Note Fund II and Note Fund III investors was paid with cash from and intended for, entities outside the Note Fund II and Note Fund III distribution and ownership structure.

---

[20] The Receiver has verified the calculations within the spreadsheet of outstanding investor principal and interest due.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

126. **Figure 2** below shows how loan proceeds received through a refinancing of one entity were used to make interest payments to Note Fund III investors. In this example, ATA Fishville Retail, LLC ("ATA Fishville Retail") received $2,304,761 in cash on March 23, 2018 from the refinancing of the loan for Fishermen's Village in Punta Gorda, Florida. On the same day, ATA Fishville Retail transferred $2,304,000 to ASRA, through ArciTerra KLS Warsaw IN, LLC ("KLS Warsaw"). Also on the same day, ASRA sent $86,000 of the $2,304,000 to ArciTerra Note Advisors III, Inc ("Note Fund III Advisor"), and to Note Fund III through Note Fund III Investment Co. Note Fund III wired $85,439 to TMI Trust Company, the administrator, to make the interest payments to investors.



Figure 2 – Illustration of Loan Proceeds Flowing from an Unrelated Investor Fund Entity to Investors on March 23, 2018



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

127. Although according to the POMs of Note Fund II and Note Fund III money was not supposed to flow through ArciTerra Note Advisors II, LLC ("Note Fund II Advisor") or Note Fund III Advisor, they did, as reflected in **Figure 2** above.

128. As discussed above, interest payments to Note Fund II and Note Fund III investors ceased after March 2020. The Receiver observed that money continued to flow from ASRA to Note Fund II Advisor and Note Fund III Advisor after March 2020, but ArciTerra did not use this money to make investor interest payments.[21] In 2021, ASRA sent Note Fund II Advisor and Note Fund III Advisor a net $41,000 and $72,000, respectively, and in 2022, ASRA received from Note Fund II Advisor and Note Fund III Advisor a net of approximately $1.2 million and $70,000, respectively; no interest payments were made to Note Fund II or Note Fund III investors in 2021 or 2022.

129. **Figure 3** below depicts, in summary, the flow of money through ASRA to Note Fund II Advisor and Note Fund III Advisor throughout 2022, and the amount of interest payments to Note Fund II and Note Fund III investors in 2022.

---

[21] The source of this observation is bank statements.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona



Figure 3 – Illustration of Flow of Money to and from ASRA in 2022

130. The Receiver observed that instead of income from ATG REIT RSC and Glenrosa flowing to Note Fund II Investment Co. and Note Fund III Investment Co., as provided for in the POMs, the money flowed through ASRA and was not used to make payments to investors.

131. The Receiver also observed instances where money that may have been available for investor interest payments was instead used to pay the ArciTerra American Express ("AMEX") account which was used



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

for both business expenses and by Jonathan and Michelle Larmore and their children for their personal expenses, like the example shown in **Figure 4** below.



132. **Figure 4** above shows how on January 4, 2023, ATG REIT RSC transferred $160,000 to ASRA which was then ultimately used to contribute to the payment of ArciTerra's December 9, 2022 AMEX statement, as well as a $15,000 transfer to Mr. Larmore's personal bank account. Investors in ATG REIT RSC did not receive any interest payments in 2023.

133. The $206,386 payment to AMEX represents the full balance due on the 12/9/2022 ArciTerra Companies AMEX statement. The charges on the 12/9/2022 statement do not include charges related to ATG REIT RSC. The statement does include over $108,000 in charges to cards held by Mr. Larmore and members of his family, and another $53,000 in charges for an account called "CSL Larmore."

134. The Receiver's work to determine the total amount paid to and due to investors in each of the Investor Funds continues. The Receiver is also working to understand to what extent ArciTerra's intercompany loan and cash commingling practices (discussed above) impacted ArciTerra's ability to pay investor interest payments or dividends.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

### b.   ArciTerra Reduced Note Interest Rates

135.   Note Fund II and Note Fund III paid investors interest payments at rates of 8.25% (and subsequently 8.75%) and 9.25%, respectively, until May 2010. After May 2010, ArciTerra reduced the interest rates for both Note Fund II and Note Fund III to 4%. The decision to decrease interest rate payments triggered an event of default, which under the POMs caused the interest on the notes for Note Fund II and Note Fund III to accrue at the rate of 12%. ArciTerra updated investors regarding the status of the Note Fund II and Note Fund III investments from at least 2011 to 2022 through periodic "Investment Update Letters." A February 2017 Investment Update Letter to Note Fund II and Note Fund III investors, states:

> *The Company anticipates that monthly payments to Noteholders will continue at the current 4% per annum level."*

### c.   Fees Charged to the Investor Funds

136.   As part of the Investor Fund analysis, the Receiver is in process of identifying the basis for calculation of the various fees contemplated in the POMs to the manager entities and other parties, or other contemporaneous evidence of the calculation of such fees. When the Receiver cannot locate evidence or information supporting the fee payments, the Receiver is working on reconstructing or reverse-engineering the basis for the fee calculation and/or fee payment.

137.   Each of the POMs analyzed to date includes provisions for the payment of certain manager fees. The POMs reviewed provides for the payment of the following fees:

| | |
|---|---|
| **Acquisition Fees** | Fee incurred for the purchase of a property calculated as a percentage of the purchase price. |
| **Financing Fee** | Fee related to debt financing or debt arrangement based on a percentage of the aggregate principal amount of indebtedness secured for a property on behalf of the Company. |
| **Guarantee Fee** | Payment made to a third party by a borrower or lender to guarantee the repayment of a debt in case of default that is calculated as a percentage of the debt payable or as a fixed annual amount. |
| **Property Management Fee** | Fee for the administration, technical and commercial management of a property based on a percentage of property revenue. |
| **Asset Management Fee** | Annual fee for managing the affairs of the investment(s) as a percentage of the property's asset value. |
| **Lease Coordination / Commission Fee** | Fee in connection with executing a lease calculated as a specific price per square foot. |



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

| Tenant Improvement / Construction Management Fee | Fee for the oversight and/or direct costs of improvement work based on a percentage of the value of the improvement or as a dollar value per square foot. |
|---|---|
| Special Disposition Distribution Fee | Fee related to the sale of an asset calculated as a percentage of the gross sale price of the properties. |
| Subordinated Participation in Distribution Fee | Once stockholders receive dividends in an aggregate amount equal to their investment or based on specific terms, the Advisors are entitled to a percentage of any distribution made by the Operating Partnership thereafter. |

138.  The Receiver is performing an analysis to review the general ledgers to assess and calculate what the entities have paid in management fees since their inception and how this compares to the allowable manager fees per the POMs. The Receiver's analysis is still ongoing.

## III.  Financial Status

139.  Below is a report of the cash balances of the Receivership Assets; the receipts, disbursements, and balance of the Receivership Estate's Fund; and administrative expenses of the Receivership.

### A.  Cash on Hand – Receivership Assets

140.  Below is a summary of the cash balances for the Receivership Assets as of April 30, 2024.

|  | Restricted | Dedicated | Other |
|---|---|---|---|
| **Operating Businesses** | | | |
| Village Brewhouse | | $1,111,400 | |
| Simply Sweet | | $211,500 | |
| **Commercial Properties** | | | |
| Glenrosa | $422,000 | | |
| REIT 3650 | $823,000 | | |
| Rialto | $174,100 | | |
| KS State Bank Portfolio[22] | | | $0 |
| Single Properties | | | $298,300 |

---

[22] As discussed above, there are no cash flows associated with these properties as any rent payments are sent to the lender directly by the tenant and the tenants are responsible for paying all operating costs.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

141. See **Exhibit 7** for a summary of net change in cash balances by Asset Group for the period December 21, 2023, through April 30, 2024.

## B.  Schedule of Receiver Estate Fund Receipts and Disbursements

142. The cash balance of the Receivership Fund as of April 30, 2024 was $36,408. The following is a schedule of the Receivership Fund's Receipts and Disbursements from the commencement of the Receivership through April 30, 2024:

| Receivership Fund Receipts & Disbursements December 21, 2023 through April 30, 2024 | |
| --- | --- |
| **Beginning Balance, December 21, 2023** | **$0.00** |
| | |
| *Receipts* | |
| REIT 3650 carve-out for Receivership Fees & Expenses | $50,000.00 |
| Cash from closed bank accounts of inactive entities | $979.39 |
| Vendor credit for overpayment of prior invoice of inactive entity | $3,531.51 |
| Sale of small airplane related assets | $2,500.00 |
| Advance from Village Brewhouse to fund payments to J. Larmore & M. Larmore per Court Order dated April 18, 2024 (ECF No. 133) | $280,000.00 |
| Total Receipts | $337,010.90 |
| | |
| *Disbursements* | |
| Document/record storage and movement costs | ($20,602.74) |
| Disbursements to J. Larmore & M. Larmore per Court Order dated April 18, 2024 (ECF No. 133) | ($280,000.00) |
| Total Disbursements | ($300,602.74) |
| | |
| **Ending Balance, April 30, 2024 (unencumbered funds)** | **$36,408.16** |

## C.  Amount and Nature of Accrued Administrative Expenses

143. On May 15, 2024, the Receiver filed the First Application of Receiver for Allowance and Payment of Professional Fees and Reimbursement of Expenses for the Period December 21, 2023 through March 31, 2024 [ECF No. 165]. We refer to such application for the requests therein.

# IV. Receivership Entities

144. Of primary concern to the Receiver at the outset of the Receivership was understanding the universe of corporate entities that comprised the Receivership Entities. To ensure completeness, the Receivership Team conducted research and analysis, beginning with the SEC's non-exhaustive list of 300



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

Receivership Entities (Exhibits A and B to ECF No. 77) to understand the nature and ownership structure of the Receivership Entities.

145. The Receivership Team continues to research and identify previously unknown ArciTerra corporate entities through public records and other research.

# V. Receivership Assets

## A. Commercial & Residential Entities

### i.   Commercial Properties

146. Below is detail on the properties for which the Court has: (1) approved the engagement of Marcus & Millichap Real Estate Investment Services as broker for the sale of the property; (2) approved the auction and bidding procedures for the sale of the property; and (3) granted related relief:

#### a.  Palencia Plaza & Mercado Walk, St. Augustine, FL

| ArciTerra Entity | Address |
|---|---|
| ATA Palencia St. Augustine FL, LLC | 7440 US Highway 1 North, St. Augustine, FL 32095 |
| ATA Mercado St. Augustine FL, LLC | 155, 159, 163, 167 Palencia Village Drive, St. Augustine, FL 32095 |

147. **Overview**. ATA Palencia St. Augustine FL, LLC and ATA Mercado St. Augustine FL, LLC are Receivership entities that own Palencia Plaza ("Palencia") and Mercado Walk ("Mercado"), respectively. Palencia and Mercado are multi-tenant commercial properties in St. Augustine, Florida. Palencia consists of one building with approximately 12,800 square feet of retail space. Mercado consists of two main buildings and an outlot with a total of 22,695 square feet of retail, restaurant, and medical space.

