ARCHER & GREINER, P.C.
1211 Avenue of the Americas
New York, New York 10036
Tel: (212) 682-4940
Allen G. Kadish[1]
Harrison H.D. Breakstone[2]
Email:  akadish@archerlaw.com
        hbreakstone@archerlaw.com

*Counsel for Allen D. Applbaum as Receiver*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States Securities and Exchange Commission,<br><br>                    Plaintiff,<br><br>  v.<br><br>Jonathan Larmore, et al.,<br><br>                    Defendants, and<br><br>Michelle Larmore; Marcia Larmore;<br>CSL Investments, LLC;<br>MML Investments, LLC;<br>Spike Holdings, LLC; and<br>JMMAL Investments, LLC,<br><br>                    Relief Defendants. | Case No. CV-23-02470-PHX-DLR<br><br>**SIXTH APPLICATION OF RECEIVER FOR ALLOWANCE AND PAYMENT OF PROFESSIONAL FEES AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD APRIL 1, 2025 THROUGH JUNE 30, 2025** |

---

[1] Admitted *pro hac vice.*

[2] Admitted *pro hac vice.*

Allen D. Applbaum, as receiver (the "Receiver"), for ArciTerra Companies, LLC and related entities ("ArciTerra"), by and through his counsel, Archer & Greiner, P.C. ("Archer"), hereby files this sixth application (the "Application") for allowance and payment of professional fees and reimbursement of expenses for StoneTurn Group LLP ("StoneTurn") and Archer (together, the "Retained Personnel") for the sixth interim period, April 1, 2025 through June 30, 2025 (the "Application Period"), as follows:

**I.       Preliminary Statement**

1.       The Receiver seeks from the Court an award of, and approval to pay fees, of $1,047,582.00 and expenses of $72,628.90[3] to StoneTurn and fees of $424,428.75 and expenses of $1,496.86 to Archer, subject to holdbacks as identified below.[4]   The Application Period includes the period from the conclusion of the period covered in the *Fifth Application of Receiver for Allowance and Payment of Professional Fees and Reimburse RFP ment of Expenses for the Period January 1, 2025 through March 31, 2024* [ECF No. 358] (the "Fifth Fee Application").   The Retained Personnel agreed to cap all hourly rates at $750.00 and provide an additional 10% discount on all fees.   These agreements reduced the requests by $148,619.50 for StoneTurn and $126,547.75 for

[3] The StoneTurn expenses consist of $53,679.78 for eDiscovery services and $18,949.12 for other reimbursable expenses.

[4] Upon submitting the Application to the SEC, the Retained Personnel conducted a dialogue with the SEC pursuant to the Receivership Order and the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission. This dialogue resulted in an increase of the holdback amount to 30% and certain additional reductions, including, exclusion from the invoice of any StoneTurn professional who billed less than 15 hours and any Archer professional who billed less than 2 hours (except those with specialized skills required for a particular task).

Archer, as set forth in the attachments hereto.

2.      This is a complex receivership including over 250 Receivership Entities[5] and 40 properties (the "Receivership").  The Receiver and his professionals are dealing or have dealt with numerous operational issues with respect to real estate holdings affecting more than 200 active tenants.  There are over 100 pending civil litigations against the Receivership Entities.  Upon his appointment, the Receiver quickly needed to obtain access to books and records, no easy task in this particular situation, conduct discovery and assess the financial and operational situation of the Receivership Entities, to determine how to proceed with operations so as to maximize the value of the assets for the benefit of creditors and investors. The Receiver immediately engaged the services of StoneTurn and Archer. These professionals have experience in real estate, business operations, forensic accounting, investigative research, litigation, reorganization, tax and other specialty areas to address the variety of needs presented by this Receivership as they arise.

3.      On September 12, 2024, the Court entered an Order approving the First Fee Application and allowing payment of certain fee and expense amounts [ECF No. 226].

4.      On November 27, 2024, the Court entered an Order approving the Second Fee Application and allowing payment of certain fee and expense amounts [ECF No. 283].

5.       On February 6, 2025, the Court entered an Order approving the Third Fee Application and allowing payment of certain fee and expense amounts [ECF No. 306].