148. **Lender Communications.** At the onset of the Receivership, ArciTerra was past due on multiple debt service payments. The Receiver engaged with the lender, Assurity Life Insurance Company ("Assurity"), to discuss forbearance. Consistent communication regarding the sale of the assets with the lender by the Receivership Team allowed the Receiver to act with an informal forbearance agreement to pause debt service payments until the assets are sold.

149. **Property Management.** The Receivership Team is serving as property manager for both Palencia and Mercado. On March 5, 2024, the Receivership Team performed a site visit of Palencia and Mercado to engage with tenants, assess the physical property condition (interior and exterior), and identify any property maintenance issues. The Receivership Team observed that the sites are in fair condition.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

150. **Asset Disposition.** On April 26, 2024, the Receiver filed its Motion for Sale of Palencia and Mercado [ECF No. 147] seeking approval of the retention of Marcus & Millichap and the proposed procedures for the sale of the properties through a public online auction process. The Court approved the bidding procedures and scheduled an auction [ECF No. 172]. At the auction, the Receiver will select the highest and best offer for the properties and enter into an asset purchase agreement, which will provide for the sale of the properties on an "as is, where is" basis, with no representations or warranties from the Receiver or the Receivership Entities and will be solely contingent on approval of the Motion for Sale Motion of Palencia and Mercado and the Receiver's ability to deliver insurable title. The Receiver and Marcus & Millichap established a minimal reserve price for the properties which the Receiver believes will allow for the satisfaction of all liens asserted against the Properties, including the undisputed claims of Assurity, any closing costs, and return proceeds to the Receivership Estate.

### b. *Glenrosa 32, LLC, Phoenix, AZ*

| ArciTerra Entity | Address |
|---|---|
| Glenrosa 32, LLC | 3200 E Glenrosa Avenue, Phoenix, AZ 85018 |

151. **Overview.** Glenrosa is a Receivership Entity that owns and operates "MorningStar at Arcadia," an assisted living and memory care facility operated and managed by MorningStar Senior Living ("MorningStar"), an operator of senior living facilities, in Phoenix, Arizona.

152. **Lender Communications.** At the time of the Receiver's appointment, Glenrosa was party to a forbearance agreement with Arizona Bank & Trust ("AB&T"), the holder of approximately $22 million in notes purportedly secured by the Glenrosa property and that matured on July 31, 2023. Prior to the maturity date, Glenrosa engaged Marcus & Millichap to market and solicit offers for the sale of the property. Five bidders submitted letters of intent, but these bids did not result in a binding offer or sale.

153. Upon appointment, the Receiver engaged with AB&T and negotiated and executed a further forbearance agreement with AB&T that matures on June 15, 2024. During negotiations with AB&T, the Receiver remains in frequent communications with MorningStar, making certain that the facility and its operations are stabilized and capable of complying with AB&T's debt service requirements.

154. **Property Management.** MorningStar independently operates and provides property management services for Glenrosa. The Receiver interacted with MorningStar leadership but does not have access to MorningStar's bank accounts, cash balances, or other operational activities.

155. **Asset Disposition.** On April 19, 2024, the Receiver filed its Motion for Sale of Glenrosa [ECF No. 134], seeking approval of the retention of Marcus & Millichap and the proposed procedures for the sale of the properties through a public online auction process. The Court approved the bidding procedures and



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

scheduled an auction [ECF No. 171]. At the auction, the Receiver will select the highest and best offer for the properties and enter into an asset purchase agreement, which will provide for the sale of the properties on an "as is, where is" basis, with no representations or warranties from the Receiver or the Receivership Entities. The sale hearing is currently scheduled for July 10, 2024.

156. Below are the properties the Receiver is in the process of stabilizing and determining for appropriate disposition or further action:

    c. *REIT 3650 Asset Group, Nation-wide*

| ArciTerra Entity | Address |
|---|---|
| AT Auburn Plaza IN II, LLC<br>AT Auburn Plaza Member, LLC | 506 North Grandstaff Drive,<br>Auburn, IN 46706 |
| ATA Lanier Fayetteville GA II, LLC<br>ATA Lanier Fayetteville Member | 320 W. Lanier Avenue,<br>Fayetteville, GA 30214 |
| AT HL Burlington IA II, LLC<br>AT HL Burlington Member, LLC | 3351 Agency Street,<br>Burlington, IA 52601 |
| AT Ville Platte LA II, LLC<br>AT Ville Platte Member, LLC | 915 E. LaSalle Street,<br>Ville Platte, LA 70586 |
| AT Altus Cumberland GA II, LLC<br>AT ALTUS Cumberland Member, LLC | 2997 Cumberland Circle,<br>Atlanta, GA 30339 |
| AT Sweden NY II, LLC<br>AT Sweden Member, LLC | 1651 Nathaniel Poole Trail,<br>Brockport, NY 14420 |
| AT Eastman GA II, LLC<br>AT Eastman Member, LLC | 970 Indian Drive,<br>Eastman, GA 31023 |
| AT New Lenox IL-Inline II, LLC<br>AT New Lenox-IL Member, LLC | 2021 East Laraway Road,<br>New Lenox, IL 60451 |
| AT Longview TX II, LLC<br>AT Longview Member, LLC | 711 Estes Drive,<br>Longview, TX 75602 |
| AT Seven Hills Aurora CO II, LLC<br>AT Seven Hills Aurora Member, LLC | 18511 E. Hampden Avenue,<br>Aurora, CO 80013 |
| AT Mayodan NC II, LLC<br>AT Mayodan Member, LLC | 131 Commerce Drive,<br>Mayodan, NC 27027 |
| AT PT Danville IL II, LLC<br>AT PT Danville Member, LLC | 22 West Newell Road,<br>Danville, IL 31082 |

157. **Overview.** The REIT 3650 Asset Group contains 12 total cross-collateralized properties across 9 states totaling over 500,000 square feet of commercial space. Two properties excluded from the SEC Receivership are also part of the REIT 3650 Asset Group.[23]

---

[23] Two properties were lost to a different receivership, Circle City, in Indiana, prior to the appointment of the Receiver.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

158. **Lender Communications.** The cross-collateralized REIT 3650 Asset Group is secured with two loans, a primary loan through REIT 3650 Loan Servicing, and a mezzanine loan through Quadrant Capital. The Receiver communicated with both lenders and held recurring conversations with REIT 3650 Loan Servicing regarding the outstanding loan balance, rent payments and collections, property conditions, and budgets. The Receiver executed a forbearance agreement with REIT 3650 Loan Servicing on March 20, 2024.

159. **Property Management.** The Receiver engaged Cushman as property manager on April 12, 2024, marking a significant step towards revitalizing the REIT 3650 Asset Group, which ArciTerra neglected for years. Cushman inspected all properties in this Asset Group at the onset of the property management service contract and the properties' respective property managers continue to visit the properties regularly. Cushman continues to source vendors to provide the reoccurring services required to stabilize the properties and to reverse the past years of deferred maintenance incurred. Cushman and the property managers helped to rectify serious issues affecting the use of sections of the properties by tenants and customers as of May 31, 2024. Cushman is currently identifying and will notify the Receiver of further capital expenditures that will be required in the near term.

160. **Asset Disposition or Further Action.** The Receiver requested a Broker's Opinion of Value ("BOV") for each property to determine the total anticipated value of the Asset Group and once complete, the Receiver will determine the next steps for disposition.

### d. *Rialto Asset Group, Nation-wide*

| ArciTerra Entity | Address |
|---|---|
| 5339 Elvis Presley Boulevard Memphis TN, LLC | 5339 Elvis Presley Boulevard, Memphis, TN, 38116 |
| 700 North Grand Avenue Mt. Pleasant IA, LLC | 700 North Grand Avenue, Mt. Pleasant, IA 52641 |
| 8001 Vaughn Road Montgomery AL, LLC | 8001 Vaughn Road, Montgomery, AL 36116 |
| 601 Trenton Road McAllen TX, LLC | 601 Trenton Road, McAllen, TX 78504 |
| 60 Colonial Promenade Parkway Alabaster AL, LLC | 60 Colonial Promenade Parkway, Alabaster, AL 35007 |
| 81 Jameson Lane Greenville AL, LLC | 81 Jameson Lane, Greenville, AL 36037 |
| 752 South Andy Griffith Parkway Mt. Airy NC, LLC | 752 S. Andy Griffith Parkway, Mt. Airy, NC 27030 |
| 1921 Gallatin Pike Nashville TN, LLC | 1921 Gallatin Pike North, Madison, TN 37115 |



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

| ArciTerra Entity | Address |
|---|---|
| 5450 US Highway 80 East Pearl MS, LLC | 5450 US Highway 80 East, Pearl, MS 39208 |
| 412 Cross Oaks Mall Plainwell MI, LLC | 412 Cross Oaks Mall, Plainwell, MI 49080 |
| 2513 E. North Street Kendallville IN, LLC | 2513-2521 E North Street, Kendallville, IN 46755 |

161. **Overview**. The Rialto Asset Group contains 12 total cross-collateralized properties across 8 states totaling nearly 200,000 square feet of commercial space. One property is excluded from the SEC Receivership but is also part of the Rialto Asset Group.[24]

162. **Lender Communications.** The Receiver is in regular contact with the lender, Rialto, to discuss the outstanding loan balance, rent payments and collections, property conditions, and budgets. Rialto notified the Receiver that ArciTerra last made a debt service payment in November 2023. On May 16, 2024, Rialto requested property and financial information from the Receivership Team. In response, on May 22, 2024, the Receivership Team provided Rialto with the 2024 budgets and is currently compiling the necessary documentation for further analysis as requested.

163. **Property Management**. The Receiver engaged SVN as property manager on March 1, 2024. SVN's immediate priority was to reverse years of neglect through a comprehensive inspection and maintenance program. SVN inspected all properties in this Asset Group at the onset of the property management service contract, and the properties' respective property managers continue to regularly visit the properties. SVN outsourced recurring services to specialized vendors for tasks such as landscaping, porter services, and life and fire safety system monitoring to ensure that each property receives the required attention. SVN identified urgent capital expenditures, particularly roofing and HVAC repairs, as a proactive measure to safeguard the Asset Group's value. Further, all properties within the Rialto REIT Asset Group will require parking lot asphalt slurry coating and restriping within the next 6 to 12 months, as the current parking lot asphalt surfaces are in poor condition.

164. **Asset Disposition or Further Action.** The Receiver requested a Broker's Opinion of Value ("BOV") for each property to determine the total anticipated value of the portfolio and once complete, the Receiver will determine the next steps for disposition.