6.      On August 6, 2025, the Court entered an Order approving the Fourth Fee

---

[5] Capitalized, undefined terms are as in the Order Appointing Receiver and Freezing Assets and Imposing Litigation Injunction [ECF No. 154] (the "Receivership Order").

Application and allowing payment of certain fee and expense amounts [ECF No. 414].

7.      The Fifth Fee Application was filed on May 19, 2025 [ECF No. 358], with a Notice of No Objection filed on June 9, 2025 [ECF No. 378].  The Fifth Fee Application remains pending with the Court.

## II.    Background

### A.    The Receivership Order and Appointment of the Receiver

8.      On November 28, 2023, the Securities and Exchange Commission filed its Complaint [ECF 1] (the "Complaint") against Jonathan Larmore; ArciTerra Companies, LLC ("ArciTerra"); ArciTerra Note Advisors II, LLC; ArciTerra Note Advisors III, LLC; ArciTerra Strategic Retail Advisor, LLC; and Cole Capital Funds, LLC (together, the "Defendants").   Michelle Larmore; Marcia Larmore; CSL Investments, LLC; MML Investments, LLC; Spike Holdings, LLC and JMMAL Investments, LLC, were named as relief defendants.

9.      On December 21, 2023, the Court entered the *Order Appointing Temporary Receiver and Temporarily Freezing Assets and Imposing Litigation Injunction* [ECF No. 77] (the "Temporary Order"), and a Temporary Restraining Order [ECF No. 78] (the "TRO").

10.     On May 6, 2024, the Court entered the Receivership Order.

11.     The Temporary Order and Receivership Order appointed the Receiver to, among other things, (a) perform the duties specified; (b) ascertain the financial condition of the Receivership Entities and all of the Receivership Assets; (c) oversee and manage the Receivership Entities and the Receivership Assets; and (d) propose for Court approval a

fair and equitable distribution of the Receivership Assets.

      B.    <u>Summary of Activity</u>

      12.    The Receiver and his Retained Personnel took control of the Receivership Entities and the Receivership Assets.  Among many other activities to date, the Receiver and his Retained Personnel (i) created and maintain a unique website, https://www.arciterrareceivership.com, to communicate with investors, creditors and the public; (ii) opened fiduciary bank accounts for the Receivership; (iii) communicated with and demanded compliance by financial institutions to change signing authority and turn over Receivership funds; (iv) asserted and obtained access and exercised dominion and control over operating and records systems, books, records and documents, to the extent feasible given the condition thereof upon appointment; (v) commenced organization and transition of accounting records necessary to commence the operation of the Receivership; (vi) visited certain key sites where Receivership Assets are located; (vii) engaged with former principals, employees and consultants; (viii) implemented redirection of mail; (ix) filed requisite notices in federal district courts around the country of the appointment of the Receiver, in accordance with 28 U.S.C. §754; (x) attended to extant litigation and notified certain parties of this Court's stay; (xi) have been conducting investigations into the Receivership Assets, Receivership Entities, and relevant individuals and entities connected with them; (xii) engaged in negotiating certain pauses or forbearances in obligations to secure Receivership Assets; (xiii) engaged with the litigation parties on particular issues; (xiv) have taken control of and continue to manage operating businesses; (xv) have established teams at StoneTurn and Archer to handle the various focus areas of

the Receivership; (xvi) responded to motions filed in the case; and (xvii) sold or disposed of Receivership Assets in Court-approved processes, and satisfied secured lender, tax and other obligations; (xviii) retained other professionals by Court Order; and (xix) are conducting the other activities set forth in the Receivership Order and required in order to administer the Receivership Entities and Receivership Assets.

13.    The Receivership Order directs the Receiver to file applications for compensation and expense reimbursement "within forty-five (45) days after the end of each calendar quarter."

**III.    Relief Requested**

14.    By this Application, the Receiver seeks an Order allowing and approving the payment of all fees and expenses as requested herein and set forth in the summaries attached hereto.