---

[24] One property was lost to a different receivership, Circle City, in Indiana, prior to the appointment of the Receiver.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

### e.   ATA Hiram Square GA, LLC, Hiram, GA

| ArciTerra Entity | Address |
|---|---|
| ATA Hiram Square GA, LLC | 5157 Jimmy Lee Smith Parkway, Hiram, GA 30141 |

165.  **Overview.** ATA Hiram Square GA, LLC ("Hiram Square") is a Receivership Entity that owns and operates a multi-tenant commercial property in Hiram, Georgia offering 27,930 square feet of retail space. Although Hiram Square is a Rialto asset, it is not cross-collateralized with other Rialto properties under Receivership.

166.  **Lender Communications.** Upon appointment, the lender notified the Receiver that ArciTerra last made a debt service payment in June or July 2023. The Receiver is in regular contact with the lender, Rialto, to discuss the outstanding loan balance, rent payments and collections, property conditions, and budgets. The Receiver and the lender have not executed a formal forbearance agreement.

167.  **Property Management.** The Receiver engaged SVN as the property manager for Hiram Square on March 1, 2024. The shopping center is in fair condition and will only require maintenance and general clean-up to mitigate the past years of neglect by previous ownership.

168.  **Asset Disposition or Further Action.** The Receiver engaged a broker to dispose of the property. the Receiver will determine the next steps for disposition.

### f.   KS State Bank Asset Group, Nation-wide

| ArciTerra Entity | Address |
|---|---|
| ArciTerra FD Greeleyville SC, LLC | 10000 US Highway 521, Greeleyville, SC 29056 |
| ArciTerra VN Clarksville TN, LLC | 2135 Lowes Drive, Clarksville, TN 37040 |
| ArciTerra VN Dickson TN, LLC | 100 Lowes Road, Dickson, TN 37055 |
| ArciTerra WG Milwaukee WI, LLC | 8488 Brown Deer Road, Milwaukee, WI 53223 |

169.  **Overview.** The KS State Bank Asset Group contains five[25] total cross-collateralized properties across three states totaling over 42,000 square feet of commercial space.

170.  **Lender Communication.** Upon appointment, the lender, KS State Bank f/k/a Kansas State Bank of Manhattan ("KS State Bank"), notified the Receiver that ArciTerra last made a debt service payment in

---

[25] The fifth, ArciTerra FD Bowman SC, LLC, is a Receivership Entity that previously owned and operated a single-tenant commercial property offering 8,011 square feet of retail space in Bowman, South Carolina. The property is currently vacant and was lost to a tax sale prior to the Receiver's appointment.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

May 2023. The Receiver worked with KS State Bank to negotiate a forbearance agreement. The Receiver presented the forbearance terms to KS State Bank on April 30, 2024, which proposed a six-month forbearance period, initially consisting of three months and an option to extend an additional three months. Negotiation attempts toward a forbearance agreement continue. KS State Bank collects the rents paid by tenants at occupied properties to fund operating expenses, insurance, taxes, and property management fees.

171. **Property Management.** The Receiver engaged SVN as the property manager for the KS State Bank Asset Group on March 1, 2024. The Milwaukee property has been vacant for approximately 20 years and the property was thoroughly vandalized with all reusable plumbing and wiring stolen from the building. The property also received violations from the city in several instances for illegal dumping, which the Receiver remedied. Additionally, there is significant mold growth and damage to the interior of the building. The Greeleyville property also experienced vandalism in several areas, and there is evidence of break-ins through the detached metal siding of the property. The Dickson and Clarksville properties appear to be in fair condition.

172. **Asset Disposition or Further Action.** The Receiver requested BOVs to determine the total anticipated value of the four properties in the scope of the Receivership and once completed, the Receiver will determine the next steps for disposition.

g. *Walcent Elk/IN, LLC, Elkhart, IN*

| ArciTerra Entity | Address |
|---|---|
| Walcent Elk/IN, LLC | 2719 Emerson Drive, Elkhart, IN 46514 |

173. **Overview.** Walcent Elk/IN, LLC ("Walcent") is a Receivership Entity that owns and operates Northfield Plaza, a multi-tenant commercial property offering 18,550 square feet of retail space in Elkhart, Indiana.

174. **Lender Communications.** Upon appointment, StanCorp Mortgage Investors, LLC ("StanCorp") advised the Receiver that the last debt service payment was withdrawn from the payment reserve in January 2024. As the payment reserve was subsequently exhausted, the Receiver engaged with StanCorp to negotiate a forbearance agreement, which the parties executed on March 29, 2024.

175. **Property Management.** The Receivership Team serves as property manager for Walcent. On May 1, 2024, the Receiver performed a site visit of the Northfield Plaza property to engage with tenants and answer any questions, assess the physical property condition, and identify any property maintenance issues. The Receivership Team observed that the site is in fair condition; landscape maintenance services have been hired to service this property, all utilities have been placed under the Receivership control and porter service has been attending to the property.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

176. **Asset Disposition or Further Action.** The Receiver engaged a broker to dispose of the property. The Receiver will determine the next steps for disposition.

h.  *900 West Marion FL LLC, Punta Gorda, FL*

| ArciTerra Entity | Address |
|---|---|
| 900 West Marion FL, LLC | 900 W. Marion Avenue, Punta Gorda, FL |

177. **Overview.** 900 West Marion FL, LLC ("900 W. Marion") is a Receivership Entity that owns and operates a multi-tenant commercial property offering 20,316 square feet of office/museum space in Punta Gorda, Florida. The Military Heritage Museum is the property's sole tenant.

178. **Lender Communications.** Upon appointment, StanCorp notified the Receiver that ArciTerra last made a debt service payment in December 2023. The Receiver engaged with the lender, StanCorp, to negotiate a forbearance agreement, which the parties executed on March 29, 2024.

179. **Property Management.** The Receivership Team serves as property manager for 900 W. Marion. On March 6, 2024 and May 17, 2024, the Receivership Team performed site visits of the property to engage with the tenant and answer any questions, assess the physical property condition (interior and exterior), and identify any property maintenance issues. Key maintenance issues discussed during the site visits included non-functional elevators, hurricane damage to a portion of the roof, broken windows, and a damaged second-floor railing which is resulting in challenges with the tenant's insurance. The Receiver took steps to mitigate the elevator issue and is obtaining price estimates for other necessary repairs. There is also a furnished shipping container in the courtyard of the property. The building permit expired, and the Punta Gorda Code Compliance Office issued a violation for the shipping container on the premises.

180. **Asset Disposition or Further Action.** The Receiver engaged a broker to dispose of the property. The Receiver will determine the next steps for disposition.

i.  *ArciTerra BP Olathe KS, LLC, Olathe, KS*

| ArciTerra Entity | Address |
|---|---|
| ArciTerra BP Olathe KS, LLC | 12051 S Renner Boulevard, Olathe, KS 66061 |

181. **Overview.** Bass Pro Shops ("Bass Pro") is the sole tenant at a stand-alone, single-tenant property located in Olathe, Kansas.

182. **Lender Communications.** The mortgage executed between ArciTerra BP Olathe KS, LLC and Thrivent Financial for Lutherans was satisfied in full prior to the Receiver's appointment. The Receiver does not know the date that ArciTerra satisfied the loan. According to the Lease Agreement with the Bass Pro



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

tenant, the owner is responsible for the real estate taxes and the general liability insurance, while the tenant is responsible for the property insurance.

183.   Upon appointment, the Receiver determined that, despite receiving rent, ArciTerra did not pay the 2018, 2019, 2020, 2021, 2022, and 2023 property taxes, resulting in approximately $2.3 million in unpaid property taxes. The Receiver and Counsel are in discussions with Siegel Jennings, the firm previously retained by ArciTerra for tax appeal services. Siegel Jennings successfully reduced the assessed tax amounts for the years 2018 through 2022. An appeal is currently pending for the tax year 2023 and the hearing for the 2023 appeal is scheduled for March 10, 2025.

184.   **Property Management.** The Receivership Team serves as property manager for Bass Pro. The Receiver has not yet visited the property but spoke with the Bass Pro Shops' Director of Facilities for this location. The condition of the parking lot and the non-functioning parking lot lighting were the main issues affecting this property when the Receiver was appointed. The pothole issues have been mitigated at this property and the parking lot lighting has since been rectified as well. The major capital expenditure that will be required at this site is the overlay and restriping of the parking lot in the near term.

185.   **Asset Disposition or Further Action.** Per the lease agreement executed with Bass Pro on November 9, 2005, and subsequent amendments, Bass Pro can purchase the property at the conclusion of the 20-year lease on February 20, 2027, for a sum of $10. Considering there is approximately $2,300,000 in unpaid taxes, the Receiver is currently obtaining an appraisal to understand the property's value. Once the appraisal is received, the Receiver will determine the next steps regarding the disposition of the property.

### j.   *AT Olathe Outlot 5, LLC, Olathe, KS*

| ArciTerra Entity | Address |
|---|---|
| AT Olathe Outlot 5, LLC | 15085 W 119th Street, Olathe, KS 66602 |

186.   **Overview**. AT Olathe Outlot 5, LLC ("AT Olathe Outlot 5") is a Receivership Entity that owns a 9,975 square foot single tenant retail building in Olathe, Kansas. This property previously went through a tenant fit out for a restaurant when the loan was originated but the prospective tenant never occupied the space.

187.   **Lender Communications.** The mortgage was acquired through a private lender, LSM Blue Sky, LLC, in 2021. Upon appointment, the Receiver was made aware that 2021, 2022 and 2023 property taxes were not paid and that the last debt service payment occurred in March 2023. The Receiver engaged with the lender and the lender's counsel via several meetings to discuss the status of the loan, property



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

status, and disposition next steps since being appointed. To date, more than $143,000 in taxes remain unpaid for this property.

188. **Property Management**. The Receivership Team serves as property manager for AT Olathe Outlot 5. The Receiver has not visited this property; however, the lender visited the property in November 2023. The site is in fair condition but because the doors were locked during the lender's site visit, the condition of the property's interior is currently unknown.

189. **Asset Disposition or Further Action**. Frontline Real Estate Partners, the receiver for the adjacent Olathe Point Shopping Center, provided a BOV for the property. The Receiver is likely to propose a motion to abandon or lift the Court-ordered stay.

### k.   AT New Lenox IL-Outlots, LLC, New Lenox, IL

| ArciTerra Entity | Address |
|---|---|
| AT New Lenox IL-Outlots, LLC | E. Laraway Road, New Lenox, IL 60451 |

190. **Overview**. AT New Lenox IL-Outlots, LLC is a Receivership Entity that owns two parcels of vacant land along East Laraway Road in New Lenox, Illinois. The ArciTerra Properties, LLC entity first acquired the property on August 9, 2013, which was then transferred via an Assignment of Purchase Agreement to AT New Lenox IL-Outlots, LLC, executed on September 18, 2013. These two parcels reside adjacent to the New Lenox property in the REIT 3650 portfolio.