15.    During the Application Period, StoneTurn incurred fees of $1,047,582.00 subject to holdback of 30% or $314,274.60, for a net interim fee request of $733,307.40, and expenses of $53,679.78 for eDiscovery services and $18,949.12 for other reimbursable expenses.  During the Application Period, Archer incurred fees of $424,428.75, subject to holdback of 30% or $127,328.62, for a net interim fee request of $297,100.13, and expenses of $1,496.86.

**IV.    Information About the Applicants and the Application**

16.    This Application is prepared in accordance with the *Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission* (the "Billing Instructions").  In compliance therewith, the Receiver states as follows:

Time Period Covered by Application:
April 1, 2025 through June 30, 2025

Date of Receiver's Appointment:
December 21, 2023

Date Services Commenced:
December 21, 2023

Names and Rates of all Professionals:
See Exhibit 2(a) and Exhibit 3(a)

Interim or Final Application:
Sixth Interim

Records Supporting Fee Application:
See Exhibit 2(b), 2(c) and Exhibit 3(b)

17.    The following exhibits are provided in accordance with the Billing Instructions.

| | |
|---|---|
| Exhibit 1: | Summary of Total Compensation and Expenses Requested |
| Exhibits 2 and 3: | Certifications |
| Exhibits 2(a) and 3(a): | Schedules – (i) Names and Hourly Rates of Professionals and Paraprofessionals and Total Amount Billed for each Professional and Paraprofessional; (ii) Total Amount Billed for each Category. |
| Exhibits 2(b), 2(c) and 3(b): | Professionals' time and fee records for |

the Application Period, sorted in chronological order, including a summary and breakdown of expenses.

Exhibit 4:           Standard Fund Accounting Report

**V.    Case Status**

18.    Since his appointment, the Receiver has undertaken activities consistent with the mandate in the Receivership Order, including the following.

A.    Initiating the Receivership

19.    Created a dedicated website for creditors, investors and other third parties with a portal for receipt of inquiries; opened fiduciary bank accounts for the Receivership; redirected mailing addresses and notified tenants and vendors; assumed control of scores of existing bank accounts of Receivership Entities at approximately a dozen financial institutions; temporarily contracted with certain remnant ArciTerra personnel to assist with Receivership accounting; and is communicating with investors and creditors who contact the Receiver to provide them information and to supplement the Receiver's review.

B.    Marshalling Assets

20.    Researched over 250 entities to verify the company names and to identify current ownership information; verified existence and ownership of Receivership Assets and Entities; visited and secured key Receivership Assets and records; conducted assessments of Receivership Assets and Entities to identify asset values and liabilities, including debt, liens, or other encumbrances; and identified and reviewed certain relevant fund offering and investor documents.

C.    Managing Real Estate

21.    Identified and took control of the Receivership commercial properties, redirected rent payments for commercial tenants of Receivership Entities to Receivership bank accounts; obtained insurance coverage for properties for which insurance policies were not paid and coverage had lapsed; addressed a number of significant tenant complaints related to longstanding, unresolved required repairs (such as fire safety compliance which the Receiver remedied) and neglected maintenance issues (such as no snow removal over the winter and serious pothole problems, which the Receiver caused to be remedied); engaged third-party professional property management companies to oversee select properties, and engaged, a real estate broker (and negotiated a discounted broker fee) so as to ascertain market values and market certain properties pending motions for court approval, and resulting in certain sales as set forth above. It appears that among the Receivership Entities, the Receivership currently has rights or potential interests to 21 commercial properties and 8 non-commercial or residential properties.

22.    The Receiver negotiated certain pauses or forbearances applicable to over 30 properties, allowing for collection of rents, payment of property maintenance and other expenses, reporting, and directing excess receipts to lenders on account of interim "adequate protection." These limited forbearances, and other informal 'pauses' or 'status quo' relationships with other lenders on other properties, allow the Receiver to work to enhance tenant performance, conduct basic property maintenance, and create a more cooperative environment where the Receiver can work together with lenders to stabilize properties for the benefit of creditors and investors.

23.    The Receiver conducted successful Court-approved auction and sale processes of certain Receivership Assets, including 12051 Bass Pro Drive, Olathe, Kansas in a unique transaction that addressed a purported self-amortizing lease/purchase agreement.