191. **Lender Communications**. The property was acquired for $50,000 by ArciTerra Properties, LLC via an all-cash transaction and therefore there is no current mortgage on the property.

192. **Property Management**. The Receivership Team serves as property manager for this property. The Receiver performed a site visit of the New Lenox property in the REIT 3650 Asset Group on April 30, 2024. The two vacant parcels are grass lots, and therefore, are being maintained by a landscaping firm providing grass mowing and general lawn care maintenance services.

193. **Asset Disposition or Further Action**. The Receiver has not yet acquired a BOV estimate. The Receiver will determine the next steps for disposition.

### l.   1000 West Marion PG FL LLC, Punta Gorda, FL

| ArciTerra Entity | Address |
|---|---|
| 1000 WEST MARION PG FL LLC | 1000 W. Marion Avenue, Punta Gorda, FL 33950 |

194. **Overview**. 1000 WEST MARION PG FL, LLC ("1000 W. Marion") is a Receivership Entity that owns a parcel of vacant land in Punta Gorda, Florida. The parcel of vacant land was previously utilized as overflow parking for the Fishermen's Village property and by Fishermen's Village employees.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

195. **Lender Communications.** The mortgage was acquired through a private lender. Upon appointment, the Receiver was made aware that 2021, 2022, and 2023 property taxes were not paid and that the last debt service payment occurred in March 2023. The Receiver engaged with the lender's counsel via several meetings to discuss the status of the loan, property status, and various next steps since being appointed. Through multiple negotiations with the lender, the Receiver and Counsel were able to negotiate the removal of the default interest rate and have the interest calculated at the note rate, increasing the equity for the Receiver. To date, more than $81,000 in taxes remain unpaid or outstanding for property.

196. **Property Management.** The Receivership Team is serving as property manager for 1000 W. Marion. On March 6, 2024 and May 17, 2024, the Receiver performed site visits of the property to assess the physical property condition. The parcel is a grass lot with four handicapped parking spaces on a paved section of the lot. On March 20, 2024, the City of Punta Gorda Code Compliance office posted a code violation for exposed soil and muddy conditions. The lot has since been closed and caution taped off, preventing the lot from being used as a parking lot. The Receiver is currently collecting pricing quotes to have the exposed soil resodded or covered with mulch, both of which are acceptable solutions per the code violation posting at the property. Additionally, the City of Punta Gorda contacted a Fishermen's Village employee advising that the temporary parking permit had expired via an email dated March 11, 2024. The Receiver is working to identify application requirements and associated fees to re-apply for the temporary parking permit.

197. **Asset Disposition or Further Action.** The Receiver has determined that the property likely will have to be transferred back to the lender via a private transaction, which requires three independent appraisals.

### m.  925 W. Marion/960 W. Olympia FL, LCC, Punta Gorda, FL

| ArciTerra Entity | Address |
|---|---|
| 925 W. Marion/960 W. Olympia FL, LLC | 925 W. Marion Avenue, Punta Gorda, FL 33950 |
| 925 W. Marion/960 W. Olympia FL, LLC | 960 W. Olympia Avenue, Punta Gorda, FL 33950 |

198. **Overview.** 925 W. Marion/960 W. Olympia FL, LLC is a Receivership Entity that owns a residential house and an adjacent parcel of vacant land in Punta Gorda, Florida. The house resides at 925 W. Marion Avenue, Punta Gorda and the vacant parcel of land resides at 960 W. Olympia, Punta Gorda.

199. **Lender Communications.** The mortgage was acquired through a private lender and the two parcels are cross-collateralized. Upon appointment, the Receiver was made aware that 2022 and 2023 property taxes were not paid and that the last debt service payment occurred in November 2023. The Receiver



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

engaged with the lender's counsel via several meetings to discuss the status of the loan, property status, and various next steps since being appointed. To date, approximately $44,000 in taxes remain unpaid or outstanding for the combined 925 W Marion and 960 W Olympia parcels.

200. **Property Management.** The Receivership Team is serving as property manager for the two properties. On March 6, 2024, and May 17, 2024, the Receiver performed a site visit to assess the physical property condition (interior and exterior) and identify any property maintenance issues. The house is gutted and demolished on the interior and appears to have suffered severe damage due to prior hurricanes or storms. There is a stop work order from the City of Punta Gorda on the front door. At the request of the lender, the house's doors and windows were boarded on May 17, 2024, which was observed by the Receiver. An additional silt fence was placed surrounding the enclosed pool area in the back of the house after the Receiver had performed the May 17, 2024 site visit. The pool is green and filled with plant growth, which is a code violation per the Punta Gorda Code Compliance office. The Receiver is working to determine the next steps regarding the pool to rectify code violations.

201. **Asset Disposition or Further Action.** The Receiver has engaged a broker to dispose of the property. The Receiver will determine the next steps for disposition.

### ii.   Residential Properties[26]

202. Below are the properties the Receiver is in the process of stabilizing and determining the appropriate disposition or further action:

#### a.   *751 W Retta Esplanade FL, LLC, Punta Gorda, FL*

| Owner | Address |
|---|---|
| 751 W Retta Esplanade FL, LLC | 751 W Retta Esplanade, Punta Gorda, FL 33950 |

203. **Overview.** 751 W Retta Esplanade FL, LLC, a Receivership Entity, owns this residential property. The residential home is 4,280 square feet, consisting of five bedrooms and three baths. The home was built in 1993 and sits on 0.45 acres.

204. **Lender Communications.** Upon contacting the mortgage lender, Regions Bank, the Receivership Team was informed that a foreclosure action had been initiated on January 24, 2024. The Receivership Team promptly coordinated with the Counsel to issue a stay order, halting the foreclosure process. On February 26, 2024, the team met with Regions Bank to discuss the property's financials and future

---

[26] The Receiver has received requests from Marcia Larmore and Michelle Larmore to relinquish rights to asset freeze properties, or Receivership properties. As the Receiver considers options as below, he analyzes these requests.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

steps. The property has a mortgage balance, with interest accruing monthly. All property taxes have been paid to date.

205. **Property Maintenance**. On March 6th, 2024 and May 17th, 2024, the Receivership Team performed site visits to inspect the property. Prior to the site visits, the team was aware that squatters were living in the residence. Due to the presence of squatters, the Receivership Team did not attempt to enter the home and therefore examined the residence's exterior from the sidewalk. Through sidewalk inspection, it was noted that the house had endured significant damage to the exterior, including siding falling off the house, cracked windows, and a deteriorating roof.

206. **Asset Disposition or Further Action**. The Bank expressed their desire to sell the home and pay the loan. The Receivership Team engaged with the Bank so that action would be taken in the coming months to protect the property and proceed with a mutually agreed-upon disposition strategy. Additionally, the Bank raised concerns about property damages and disclosed that they had restricted escrow funds, which could not be disbursed due to the lack of proof of an insurance claim. The Receiver team is actively engaging with a broker to evaluate the sale of the property.

*b.  1001 West Marion Avenue, Unit 21, Punta Gorda, FL 33950*

| Owner | Address |
|---|---|
| Spike Holdings LLC | 1001 West Marion Avenue, Unit 21, Punta Gorda, FL 33950 |

207. **Overview**. Spike Holdings LLC, a Receivership entity, owns the 1001 West Marion Avenue, Unit 21 condominium. This single-family residence is 998 square feet with two bedrooms and two baths. The condominium is situated across the street from Fishermen's Village.

208. **Lender Communications**. There is no active mortgage balance on the unit.

209. **Property Maintenance**. On March 6th, 2024 and May 17th, 2024, the Receivership Team performed site visits to inspect the property. Prior to the visit, the team was informed that the unit had recently been rented out through a vacation rental website, VRBO. The temporary resident had vacated the unit a few weeks before the Receivership Team's first inspection. Upon arrival, the team observed that the unit was in excellent condition, fully furnished, with new kitchen appliances. Additionally, the landscaping in front of the unit was well-maintained.

210. **Asset Disposition or Further Action**. The Receiver team is engaging a broker to evaluate the sale of the property.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

### c. *880 West Marion Avenue & 150 Shreve Street, Punta Gorda FL 33950*

| Owner | Address |
|---|---|
| Spike Holdings LLC | 880 West Marion Avenue, Punta Gorda, FL 33950 |
| Spike Holdings LLC | 150 Shreve Street, Punta Gorda, FL 33950 |

211. **Overview**. Spike Holdings LLC, a Receivership entity, owns both the 880 West Marion Avenue ("880 West Marion") and 150 Shreve Street ("150 Shreve") properties. 880 West Marion is a residential home spanning 1,041 square feet with two bedrooms and two baths. The property sits on 0.31 acres of land. 150 Shreve is a vacant plot of land, situated adjacent to 880 West Marion.

212. **Lender Communications**. Upon appointment, the Receivership Team made various efforts to contact the loan servicer, Specialized Loan Servicing LLC ("SLS"). On June 3, 2024, SLS shared the current remaining loan balance with the Receivership Team. The mortgage on the 150 Shreve property was acquired through John L Bevis Trustee of the John L. Bevis 401k Profit Sharing Plan and Trust. Upon appointment, the Receivership Team was made aware that over $11,000 of 2021, 2022, and 2023 property taxes had gone unpaid on the 150 Shreve property. The 880 West Marion property taxes have been paid to date.

213. **Property Maintenance**. On March 6th, 2024 and May 17th, 2024, the Receivership team conducted site visits to inspect the properties. During these visits, the team entered the 880 West Marion residence and found the interior to be in well-kept condition with no indications of occupancy. However, the exterior showed minor signs of wear and tear that could benefit from improvements to enhance its overall appearance. The team observed a notice from SLS taped to the front door and a notice on the lawn from the City of Punta Gorda's Code Compliance Department regarding landscaping violations. The Receiver addresses these violations, which have since been confirmed as closed. Additionally, the City of Punta Gorda's Code Compliance Office informed the Receivership Team about a tree stump along the street adjacent to the residence that must be removed to prevent a violation. The Receivership's property management team is currently addressing this issue. As for the 150 Shreve property, the vacant land appears to be in well-maintained condition. The Receivership Team confirmed with the city's Code Compliance Department that there are no open violations on the land.

214. **Asset Disposition or Further Action**. The Receivership Team is engaging a broker to evaluate the sale of both properties.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

### d.   11751 Black Point Road, Syracuse, IN 46567

| Owner | Address |
|---|---|
| Jonathan Larmore | 11751 Black Point Road, Syracuse, IN 46567 |

215.  **Overview**. The Black Point Road property is located on Lake Wawasee in Syracuse, Indiana. The title for this property was originally held by Black Point Rd, LLC, a Receivership entity. In 2020, Jonathan Larmore transferred the property to himself. The property is 7,154 square feet, with seven bedrooms.