24.    The Receiver continues to manage and analyze all other Receivership Assets including real estate and to market additional properties for sale for the benefit of the Receivership Estate.

25.    Much of the Receiver's activity before the Court to date, including sales of individual or cross-collateralized real properties, has been on a no-objection basis or where objections, limited objections or reservations of rights filings have been resolved.

D.    Managing Operating Businesses

26.    Took control of operating businesses; obtained access and control over operating systems, books, records, and documents, to the extent feasible given the condition thereof upon appointment; and implemented a process to review, approve, and pay operating expenses of the commercial and residential properties in a timely manner.

27.    The Receiver developed an operating model to manage the ArciTerra entities and properties, including Village Brewhouse, Simply Sweet and real estate assets to handle entity and asset operations; paid delinquent sales taxes; and implemented financial and operational controls, as well as day-to-day business processes including financial, risk management, and ongoing business operations.

E.    Conducting Forensic Analysis

28.    The Receiver collected and processed more than four million documents

obtained to date and review of these documents continues based on specific search criteria to identify information relevant to the ongoing work of the Receivership Team; reviewed and analyzed contemporaneous records, databases and repositories, and communications; conducted analyses to identify investors in the ArciTerra Funds and other Receivership Entities, and funds received from and paid to investors; commenced flow of funds analyses; preliminarily identified potential sources of asset recovery.

F.    Reporting

29.    Pending a First Status Report required by the Receivership Order, and in the context of certain litigation, the Receiver filed the Initial Factual Update on April 1, 2024 [ECF No. 125].

30.    On June 7, 2024, the Receiver filed the *ArciTerra Receiver's First Status Report* [ECF No. 179].

31.    On August 20, 2024, the Receiver filed the *ArciTerra Receiver's Second Status Report* [ECF No. 205].

32.    On November 20, 2024, the Receiver filed the *ArciTerra Receiver's Third Status Report* [ECF No. 269].

33.    On February 20, 2025, the Receiver filed the *ArciTerra Receiver's Fourth Status Report* [ECF No. 311].

34.    On May 20, 2025, the Receiver filed the *ArciTerra Receiver's Fifth Status Report* [ECF No. 363].

G.    Summary

35.    Accordingly, the Receiver has implemented control over the Receivership

assets, books and records so as to undertake the duties assigned him under the Receivership Order, and to position him to seek redress for losses to creditors and investors. It is too early at this time to predict when a claims process will occur, what value may be available for distribution, or when the case may close.

## VI.    Summary of Services Rendered

### A.    StoneTurn

**StoneTurn's work during the Application Period falls into the following categories:**

i.   Accounting/Auditing – Maintaining accounting records, including general ledgers and supporting documentation for entity operations, including purchases of goods/services, revenue generation activities, and cash receipts and disbursements for all Receivership entities. Preparation of operating and financial statements and cash flow analyses. Reconciliation of bank statements and rent collections. Preparation and filing of various local and state tax returns. Maintaining accounting records and supporting documentation for all Receivership fund transactions.

ii.  Asset Analysis – Identification, review and analysis related to the current status of properties, ownership, tenants, and rent payments, including discussions with lenders, tenants, and other receivers relating to ArciTerra assets in order to understand the status of various tangible assets, properties and real estate portfolios and related liabilities, if any. Research into ArciTerra entities and assets. Weekly Receivership workstream team meetings related to the above to coordinate efforts and share information and findings. Draft organizational charts and memoranda to understand the ownership of Receivership Entities in conjunction with the investment fund analyses being performed. Drafting and editing the *Receiver's Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 332], *Receiver's Second Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 372] and the *Receiver's Omnibus Reply to Objections to Receiver's Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 377].