216.  **Lender Communications**. Jonathan Larmore refinanced the property in 2020 with Wintrust Mortgage ("Wintrust"). The property has an active mortgage balance. On March 12, 2024, the Receivership Team received a notice from the State of Indiana regarding mortgage foreclosure. In response, Counsel promptly sent a stay of enforcement action to Wintrust. On May 15, 2024, Wintrust confirmed that the correspondence had been forwarded to their counsel for review and informed the Receivership Team that an attorney would be in contact soon.

217.  **Property Maintenance**. The Receivership Team has not yet visited this property or been made aware of any property conditions requiring attention.

218.  **Asset Disposition or Further Action**. The Receivership Team is aware that the property is currently leased to Leisuretown Rentals, LLC. The Receiver's Counsel is aware, and actively working towards determining the next steps on assessing the validity of the lease.

### e.   8150 East Highland View Drive, Syracuse, IN 46547

| Owner | Address |
|---|---|
| HV Gardens LLC | 8150 East Highland View Drive, Syracuse, IN, 46547 |

219.  **Overview**. HV Gardens, LLC, a Receivership entity, owns 8150 East Highland View Drive in Syracuse, Indiana ("8150 East Highland"). The residence, spanning 1,350 square feet, comprises three bedrooms and one and a half baths. The property is situated on a 0.3-acre lot.

220.  **Lender Communications**. The property does not have an active mortgage. However, the Receivership Team was made aware that 2022 and 2023 property taxes have not been paid.

221.  **Property Maintenance**. The Receivership Team has not yet visited this property or been made aware of any property conditions requiring attention.

222.  **Asset Disposition or Further Action**. On April 11, 2024, Jonathan Larmore's Counsel submitted a request to the Receiver's Counsel for properties owned by Marcia Larmore that were purchased in the 1960s and 1990s that should be removed from the Receivership. The 8150 East Highland property was



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

included in this request. As the Receivership Team considers this request, it is also engaging with a broker to consider the sale of the property.

### f.   10507 North Grand Boulevard, Syracuse, IN 46567

| Owner | Address |
|---|---|
| Morrison Island LLC | 10507 N. Grand Boulevard, Syracuse, IN, 46567 |

223.   **Overview.** Morrison Island LLC, a Receivership entity, owns 10507 North Grand Boulevard in Syracuse, Indiana ("North Grand"). The residence, spanning 3,296 square feet, comprises three bedrooms and one and a half baths. The property is situated on 0.22 acres of land.

224.   **Lender Communications.** The property does not have an active mortgage. However, the Receivership Team was made aware that 2022 and 2023 property taxes have not been paid.

225.   **Property Maintenance.** The Receivership Team has not yet visited this property or been made aware of any property conditions requiring attention.

226.   **Asset Disposition or Further Action.** On April 11, 2024, Jonathan Larmore's Counsel submitted a request to the Receiver's Counsel for "properties owned by Marcia Larmore that were purchased in the 1960s and 1990s that should be removed from the Receivership." The North Grand property was included in this request. The Receivership team is engaging a broker to evaluate the sale of the property.

### g.   567 Mountain Village Blvd., Units 114-6 and 115-1, Telluride, CO 81435

| Owner | Address |
|---|---|
| FK Telluride LLC | 567 Mountain Village Blvd, Unit 114-6 Telluride, CO, 81435 |
| FK Telluride LLC | 567 Mountain Village Blvd, Unit 115-1, Telluride, CO, 81435 |

227.   **Overview.** FK Telluride LLC, a Receivership entity, owns Units 114-6 and 115-1 at 567 Mountain Village Boulevard in Telluride, Colorado. Each residential condo unit has a 5% fractional interest stake. Each unit spans 1,677 square feet, featuring three bedrooms and three bathrooms.

228.   **Lender Communications.** There is no active mortgage on either timeshare unit.

229.   **Property Maintenance.** The Receivership Team has not yet visited this property or been made aware of any property conditions requiring attention.

230.   **Asset Disposition or Further Action.** The Receivership Team is engaging with a broker to evaluate the sale of the 5% interest in each unit.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

## B.  Other Assets

231. The Receiver is currently managing the disposition of three watercrafts: one in pre-Receivership arrest and dry dock in the Eastern District of Virginia ("Watercraft #1"), one significantly damaged, notwithstanding insurance claims that did not result in repair and restoration, and in dry storage in Indiana ("Watercraft #2"), and one in Punta Gorda, Florida ("Watercraft #3"). The Receiver is engaging with the secured lenders on the first two vessels to see whether an advantageous disposition may be obtained despite material encumbrances, defaults, and arrears.

232. Watercraft #1 is an 87-foot Cheoy Lee powerboat purchased by Mr. Larmore on December 9, 2022 for $2.15 million and is owned in the name of AT LC 87, LLC. The seller, James F. Wilson Living Revocable Trust, financed $1.0 million of the purchase price. Mr. Larmore caused monthly payments to be made to the seller up until, and including, the June 2023 payment. The seller filed suit on September 7, 2023 in the United States District Court for the Eastern District of Virginia (Norfolk Division) seeking to foreclose on the mortgage. The seller and a third-party entered into an Assignment of First Preferred Ship's Mortgage on September 27, 2023 that transferred the mortgage from the James F. Wilson Living Revocable Trust to ST Liberty LLC.

233. The Receiver filed a motion to approve an abandonment agreement with respect to Watercraft #1 [ECF No. 176].

234. Watercraft #2 is a Nautique Paragon 23 purchased by Mr. Larmore on July 17, 2020 for $264,760, with $200,000 financed by a loan from Lake City Bank. The loan agreement called for payments of $1,635 per month beginning July 17, 2020. Mr. Larmore made some payments to Lake City Bank before payments ceased. As of May 31, 2024, Mr. Larmore owes Lake City Bank approximately $178,000 on the Watercraft #2 loan.

235. Upon his appointment, the Receiver observed that Watercraft #2 was severely damaged (though the Receiver is not aware of when the damage occurred), and the Receiver had the boat transported to Indy Marine & Auto Body Inc. for a repair estimate and repair. The damage, and the fact that Watercraft #2 was used in saltwater, a purpose for which it was not intended, reduced the value of Watercraft #2 significantly. The Receiver is currently negotiating the disposition of Watercraft #2 with Lake City Bank.

236. Watercraft #3 is a 28-foot Bull Dog A&M Tiki Boat purchased new by Mr. Larmore on July 31, 2023 for $105,120. Mr. Larmore paid for Watercraft #3 on May 3, 2023 with money from a Spike Holdings bank account at KS State Bank that Spike Holdings received the prior day from a Glenrosa bank account at KS State Bank.

237. The Receiver is currently preparing Watercraft #3 for sale.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

238. The Receivership Team continues to identify other assets included in the ArciTerra Estate and to physically locate other known assets to bring them into the Receivership Estate.

# VI. Claims Against the Receivership

239. The Receiver is developing a process to identify claims. As the Receivership progresses, the Receiver will implement a mechanism to validate claims, determine their eligibility and compensate eligible claimants subject to Court approval of the filing and distribution process.

## A.  Investor Claims

240. To confirm the identity and amount of claims from investors, the Receivership Team implemented a three-pronged approach:

   a. **Identification and Analysis of Internal ArciTerra Information.** The first step was to review investor files and identify key documents containing investor information. Investor information was identified and consolidated for each of the ten funds that are still open.

   b. **External Confirmation Through Third Parties.** First, the focus was on Broker Dealers. During the internal review process discussed above, the Receivership Team located names lists of broker dealers and matched those to the consolidated investor details to have a complete list of which investors are associated with which broker dealers. The Receivership Team researched the various broker dealers to identify potential contacts or to understand the status of each broker dealer as some have been dissolved or merged with others since the initial fund raising took place many years ago. Review of ArciTerra documents allowed the Receivership Team to locate Trustee or Escrow agent information for each of the funds (if there was one). The Receiver issued letters to each of the broker dealers, is in the process of sending communication to trustees and escrow agents, for which contact information was found, with detailed attachments of the investors specific to that third-party. The detailed attachments included Investor Fund names, investor names, date of investments, total paid and date of last payment. The letters request that the details related to investors and/or funds specific to each third-party be confirmed or adjusted for accuracy. Responses to the letters continue to come in to the Receiver.

   c. **Gather Information Directly from Investors – Proof of Claims.** The Receivership Team is in the process of developing a web-based form for investors to fill out their information including details such as amounts paid to date, etc. The development of this application is ongoing and



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

will go live on the Receiver's website when it is complete. In addition, it will allow the Receiver to interface with the investors.

241. This process will allow the Receiver to understand the scope of the investor claims and when claims are ready to be paid out, communicate with investor claimants, verify identity of claimants, and collect appropriate information.

## B. Vendor Claims

242. The Receiver is investigating and in the process of:

   a.  Identifying liabilities from the books and records of the Receivership Entities.

   b.  Developing a web-based solution (similar to the solution the Receiver is developing for investors) to intake the claims related to vendors and other stakeholders; and

   c.  Evaluating potential additional liabilities, including the Small Business Administration Loans discussed below.

## C. Potential Liabilities to Creditors – Small Business Administration

243. As part of the analysis into ArciTerra's creditors, the Receiver notes that several ArciTerra Entities applied for and received Small Business Administration ("SBA") loans through its Paycheck Protection Program ("PPP") in 2020 and 2021. To understand whether the loans have resulted in the SBA being a current creditor of any of the Receivership Entities, the Receivership Team reviewed emails, PPP loan documents, bank statements, and conducted external research to understand the details of these loans.

244. As a result, the Receivership Team identified six ArciTerra entities that received SBA loans, including first draw and second draw loans:[27]

|     | Borrower | Lender | Loan Principal | Status |
|-----|----------|--------|----------------|--------|
| 1.1 | ArciTerra Companies, LLC | Johnson Bank | $ 267,670 | Forgiven |
| 1.2 | ArciTerra Companies, LLC | Arizona Bank and Trust | $ 237,511 | Forgiven |
| 2.1 | AT ML Management HI, LLC | Johnson Bank | $ 48,200 | Forgiven |
| 2.2 | AT ML Management HI, LLC | Arizona Bank and Trust | $ 48,239 | Forgiven |
| 3.1 | ATA Fishville Management, LLC | Johnson Bank | $ 261,600 | Forgiven |

---

[27] The first draw PPP loans refer to the original loan program from the SBA for small businesses to keep their workers on payroll. A second draw PPP loan program was implemented by the SBA that allowed certain eligible borrowers that previously received a PPP loan to apply for a second draw PPP loan with the same general loan terms as their first draw PPP loan. [https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program].