iii. <u>Asset Disposition</u> – Preparation for, and discussion with attorneys, brokers, property owners, managers and/or tenants, regarding the potential sale of real property and other physical assets. Assess updated property valuations and estimate costs associated with potential transactions to determine the appropriate sale and disposition process for properties.  Review and draft potential transaction documents and identify and assess potential buyers. Prepare due diligence packages for data rooms, ensuring all relevant property information is organized and accessible to facilitate the sales process. Coordinate the sale preparation of two business assets, which requires coordination and negotiation with an online auction platform, establishing secure data rooms, preparing and uploading financial records, developing marketing materials, and fielding inquiries from interested bidders. Coordinate with other receivers (as applicable) to ensure alignment and unification on all aspects of portfolio/property sales and disposition. Calculate scenarios to confirm that senior debt obligations are satisfied through sales proceeds. Maintain daily communication with real estate brokers across various markets throughout the United States, ensuring potential buyers are provided with the necessary information both prior to and during the sales process. Review all title commitments and work with title companies to address any issues leading up to, during, and after closing. Analyze rent and utility prorations and ensure settlement statements are reviewed and confirmed for accuracy. Engage in communication with lenders to manage and coordinate closing logistics. Oversee post-sale communication with tenants, including notifying them of ownership transfers and canceling and subsequently transferring utility services. Respond to post-sale documentation requests from new owners, providing information as needed. Reach out to local municipalities for all cities where properties are located to confirm that no outstanding issues will impede the closing process. Coordinate with relevant parties to close sales transactions, including the preparation and execution of closing documentation. In Q2 2025, the Receiver successfully closed the sale of one commercial property, and the transaction resulted in over $489,000 in excess funds for the Receivership Estate.

iv. <u>Business Operations</u> – Execute control over ArciTerra-related operating entities, including  communications and management of day-to-day operations of businesses under Receivership control, including, but not limited to, managing properties and tenants, interacting with third-party property managers, resolving maintenance issues, coordinating with vendors, negotiating lease extensions or renewals, address delinquent tax

matters, managing relationships and regular communication with lenders including facilitating loan and mortgage payments including forbearance requests, and addressing insurance coverage issues or questions, working closely with business managers on the ground, and managing cash flow and bank relationships, interactions with other pre-Receivership ArciTerra receivers. Efforts also include completing Common Area Maintenance reconciliations for over 90 tenants by analyzing existing charges, reconciling against 2024 actuals, communicating current and corrected charges to tenants, and responding to tenant inquiries regarding supporting documentation and backup requests.

v.   <u>Forensic Accounting</u> – Review and analysis of ArciTerra financial statements and other financial records. Review and analysis of historical and current investment and investor information, including offering memoranda, operating agreements, investor subscriptions and payments, equity roll-forwards, correspondence with and reporting to investors by ArciTerra. Analysis and determination of investment fund structures, investor capital balances, and amounts due investors and lenders and others and performance of waterfall analyses. Analysis of cash flows and loans between ArciTerra entities, and analysis of the sources and uses of cash of ArciTerra entities via financial records including journal entries, trial balances, credit card and bank statements. Search for contemporaneous documentation supporting certain accounting entries. Identification of potential claims against third parties and other sources of recovery.

vi.   <u>Claims Administration and Objections</u> – Activities and task related to the development of a claims process for investors and creditors and other interested parties, including the preparation of notice lists, list of third-party claims, the creation of intake and tracking of claimant data, and the process of selecting a claims administrator.

vii.   <u>eDiscovery/Data Analysis</u> – Analysis of accounting and property management databases and consolidation of large data sets including investor information, operational files related to properties and operating entities, financial records, and other pertinent records. Supporting requests for document production.

viii.   <u>Status Reports</u> – Planning, preparation, drafting and editing of *ArciTerra Receiver's Fifth Status Report* filed with the Court on May 20, 2025 [ECF No. 363] pursuant to the Receivership Order.

ix.  <u>Litigation</u> – Monitor filings in ongoing federal and state court actions with respect to the Excluded Entities to ascertain whether there are claims to be made by the Receiver with respect to real properties and other assets sold.

x.  <u>Tax Issues</u> – Consultation with tax professionals, analysis of tax issues and tax reporting and filing for businesses, preparation of investor forms, state, and federal tax returns. Post updates for creditors and investors on website.

xi.  <u>Case Administration</u> – Managing overall progression of the Receivership including setting up processes and facilitating communication and coordination between various workstreams, and interaction with regulator.