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

| | Borrower | Lender | Loan Principal | Status |
|---|---|---|---|---|
| 3.2 | ATA Fishville Management, LLC | Arizona Bank and Trust | $ 240,112 | Forgiven |
| 4.1 | AT FL Construction, LLC | Johnson Bank | $ 102,000 | Forgiven |
| 4.2 | AT FL Construction, LLC | Arizona Bank and Trust | $ 52,218 | Forgiven |
| 5.1 | Brewhouse Fishville, LLC | Johnson Bank | $ 403,000 | Forgiven |
| 5.2 | Brewhouse Fishville, LLC | Arizona Bank and Trust | $ 564,226 | Forgiven |
| 6.1 | Glenrosa 32, LLC | Johnson Bank | $ 529,500 | Forgiven |
| 6.2 | Glenrosa 32, LLC | Arizona Bank and Trust | $ 529,500 | Forgiveness Denied |
| Total | | | $ 3,283,776 | |

245. In 2020 and 2021, the SBA granted the six ArciTerra companies $3,283,776 in total. All PPP loans above were forgiven except for the second draw loan made to Glenrosa.

246. According to the SBA loan applications and other documentation, the PPP loan proceeds were to be used by the borrower to help fund payroll costs, including benefits, and may have also been used to pay for mortgage interest, rent, utilities, worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. To identify any additional creditors, the Receivership Team analyzed whether the use of funds was in accordance with the PPP loan stipulations and therefore would not have to be paid back.

247. The Receivership Team reviewed the entities' bank statements to confirm whether ArciTerra used the funds received from the lenders (i.e., AB&T and Johnson Bank) for payroll and related costs as represented and certified in the loan forgiveness applications by the respective applicants in accordance with the SBA requirements.

248. The Receiver found that of the $2,754,276 loan funds received and forgiven, $230,042, or 8.4%, was directly used for payroll. For Brewhouse Fishville, the direct use of the funds received could not be confirmed as other deposits and payments were aggregated with the PPP loan proceeds. The Receiver confirmed payments to ADP equaling the total amount of the $967,226 or 35.1% loan proceeds ultimately occurred after the funds were originally received. The Receivership Team could not verify whether the indirect use of funds for payroll is allowable or would be deemed unallowed by the SBA and therefore could become a potential liability.

249. ArciTerra used the remaining $1,557,008, or 56.5%, in funds forgiven to pay non-payroll costs and/or transferred to non-applicant entities such as ASR Advisor 2, ARC Olathe PT OLA KS, Spike Holdings, ASR Mauna Lani, ATA Fish FL Resort, ARC KLS Warsaw, and ATA Fish MGMT. Glenrosa transferred $157,729 to "Glenrosa 32 LLC DBA Morningstar at Arcadia." The direct use of these transferred funds could not



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

be determined due to other deposits and payments aggregated with these funds but ultimately, Glenrosa 32 LLC DBA Morningstar at Arcadia made payments to ADP equaling the transferred amount. As the use of funds were by a non-applicant, the $157,729 could be a potential liability as it is an unallowed use of loan funds. The remaining $1,399,280 could also be a potential liability as it was used for non-payroll costs by the applicant and/or transferred to non-applicant entities.

250. If the SBA were to conclude that a portion of the PPP loan proceeds were not directed toward payroll and allowable costs as seems to be the case, Arizona Bank and Trust, Johnson Bank, and ultimately the SBA could be potential creditors of various entities including Receivership Entities for the $1,557,008 loan funds used directly to fund expenditures, other than payroll costs. In summary, our analysis is outlined in the table below:

| PPP Loans | Potential Liability | Allowable | Unverified | Not Applicable | Total |
|---|---|---|---|---|---|
| **Forgiveness Denied** | | | | | |
| PPP second draw loan to Glenrosa 32 LLC repaid to Lender | | | | $529,500 | $529,500 |
| **Forgiven** | | | | | |
| Direct use for payroll costs by applicants | | $230,042 | | | $230,042 |
| Indirect use for payroll costs by applicants | | | $967,226 | | $967,226 |
| *Unallowed use of funds:* | | | | | |
| Indirectly used for payroll costs by non-applicant | $157,729 | | | | $157,729 |
| Transferred to non-applicants for undetermined use and/or used for unallowed costs | $1,399,280 | | | | $1,399,280 |
| **Total** | **$1,557,008** | **$230,042** | **$967,226** | **$529,500** | **$3,283,776** |

251. Glenrosa initially applied for a $529,500 loan from the SBA in April 2020 and requested a second draw on February 18, 2021. The second loan was approved; however, the SBA required that the loan be repaid. Glenrosa appealed the SBA's decision arguing that the loan review decision denying the loan's forgiveness was made in error. On May 5, 2023, a hearing was held by the SBA; Glenrosa's appeal was denied because the SBA determined that the borrower was ineligible for the PPP loan because it was organized as an ineligible Passive Real Estate Entity. The lender, Arizona Bank and Trust, confirmed Glenrosa repaid the second draw loan in full.



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

## VII.   Litigation Claims of the Receivership

252.   The Receiver will bring actions and legal proceedings against various parties on behalf of the Receivership Estate in the future as allowed and contemplated for in the Receivership Order at paragraph 24, if warranted.

## VIII.   Future Actions and Recommendations

253.   The Receiver's initial focus was on securing and maintaining the assets of the Receivership Entities, progressing disposition of assets, tracing the flow and use of the individual investor funds and responding to inquiries from the investors, creditors and other interested parties.

254.   The Receiver's work continues in accordance with the duties laid out in the Receivership Order. The Receiver is managing the Receivership Assets and stabilizing cash flows from income-generating assets, including streamlining the rent collection process, paying real estate taxes and property vendors, negotiating forbearances, and analyzing properties and assets for disposition or further action.

255.   The Receiver is also working to identify secured loans and other encumbrances on Receivership Assets and communicating and negotiating with lenders to implement strategies with respect to real property and other assets, including watercraft. The Receiver will continue to manage the real estate of the Receivership and will continue to entertain viable acquisition offers for all or part of the Receivership Assets.

256.   The Receiver identified multiple PPP loans obtained for ArciTerra and affiliated entities. The Receiver is investigating these and other SBA loans and subsequent disbursements.

257.   The Receiver will continue to identify potential additional entities or assets in which the Defendants or the Relief Defendants have an interest and are not currently part of the listed Receivership Entities or Receivership Assets and where assets may have been commingled with investor funds.

258.   The Receiver will continue to work to confirm the population of investors in Note Fund II, Note Fund III and other Investor Funds, as well as the total amount received from and paid to the investors, and the current capital balances and amounts due to the investors.

259.   The Receiver will retain an accounting firm to prepare and file the necessary federal and state tax returns for 2022, 2023, and 2024.

260.   The Receiver will continue his analysis of the Receivership Entities, including:

   a.   Continuing to trace and analyze Investor Funds and balances through books and records, including bank accounts to (1) determine the degree to which investor funds were commingled and used, (2) establish how much may be owed to investors, and (3) identify any funds related



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

to improper transactions that the Receiver may potentially recover to address investor and creditor claims.

b.  Reviewing bank statements and credit card statements, as well as email communications. The Receiver will look to determine whether investor money was used to fund assets and/or expenses, improperly.

c.  Compiling and reviewing historical bank records and other financial records to understand the overall operations of the Receivership Entities and determine the flow of funds between and amongst the entities, Mr. Larmore, and former employees and consultants of the ArciTerra entities.

d.  Performing digital forensics on more than four million documents and emails for information relevant to understanding the operations of the Receivership Entities and the Receivership Assets.

e.  Continuing interviews of former ArciTerra employees, consultants, and other relevant parties.

f.  Determining the ultimate disposition of funds, if any, diverted from creditors and investors to other parties.

261.  The Receiver intends to continue to seek Court approval of his actions going forward as necessary and appropriate under governing law and the Receivership Order.

262.  Based on the Receiver's work as described above, the Receiver recommends that the Receivership continue consistent with the Receivership Order. The reasons for continuing the Receivership include:

a.  **ArciTerra Operations.** The Receiver is actively managing ArciTerra and related entities and properties, as detailed above. The nature of the Receivership Entities requires the ongoing management of the properties and corporate entities to prevent them from regressing.

b.  **Analysis to Determine Investor Obligations.** The Receivership Team continues its ongoing analyses associated with unwinding the apparent commingling of investors' funds. The commingling of so many entities' funds may affect the determination of how the Receivership Estate will satisfy future claims. The Receiver is not yet in a position to approach a proposal to address creditors or investors at this time as the analyses discussed in this report are in process.

c.  **Asset Disposition.** The Receiver, in accordance with Paragraph 6(N) of the Receivership Order, will continue to prepare real property and other assets, as appropriate and approved by the Court, for sale or further action.

263.  The Receiver continues to research the extensive labyrinth of ArciTerra entities and properties. While it has reached no determination at this time about the appropriateness of adding corporate entities or



United States Securities and Exchange Commission v. Jonathan Larmore, et al.
Case No. 2:23-cv-02470-PHX-DLR
United States District Court for the District of Arizona

other assets to the Receivership, the Receiver reserves the right to do so, should the facts and circumstances dictate their inclusion.

264. The Receiver reserves all rights to amend or supplement the information set forth herein and assert the rights of the Receivership as against any party, as appropriate.

Respectfully submitted,

June 7, 2024

Allen D. Applbaum
Receiver of ArciTerra Companies, LLC and Related Entities

EXHIBIT 1

# Commercial Properties

There are 39 commercial properties within the scope of the ArciTerra Receivership.



# Residential Properties

There are 9 residential properties that are within the scope of the ArciTerra Receivership.



# Properties Lost Pre-Receivership

There are 30 properties that were lost to pre-existing receiverships. There are an additional 6 properties that were lost to bank foreclosures, and 2 properties lost to tax liens.