36.  StoneTurn also requests the Court approve reimbursement of $53,679.78 for eDiscovery services and $18,949.12 for other reimbursable expenses. A detailed listing of each expense is included in Exhibit 2(c). The Application Period expenses included document (hard copy) retrieval, shipping, processing and scanning charges, property searches, expenses associated with investigative research (database and records retrieval), eDiscovery data processing, hosting and project management service. In addition, StoneTurn incurred costs to maintain the Receivership website including the Receivership inquiry ticketing system.

B.  <u>Archer</u>

**As counsel for the Receiver, Archer's work during the Application Period falls into the following categories:**

i.  <u>Asset Analysis and Recovery</u> – Identification, review and analysis related to the current status of properties, ownership, tenants, and rent payments, including discussions with lenders, tenants, and other receivers relating to ArciTerra assets in order to understand the status of various tangible assets, properties and real estate portfolios and related liabilities, if any. Investigative research and diligence into ArciTerra entities and assets. Internal and external meetings related to the above to coordinate efforts and share information and findings. Drafting and editing the *Receiver's Motion*

*for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 332], the *Receiver's Second Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 372] and the *Receiver's Omnibus Reply to Objections to Receiver's Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 377].

ii. <u>Asset Disposition</u> – Preparation for, and discussions with Receiver, brokers, property owners, managers and/or tenants, regarding the potential sale, lease or abandonment of real property and other physical assets. Review and draft potential transaction documents and identify and assess potential buyers. Work on sales or other dispositions on behalf of the Receiver, including negotiation of broker and sale agreement and inception to closing.  Drafting, editing and filing the *Receiver's Omnibus Reply to Objections to Receiver's Motion for an Order (I) Designating Additional Receivership Entities; and (II) Granting Related Relief* [ECF No. 369], *Receiver's Motion for Orders (I) Approving the Auction and Bidding Procedures for the Sale of Substantially All Assets of VBH PG, LLC; (II) Approving the Sale of Substantially All Assets of VBH PG, LLC, Free and Clear of All Liens, Claims, Encumbrances and Interests; and (III) Granting Related Relief* [ECF No. 370] and *Receiver's Motion for Orders (I) Approving (A) the Engagement and Compensation of Marcus & Millichap Real Estate Investment Services as Broker to Sell the Real Properties Subject to the CMBS Loan Serviced by 3650 REIT Loan Servicing LLC And (B) the Sale and Auction Procedures for the Sale of the Properties; (II) Approving (A) the Sale of the Properties, Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) the Engagement and Compensation of the Defeasance Consultant, and (C) the Use of the Sale Proceeds to Defease and Satisfy the CMBS Loan; and (III) Granting Related Relief* [ECF No. 394].

iii. <u>Business Operations</u> – Activities and tasks related to operation of an ongoing business.  Assist with establishing dominion over ArciTerra-related operating entities, including communications and management of day-to-day operations of businesses under Receivership control, including communicating with vendors, and providing support with regard to managing cash flow and bank relationships, interactions with receivers obtained by creditors prior to the Receivership ordered by this Court.

iv.  <u>Claims Administration and Objections</u> – Receiving, responding and analyzing claim inquiries. Attend to preparation and planning for claims process.

v.  <u>Accounting/Auditing</u> – Coordination with various banks which maintained accounts for ArciTerra entities under Receivership control to take appropriate action with regard to accounts and funds. Analysis of financial position and management of cash flow activities across all Receivership entities. Retention of and communications with tax accountants.

vi.  <u>Business Analysis</u> – Investigation into Receivership Entities and others connected to ArciTerra that are related to ownership and investors. Review and analysis of related formation documents.

vii.  <u>Status Reports</u> – Planning, preparation, drafting and editing of *ArciTerra Receiver's Fifth Status Report* filed with the Court on May 20, 2025 [ECF No. 363].

viii.  <u>Litigation</u> – Continued management of over 100 pending litigations. Communications and interactions with counsel nationwide including other receivers. Additionally, the Receiver, through Archer, has relied upon this Court's stay of litigation to minimize the amount of work required in connection with various litigation matters involving the Receivership Entities that were pending at the time the Court established the Receivership. Monitor filings in ongoing federal and state court actions with respect to the Excluded Entities to ascertain whether there are claims to be made by the Receiver with respect to real properties and other assets sold.