# EXHIBIT 2

| No. | Portfolio/Single Property | Portfolio Name or Asset Group | Owner (ArciTerra Entity) | Center Name | Address | Property Manager |
|---|---|---|---|---|---|---|
| | | | **Commercial Properties** | | | |
| 1 | Single Property | Mercado/Palencia | ATA Mercado St. Augustine FL, LLC | Mercado | 155, 159, 163, 167 Palencia Village Dr., St. Augustine, FL  32095 | SEC Receiver Team |
| 2 | Single Property | Mercado/Palencia | ATA Palencia St. Augustine FL, LLC | Palencia | 7440 US Highway 1 North, St. Augustine, FL 32095 | SEC Receiver Team |
| 3 | Single Property | Glenrosa32 | Glenrosa 32, LLC | MorningStar | 3200 E Glenrosa Phoenix, AZ 85018 | MorningStar |
| 4 | Portfolio | REIT 3650 | AT Auburn Plaza IN II, LLC AT Auburn Plaza Member, LLC | Auburn Plaza | 506 North Grandstaff Drive, Auburn, IN 46706 | Cushman & Wakefield |
| 5 | Portfolio | REIT 3650 | ATA Lanier Fayetteville GA II, LLC ATA Lanier Fayetteville Member | Main Street Building | 320 W. Lanier Ave., Fayetteville, GA 30214 | Cushman & Wakefield |
| 6 | Portfolio | REIT 3650 | AT HL Burlington IA II, LLC AT HL Burlington Member, LLC | Burlington Plaza West | 3351 Agency St., Burlington, IA 52601 | Cushman & Wakefield |
| 7 | Portfolio | REIT 3650 | AT Ville Platte LA II, LLC AT Ville Platte Member, LLC | Ville Platte | 915 E. LaSalle St., Ville Platte, LA 70586 | Cushman & Wakefield |
| 8 | Portfolio | REIT 3650 | AT Altus Cumberland GA II, LLC AT ALTUS Cumberland Member, LLC | Cumberland Place | 2997 Cumberland Cir., Atlanta, GA 30339 | Cushman & Wakefield |
| 9 | Portfolio | REIT 3650 | AT Sweden NY II, LLC AT Sweden Member, LLC | Sweden | 1651 Nathaniel Poole Trl., Brockport, NY 14420 | Cushman & Wakefield |
| 10 | Portfolio | REIT 3650 | AT Eastman GA II, LLC AT Eastman Member, LLC | Eastman Shopping Center | 970 Indian Dr., Eastman, GA 31023 | Cushman & Wakefield |
| 11 | Portfolio | REIT 3650 | AT New Lenox IL-Inline II, LLC AT New Lenox-IL Member, LLC | New Lenox | 2021 East Laraway Rd., New Lenox, IL 60451 | Cushman & Wakefield |
| 12 | Portfolio | REIT 3650 | AT Longview TX II, LLC AT Longview Member, LLC | Longview | 711 Estes Dr., Longview, TX 75602 | Cushman & Wakefield |
| 13 | Portfolio | REIT 3650 | AT Seven Hills Aurora CO II, LLC AT Seven Hills Aurora Member, LLC | Seven Hills Plaza | 18511 E. Hampden Ave., Aurora, CO 80013 | Cushman & Wakefield |
| 14 | Portfolio | REIT 3650 | AT Mayodan NC II, LLC AT Mayodan Member, LLC | Mayodan | 131 Commerce Dr., Mayodan, NC 27027 | Cushman & Wakefield |
| 15 | Portfolio | REIT 3650 | AT PT Danville IL II, LLC AT PT Danville Member, LLC | Pine Tree Plaza | 22 West Newell Rd., Danville, IL 31082 | Cushman & Wakefield |
| 16 | Portfolio | Rialto | 5339 ELVIS PRESLEY BOULEVARD MEMPHIS TN, LLC | Belvedere Commons | 5339 Elvis Presley Boulevard, Memphis, TN, 38116 | SVN Elevate |
| 17 | Portfolio | Rialto | 700 North Grand Avenue Mt. Pleasant IA, LLC | Orscheln's Center | 700 North Grand Ave., Mt. Pleasant, IA 52641 | SVN Elevate |
| 18 | Portfolio | Rialto | 8001 Vaughn Road Montgomery AL, LLC | Festival Plaza | 8001 Vaughn Road, Montgomery, AL 36116 | SVN Elevate |
| 19 | Portfolio | Rialto | 601 Trenton Road McAllen TX, LLC | McAllen Plaza | 601 Trenton Road, McAllen, TX 78504 | SVN Elevate |
| 20 | Portfolio | Rialto | 60 Colonial Promenade Parkway Alabaster AL, LLC | Shoppes at Alabaster | 60 Colonial Promenade Parkway Alabaster, AL 35007 | SVN Elevate |
| 21 | Portfolio | Rialto | 81 Jameson Lane Greenville AL, LLC | Greenville Plaza | 81 Jameson Lane, Greenville, AL 36037 | SVN Elevate |
| 22 | Portfolio | Rialto | 752 South Andy Griffith Parkway Mt. Airy NC, LLC | Wachovia Shops Plaza | 752 S. Andy Griffith Parkway, Mt. Airy, NC 27030 | SVN Elevate |
| 23 | Portfolio | Rialto | 1921 Gallatin Pike Nashville TN, LLC | Men's Wearhouse | 1921 Gallatin Pike North, Madison, TN 37115 | SVN Elevate |
| 24 | Portfolio | Rialto | 5450 US Highway 80 East Pearl MS, LLC | Office Depot Plaza | 5450 US Highway 80 East, Pearl, MS 39208 | SVN Elevate |
| 25 | Portfolio | Rialto | 412 Cross Oaks Mall Plainwell MI, LLC | Plainwell Plaza | 412 Cross Oaks Mall, Plainwell, MI 49080 | SVN Elevate |
| 26 | Portfolio | Rialto | 2513 E. North Street Kendallville IN, LLC | Kendallville Plaza | 2513-2521 E North St., Kendallville, IN 46755 | SVN Elevate |
| 27 | Single Property | Rialto | ATA Hiram Square GA, LLC | Hiram Square | 5157 Jimmy Lee Smith Parkway, Hiram, GA 30141 | SVN Elevate |
| 28 | Portfolio | National REIT/KS State Bank | ArciTerra FD Greeleyville SC, LLC | Available - Greeleyville (former Family Dollar) | 10000 US Highway 521, Greeleyville, SC 29056 | SVN Elevate |

| No. | Portfolio/Single Property | Portfolio Name or Asset Group | Owner (ArciTerra Entity) | Center Name | Address | Property Manager |
|---|---|---|---|---|---|---|
| | | | **Commercial Properties** | | | |
| 29 | Portfolio | National REIT/KS State Bank | ArciTerra VN Clarksville TN, LLC | Angry Crab - Clarksville | 2135 Lowes Dr., Clarksville, TN 37040 | SVN Elevate |
| 30 | Portfolio | National REIT/KS State Bank | ArciTerra VN Dickson TN, LLC | Lowe's Outparcel - Dickson | 100 Lowes Road, Dickson, TN 37055 | SVN Elevate |
| 31 | Portfolio | National REIT/KS State Bank | ArciTerra WG Milwaukee WI, LLC | Available - Milwaukee | 8488 Brown Deer Road, Milwaukee, WI 53223 | SVN Elevate |
| 32 | Single Property | StanCorp/REIT 1 | Walcent Elk/IN, LLC | Northfield Plaza | 2719 Emerson Dr., Elkhart, IN 46514 | SEC Receiver Team |
| 33 | Single Property | StanCorp/Fishermen's Village | 900 West Marion FL LLC | 900 W. Marion | 900 W. Marion Ave, Punta Gorda, FL | SEC Receiver Team |
| 34 | Single Property | Bass Pro | ArciTerra BP Olathe KS, LLC | Bass Pro - Olathe | 12051 S Renner Blvd., Olathe, KS 66061 | SEC Receiver Team |
| 35 | Single Property | Olathe Outlot 5 | AT Olathe Outlot 5, LLC | Olathe Outlot 5 (Granite City Grill) | 15085 W 119th St., Olathe KS 66602 | SEC Receiver Team |
| 36 | Single Property | New Lenox Outparcel | AT New Lenox IL-Outlots, LLC | New Lenox Outparcel | E. Laraway Rd., New Lenox, IL  60451 | SEC Receiver Team |
| 37 | Single Property | 1000 W Marion | 1000 WEST MARION PG FL LLC | 1000 W Marion | 1000 W. Marion Avenue, Punta Gorda, FL 33950 | SEC Receiver Team |
| 38 | Single Property | 925 W Marion/960 W Olympia | 925 W. Marion/960 W. Olympia FL, LCC | 925 W. Marion | 925 W. Marion Ave., Punta Gorda, FL 33950 | SEC Receiver Team |
| 39 | Single Property | 926 W Marion/960 W Olympia | 925 W. Marion/960 W. Olympia FL, LCC | 960 W. Olympia | 960 W. Olympia Ave., Punta Gorda, FL 33950 | SEC Receiver Team |

| | Residential Properties | | |
|---|---|---|---|
| No. | Owner | Address | Property Type |
| 1 | 751 W Retta Esplanade FL, LLC | 751 W Retta Esplanade, Punta Gorda, FL 33950 | Residential |
| 2 | Spike Holdings LLC | 1001 West Marion Avenue, Unit 21, Punta Gorda, FL 33950 | Residential; Condominium Unit |
| 3 | Spike Holdings LLC | 880 West Marion Avenue, Punta Gorda, FL 33950 | Residential |
| 4 | Spike Holdings LLC | 150 Shreve Street, Punta Gorda, FL 33950 | Vacant Land |
| 5 | Jonathan Larmore | 11751 Black Point Road, Syracuse, IN 46567 | Residential |
| 6 | HV Gardens LLC | 8150 East Highland View Drive, Syracuse, IN, 46547 | Residential |
| 7 | Morrison Island LLC | 10507 N. Grand Boulevard, Syracuse, IN, 46567 | Residential |
| 8 | FK Telluride LLC | 567 Mountain Village Blvd, Unit 114-6 Telluride, CO, 81435 | Residential; Timeshare Unit |
| 9 | FK Telluride LLC | 567 Mountain Village Blvd, Unit 115-1, Telluride, CO, 81435 | Residential; Timeshare Unit |

# EXHIBIT 3

**ArciTerra Entities with Outstanding 2022 Federal and State Tax Returns Provided to the Receiver by CLA**

| CLIENT NAME | |
|---|---|
| Arciterra Strategic Retail Plaza OK LLC | Form 1065 |
| Arciterra Strategic Retail Briargate & Linden LLC | Form 1065 |
| Arciterra Strategic Retail Wheatland | Form 1065 |
| Arciterra REIT Advisors, LLC | Form 1065 |
| Arciterra Group, LLC | Form 1065 |
| Arciterra Real Estate Investment Trust Inc | REIT |
| 2006 operating | Form 1065 |
| Arciterra Walcent Portfolio LP | Form 1065 |
| Arciterra Note Advisors, LLC | Form 1065 |
| Arciterra Note Advisors II, LLC | Form 1065 |
| Arciterra 32nd Street Advisors, LLC | Form 1065 |
| CSL Investments, LLC | Form 1065 |
| Walcent Shelby MI, LLC | Form 1065 |
| Arciterra Strategic Income Advisors, LLC | Form 1065 |
| Arciterra Strategic Income Belleville Crossing Inc | REIT |
| Arciterra Strategic Retail Echelon IN (III), LLC | Form 1065 |
| Arciterra Strategic Retail Park Lee (V), LLC | Form 1065 |
| Arciterra Strategic Retail Advisors, LLC | Form 1065 |
| AT Altus Echelon IN, LLC | Form 1065 |
| Arciterra Note Advisors III, LLC | Form 1065 |
| Arciterra National REIT Advisors, LLC | Form 1065 |
| Arciterra National REIT, INC | REIT |
| Arciterra National REIT, LP | Form 1065 |
| Glenrosa 32, LLC | Form 1065 |
| ATR 32 LLC | Form 1065 |
| ASR Centerville & Colony GA LLC | Form 1065 |
| Arciterra REIT RSC, LP | Form 1065 |
| Wawasee Family Limited Partnership | Form 1065 |
| AT Longview LLC | Form 1065 |
| ASR Mauna Launi | Form 1065 |
| ASR REIT LP | Form 1065 |
| ArciTerra Strategic Retail REIT, INC | Form 1120 |