ix.  <u>Tax Issues</u> – Consultation with StoneTurn and SAX LLP, analysis of tax issues and tax reporting and filing for businesses.

x.  <u>Real Estate</u> – Legal analysis with regard to at least 40 properties. Additionally, further legal analysis is required for 42 properties that are either (1) residential and not explicitly defined as Receivership entities or (2) under the control of other receivers but owned by Receivership entities, necessitating the analysis. Communications and negotiations with lenders and counsel for same. Attend to various other operational issues including leasing.

37.  Archer also requests the Court approve reimbursement of $1,496.86 in

expenses.  A listing of each expense is included in Exhibit 3(b).

**VII.   Basis for Relief Requested**

38.     The Court's power to supervise an equity receivership and to determine the appropriate actions to be taken in the administration of the receivership is extremely broad. *See Securities and Exchange Com'n v. Capital Consultants*, *LLC,* 397 F.3d 733, 738 (9th Cir. 2005) (*quoting Securities and Exchange Com'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986)).  "The power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief." *Securities and Exchange Com'n v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  A court imposing a receivership assumes custody and control of all assets and property of the receivership, and it has broad equitable authority to issue all orders necessary for the proper administration of the receivership estate. *See Securities and Exchange Com'n v. Credit Bancorp Ltd.*, 290 F.3d 80, 82-83 (2d Cir. 2002).

39.     "The obligations and expenses which the court creates in its administration of the property are necessarily burdens on the property taken possession of, and this, irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership. The appointing court pledges its good faith that all duly authorized obligations incurred during the receivership shall be paid." 2 Clark, Ralph Ewing, *A Treatise on the Law and Practice of Receivers* § 637, p. 1052 (3rd ed. Rev. 1992).

40.     A receiver appointed by a court who reasonably and diligently discharges his

duties is entitled to be fairly compensated for services rendered and expenses incurred. *See Securities and Exchange Com'n v. Byers*, 590 F.Supp.2d 637, 644 (S.D.N.Y. 2008); *see also Securities and Exchange Com'n v. Elliott*, 953 F.2d 1560 (11th Cir. 1992) ("[I]f a receiver reasonably and diligently discharges his duties, he is entitled to compensation"). "The court supervises the receiver, who is entitled to reasonable fees and expenses, subject to the court's approval." *Securities and Exchange Com'n v. J.T. Wallenbrock & Assocs.*, 584 Fed. App'x 424, 425 (9th Cir. 2014), *citing Hardy,* 803 F.2d at 1037.

41.     "In general, a reasonable fee is based on all circumstances surrounding the receivership." *Securities and Exchange Com'n v. W. L. Moody & Co.*, *Bankers,* 374 F. Supp. 465, 480 (S.D. Tex. 1974), *aff'd*, 519 F.2d 1087 (5th Cir. 1975). "[T]he court may consider all of the factors involved in a particular receivership in determining an appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994)).

42.     The Supreme Court has noted:

> The receiver is an officer of the court, and subject to its directions and orders . . . . [H]e is . . . permitted to obtain counsel for himself, and counsel fees are considered as within the just allowances that may be made by the court. . . . So far as the allowances to counsel are concerned, it is a mere question as to their reasonableness. The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs [i]ntrusted to him, and the perplexity and difficulty involved in that management.

*Stuart v. Boulware*, 133 U.S. 78, 81-82 (1890).

43.     In determining the reasonableness of fees, the Court must calculate the lodestar, which is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "A fee award

calculated by a lodestar method – multiplying a reasonable hourly rate by the number of hours expended – is presumptively reasonable." *Garcia v. JPMorgan Chase Bank NA,* No. CV-16-01023-PHX-DLR, 2018 WL 1570249, at *7 (D. Ariz. Mar. 30, 2018) (*citing Flood Control Dist. of Maricopa Cty. v. Paloma Inv. Ltd. P'ship*, 279 P.3d 1191, 1212 (Ariz. Ct. App. 2012)).