**ArciTerra Entities with Outstanding 2022 Federal and State Tax Returns Provided to the Receiver by CLA**

| CLIENT NAME- SMLLC | SMLLC OWNER |
|---|---|
| Burlington (SMLLC) | ASR Advisor, LLC |
| New Lenox (SMLLC) | ASR Advisor, LLC |
| AT Telcom 32 LLC | ASR Advisor, LLC |
| Arciterra Strategic Retail Fayetteville GA, LLC (SMLLC) | ASR Advisor, LLC |
| AT JPM Lindenhurst (SMLLC) | ASR Advisor, LLC |
| AT MF Las Vegas (SMLLC) | ASR Advisor, LLC |
| AT Eastman GA, LLC (SMLLC) | ASR Advisor, LLC |
| AT Sandersville GA, LLC (SMLLC) | ASR Advisor, LLC |
| AT Boutte LA LLC | ASR Advisor, LLC |
| AT Castleton IN LLC | ASR Advisor, LLC |
| AT PT Danville IL LLC | ASR Advisor, LLC |
| AT Jefferson Center FW IN LLC | ASR Advisor, LLC |
| AT New West Clifton Co, LLC | ASR Advisor, LLC |
| ASR Seven Hills CO, LLC | ASR Advisor, LLC |
| AT Midway Elyria OH LLC | ASR Advisor, LLC |
| AT Wildwood Plaza MO LLC | ASR Advisor, LLC |
| AT Lubbock TX LLC | ASR Advisor, LLC |
| AT Cedartown GA LLC | ASRA 2*** |
| AT Ville Platte LA LLC | ASRA 2 |
| AT Pueblo West CO LLC | ASRA 2 |
| AT Mayodan NC LLC | ASRA 2 |
| AT Sweden NY LLC | ASRA 2 |
| AT Bloomington | ASRA 2 |
| Spike LLC | J Larmore |
| ASRA2 LLC | Spike LLC |
| 900 Marion Ave | ASRA 2 |
| AT Suffolk | ASRA 2 |
| AT Castleton | ASRA 2 |
| JB RE Investments | J Larmore |
| JML | J Larmore |
| Brewhouse I LLC | J Larmore |
| Arciterra Strategic Retail Forum KY LLC | J Larmore |
| JJF Mattress LLC (SMLLC) | J Larmore |

EXHIBIT 4

| | Summary of Investor Funds Detail (In Receivership Scope) | | | |
|---|---|---|---|---|
| | Investor Fund | Date of POM | Investor Count* | Total Raised** |
| 1 | ArciTerra National REIT, Inc. | 10/28/08 | 388 | $16,330,350 |
| 2 | ArciTerra Note Fund II, LLC | 11/17/06 | 449 | $20,000,000 |
| 3 | ArciTerra Note Fund III, LLC | 03/21/08 | 541 | $25,000,000 |
| 4 | ArciTerra REIT, Inc. | 04/03/06 | 498 | $20,258,940 |
| 5 | ASI Belleville Crossing IL, LLC | 09/16/11 | 161 | $7,376,760 |
| 6 | ASR Briargate & Linden IL, LLC | 06/16/14 | 75 | $4,245,194 |
| 7 | ASR Centerville & Colony GA, LLC | 11/30/15 | 7 | $1,210,869 |
| 8 | ASR Plainfield Village IN, LLC | 11/12/15 | 15 | $3,025,000 |
| 9 | ASR Trinity Place TN, LLC | 06/30/11 | 62 | $1,838,333 |
| 10 | ASR Wheatland IL, LLC | 03/01/15 | 112 | $5,254,834 |
| 11 | Whitefish Opportunity Fund, LLC | 05/04/07 | 157 | $6,344,000 |

\* The Investor Count amounts are based on the Receiver's work to date and may change as the Receiver's work is ongoing.

\** Total Raised represents the total amount raised from investors in the Investor Funds and is not intended to represent amounts due to investors in these Investor Funds.

EXHIBIT 5

**From:** Jon Larmore
**Sent:** Saturday, September 23, 2023 5:49 PM
**To:** Lane Hasler;Blaine Rice;D DeCarlo
**BCC:** Alex Schwyhart
**Subject:** Investor Obligations
**Attachments:** Investor Obligation Spreadsheet.xlsx


The Note Funds will have an accrued obligations of $101 Million +-.

Creditors could claim that these funds have touched every asset.

This needs to be explained to Michelle and her counsel.  While I may be able to resolve these in some fashion, she cannot. That is just the way it is and it wipes out any potential equity in any other asset for her.

**Jon Larmore**|CEO

Fishermen's Village
ArciTerra Companies

1200 West Retta Esplande 57A
Punta Gorda FL 33950
O: (602) 840-6800|C: (602) 708-8818
Jon.Larmore@arciterra.com

**SUMMARY**

Hypothetical Calculation Including Preferred Return and/or stated and default interest rates

| PROGRAM | PER UNIT/SHARE INTEREST/DIVIDENDS DUE | TOTAL INTEREST/DIVIDENDS DUE | PER UNIT/SHARE PRINCIPAL DUE | TOTAL PRINCIPAL DUE | TOTAL PER UNIT DUE | TOTAL AMOUNT DUE |
|---|---|---|---|---|---|---|
| Arciterra REIT | $10.80 | $21,872,362.31 | 10.00 | 20,258,940.00 | $20.80 | $42,131,302.31 |
| National REIT | $3.67 | $5,996,975.50 | 10.00 | 16,330,350.00 | $13.67 | $22,327,325.50 |
| Note Fund 2 | $1.25 | $24,920,644.01 | 1.00 | 20,000,000.00 | $2.25 | $44,920,644.01 |
| Note Fund 3 | $1.25 | $31,210,920.28 | 1.00 | 25,000,000.00 | $2.25 | $56,210,920.28 |

| PROGRAM | PRINCIPAL DUE | # OF SHARES | PREFERRED RETURN | TOTAL DIVIDENDS PAID TO DATE | TOTAL PREFERRED RETURN 7/15/06-9/30/23 | DIVIDENDS DUE FOR PREF SINCE INCEPTION | PER SHARE DIVIDENDS DUE | PER SHARE PRINCIPAL DUE | TOTAL DUE | TOTAL PER UNIT DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| Arciterra REIT | $20,258,940.00 | 2,025,894.00 | 8% | $6,039,461.65 | $27,911,823.96 | $21,872,362.31 | $10.80 | $10.00 | $42,131,302.31 | $20.80 |

7/15/2006
9/30/2023
4/15/2009
3/15/2007

| PROGRAM | PRINCIPAL DUE | # OF SHARES | PREFERRED RETURN | TOTAL DIVIDENDS PAID TO DATE | TOTAL PREFERRED RETURN 4/15/09-9/30/23 | DIVIDENDS DUE FOR PREF SINCE INCEPTION | PER SHARE DIVIDENDS DUE | PER SHARE PRINCIPAL DUE | TOTAL DUE | TOTAL PER UNIT DUE |
|---|---|---|---|---|---|---|---|---|---|---|
| National REIT | $16,330,350.00 | 1,633,035.00 | 8% | $12,905,069.07 | $18,902,044.57 | $5,996,975.50 | $3.67 | $10.00 | $22,327,325.50 | $13.67 |

2/15/2010
3/15/2010
5/15/2010
5/16/2010
2/16/2010

| PROGRAM | PRINCIPAL DUE | # OF UNITS | STATED INTEREST RATE | DEFAULT INTEREST RATE | STATED INTEREST 3/15/07-2/15/10 | STATED INTEREST 2/16/2010-5/15/2010 | DEFAULT INTEREST 5/16/2010-9/30/23 | TOTAL INTEREST PAID TO DATE | TOTAL INTEREST DUE | TOTAL PER UNIT INTEREST DUE | TOTAL PER UNIT PRINCIPAL DUE | TOTAL DUE | TOTAL PER UNIT DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note Fund 2 | $20,000,000.00 | 20,000,000.00 | YEARS 1-3: 8.25% YEAR 4: 8.75% YEAR 5: 9.25% | 12% | $4,950,000.00 | $421,917.81 | $32,120,547.95 | $12,571,821.74 | $24,920,644.01 | $1.25 | $1.00 | $44,920,644.01 | $2.25 |

5/15/2008

| PROGRAM | PRINCIPAL DUE | # OF UNITS | STATED INTEREST | DEFAULT INTEREST RATE | STATED INTEREST 5/15/08-5/15/2010 | DEFAULT INTEREST 5/16/2010-9/30/23 | TOTAL INTEREST PAID TO DATE | TOTAL INTEREST DUE | TOTAL PER UNIT INTEREST DUE | TOTAL PER UNIT PRINCIPAL DUE | TOTAL DUE | TOTAL PER UNIT DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note Fund 3 | $25,000,000.00 | 25,000,000.00 | YEARS 1-4: 9.25% YEAR 5: 10.5% | 12% | $4,625,000.00 | $40,150,684.93 | $13,564,764.65 | $31,210,920.28 | $1.25 | $1.00 | $56,210,920.28 | $2.25 |

# EXHIBIT 6

NOTE FUND II – OWNERSHIP STRUCTURE



NOTE FUND III – OWNERSHIP STRUCTURE



EXHIBIT 7

Summary of Change In Cash Balances - December 21, 2023 through April 30, 2024

| Asset Group | Balance as of 12/21/2023 | Net Change | Balance as of 4/30/2024 |
|---|---|---|---|
| *Operating Businesses* | | | |
| Village Brewhouse | $55,300 | $1,056,100 | $1,111,400 |
| Simply Sweet | $58,570 | $152,930 | $211,500 |
| | | | |
| *Commercial Properties* | | | |
| Glenrosa | $556,500 | ($134,500) | $422,000 |
| REIT3650 | $186,400 | $636,600 | $823,000 |
| Rialto | $120,400 | $53,700 | $174,100 |
| KS State Bank | $0 | $0 | $0 |
| Single Properties | $66,200 | $232,100 | $298,300 |