44.    The Court has broad discretion in determining the reasonableness of fees to be awarded a receiver. *See In re San Vicente Medical Partners Ltd.*, 962 F. 2d 1402, 1409-1410 (9th Cir. 1992).  The Court may evaluate the time and effort expended by the Receiver with respect to specific projects and aspects of the administration of the estate, and may look to a number of different factors under the case law in approving receiver's and counsel's fees. *Id.* at 1409-1410.

45.    As the Court explained in *Securities and Exchange Comm'n v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (citations omitted), it is sometimes difficult to ascertain what type of benefits a receiver has bestowed on receivership property:

> … [A] benefit to a secured party may take more subtle forms than a bare increase in monetary value. Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation.

46.    Upon his appointment, the Receiver quickly needed to assess the financial situation of the Receivership Entities, to determine how to proceed with operations so as to maximize the value of the assets for the benefit of the investors and creditors. The Receiver immediately engaged the services of StoneTurn and Archer.

47.    When the receivership commands full-time attention and prevents

professionals from accepting other engagements, the fee award should reflect it. *Securities and Exchange Com'n v. W.L. Moody & Co.*, 374 F.Supp. 465, 483-484, 486 (S.D. Tex. 1974). Such is the case here, where enormous resources were required to take control of books, records, documents, assets and properties, operate properties and businesses, and effectuate sales for the benefit of the Receivership Estate.

48.    As set forth above, the Receiver and his Retained Personnel have each limited and discounted their normal and customary rates, as requested by the SEC, as an accommodation to the Receivership and to conserve Receivership assets. Although StoneTurn and Archer generally raise rates across the board at the start of their respective fiscal years, in respect of the Receivership and supervision by the SEC, neither firm applied rate increases here.

49.    While the Receiver is sensitive to the need to conserve Receivership assets, the fees and costs incurred to date were reasonable, necessary, and benefited the Receivership.

50.    The Receiver's Retained Professionals also experience delay, discounts and holdbacks, as payment of fees and reimbursement of disbursements are governed by Court applications and orders herein. The delay in applying for and procuring Court approval and actual payment of fees is a concession unique to fiduciary representation.

51.    As more fully described herein and supported by the time records, the Receiver and his professionals have reasonably and diligently discharged their duties, and provided a benefit to the Receivership estate, and ultimately the creditors and investors.

### VIII.  Conclusion

52.    No prior request for the relief sought herein has been made to any court, except for the First, Second, Third, Fourth and Fifth Fee Applications.

53.    The Receiver timely provided a copy of this Application to both the SEC and the Defendant, through counsel.

54.    Given the authorities set forth herein, request is made to waive any requirement to file a separate memorandum of law.  *See* LRCiv 7.2(b).

WHEREFORE, the Receiver respectfully requests that this Court approve and authorize payment of the fees and expenses requested herein, and grant such other and further relief as is just and proper.

Dated: August 15, 2025                    ARCHER & GREINER, P.C.

By: _____
    Allen G. Kadish[1]
    Harrison H.D. Breakstone[2]
    1211 Avenue of the Americas
    New York, New York 10036
    Tel: (212) 682-4940
    Email:    akadish@archerlaw.com
             hbreakstone@archerlaw.com

*Counsel for Allen D. Applbaum as Receiver*

1

## INDEX TO EXHIBITS

2

**Exhibit 1 – Summary of Total**
3            **Compensation and Expenses Requested**

4
**Exhibit 2 – Receiver's Certification with Exhibits**
5
**Exhibit 2(a) – StoneTurn Fee and Expense Schedules**
6
**Exhibit 2(b) – StoneTurn Time Records**
7
8            **Exhibit 2(c) – StoneTurn Expense Records**

9
**Exhibit 3 – Counsel's Certification with Exhibits**
10
**Exhibit 3(a) - Archer Fee and Expense Schedules**
11
12           **Exhibit 3(b) - Archer Time and Expense Records**

13
**Exhibit 4 – Standardized Fund Accounting Report**
14
**Exhibit 5 – Proposed Order**
15

16

17

18

19

20

21

22

23

24

25

26

27

28